# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

        *Plaintiff,*

    v.

LEON BLACK,

        *Defendant.*

Case No. 1:23-cv-06418-JGLC

## **DECLARATION OF CARLOS MELENDEZ**

I, CARLOS MELENDEZ, do hereby declare under penalty of perjury that the following is true and correct:

1. I am fully familiar with all matters set forth in this Declaration based on personal knowledge about the facts and matters below. I am over the age of 18 years and not laboring under any disabilities.

2. My name is Carlos Melendez. My date of birth is October 7, 1939. I am 83 years old.

3. I am a retired U.S. Army Infantry Officer with 20 years of military service. I enlisted in the U.S. Army in 1961, and was honorably discharged in 1981.

4. During my military service, I received the following awards and decorations, among others: (i) Distinguished Flying Cross; (ii) Air Medal with 28 Oak Leaf Clusters; (iii) Bronze Star with 3 Oak Leaf Clusters; (iv) Army Commendation Medal with 3 Oak Leaf Clusters; (iv) Joint Commendation Medal; (v) Good Conduct Medal; (vi) Combat Infantry Badge; (vii) Expert Infantry Badge; (viii) Parachute Badge, Ranger Tab; (ix) Army Aviator Badge;

(x) Senior Army Aviator Badge; (xi) National Defense Service Medal; and (xii) Vietnamese Service Medal.

5. I have several investigatory designations, including: (i) Certified Fraud Examiner; (ii) Certified International Investigator, CII; (iii) Private Investigator, Class C License #0001855, Florida; and (iv) Private Investigative Agency, Class A License #A0002225.

6. I have substantial experience with investigations and private security. I have served as an Independent Contractor Investigator for investigative agencies, corporate, insurance, and law firm clients. I have served as a security director for The Green Companies in Miami, Florida, and a security consultant for the Miami International Boat Show and several property managers in Miami, Florida.

7. I was engaged to investigate the claims and allegations made by Jane Doe in the above-captioned litigation.

8. In connection with that investigation, I conducted in-person interviews with several individuals with close affiliations with Ms. Doe, including her mother, father, sister, aunt, and cousin. I also interviewed the father of Ms. Doe's youngest child. When I met with a witness, I was accompanied by a second investigator. These interviews lasted, in total, approximately four hours. In each instance that someone agreed to speak with me, I recorded the conversation, including confirming on the recording that the individual knew he or she was being recorded, consented to it, and was speaking with me voluntarily and with no coercion or inducement.

9. I did not begin these interviews until August 7, 2023. I first spoke with Ms. Doe's father at 12:30 p.m. on August 7, 2023. He then called his wife who was not at home, and we confirmed an appointment to meet Ms. Doe's mother at 2.30 p.m., when she would be home. I went for lunch and was running late, so I called and notified Ms. Doe's mother that I was running

late coming from lunch. As a gesture of politeness, I brought dessert over and apologized that I "made the lady wait."

10.     During the course of my conversation with Ms. Doe's mother and father, I showed a picture of Ms. Doe's child taken from a public Facebook account, but not to gain entrance or intimidate.

11.     While I was interviewing Ms. Doe's mother and father, Ms. Doe's mother offered to call Ms. Doe's oldest child—who lives with them—to meet the investigators. He entered the room and joined the conversation. Ms. Doe's mother informed me that he was 16 years old. Ms. Doe's mother volunteered to invite him to speak to me. Ms. Doe's mother also volunteered to call and invite her other daughter over—Ms. Doe's sister—who also came over to join in the interview. None of this was coerced by me or my investigation team.

12.     During the conversation, Ms. Doe's mother voluntarily showed me and my team pictures of Ms. Doe. Based on photographs I observed, Ms. Doe appeared to be of average weight and developmentally age appropriate when she was in high school, and it was unlikely that she could fit into a uniform for 8–12 year-old children at that time.

13.     While I was speaking with Ms. Doe's aunt, Jeanne Christensen of Wigdor LLP was texting her, trying to put a stop to the voluntary conversation. Ms. Christensen then called the witness during the interview, at which time I heard Ms. Doe's aunt tell Ms. Christensen that she did not like Ms. Christensen's attitude and that I and my team had been "nothing but polite and very reasonable."

14.     The recordings of my interviews demonstrate that one or more of the individuals I interviewed told me, in sum or substance, the following information:

- Ms. Doe, who has used a series of different names and personas, has a history of making up alternate realities; a diagnosis of borderline personality disorder; and invents things that "become[] her reality."

- Ms. Doe lived at home through high school, and did not travel to Florida, New York, or the Virgin Islands during that time. While in high school, she did not travel out of town on weekends or weekdays.

- Ms. Doe graduated high school on time, did not fail any classes, and did not miss school for any significant amounts of time (other than when she was hospitalized for two weeks in Baltimore).

- Ms. Doe participated in a county cheerleading program when she was a senior in high school—not when she was 15 or 16. The program was for high school students, not for children aged 8–12. The cheerleading program did not involve overnight trips.

- Ms. Doe appeared to be of average weight and developmentally age appropriate.

- Ms. Doe was not diagnosed with either autism or Mosaic Down Syndrome during her childhood or while she lived at home throughout high school, and did not display symptoms or behaviors of either condition. Instead, Ms. Doe became aware of and studied those behaviors and began intentionally displaying them in her twenties in order to present herself as a person with autism. For example, she once noted that people with autism don't look other people in the eye, and thereafter began to avoid looking people in the eye—a behavior she had never before displayed. The first time her family heard Ms. Doe claim to have Mosaic Down Syndrome was when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome, and received positive support and attention. Ms. Doe has a history of seeking attention through any means available to her.

- Recently, Ms. Doe posted on social media that she had been abused by Jeffrey Epstein. She had never made such allegations before. Her family told her that they did not believe this to be true, and Ms. Doe's mother told her to delete the posts and she deleted them.

15.   Neither I nor anyone assisting me or working with me in my investigation parked a white Suburban bearing a Virginia license plate TSH-8229 outside Ms. Doe's house. I do not recognize that vehicle or license plate number.

16. I have read this document more than once very carefully. Every statement in this document is completely truthful and accurate and I have given this declaration under my own free will.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in _Tamarac Florida_, on August _14_, 2023.

By: _Carlos Melendez_
Carlos Melendez