**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JANE DOE,

       Plaintiff,

   v.

LEON BLACK,

       Defendant.

Case No. 1:23-cv-06418

**DEFENDANT LEON BLACK'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION FOR SANCTIONS**
**<u>AGAINST WIGDOR LLP AND JEANNE CHRISTENSEN</u>**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................5

I.      PLAINTIFF'S ALLEGATIONS ...........................................................................5

II.     DEFENDANT'S INVESTIGATION IMMEDIATELY UNCOVERS
EVIDENCE DISPROVING THESE ALLEGATIONS. .........................................6

      A.    The Cheerleading Program .....................................................................6

      B.    Living With "Elizabeth" ...........................................................................7

      C.    Plaintiff's History Concerning Mental Health Issues ..............................8

      D.    Absolutely No Evidence Connecting Plaintiff to Epstein or His Associates..........9

III.    MR. BLACK SERVES A RULE 11 WARNING LETTER; PLAINTIFF FAILS
TO MEANINGFULLY RESPOND. ....................................................................10

ARGUMENT .....................................................................................................................10

I.      LEGAL STANDARD.........................................................................................10

II.     WIGDOR AND CHRISTENSEN FAILED TO CONDUCT A REASONABLE
INVESTIGATION OF PLAINTIFF'S ALLEGATIONS .....................................14

      A.    Wigdor's Allegations of Violent Rape and Trafficking of an Underage
Girl with Developmental and Medical Issues Required a Serious Inquiry............14

            1.    The Horrific Nature of the Allegations and the Impact on those
Accused Required Widgor to Conduct a Serious Investigation................15

            2.    Plaintiff's Alleged Developmental and Medical Issues Placed a
Heavy Burden on Wigdor to Investigate Her Allegations. .......................16

      B.    Several Key Allegations in the Complaint Do Not Withstand the Slightest
Scrutiny.................................................................................................18

      C.    Wigdor's Inquiry, If Any, of Plaintiff's Allegations, Was Not Reasonable.........22

III.    WIGDOR FAILED TO REASSESS THEIR CLAIM WHEN PRESENTED
WITH EVIDENCE THAT THE ALLEGATIONS HAVE NO MERIT..........................23

CONCLUSION....................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*AJ Energy LLC v. Woori Bank*,
  2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019), *aff'd*, 829 F. App'x 533 (2d
  Cir. 2020) ..................................................................................................................13, 21, 22, 25

*Anderson v. County of Montgomery*,
  111 F.3d 494 (7th Cir. 1997) .........................................................................................12, 15

*In re Austr. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
  712 F. Supp. 2d 255 (S.D.N.Y. 2010)..................................................................................11

*Bernal v. All Am. Inv. Realty, Inc.*,
  479 F. Supp. 2d 1291 (S.D. Fla. 2007) ...........................................................................12, 16

*Calloway v. Marvel Entm't Grp.*,
  111 F.R.D. 637 (S.D.N.Y. 1986) .........................................................................................17

*Estate of Calloway v. Marvel Entm't Grp.*,
  138 F.R.D. 646 (S.D.N.Y. 1991) ....................................................................................13, 17

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990)..............................................................................................................11

*Craig v. City of N.Y.*,
  2022 WL 2238451 (E.D.N.Y. June 22, 2022) .................................................................11, 20

*Galin v. Hamada*,
  283 F. Supp. 3d 189 (S.D.N.Y. 2017)...................................................................................25

*Gartenbaum v. Beth Israel Med. Ctr.*,
  26 F. Supp. 2d 645 (S.D.N.Y. 1998)...............................................................................11, 20

*Goldman v. Barrett*,
  825 F. App'x 35 (2d Cir. 2020) ............................................................................................11

*Jeffreys v. Rossi*,
  275 F. Supp. 2d 463 (S.D.N.Y. 2003)...................................................................................11

*Meza-Perez v. Sbarro LLC*,
  2020 WL 5848091 (D. Nev. Sept. 30, 2020) ..................................................................12, 20

*O'Rourke v. Dominion Voting Sys. Inc.*,
  552 F. Supp. 3d 1168 (D. Colo. 2021)............................................................................12, 15

*O'Sekon v. Exxon Corp.*,
   2001 WL 1715783 (D.N.J. Dec. 21, 2001) ............................................................ 12

*Perez v. Posse Comitatus*,
   373 F.3d 321 (2d Cir. 2004) ................................................................................... 14

*Perry v. S.Z. Rest. Corp.*,
   45 F. Supp. 2d 272 (S.D.N.Y. 1999) .......................................................... 13, 24, 25

*Safe-Strap Co. v. Koala Corp.*,
   270 F. Supp. 2d 407 (S.D.N.Y. 2003) ............................................................. 14, 22

*Saltz v. City of N.Y.*,
   129 F. Supp. 2d 642 (S.D.N.Y. 2001) .............................................................. 12, 25

*Stewart v. RCA Corp.*,
   790 F.2d 624 (7th Cir. 1986) ................................................................................. 11

*Thornton v. Acme Steel Co.*,
   1989 WL 88497 (N.D. Ill. Aug. 3, 1989) .............................................................. 12

## Rules / Statutes

Fed. R. Civ. P. 11 .............................. 4, 10, 11, 13, 14, 15, 16, 20, 21, 22, 23, 24, 25, 26

Fed. R. Civ. P. 11(b) ................................................................................ 5, 11, 14, 20

Fed. R. Civ. P. 11(b)(3) ...................................................................................... 10, 11

Fed. R. Civ. P. 11(c) .................................................................................................. 14

Fed. R. Civ. P. 11(c)(2) ............................................................................................. 10

## Other Authorities

Cynthia Grant Bowman & Elizabeth Mertz, *Attorneys As Gatekeepers to the
   Court: The Potential Liability of Attorneys Bringing Suits Based on Recovered
   Memories of Childhood Sexual Abuse*, 27 Hofstra L. Rev. 223, 266 (1998) ........................ 16

Defendant Leon D. Black respectfully submits this memorandum in support of his motion for sanctions against Wigdor LLP ("Wigdor") and Jeanne Christensen, counsel for Plaintiff.

## PRELIMINARY STATEMENT

This is a textbook case for the imposition of sanctions. To put it plainly, the Complaint in this action is made up out of whole cloth, stitched together by Plaintiff and her lawyers at Wigdor for a sole, transparent purpose: to inflict maximal reputational and other harm on someone of means in hopes of extracting a major and totally undeserved payday. Plaintiff—whose own immediate family members have consistently acknowledged has a long history of dreaming up alternate realities—concocted the entire story. And her lawyers at Wigdor—now pursuing their third utterly frivolous sexual assault litigation against Mr. Black (the first of which has now been dismissed and the second of which will be hotly contested)—knowingly aided and abetted their client's delusions without doing even the most basic due diligence into the facts and indeed deliberately turning a blind eye to an overwhelming body of evidence squarely contradicting the allegations in the Complaint. Sanctions here are not only warranted but compelled in order to vindicate the Court's authority, to hold Wigdor to account for their egregious misconduct, and to dissuade prospective copycats from charting the same wayward course that Wigdor has pursued.

Plaintiff's Complaint spins a dramatic tale of a young girl with supposed developmental and congenital disabilities, abandoned by her parents and then lured into the orbit of a cheerleading coach, named "Elizabeth" in the Complaint,[1] who purportedly subjected her to sexual and physical abuse and then trafficked her to notorious pedophile Jeffrey Epstein and many others. As relevant here, Wigdor alleges that during an extended period when she was shipped off, on a weekly basis,

---

[1]  Although not her true name, the individual identified as Elizabeth in the Complaint will be referred to as such in this Motion to preserve her anonymity given the vile crimes alleged against her in the Complaint. Mr. Black was easily able to locate Elizabeth and to speak with her. Notably, Wigdor did not bother to do so until *after* it filed the Complaint, just as they did not bother to speak with others who had been close with Plaintiff.

to Epstein's properties in New York, the U.S. Virgin Islands, and Florida, she was sexually assaulted, including allegedly being raped by Mr. Black more than 22 years ago.

Everything the Complaint says about Mr. Black is utterly and demonstrably false. Mr. Black has never met or even heard of Plaintiff, much less raped her, a fact Mr. Black is fully prepared to establish should this matter proceed. But the Complaint here is a sham—the direct product of obvious lies by Plaintiff squarely enabled by a law firm that not only failed to conduct a reasonable inquiry but that in fact has ignored objective evidence casting a serious pall on their client's *bona fides* and directly disproving key allegations in the Complaint.

After getting word of the Complaint, Mr. Black retained professional investigators to investigate Plaintiff and her allegations, and swiftly learned facts that the most basic inquiry—had Wigdor done one—would have unearthed. That investigation—entailing, among other things, discussions with Plaintiff's family, friends and acquaintances—raises serious doubts about the allegations that she is autistic and that she has Mosaic Down Syndrome. Putting aside the fact that these allegations (if believed) would compel a diligent lawyer to be on heightened alert and to make additional inquiries before accusing anyone of heinous crimes decades in the past, Mr. Black's investigation showed that, according to Plaintiff's own family, Plaintiff is believed to have long ago been diagnosed with borderline personality disorder; has a history of making up alternate realities; and never claimed to have, autism or Mosaic Down Syndrome until well into adulthood. Plaintiff's family confirmed that Plaintiff studied the behavior of people with autism and intentionally mimicked that behavior starting in her twenties.  Her family said she claimed to have Mosaic Down Syndrome only when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome and received positive support and attention. And, far from

suffering from learning or other significant intellectual challenges, Plaintiff graduated from high school and college, and is now believed to be studying law.

Mr. Black's investigation also found that Plaintiff did not join the cheerleading squad coached by Elizabeth until Plaintiff was in her senior year of high school—not when she was 15, as the Complaint claims. It also showed that, contrary to the allegations in the Complaint, Plaintiff lived with her parents throughout high school and moved in with Elizabeth for a short time only after she had graduated and started college, because Elizabeth's home was closer to her college campus. Indeed, Plaintiff drove her sister to and from school nearly every single day during Plaintiff's senior year of high school. Plaintiff did not, as she and Wigdor now claim, miss "countless Fridays and Mondays from her junior year of high school" due to trips to Epstein's properties: her parents, sister, and friends all do not recall her missing any significant time from school, other than a single period of in-patient hospitalization. In fact, *none* of the individuals contacted recalled Plaintiff ever making any trips to New York, Florida, or the U.S. Virgin Islands; instead, they recall only a single trip abroad, to the Bahamas, with Elizabeth, Elizabeth's young son, and Elizabeth's female friend—after Plaintiff had graduated high school.

On top of all this, there is not one reference to Plaintiff's actual name in the multitude of materials available in the public domain in connection with the various investigations and lawsuits connected to Epstein over the years. Plaintiff has not made any claim against the Epstein estate, never retained any of the lawyers representing groups of victims, nor joined any of the many public lawsuits. It blinks reality to suggest that Plaintiff had been regularly trafficked by the world's most notorious pedophile and yet her name has never surfaced anywhere at any time—until now, that is, and only against Mr. Black. Moreover, the Complaint' allegations purporting to reference "facts" about Epstein simply repeat information that is readily available through an internet search.

3

Had Wigdor conducted any inquiry at all, and at a minimum a reasonable inquiry, it would have discovered any or all of the facts Mr. Black so quickly identified that disprove her made up claims. But regardless, Wigdor was on notice that Plaintiff's claims should be investigated because it was expressly told prior to filing the Complaint that Plaintiff's allegations were false, uncorroborated, and likely fabricated. Her family and friends—and contemporary photographs of Plaintiff in high school—confirm the falsity of her allegation that she physically presented as a young child at that time. Wigdor's response was to disregard that notice, refuse to investigate the facts, and file a Complaint accusing Mr. Black (and others) of some of the most despicable acts one could imagine. And, worse, Wigdor **still** refused to lift a finger even after Mr. Black sent it a Rule 11 letter detailing these facts and the result of Mr. Black's preliminary investigation—even though, more shockingly, Wigdor has evidently been in contact with Plaintiff's family, Elizabeth, and others only *after* the filing of the Complaint—and undoubtedly either heard and ignored or simply turned a blind eye to what Plaintiff's family has told them.

Although Plaintiff's name has been anonymized in this case, Mr. Black's name has not. And true to form, Wigdor has whipped up yet another media frenzy surrounding these unimaginably lurid and disgusting allegations for the consumption of Mr. Black's family, friends, business associates, and the public. One reason the law requires attorneys to investigate claims is to avoid the untoward ruination of a putative defendant's name. Wigdor failed to uphold its duty to investigate Plaintiff's claims, choosing instead to blindly accept her specious allegations at face value. Because Wigdor did not do so and has refused to withdraw or modify the Complaint's allegations in the face of the evidence Mr. Black has advanced, sanctions should be imposed.

## BACKGROUND

### I.    PLAINTIFF'S ALLEGATIONS

On July 25, 2023, Wigdor filed a complaint on behalf of Plaintiff Jane Doe, commencing the instant proceeding. ECF Doc. No. 1 ("Compl."). The Complaint tells a lurid story of abuse, grooming, and sex trafficking, starring Epstein and his cohort of notorious associates, culminating in the heinous sexual assault of Plaintiff, allegedly at the hands of Mr. Black. The Complaint is replete with specific, detailed allegations about Plaintiff and the circumstances that led to her alleged introductions to Epstein and Defendant. Nowhere did Wigdor specifically identify that there were any allegations that it believes "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"; in other words, it made a representation to the Court that the Complaint's "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b). Mr. Black's attorneys understand that Wigdor was expressly warned prior to filing the Complaint that Plaintiff's allegations regarding Epstein and Leon Black were false, uncorroborated, and likely fabricated. Estrich Decl. ¶ 9 (Ex. A).[2]

Among other things, Plaintiff alleges that, when she was 15, she participated in a county cheerleading program for 8-12-year-old girls. Compl. ¶¶ 13-14. She specifically alleges that she was allowed to participate, despite being much older than the other girls, because she could fit into the child-sized uniform. *Id.* ¶¶ 14-15. She then alleges that she was groomed by the adult who ran the program, whom Plaintiff refers to as "Elizabeth," and soon began living at Elizabeth's house, while still a high school student. *Id.* ¶¶ 15-18. Plaintiff claims that "she did not have her own bed there, much less a bedroom." *Id.* ¶ 21. According to Plaintiff, Elizabeth subjected Plaintiff to horrific physical, psychological, and sexual abuse, including punching, kicking, dragging Plaintiff

---

[2]  The declarations of Susan Estrich, Carlos Melendez, and ███████ are attached to this memorandum as Exhibits A, B, and C, respectively.

up the stairs, depriving her of food or water, making her dress in small children's clothing, forcing her to exercise to exhaustion, threatening to kill her, and forcing her to watch Elizabeth and her male friend, "Charlie," have sex. *Id.* ¶¶ 20-24. Plaintiff next alleges that, "in the late summer of 2001," when she was fifteen, Elizabeth and Charlie took her to "an adult 'party' in a suburb outside of Washington D.C.," where she was introduced to Ghislaine Maxwell. *Id.* ¶¶ 13, 27-31.

"The very next week," Plaintiff alleges, Elizabeth "put Plaintiff on a private plane from Virginia to Palm Beach," where Plaintiff was introduced to Epstein and brought into his fold. *Id.* ¶¶ 37-42. Plaintiff alleges that she was thereafter "shipped out" to Epstein's homes in Palm Beach and the U.S. Virgin Islands "[m]ost weekends," and, as a result, "missed countless Fridays and Mondays from her junior year of high school, almost causing her to fail." *Id.* ¶ 44. Plaintiff also alleges that Epstein began "hand[ing] [Plaintiff] off" to other men, *id.* ¶¶ 47-48, which would ultimately lead to the alleged rape by Defendant that forms the basis of Plaintiff's putative claim.

## II.   DEFENDANT'S INVESTIGATION IMMEDIATELY UNCOVERS EVIDENCE DISPROVING THESE ALLEGATIONS

Soon after Wigdor filed the Complaint, Mr. Black began investigating the outlandish, salacious, and sensational allegations in the Complaint. The story began to unravel immediately with a modicum of inquiry. Indeed, Defendant's initial, preliminary investigation gives the lie to Plaintiff's entire narrative, and has failed to uncover even a shred of evidence supporting Plaintiff's account. His investigators easily obtained evidence that either refuted key details in the Complaint or showed them to be patently and unequivocally false.

### A.   The Cheerleading Program

For example, Plaintiff alleges that, as a 15-year-old high school student, she participated in a cheerleading program for 8–12-year-old girls, and that she was allowed to participate because she could fit into a child-sized uniform. Compl. ¶¶ 13-15. This hyper-specific allegation, no doubt

included to make Plaintiff's allegations of underage sex trafficking seem even more heinous, is demonstrably false. Witness statements (including signed, sworn declarations) and photographic evidence prove that Plaintiff participated in a recreational cheerleading program, called ███ ████████████ that was open to high school aged girls. Melendez Decl. ¶ 13 (Ex. B); ████ Decl. ¶¶ 3-4 (Ex. C). Furthermore, Plaintiff's physical development was normal, and she could not have fit into a uniform for 8–12-year-old children. Melendez Decl. ¶¶ 11, 13; ████ Decl. ¶ 5. Numerous photographs of Plaintiff from the period alleged in the Complaint confirm that she was of at least normal size and development. Melendez Decl. ¶ 11. Indeed, a dated, official photograph of Plaintiff and her cheerleading team—which Mr. Black's investigators were able to easily obtain during their preliminary inquiry—shows that Plaintiff was of normal size and development for her age. Estrich Decl. ¶ 6.

## B.    Living With "Elizabeth"

As another example, Plaintiff alleges that she began living "nearly full-time" with her cheerleading coach, Elizabeth, while Plaintiff was still in high school. Compl. ¶ 18. Plaintiff's family, however, stated unequivocally that Plaintiff lived at home *throughout* high school. Melendez Decl. ¶ 13[3]. Indeed, Plaintiff's younger sister stated that Plaintiff drove her to school nearly every day during Plaintiff's senior year of high school, when her sister was a freshman. *Id.* ¶ 13. Plaintiff's family members and high school classmates deny that Plaintiff ever lived outside of her home during high school, nor do any of them recall Plaintiff missing school for any

---

[3]  Wigdor will be sure to assert in its response papers that—after and only after Christensen got to her—Plaintiff's mother appeared to backtrack a bit with respect to timing. Though she had stated repeatedly and unequivocally in recorded conversations that Plaintiff lived with her exclusively throughout high school, and that Plaintiff had not lived with Elizabeth during high school, she later (after speaking with Christensen) sent the investigator an email backpedaling to a degree and professing a faulty memory as to this timeline. Given her unequivocal comments before any coaching, and those of numerous others, as well as photographs and documentary evidence, we are highly confident in our timeline.

significant amounts of time—other than when Plaintiff was, regrettably, hospitalized for two weeks for inpatient mental health treatment. *Id.* ¶ 13.

Mr. Black's investigators were able to quickly determine that Plaintiff did in fact live with her former cheerleading coach—███████████████—for a brief period of time *after* Plaintiff graduated from high school. After graduating in 2003, Plaintiff enrolled at ███████ ████████ Decl. ¶ 9. Ms. █████ lived closer to ███████████ than Plaintiff's family and so, as a favor, offered to let Plaintiff live with her while she attended college. *Id.* Plaintiff was 18 years old at the time, and (contrary to the allegations in the Complaint) had her own bedroom. *Id.* ¶ 15. Plaintiff's family, Ms █████ Ms. █████ s son, and Ms. █████ s then-boyfriend (who lived with Ms. █████ at the time), all confirm that Plaintiff was a freshman in college during the brief period when she lived with Ms. █████ and that Plaintiff did not live with Ms. █████ while she was in high school. *Id.* ¶¶ 9-12, 15.

In addition, contrary to Plaintiff's allegations about being trafficked around the country and the U.S. Virgin Islands, all of the interviewees stated that Plaintiff never traveled out of the state, let alone out of the country, other than for her hospitalization and a trip to the Bahamas that she took with Ms. █████ Ms. █████ s teenage son, and a female friend of Ms. █████ s—which occurred after Plaintiff graduated high school. Melendez Decl. ¶ 13; █████ Decl. ¶¶ 8, 15.

### C.      Plaintiff's History Concerning Mental Health Issues

In addition to evidence refuting, and indeed outright disproving, key allegations in Plaintiff's Complaint, Mr. Black's investigation revealed that Plaintiff has a long history of mental health issues that pre-date (and also post-date) the events alleged in the Complaint. Among other things, members of Plaintiff's family stated that she has assumed a series of different names and personas, is believed to have a diagnosis of borderline personality disorder, has a history of making up alternate realities, and frequently invents things that, in their words, "become[] her reality."

Melendez Decl. ¶ 13. Plaintiff has received inpatient mental health treatment on several occasions, including during high school. *Id.* ¶ 13.

Plaintiff's family members, Ms. ▮▮▮▮ and Plaintiff's high school classmates all stated that Plaintiff did not display any symptoms or characteristics of autism while in high school, and indeed Plaintiff's family confirmed that she was not diagnosed with autism during her childhood or while she lived at home throughout high school. *Id.* ¶ 13. Plaintiff's sister, who now works with autistic children, stated that Plaintiff only began displaying such behaviors in her twenties, and did so intentionally in order to present herself as a person with autism. *Id.* For example, Plaintiff once noted that people with autism don't look other people in the eye, and thereafter began to avoid looking people in the eye—a behavior she had never before displayed. *Id.* Plaintiff's family members also noted that Plaintiff first claimed to have Mosaic Down Syndrome when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome and received positive support and attention. *Id.*

### D.  Absolutely No Evidence Connecting Plaintiff to Epstein or His Associates

Mr. Black's investigation has not turned up even a shred of evidence connecting Plaintiff to Epstein. Investigations concerning Epstein have been ongoing for many years, led by numerous criminal, civil, and other regulatory authorities, as well as civil litigants and the innumerable law firms representing them. Many of the women actually associated with Epstein have been identified. Yet no one has ever identified Plaintiff, either directly or indirectly, as having had any connection to Epstein. Significant materials concerning Epstein have been made public through judicial proceedings, and multiple databases, but not one contains any direct or indirect reference to Plaintiff.

### III.   MR. BLACK SERVES A RULE 11 WARNING LETTER; WIGDOR FAILS TO MEANINGFULLY RESPOND

On August 25, 2023, counsel for Defendant served Wigdor with a warning letter pursuant to Rule 11(c)(2) of the Federal Rules of Civil Procedure. Estrich Decl. ¶ 7. In the Rule 11 Letter, counsel raised many of the investigative findings cataloged above, and put Wigdor on notice that Defendant would seek sanctions under Rule 11 based on Wigdor's apparent failure to conduct *any* investigation—let alone a "reasonable inquiry"—prior to filing the Complaint. *Id.*

On September 7, 2023, Wigdor served its response to the Rule 11 letter. Estrich Decl. ¶ 10. In the Response, Wigdor stated only "[w]e are fully confident in our investigation and inquiry that was more than reasonable of our client's claims [sic]." *Id.* However, Wigdor did not identify any investigative steps it took prior to filing Plaintiff's Complaint. *Id.* ¶ 11. Nor did Wigdor address any of the investigative findings discussed above or explain why it had either failed to discover those facts during its supposed investigation, or why it proceeded to file Plaintiff's Complaint despite having learned them. *Id.* Nowhere in Wigdor's Response did it explain why, in light of the facts uncovered by Mr. Black's investigators, it nevertheless believed that "the factual contentions [in the Complaint] have evidentiary support." Fed. R. Civ. P. 11(b)(3); Estrich Decl. ¶ 12. Nor did Wigdor "specifically so identif[y]," any allegations it believes "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3); Estrich Decl. ¶ 12.

### ARGUMENT

### I.   LEGAL STANDARD

Rule 11 requires an attorney who files a pleading to certify, among other things, that all factual contentions made within those pleadings "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery[.]" Fed. R. Civ. P. 11(b)(3). "Rule 11 *requires* lawyers to think first and file later, on pain of personal liability." *Stewart v. RCA Corp.*, 790 F.2d 624, 633 (7th Cir. 1986).

Accordingly, Rule 11 imposes a duty upon counsel to undertake a reasonable inquiry into the factual validity and legal viability of their pleadings. Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the pleading is valid and properly brought before the court); *see Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) (Rule 11 directs counsel to "stop, think and investigate [. . .] carefully before serving and filing papers") (internal quotation marks and citation omitted); *In re Austr. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 263 (S.D.N.Y. 2010) ("[U]nder Rule 11, an attorney has an affirmative duty to make reasonable inquiry into the facts and the law.") (internal quotation marks and citation omitted). An attorney can violate Rule 11 by either "fail[ing] to make a reasonable pre-filing inquiry into the bases for [her client's] allegations" or filing "a paper that no competent attorney could believe, after reasonable inquiry, is well-grounded in fact[.]" *Goldman v. Barrett*, 825 F. App'x 35, 37–38 (2d Cir. 2020).

Attorneys are entitled to rely on their clients' factual representations only if those representations are "objectively reasonable." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 480 (S.D.N.Y. 2003)), *aff'd sub nom. Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005); *Gartenbaum v. Beth Israel Med. Ctr.*, 26 F. Supp. 2d 645, 646–47 (S.D.N.Y. 1998) (attorney "cannot totally rely on the uncorroborated word of h[is] client and hearsay witnesses for all of the key contentions of the case" but "should question [the client] thoroughly, not accepting his version on faith alone"). "'[I]f all the attorney has is [her] client's assurance that facts exist or do not exist, when a reasonable inquiry would reveal otherwise, [she] has not satisfied [her] Rule 11 obligation.'" *Craig v. City of*

*N.Y.*, 2022 WL 2238451, at \*14 (E.D.N.Y. June 22, 2022) (quoting *Saltz v. City of N.Y.*, 129 F. Supp. 2d 642, 646 (S.D.N.Y. 2001); *see Meza-Perez v. Sbarro LLC*, 2020 WL 5848091, at \*2 (D. Nev. Sept. 30, 2020) (sanctioning plaintiff's counsel for failing to conduct any investigation where "'[e]ven minimal due diligence' would have revealed the impossibility of [plaintiff's] allegations [. . .], especially considering that a close reading of the amended complaint leads to serious questions about the timeline of events.") (citation omitted).

Where, as here, the claims involve allegations of serious wrongdoing against others, counsel should conduct a thorough investigation before filing. *See Anderson v. County of Montgomery*, 111 F.3d 494, 501 (7th Cir. 1997) (before alleging "what actually amounted to criminal wrongdoing" by various court officers, attorney should have conducted "a serious investigation"); *O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d 1168, 1203 (D. Colo. 2021) (in light of serious nature of allegations, "the required degree of due diligence and pre-filing investigation was heightened"); *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1327 (S.D. Fla. 2007) ("Kleppin's blind reliance on his client was especially unreasonable given the nature of Khan's charges. The affidavit accused Plaintiff of bribery, witness tampering, obstruction of justice and subornation of perjury: serious criminal conduct under any circumstance, but extraordinary charges in the context of otherwise ordinary civil litigation."); *O'Sekon v. Exxon Corp.*, 2001 WL 1715783, at \*13 (D.N.J. Dec. 21, 2001) ("The Court cautions that great care ought to be exercised in filing a complaint, particularly where serious allegations of racial discrimination are being alleged against a publicly recognized corporation. An attorney should not file a complaint based on assumptions of facts. He must first conduct a reasonable investigation into the facts."). The key elements of a claim should be examined with special scrutiny, particularly where an inquiry would reveal a lack of factual basis for the allegations. *Thornton v. Acme Steel Co.*, 1989

WL 88497, at *2 (N.D. Ill. Aug. 3, 1989) (counsel sanctioned for failure to question client concerning key element of claim, which would have revealed total lack of factual basis for allegations).

Where, as here, a client's mental illness or other condition may affect their perception or ability to discern or tell the truth, their attorneys have a "heavy burden to investigate the foundation and details" of their claims. *Estate of Calloway v. Marvel Entm't Grp.*, 138 F.R.D. 646, 653 (S.D.N.Y. 1991) (Where client "may have been mentally ill," a "reasonable attorney would not pursue a claim . . . based on such equivocal evidence from such an untrustworthy source.").

An attorney also has a continuing duty to reassess the validity of his or her client's claim. "[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment, subdivisions (b) & (c); *see AJ Energy LLC v. Woori Bank*, 2019 WL 4688629, at *11 (S.D.N.Y. Sept. 26, 2019), *aff'd*, 829 F. App'x 533 (2d Cir. 2020); *Perry v. S.Z. Rest. Corp.*, 45 F. Supp. 2d 272, 274-75 (S.D.N.Y. 1999). In *Perry*, the court sanctioned plaintiff's counsel where a reasonable inquiry "would have made it 'patently clear' that the claims had absolutely no chance of success," and explained that was the case regardless of when the facts that would have invalidated the claims were discovered. *Id.* ("Even if counsel's initial interview with their client *might* have suggested a good faith basis for filing this suit, defendants' proffer of plumbing receipts and all the above information revealed in motions would have prompted an objectively reasonable attorney to make a more thorough examination of his client.").

13

Under Rule 11(c) the Court may impose "an appropriate sanction" for violations of Rule 11(b), which "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* "Parties that seek sanctions for the submission of a complaint are encouraged to file a Rule 11 motion promptly after the complaint is filed." *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 413 n.3 (S.D.N.Y. 2003). Ultimately, the decision of what sanctions to impose under Rule 11 is within the Court's discretion. *See Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004).

Christensen signed the Complaint on behalf of Wigdor. Pursuant to Rule 11, Wigdor and Christensen thus certified that Plaintiff's claims were based on factual allegations corroborated by a reasonable pre-filing inquiry. Either they did not perform such an inquiry or decided to pursue Plaintiff's claim despite the blatant inconsistencies in her story and with, at least, indifference to easily discoverable contradictory facts. After they were placed on notice of that fact and were provided with sworn statements that disproved many of the key allegations in the Complaint, they refused to retract those obviously false statements. This conduct violates Rule 11, and the Court should sanction Wigdor and Christensen for their repeated failures to make reasonable inquiries into the facts.

## II. WIGDOR AND CHRISTENSEN FAILED TO CONDUCT A REASONABLE INVESTIGATION OF PLAINTIFF'S ALLEGATIONS

### A. Wigdor's Allegations of Violent Rape and Trafficking of an Underage Girl with Developmental and Medical Issues Required a Serious Inquiry

The reasonable inquiry required by Rule 11 varies from case to case, but the inquiry in this case should have been substantial and serious for two independent reasons. *First*, the Complaint levels horrific charges of sexual assault and human trafficking of a minor, not only against Mr.

14

Black, but also against multiple other individuals, including "Elizabeth" and "Charlie." If those allegations are false—and they are—it inflicts serious damage upon each of those individuals and their families in ways that cannot be undone even when the allegations are eventually disproven. *Second*, Wigdor alleges that Plaintiff has specific developmental and medical issues that, if true, would impact her ability to perceive reality and leave her inclined to suggestion. Both of these factors should have given Wigdor pause and caused them to conduct a serious investigation of Plaintiff's allegations, as officers of the Court. Instead, Wigdor exploited and emphasized these factors to tell a headline-grabbing story in the Complaint, plainly shirking its responsibilities under Rule 11 and displaying, at the very least, a reckless indifference to the truth of those allegations.

      1.    <u>The Horrific Nature of the Allegations and the Impact on those Accused Required Widgor to Conduct a Serious Investigation.</u>

When a plaintiff makes serious allegations of wrongdoing, their counsel is obligated to conduct a "serious investigation" prior to making such allegations public. *See Anderson*, 111 F.3d at 501. Numerous cases bear this out. In *Anderson*, "the allegation of what actually amounted to criminal wrongdoing on the part of the Montgomery County attorney, a defense attorney, and later a court reporter for fabricating a sentencing hearing transcript" was held by the Seventh Circuit to be "such an extremely serious charge that it required a serious investigation by [counsel] before he acted." *Id.* Similarly, in *O'Rourke*, the court held that the plaintiffs' serious claims about election fraud and rigging, and the volatile environment in which they were asserted, entailed that "the required degree of due-diligence and pre-filing investigation was heightened." 552 F. Supp. 3d at 1203. And in *Bernal*, the court imposed sanctions on an attorney for failing to conduct a reasonable investigation before submitting an affidavit from his client that accused the plaintiff of serious conduct, which made the attorney's "blind reliance on his client . . . especially unreasonable." 479 F. Supp. 2d at 1327.

The charges here are at least as serious as the allegations those courts found sufficient to trigger a heightened duty to investigate. Plaintiff alleges that Mr. Black brutally raped and sodomized her, as a disabled minor, in Epstein's townhouse as part of being repeatedly trafficked and abused over an extended period of time by Epstein and numerous others. Plaintiff also alleges that members of her own family, as well as "Elizabeth" and "Charlie," facilitated that trafficking and/or sexually assaulted and abused Plaintiff. Such horrific allegations necessarily have a profound impact on the lives of the accused and their families. They require a serious pre-filing investigation into the facts and the client's trustworthiness, and demand far more than blind reliance on the client.

Indeed, in this context, Rule 11's requirement serves as a safeguard to protect the falsely accused against baseless allegations, while still allowing plaintiffs to bring claims that can withstand a serious pre-filing investigation. "Sanctions appear well designed as a remedy for cases in which child sex abuse allegations are filed but a reasonable investigation would have revealed to the plaintiff's attorney that they were baseless." Cynthia Grant Bowman & Elizabeth Mertz, *Attorneys As Gatekeepers to the Court: The Potential Liability of Attorneys Bringing Suits Based on Recovered Memories of Childhood Sexual Abuse*, 27 Hofstra L. Rev. 223, 266 (1998). Plaintiff chose to anonymize herself in this case (and Mr. Black has not objected to date), but of course Mr. Black's name is out there for all the world to see and to trash. Plaintiff's counsel should be sanctioned for their failure to conduct any investigation of the hideous claims that have done incalculable damage to Mr. Black.

2.    Plaintiff's Alleged Developmental and Medical Issues Placed a Heavy Burden on Wigdor to Investigate Her Allegations.

The allegations surrounding Plaintiff's developmental and medical issues that Wigdor uses to make Plaintiff's story even more harrowing and horrific themselves triggered a heavy burden

on Wigdor to inquire into the foundation and details of her story before filing. In *Calloway*, the Court explained that where the client may have been mentally ill, it was counsel's duty to investigate those claims rather than engaging in "the headlong and heedless pursuit of a claim of the most serious misconduct by another attorney." 138 F.R.D. at 652. The existence of such illness "placed upon Calloway's counsel a heavy burden to investigate the foundation and details of Calloway's claims." *Id.* at 653 (quoting *Calloway v. Marvel Entm't Grp.*, 111 F.R.D. 637, 640 (S.D.N.Y. 1986)). Here, the complaint alleges that Plaintiff is autistic, has Mosaic Down Syndrome, is developmentally "about 12" years old, "experiences the world in a child-like way," is "extremely trusting," does as she is told by authority figures, and does not question them. Compl. ¶¶ 2, 11-13. Under these circumstances, Wigdor and Christensen, whom such a plaintiff would see as an authority figure, had a heavy burden indeed to investigate the foundation and details of her claims.

Had Wigdor conducted such an investigation, it immediately would have discovered that Plaintiff has a long history of mental health issues and would have found information that should have reinforced the need to investigate the foundation and details of her claim. Importantly, it would have discovered that Plaintiff's mother, sister, cousin, and others close to her believe that Plaintiff frequently creates realities for herself that are not grounded in fact, and then believes them—particularly where these alternative realities help her to gain attention. Melendez Decl. ¶ 13. For example, Plaintiff first claimed to have Mosaic Down Syndrome in her thirties, and only after a family member posted on social media about her child having Down Syndrome and receiving positive attention as a result. *Id.*

Wigdor would also have discovered that Plaintiff's family is skeptical that Plaintiff suffers from autism; her sister, who works with autistic children, stated that Plaintiff in her twenties began

intentionally displaying symptoms and characteristic behaviors of autism for the first time (such as avoiding looking people in the eyes) in order to present herself as a person with autism. *Id.* Plaintiff's family states that she never displayed any symptoms of either Mosaic Down Syndrome or autism, nor was she diagnosed with either condition, during her childhood. *Id.* Wigdor would also have known that approximately a year ago, Plaintiff suddenly began posting online about allegedly being trafficked by Epstein, and then, when asked by her family members to remove the posts because they believed them to be false, promptly took down the posts of her own volition.

The lack of unique specifics in the Complaint also required Wigdor to thoroughly investigate the allegations. Details about Epstein's homes, practices, colleagues, and the like are clearly available from widely distributed public reporting, as opposed to details that would uniquely have been known to the Plaintiff. Similarly, all her allegations against Defendant appear to have been cribbed from prior narratives created by Wigdor in its prior lawsuits. Plaintiff has a history of learning about certain situations and circumstances and then using such information to insert herself into an alternative version of reality in which she claims to have actually experienced what she learned about. This should have triggered a duty for Wigdor to investigate her claims.

All of the available evidence, including Plaintiff's own allegations, make clear that Wigdor bore a heavy burden to seriously investigate the foundation and details of Plaintiff's allegations.

**B.    Several Key Allegations in the Complaint Do Not Withstand the Slightest Scrutiny.**

As explained in detail above, several key allegations regarding the foundation and details of the Plaintiff's claim are patently false. Specifically:

- Plaintiff lived with her parents the entire time that she attended high school.

- None of her family or high school acquaintances that Defendant's investigators interviewed recalled Plaintiff missing any significant time from school, except for one occasion when Plaintiff was hospitalized;

- None of the interviewees recalled Plaintiff ever travelling out of the state, let alone out of the country, other than for her hospitalization and a single trip to the Bahamas that she took with Elizabeth, Elizabeth's teenage son, and a female friend of Elizabeth's after Plaintiff had graduated high school;

- Plaintiff did not live with Elizabeth during high school. She lived with Elizabeth for a short time only after she graduated from high school and was attending ████ ██████████████;

- Plaintiff had her own bedroom while she lived with Elizabeth;

- Plaintiff's physical development was normal in high school and she would not have fit into a uniform intended for an 8-12 year old girl;

- The cheerleading team that Elizabeth was involved in was not restricted to girls ages 8-12.

Melendez Decl. ¶ 13.

All of these facts, confirmed by Defendant's investigation, are inconsistent with Plaintiff's allegations in the Complaint, and they raise serious questions as to the accuracy of Plaintiff's allegations, especially given her developmental and mental health issues.

These facts were obtained through a brief, preliminary investigation that the Defendant conducted without subpoena or discovery power. Defendant expects that additional evidence, such as high school attendance records, travel records, and medical records, which presumably already are available to Plaintiff and her counsel, will corroborate these initial results. Accordingly, it is difficult to see how any reasonable inquiry into the facts could possibly have provided a basis for Wigdor to have certified that the facts alleged in the Complaint have evidentiary support. Other than the Plaintiff's assurances, which, standing alone, are insufficient under Rule 11, Defendant's investigation found no evidentiary support for any of these allegations. Were there any corroborative evidence, surely it would have been included in the Complaint, or at least Wigdor would have shared it in its response to Defendant's Rule 11 letter.

Rule 11 requires more than Plaintiff's assurances where, as here, there are objective reasons to question those assurances. *See Gartenbaum*, 26 F. Supp. 2d 646–47; *Craig*, 2022 WL 2238451, at *14; *Meza-Perez*, 2020 WL 5848091, at *2. In *Meza-Perez*, the court deemed certain claims "factually impossible" based on plaintiff's own allegations and email evidence. The court found "monetary sanctions justified" because plaintiff's counsel, despite having "conferred" with their client before filing the pleading, "conducted no factual investigation into [their client's] claims and signed a complaint asserting serious, yet factually impossible, allegations." *Id.* at *2-3.

Nor is there reliable corroboration for any of the details alleged in the Complaint. To avoid sanctions, counsel must show it conducted an "inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). While Plaintiff is not required to corroborate her allegations, such corroboration could potentially support Wigdor's contention that its inquiry was reasonable, as well as demonstrate that it did not simply accept Plaintiff's assurances. Defendant's investigation has not revealed any such evidence, none is alleged in the Complaint, and Wigdor has not provided any reliable evidence supporting allegations that it certified had "evidentiary support."

In addition to the evidence cited above that directly contradicts Plaintiff's allegations, there is no evidence linking Plaintiff, her parents, or Elizabeth to Epstein or anyone within his orbit. As discussed above, none of the available information associated with the many investigations and lawsuits related to Epstein has revealed any connection whatsoever to Plaintiff, her parents, Elizabeth or Charlie. Again, that fact does not disprove Plaintiff's allegations, but it does bear on whether or not Wigdor's inquiry under these particular circumstances was reasonable. It was not.

The issue of whether Wigdor's inquiry was reasonable under Rule 11 is also distinct from whether the Complaint would survive a motion to dismiss or a motion for summary judgment. In its Response to Defendant's Rule 11 letter, Wigdor attempts to conflate the two and argues that it

is inappropriate, and indeed itself sanctionable, for Defendant to challenge any of Plaintiff's allegations outside of motions to dismiss or for summary judgment. Estrich Decl. ¶ 13. This mischaracterizes Defendant's position and misstates the applicable law. As explained above, it is insufficient for Wigdor to simply rely on Plaintiff's assurances under these circumstances. In addition, in this Circuit, an "expanded record" that includes "multiple affidavits" that demonstrate that the allegations made in a complaint are inaccurate can be the basis of sanctions under Rule 11. In *AJ Energy LLC*, the court granted defendants' motion to dismiss using the appropriate standard. 2019 WL 4688629, at *3. After dismissing the claims, the court "easily" concluded that "sanctions should be imposed" against the plaintiff and its counsel. *Id.* at *10.

> In concluding that sanctions were warranted, the court explained that:

> The Court would be on firm ground imposing sanctions if all it had to go on were the [operative complaint] and its attachments. But, of course, that is not all the Court has to go on: It now has the benefit of an expanded record, which includes multiple affidavits from representatives . . . and, more importantly, the Sewing affidavit submitted by AJ Energy, which is almost certainly a forgery.

*Id.* at *11-12 (sanctioning plaintiff and its counsel).

That ruling was upheld by the Second Circuit. *Id.*, 829 F. App'x 533, 535-36 (2d Cir. 2020) (holding that "in imposing sanctions, the district court explained that it was relying on additional documents submitted during the litigation" and sanctions were "well supported by the record."). The Circuit also confirmed that "even if AJ Energy and its counsel had an objectively reasonable basis to file this lawsuit in the first instance, sanctions would be warranted based on their persistence in the face of evidence that their allegations were utterly lacking in support." *Id.* at 536 (internal quotations omitted). Wigdor is incorrect that using evidence outside of a complaint is inappropriate in considering a Rule 11 motion based on a failure to make a reasonable inquiry.

Wigdor is also incorrect that factual issues such as these can only be decided after discovery, and that it is sanctionable for Defendant to argue otherwise or to bring a motion for

sanctions at this stage. Although a Court may defer decisions on Rule 11 motions until after discovery is completed, it is not required to do so. As noted above, *AJ Energy LLC* was decided in concurrence with a motion to dismiss and without discovery. 2019 WL 4688629. In *Safe-Strap Co.*, a case cited multiple times by Wigdor in its Response, the court held that a Rule 11 sanctions motion need not wait until after discovery. 270 F. Supp. 2d at 413 (S.D.N.Y. 2003). In a lengthy footnote the court explained that "[i]f anything, *parties that seek sanctions for the submission of a complaint are encouraged to file a Rule 11 motion promptly after the complaint is filed*." *Id.* at 413 n.3 (emphasis added). This was because of the advisory committee's guidance that "'ordinarily' Rule 11 motions 'should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely.'" *Id.* (quoting Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment, citing cases where delayed motions denied as untimely).

The court in *AJ Energy* also explained that the addition of the "safe harbor" provision to Rule 11 in 1993 acts "as a practical time limit" and concluded that "in the wake of the 1993 Amendments to Rule 11, 'a party may no longer wait until the end of the litigation to serve up the Rule 11 violation.'" *Id.* (internal citations omitted); *see* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendments ("Given the 'safe harbor' . . . a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)."). An attempt by Wigdor to seek sanctions based on the timing of this motion is incorrect as a matter of law and makes no practical sense in the context of a Rule 11 motion challenging a complaint.

### C.    Wigdor's Inquiry, If Any, of Plaintiff's Allegations, Was Not Reasonable.

Wigdor's Response fails to provide even the slightest substantive explanation of the inquiry, if any, that Wigdor made into the allegations that it certified were supported by evidence. Estrich Decl. ¶¶ 10-11. Accordingly, Defendant has no way of evaluating the reasonableness of Wigdor's inquiry other than by its results, which show that Wigdor included multiple, easily

disprovable allegations in the Complaint, whose falsity should have been discovered by the even most basic inquiry into facts such as Plaintiff's living situation in high school and college, her high school attendance, and her appearance when she was fifteen or sixteen years old.

However, the elements of what could be considered a reasonable inquiry under these circumstances are straightforward and would have been simple to accomplish. By way of example only, prior to filing the Complaint, Wigdor could have: (1) spoken with Plaintiff's family members and Elizabeth, Elizabeth's family members, and Charlie; (2) searched the vast amount of materials available related to Epstein and his associates and/or heeded counsel for those parties or for Epstein's victims with respect to whether there is any reference or understanding that Plaintiff was connected to Epstein; (3) consulted with Plaintiff's doctors to fully evaluate the impact of her medical and psychological conditions on her memories and/or her allegations; (4) obtained Plaintiff's attendance records, transcripts, and photographs from her time in high school; and (5) checked with ▮▮▮▮▮▮▮▮▮▮ to see if any of Plaintiff's records listed Elizabeth's address. None of that appears to have occurred here. If it had, Wigdor should not have included its erroneous allegations, or should have decided not to file the Complaint at all until (or if), as required by Rule 11, it could ensure that it had sufficient evidentiary support.

## III.   WIGDOR FAILED TO REASSESS THE CLAIM WHEN PRESENTED WITH EVIDENCE THAT THE ALLEGATIONS HAVE NO MERIT.

Wigdor turned a blind eye on multiple occasions to significant pre-and post-complaint indicators that Plaintiff's allegations were not credible, which also violates Rule 11. *See Perry*, 45 F. Supp. 2d at 274-75 ("Suit should not have been brought if these things had been learned at the outset, or it should have been dropped if they were learned later in the process."). Here, Wigdor has had several significant opportunities to reassess Plaintiff's claims, both before and after filing the Complaint, and has failed to do so each time.

For example, as stated in the Rule 11 Letter, we understand that Wigdor was expressly warned prior to filing the Complaint that Plaintiff's allegations regarding Epstein and Mr. Black were false, uncorroborated, and likely fabricated. Estrich Decl. ¶ 9. Wigdor ignored that statement entirely in their Response, but it is clear from their filing of the Complaint that they did not adequately reassess the claim based on that information. Estrich Decl. ¶ 11.  Also, the Rule 11 Letter and the sworn testimony attached to and included in that letter placed Wigdor on notice that several of the key allegations in the Complaint are false, including those relating to (i) Plaintiff's alleged travel to New York, Palm Beach, and the U.S. Virgin Islands, and the substantial number of school absences that are alleged to have resulted; (ii) Plaintiff allegedly living with Elizabeth during high school and prior to her entering college; and (iii) Plaintiff's alleged participation as a 15 year old in a cheerleading squad coached by Elizabeth, including the fabricated story of Plaintiff fitting into a uniform designed for 8-12 year old girls when she was fifteen. Estrich Decl. ¶ 8.

Wigdor's reaction was, again, to bury its head in the sand and ignore the evidence presented to it. Once again, it did not reassess its claims; instead, it threatened to seek sanctions against Defendant and his counsel if they brought the motion. It did not explain the process it engaged in to make sure that Plaintiff's factual assertions have (and continue to have) evidentiary support, as required by Rule 11. Perhaps most tellingly, it did not respond to the facts presented to it by conducting an investigation to confirm the facts contained in the Rule 11 Letter and attempting to amend the complaint to address those facts. Indeed, Wigdor has stubbornly and inappropriately refused to reassess even those facts that are not particularly relevant to the Complaint's core claim that Plaintiff was sexually assaulted and trafficked, such as the cheerleading uniform story. This willful ignorance and refusal to reassess is sanctionable. *See Perry*, 45 F. Supp. 2d at 274-75; *AJ Energy,* 2019 WL 4688629, at *11 ("'[A] court may impose sanctions on a party for refusing to

withdraw an allegation or claim even after it was shown to be inaccurate.'" (quoting *Galin v. Hamada*, 283 F. Supp. 3d 189, 202 (S.D.N.Y. 2017))).

Wigdor appears to have sent out an investigator to attempt to speak to Elizabeth only *after* filing the Complaint and when it was aware that Defendant was conducting an investigation. *See* ▮▮▮ Decl. ¶¶ 18-19. But that investigator did not ask her about any of the substantive allegations in the Complaint, presumably to avoid learning about any information that would contradict Plaintiff's allegations. This further proves Wigdor's sanctionable failure to perform a reasonable inquiry into Plaintiff's allegations. *See Saltz*, 129 F. Supp. 2d at 646-47 (failure to elicit evidence in discovery supported allegations beyond "modest efforts" to request records was part of sanctionable failure to conduct a reasonable inquiry). In addition, Wigdor actively attempted to interfere with Defendant's investigation. While Defendant's investigator was speaking with Plaintiff's aunt, Christensen texted and called her in an attempt to stop the conversation. Melendez Decl. ¶ 12. Plaintiff's aunt refused and told Christensen that the investigator had been "nothing but polite and very reasonable." *Id.* Wigdor's repeated failures to address multiple, serious challenges to the lurid story it told in the Complaint is sanctionable under Rule 11.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court grant his motion and issue sanctions against Wigdor and Christensen that the Court deems appropriate.

Dated:  New York, New York
       September 20, 2023

ESTRICH GOLDIN LLP

By :  */s/ Susan Estrich*
      Susan Estrich (pro hac vice)
      947 Berkeley St.
      Santa Monica, CA 90403
      (213) 399-2132

      QUINN EMANUEL URQUHART
       & SULLIVAN, LLP
      Michael B. Carlinsky
      Jennifer J. Barrett
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      (212) 849-7000

      *Counsel for Defendant Leon Black*