# Exhibit 1

| | |
|---|---|
| **From:** | Susan Estrich |
| **To:** | Jeanne M. Christensen |
| **Cc:** | Michael Carlinsky; Jennifer Barrett; Danya Perry; "Peter Gwynne"; Douglas Wigdor |
| **Subject:** | Case No. 1:23-cv-06418-JGLC |
| **Date:** | Friday, August 25, 2023 6:14:51 PM |
| **Attachments:** | Declaration of ███████.pdf<br>08.25.2023 Rule 11 Letter.pdf<br>Declaration of Carlos Melendez.pdf<br>2023.08.25 Notice of Motion - Sanctions.pdf |

Dear Jeanne,

Please see attached correspondence.

Sincerely,
Susan Estrich



EstrichGoldin.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments. Estrich Goldin LLP may monitor electronic communications sent or received in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy standards.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JANE DOE,<br><br>    *Plaintiff,*<br><br>  v.<br><br>LEON BLACK,<br><br>    *Defendant.* | Case No. 1:23-cv-06418-JGLC |

## NOTICE OF MOTION PURSUANT TO FED. R. CIV. P. 11

**PLEASE TAKE NOTICE** that, the Defendant, Leon Black ("Defendant" or "Black"), hereby moves this Court pursuant to Fed. R. Civ. P. 11(c) for an order imposing sanctions on Plaintiff Jane Doe ("Plaintiff"), her counsel Jeanne Christensen, and her counsel's law firm, Wigdor LLP, because:

  (i) Plaintiff and her counsel violated Fed. R. Civ. P. 11(b)(3), by asserting factual contentions in the Complaint in this action without any evidentiary support, without any likelihood of obtaining any evidentiary support, and without making any reasonable inquiry regarding the evidentiary support for their contentions. These baseless factual contentions include the claims that Plaintiff was sex trafficked by Jeffrey Epstein, sexually assaulted by Defendant, and groomed and sex trafficked by "Elizabeth" beginning after her 16th birthday.

**PLEASE TAKE FURTHER NOTICE** that Plaintiff's papers in opposition to this motion, and Defendant's reply papers, shall be served in accordance with Local Civil Rule 6.1.

Dated: New York, New York
       August __, 2023

QUINN EMANUEL URQUHART
 & SULLIVAN, LLP

By:  */s/ draft*
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

PERRY LAW
E. Danya Perry
Peter A. Gwynne
157 East 86th St., 4th Floor
New York, NY 10028
(646) 974-0935

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice forthcoming*)
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132

*Counsel for Defendant Leon Black*



www.estrichgoldin.com

August 25, 2023

**By Email and Federal Express**

Jeanne Christensen
Wigdor LLP
85 Fifth Avenue
New York, NY 10003

*Jane Doe* v. *Leon Black*,
No. 23-cv-06418 (S.D.N.Y.)

Dear Jeanne:

  As you know, we represent Leon Black in the above-referenced matter. We have reviewed the complaint that you filed on behalf of a certain Jane Doe (the "Plaintiff") on July 25, 2023, in the above-referenced case, and are writing to advise you that the allegations in the complaint and your conduct in filing it violate Rule 11(b)(3) of the Federal Rules of Civil Procedure, for the reasons described below. Accordingly, we are writing to demand that you and your client promptly withdraw those claims with prejudice within 21 days of the date of this letter. If you do not do so, we reserve the right, without further notice to you, to file the accompanying Notice of Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure. The filing of the motion will be accompanied by a separate memorandum of law.

  Rule 11(b)(3) provides that, "[b]y presenting to the court a pleading[,] . . . an attorney . . . certifies that to the best of the person's knowledge, information, belief, formed after an inquiry reasonable under the circumstances[,] . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). Thus, an attorney violates Rule 11 by filing a pleading, motion, or other paper "where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 391 (S.D.N.Y. 2007) (internal quotations omitted); *see also Steele v. Polymer Rsch. Corp. of Am.*, 1987 WL 12819, at *2 (S.D.N.Y. June 18, 1987) ("Rule 11 . . . imposes upon attorneys an affirmative duty of prefiling inquiry into the facts and the law."). Furthermore, Rule 11(c) <u>requires</u> the imposition of sanctions for violations of Rule 11(b): "[s]anctions **shall be imposed** against an attorney and/or his client" for filing a pleading in violation of Rule 11. *In re Sony Corp. SXRD Rear Projection Television Mktg., Sales Pracs. & Prod. Liab. Litig.*, 268 F.R.D. 509, 517 (S.D.N.Y. 2010) (emphasis added; internal quotations omitted).

  It is clear that you did not come close to satisfying your obligations under Rule 11(b)(3) before filing the complaint in this action. To the contrary, your conduct plainly violates that rule and the case law interpreting it, because the essential allegations in the complaint you filed are total fiction, and even a modicum of investigation on your part would have revealed that the key factual assertions in the complaint are false. Your obvious failure to have undertaken any such investigation, let alone a "reasonable" one, directly contravenes Rule 11, pursuant to which an attorney has an affirmative duty to make a "reasonable inquiry into the facts of the case . . . before filing [it]." *Geler v. Nat'l Westminster Bank USA*, 145 F.R.D. 25, 27 (S.D.N.Y. 1992). "Since the inquiry must be 'reasonable under the circumstances,' liability for Rule 11 violations requires only a showing of *objective unreasonableness* on the part of the attorney or client signing the papers." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009) (emphasis added). Moreover, an attorney may not rely solely on a client's assurances regarding factual allegations where a reasonable inquiry would reveal such assurances to be false. *See Saltz v. City of New York*, 129 F. Supp. 2d 642, 646 (S.D.N.Y. 2001); *accord. AJ Energy LLC v. Woori Bank*, 2019 WL 4688629, at *11 (S.D.N.Y. Sept. 26, 2019) ("[A]n attorney

may not simply take her client's word on faith where that word would be easily proved (or disproved) through a reasonable investigation or where red flags should have (and would have) alerted counsel to problems."), *aff'd*, 829 F. App'x 533 (2d Cir. 2020).

Given the extent to which the complaint you filed is demonstrably and objectively false, as demonstrated below, we can only conclude that either you conducted no investigation prior to filing, or any investigation you purported to have conduct was objectively unreasonable in the extreme. Either scenario easily meets the standard for sanctions. Worse, we have reason to believe that you were expressly warned prior to filing the complaint that your client's allegations regarding Jeffrey Epstein and Leon Black were false, uncorroborated, and likely fabricated.

The complaint contains <u>no</u> corroboration whatsoever of the supposed events it purports to describe. Had you conducted any investigation at all, much less a reasonable one, you would have discovered not only the absence of any such corroboration, but worse, substantial evidence flatly *contradicting* the outrageously prejudicial allegations in the complaint. But rather than fulfilling your obligations under Rule 11, it is clear that you blindly relied on your client and failed to make a reasonable inquiry, displaying either deliberate or reckless indifference to the truth of her allegations. Indeed, even our initial investigation has made it blatantly clear that there is <u>no</u> evidence whatsoever corroborating Plaintiff's allegations that she ever met Jeffrey Epstein (much less Leon Black) or was trafficked by him. To the contrary, numerous individuals with knowledge of the time period in question, including Plaintiff's parents, sister, and others—including individuals specifically identified in the complaint—have emphatically and unequivocally stated that key allegations in the complaint are false, and that Plaintiff's claims are untrue.

### The Allegations Concerning Trafficking Of Plaintiff To Jeffrey Epstein Are False

Plaintiff's entire complaint revolves around the central allegation that she was trafficked to and/or by Jeffrey Epstein, allegedly traveling to his residences in the U.S. Virgin Islands or Palm Beach "most weekends" while in her junior and senior years of high school, missing many Fridays and Mondays from school. (Compl. ¶ 44.) This conduct allegedly occurred shortly after Plaintiff's 16th birthday. (*Id.* ¶ 45.) Those core allegations are demonstrably false. Plaintiff's mother and sister—in recorded, voluntary interviews—repeatedly confirmed that Plaintiff lived at home throughout her high school years, including during her junior and senior years of high school. (Melendez Decl. ¶ 14.) Indeed, Plaintiff drove ▮▮▮▮▮ who was ▮▮▮▮▮▮▮▮▮▮ to school nearly every day of Plaintiff's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And both Plaintiff's mother and sister confirmed that Plaintiff only missed significant time from school when Plaintiff, regrettably, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Had you conducted any investigation at all, you would have learned that Plaintiff has a ▮▮▮▮▮▮▮▮▮▮ stretching back long before any of the events alleged in the complaint occurred. (*Id.* ¶ 14.) In addition, you would have learned that Plaintiff's mother, sister, cousin, and others close to her believe that Plaintiff frequently creates realities for herself that are not grounded in fact, and then believes them—particularly where they gain her attention. (*Id.*) For example, Plaintiff first claimed to have Mosaic Down syndrome in her thirties, and only after a family member posted on social media about her child having Down syndrome and receiving positive attention as a result. (*Id.*) As a second example, Plaintiff's family is skeptical that Plaintiff suffers from autism and her sister, who works with autistic children, stated that Plaintiff in her twenties began intentionally displaying symptoms and characteristic behaviors of autism for the first time (such as avoiding looking people in the eyes) in order to present herself as a person with autism. (*Id.*) Indeed, Plaintiff's family states that she never displayed any symptoms of either Mosaic Down syndrome or autism, nor was she diagnosed with either condition, during her childhood. (*Id.*) As yet another example of such manufactured realities, within just the past few years, Plaintiff—without ever having mentioned this earlier in her life—suddenly began posting online about allegedly being trafficked by Mr. Epstein, and then, when asked by her family members to remove the posts because they were false, promptly took down the posts of her own volition. (*Id.*)

In light of all this, it is not surprising that Plaintiff does not allege, even obliquely, that Plaintiff contemporaneously told a soul about anything relating to Mr. Epstein, Ms. Groff, Ms. Kellen, or anyone else referred to in her complaint, including, specifically, Mr. Black. The complaint does not identify, or even obliquely advert to the existence of, any friends, family, acquaintances, or professionals who learned of Plaintiff's trauma many years ago. Nor, similarly, does the complaint point to a shred of documentary proof or even any contemporaneous memorialization of Plaintiff's professed recollection. We, of course, understand that in many circumstances victims of sexual assault do not report their experiences in real time, or even close

in time to the event at issue, and we similarly do not doubt that victims often do not otherwise document what happened to them. Nonetheless, the apparent absence of any record over the last 20 plus years remotely substantiating Plaintiff's claims—███████████████████████████—is a significant data point in evaluating her, and therefore your, bona fides.

The timing of Plaintiff's complaint likewise belies the notion that there is any truth to Plaintiff's allegations. Investigations concerning Mr. Epstein have been ongoing for many years, led by numerous criminal, civil, and other regulatory authorities, not to mention civil litigants and the innumerable law firms representing them. No one has ever identified Plaintiff as having had any connection to Mr. Epstein. Significant materials concerning Mr. Epstein have been made public through judicial proceedings, and multiple databases, and not a single one contains any direct or indirect reference to Plaintiff.

Not only that, but references to specific individuals in Plaintiff's complaint, transparently included to provide some semblance of support for Plaintiff's claims, are pure fiction. Plaintiff refers, for instance, to interactions with Leslie Groff, Mr. Epstein's longtime assistant. But Ms. Groff's representatives have informed us that she disclaims ever interacting with Plaintiff or, indeed, ever hearing anything about her. The same is true of Sarah Kellen, another individual affiliated with Mr. Epstein and identified by name in the complaint. Ms. Kellen's representatives have likewise informed us that Ms. Kellen has never heard of Plaintiff, and in fact believes that her allegations are outlandish. Given the frequency and nature of the trafficking alleged in the complaint, it is implausible in the extreme that neither of these persons would have any knowledge of Plaintiff if her allegations were true. It is also highly telling that the "details" pleaded concerning Mr. Epstein's townhouse, Ms. Maxwell's conduct, and other features of the alleged trafficking all reflect information easily ascertained from public sources. By way of example, the allegations about the third floor of Mr. Epstein's townhouse—which you offered as supposed evidence of Plaintiff's veracity—are all readily found in multiple mainstream media sources. *See, e.g.*, https://nypost.com/2021/12/07/take-a-look-inside-jeffrey-epsteins-creepy-manhattan-lair/.

All of these points—individually or in aggregate—demonstrate the manifest unreasonableness of your pre-filing investigation and require your immediate withdrawal of the pleading. And if this case goes forward, we will develop additional dispositive evidence that the allegations in the complaint were invented. We expect that information uncovered from Mr. Epstein's estate—consistent with the documents released publicly to date—will demonstrate that Plaintiff never had any connection to Mr. Epstein. You should know, given the allegations that you have leveled, that there are extensive records of Mr. Epstein's horrific misconduct, including flight manifests, visitor logs, and the like. We have every expectation that this evidence will further put the lie to Plaintiff's invented claims. And we very much doubt that you ever bothered to review, or even attempted to review, any of those materials—or ever attempted to contract representatives for Ms. Groff or Ms. Kellen—in an effort to pressure-test what you claim your client has told you.

On this record, the only plausible conclusion is that Plaintiff has concocted—for whatever reason—the assertion that she was trafficked to Jeffrey Epstein and assaulted by Leon Black. This claim is unsupported by any objective evidence, any contemporaneous (or other) corroboration, and is flatly refuted by both her family members who knew and lived with her at the time and the individuals she supposedly encountered while being trafficked.

**The Allegations Concerning Trafficking To "Elizabeth" Are False**

Another critical element of the complaint is the allegation that Plaintiff participated in a cheerleading program for 8–12-year-olds, when an individual referred to as "Elizabeth" groomed her for Mr. Epstein. In fact, as photographic evidence and the statements of Plaintiff's family members and "Elizabeth" show, the cheerleading program was for high-school students, and the assertion that Plaintiff was able to participate because she could fit into a child-sized uniform is demonstrably untrue. (███ Decl. ¶¶ 4-5, 15; Melendez Decl. ¶ 12.) And those fabrications are just the tip of the iceberg.

"Elizabeth," who as you know is in fact named ████████████████████ has emphatically refuted Plaintiff's allegations under oath. Like Plaintiff's family, Ms. ███ confirmed that Plaintiff lived at her parental home throughout high school and did not live outside the home prior to college. (███ Decl. ¶¶ 7, 12, 15.) Ms. ███ also confirmed—consistent with statements made by Plaintiff's family—that the only trip Plaintiff ever took with her was to the Atlantis Resort in the Bahamas—a trip that only occurred *after* Plaintiff graduated

from high school. (*Id.* ¶ 8.) Ms. ▇▇ also confirmed—again under oath—that Ms. ▇▇ son, as well as a female friend of hers, also came on the trip. (*Id.*) Like Plaintiff's family, Ms. ▇▇ is entirely unaware of Plaintiff ever traveling to Florida, the U.S. Virgin Islands, or New York on weekends in high school. (*Id.* ¶ 15.)

Although the complaint alleges that Plaintiff lived with "Elizabeth" during high school, Plaintiff in fact only lived with Ms. ▇▇ for a few months when she started attending ▇▇ because Ms. ▇▇ lived closer to the school than Plaintiff's parents did. (*Id.* ¶¶ 9, 11.) Plaintiff never informed Ms. ▇▇ of any alleged sexual abuse, either during that period or previously. (*Id.* ¶ 17.) Nor did she inform Ms. ▇▇, contemporaneously, of any diagnosis of autism or Mosaic Down syndrome, and Ms. ▇▇ did not observe any evidence of such conditions during Plaintiff's high school or college years. (*Id.* ¶ 16.) And, under oath, Ms. ▇▇ stated emphatically that none of the alleged sexual misconduct alleged in the complaint involving Ms. ▇▇ ever occurred. (*Id.* ¶¶ 15, 20.)

It is particularly telling that an investigator claiming to represent Plaintiff first contacted Ms. ▇▇—whose identity was plainly known to you—only <u>after</u> you filed your complaint. (*Id.* ¶¶ 18-19.) And even then, when that investigator spoke with Ms. ▇▇, he did not ask her about any of the substantive allegations in the complaint that you had already filed—presumably, because you did not want to learn contrary information. (*Id.*)

\*   \*   \*

As we stated at the outset, Rule 11 imposes an affirmative duty to conduct a reasonable inquiry into the facts alleged in a pleading. An attorney may not rely solely on a client's assurances and avoid her obligation to investigate, and certainly may not take deliberate steps to avoid learning facts that contradict her client's claims. *See, e.g., Saltz*, 129 F. Supp. 2d at 646; *AJ Energy LLC*, 2019 WL 4688629, at \*11.

But that is precisely what you did here. You did not conduct any due diligence. Your investigation—to the extent you conducted one at all—was objectively unreasonable. And you signed your name to a complaint that should never have been filed. Your conduct clearly violates Rule 11. Courts in the Second Circuit routinely impose sanctions where, as here, the allegations in a pleading are utterly lacking in evidentiary support and are in fact squarely contradicted by objective evidence. *See, e.g., Mason Agency Ltd. v. Eastwind Hellas SA*, 2009 WL 3169567, at \*2 (S.D.N.Y. Sept. 29, 2009) ("Rule 11(c) of the Federal Rules of Civil Procedure permits the court . . . to sanction an attorney, law firm, or party if the court determines . . . that the attorney, law firm, or party has violated Rule 11(b) by making false, misleading, improper, or frivolous representations to the court.") (internal quotations omitted); *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996) (court may impose sanctions if a particular allegation is utterly lacking in support); *Chien v. Skystar Bio Pharm. Co.*, 256 F.R.D. 67, 74 (D. Conn. 2009) (Rule 11(b)(3) violated where complaint contained material falsehoods), *aff'd*, 378 F. App'x 109 (2d Cir. 2010); *AJ Energy LLC*, 2019 WL 4688629, at \*11 (holding that sanctions were warranted where attorneys were indifferent to "red flags galore" regarding the improbability of factual allegations central to their client's claims).

This letter and the accompanying Notice of Motion will serve as notice to you that if the complaint is not dismissed voluntarily with prejudice within 21 days of the date of this letter, we reserve the right to move anytime thereafter for sanctions against Plaintiff, you, and your law firm pursuant to Rule 11(c)(2) of the Federal Rules of Civil Procedure. *See Star Mark Mgmt. Inc. v. Koon Chun Hing Kee Soy & Sauce Factory Ltd.*, 682 F.3d 170, 176 (2d Cir. 2012).

Sincerely,

*Susan Estrich*

Susan Estrich

cc:   Douglas Wigdor

<u>Enclosures</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

        Plaintiff,

v.

LEON BLACK,

        Defendant.

Case No. 1:23-cv-06418-JGLC

**DECLARATION OF** ▮

I, ▮ hereby declare under penalty of perjury that the following is true and correct:

1. I am over 18 years of age, of sound mind and otherwise competent to make this Declaration. The statements in this Declaration are based upon my personal knowledge.

2. My name is ▮. My date of birth is ▮. I live in ▮.

3. I first met the Plaintiff in the above-captioned action when she was in high school. Plaintiff participated in a recreational cheerleading program with an organization called ▮, for which I was a volunteer.

4. The cheerleading program was open to youth of all ages. It was not reserved for 8–12-year-olds, as alleged in the Complaint in this action. Plaintiff participated in a program for ~~high school-aged~~ girls [handwritten: girls] ~~, and was approximately the same age as the other girls in her group~~ [handwritten: up to age 16]. The cheerleading program did not involve overnight trips.

5. When she participated in the cheerleading program as a high school student, Plaintiff's physical development was normal. She could not have fit into a uniform for 8–12-year-old children.

6. Plaintiff and I became friendly during and after her participation in the cheerleading program. Plaintiff appeared to be emotionally troubled, and looked to me to provide support. I cared for her and wanted her to be successful and happy. Among other things, I helped Plaintiff with her college applications.

7. I met Plaintiff's mother and got along fine with her. I believe Plaintiff had a stable home life.

8. After Plaintiff graduated from high school in 2003, and with parental permission, I took her on a trip to the Bahamas with my son and a female friend of mine. That was the first and only overnight trip I ever took with Plaintiff. I never traveled with her to New York City, Palm Beach, or the Virgin Islands, and I am not aware of her ever traveling to any of those places while she was in high school or college.

9. After graduating high school in 2003, Plaintiff enrolled at ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ I lived closer to ▮▮▮▮▮▮▮▮ than Plaintiff's family, and, as a favor, I offered to let her live with me while she attended college. Plaintiff's parents were aware of and fine with this arrangement.

10. At the time, I lived with my then-13-year-old son. My now-▮▮▮▮▮▮▮▮, did not live with me then. ▮▮▮▮▮▮▮▮ has only met Plaintiff a few times.

11. Plaintiff moved out of my house within a few months, saying that she missed her parents and being at home with her sister. I had also grown concerned that Plaintiff was spending

2

a lot of her time going out with friends back home in ▮▮▮▮ and did not appear to be appropriately focused on her college education.

12. To be clear, Plaintiff never lived with me or stayed overnight with me while she was in high school; she only stayed with me for several months while she was in college.

13. I have not spoken with Plaintiff by phone or in person since she moved out. The last time I had any contact with her was ▮▮▮▮ several years ago.

14. I have read the Complaint in the above-captioned action, and believe that the allegations concerning "Elizabeth" refer to me. ▮▮▮▮

15. Other than the fact of Plaintiff's participation in a cheerleading program while in high school, none of the allegations concerning "Elizabeth" are true. Specifically:

- Plaintiff participated in a cheerleading program for high school aged girls, not for 8–12-year-old children.

- Plaintiff did not live with me while she was in high school. She moved in with me for a brief period in 2003 after she graduated and while she was attending ▮▮▮▮. Plaintiff was 18 years old at the time. Plaintiff had her own bedroom.

- I never physically, sexually, or psychologically abused Plaintiff. I never punched or kicked her, dragged her up the stairs, deprived her of food or water, made her dress in small children's clothing, or forced her to work out at a gym.

- I did not own a gun at the time Plaintiff lived with me. I never threatened Plaintiff with violence, or that she would "go missing" if she disobeyed me.

- My now-husband ▮▮▮▮ did not live with me at the time, ~~and has only met Plaintiff once or twice~~. ▮▮▮▮ was not in his "late forties" at the time—he is two years younger than me and therefore would have been in his mid-thirties at the time.

- Neither I nor ▮▮▮▮ ever forced Plaintiff to watch us have sex ▮▮▮▮

- Neither ▮▮▮▮ nor I have ever met Ghislaine Maxwell, Jeffrey Epstein, Sarah Kellen, or Leon Black.

3

- Neither I nor ever "shipped out" Plaintiff to Palm Beach, the Virgin Islands, New York City, or any other place. Plaintiff did not take any flights or travel to any of those places during the time she lived with me, and I am not aware of her doing so while she was in high school.

16. To my knowledge, Plaintiff was not diagnosed with either autism or Mosaic Down syndrome prior to the time I knew her. In my view, she did not engage in or display the characteristics of either condition when she was in the cheerleading program or during the brief period when she lived with me while attending college. The first time I became aware that she claimed to have autism was years later when she mentioned it in a post on Facebook.

17. During the entire time I knew her, Plaintiff never mentioned Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, or Leon Black. I have no reason to believe she has ever met any of them, let alone that she was abused by them as alleged in her Complaint. Plaintiff has never made any allegations to me of being abused, molested, or raped by anyone.

18. A few weeks ago, I was approached by an investigator who stated that he was working for Plaintiff. The investigator stated that he was researching Plaintiff's background, and asked me questions about her state of mind and well being. The investigator did not ask me any questions about the allegations in the Complaint. He took notes but did not, to my knowledge, record our conversation.

19. The investigator referred to me as "███" and never mentioned the name "Elizabeth." He asked me if I knew Leon Black, but did not mention this lawsuit or provide me with a copy of the Complaint.

20. I first became aware of this lawsuit when I met with Carlos Melendez on August 19, 2023. Mr. Melendez provided me with a copy of the Complaint. As stated above, other than the fact of Plaintiff's participation in a cheerleading program while in high school, the allegations in the Complaint concerning "Elizabeth" (if they in fact refer to me) are completely untrue.

4

21. I have read this Declaration more than once very carefully. Every statement in this Declaration is completely truthful and accurate and I have given this Declaration under my own free will. I have not been threatened in any way or offered any money to make this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in ███████████████ on August 22, 2023.

By: ███████████

Witness to the above signature:

By: ▰▰▰
Richard Restoll
082223

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

        *Plaintiff,*

    v.

LEON BLACK,

        *Defendant.*

Case No. 1:23-cv-06418-JGLC

### DECLARATION OF CARLOS MELENDEZ

I, CARLOS MELENDEZ, do hereby declare under penalty of perjury that the following is true and correct:

1. I am fully familiar with all matters set forth in this Declaration based on personal knowledge about the facts and matters below. I am over the age of 18 years and not laboring under any disabilities.

2. My name is Carlos Melendez. My date of birth is October 7, 1939. I am 83 years old.

3. I am a retired U.S. Army Infantry Officer with 20 years of military service. I enlisted in the U.S. Army in 1961, and was honorably discharged in 1981.

4. During my military service, I received the following awards and decorations, among others: (i) Distinguished Flying Cross; (ii) Air Medal with 28 Oak Leaf Clusters; (iii) Bronze Star with 3 Oak Leaf Clusters; (iv) Army Commendation Medal with 3 Oak Leaf Clusters; (iv) Joint Commendation Medal; (v) Good Conduct Medal; (vi) Combat Infantry Badge; (vii) Expert Infantry Badge; (viii) Parachute Badge, Ranger Tab; (ix) Army Aviator Badge;

(x) Senior Army Aviator Badge; (xi) National Defense Service Medal; and (xii) Vietnamese Service Medal.

5. I have several investigatory designations, including: (i) Certified Fraud Examiner; (ii) Certified International Investigator, CII; (iii) Private Investigator, Class C License #0001855, Florida; and (iv) Private Investigative Agency, Class A License #A0002225.

6. I have substantial experience with investigations and private security. I have served as an Independent Contractor Investigator for investigative agencies, corporate, insurance, and law firm clients. I have served as a security director for The Green Companies in Miami, Florida, and a security consultant for the Miami International Boat Show and several property managers in Miami, Florida.

7. I was engaged to investigate the claims and allegations made by Jane Doe in the above-captioned litigation.

8. In connection with that investigation, I conducted in-person interviews with several individuals with close affiliations with Ms. Doe, including her mother, father, sister, aunt, and cousin. I also interviewed the ▇▇▇ of Ms. Doe's ▇▇▇▇▇▇▇. When I met with a witness, I was accompanied by a second investigator. These interviews lasted, in total, approximately four hours. In each instance that someone agreed to speak with me, I recorded the conversation, including confirming on the recording that the individual knew he or she was being recorded, consented to it, and was speaking with me voluntarily and with no coercion or inducement.

9. I did not begin these interviews until August 7, 2023. I first spoke with Ms. Doe's father at 12:30 p.m. on August 7, 2023. He then called his wife who was not at home, and we confirmed an appointment to meet Ms. Doe's mother at 2.30 p.m., when she would be home. I went for lunch and was running late, so I called and notified Ms. Doe's mother that I was running

late coming from lunch. As a gesture of politeness, I brought dessert over and apologized that I "made the lady wait."

10. During the course of my conversation with Ms. Doe's mother and father, I showed a picture of ▇▇▇▇▇▇▇ taken from a public Facebook account, but not to gain entrance or intimidate.

11. While I was interviewing Ms. Doe's mother and father, Ms. Doe's mother offered to call ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇—to meet the investigators. He entered the room and joined the conversation. Ms. Doe's mother informed me that ▇▇▇▇▇▇ Ms. Doe's mother volunteered to invite ▇ to speak to me. Ms. Doe's mother also volunteered to call and invite her other daughter over—Ms. Doe's sister—who also came over to join in the interview. None of this was coerced by me or my investigation team.

12. During the conversation, Ms. Doe's mother voluntarily showed me and my team pictures of Ms. Doe. Based on photographs I observed, Ms. Doe appeared to be of average weight and developmentally age appropriate when she was in high school, and it was unlikely that she could fit into a uniform for 8–12 year-old children at that time.

13. While I was speaking with Ms. Doe's aunt, Jeanne Christensen of Wigdor LLP was texting her, trying to put a stop to the voluntary conversation. Ms. Christensen then called the witness during the interview, at which time I heard Ms. Doe's aunt tell Ms. Christensen that she did not like Ms. Christensen's attitude and that I and my team had been "nothing but polite and very reasonable."

14. The recordings of my interviews demonstrate that one or more of the individuals I interviewed told me, in sum or substance, the following information:

3

- Ms. Doe, who has used a series of different names and personas, has a history of making up alternate realities; ▬▬▬▬▬▬▬▬▬▬▬▬▬; and invents things that "become[] her reality."

- Ms. Doe lived at home through high school, and did not travel to Florida, New York, or the Virgin Islands during that time. While in high school, she did not travel out of town on weekends or weekdays.

- Ms. Doe graduated high school on time, did not fail any classes, and did not miss school for any significant amounts of time ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

- Ms. Doe participated in a county cheerleading program when she was a senior in high school—not when she was 15 or 16. The program was for high school students, not for children aged 8–12. The cheerleading program did not involve overnight trips.

- Ms. Doe appeared to be of average weight and developmentally age appropriate.

- Ms. Doe was not diagnosed with either autism or Mosaic Down Syndrome during her childhood or while she lived at home throughout high school, and did not display symptoms or behaviors of either condition. Instead, Ms. Doe became aware of and studied those behaviors and began intentionally displaying them in her twenties in order to present herself as a person with autism. For example, she once noted that people with autism don't look other people in the eye, and thereafter began to avoid looking people in the eye—a behavior she had never before displayed. The first time her family heard Ms. Doe claim to have Mosaic Down Syndrome was when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome, and received positive support and attention. Ms. Doe has a history of seeking attention through any means available to her.

- Recently, Ms. Doe posted on social media that she had been abused by Jeffrey Epstein. She had never made such allegations before. Her family told her that they did not believe this to be true, and Ms. Doe's mother told her to delete the posts and she deleted them.

15. Neither I nor anyone assisting me or working with me in my investigation parked a white Suburban bearing a Virginia license plate TSH-8229 outside Ms. Doe's house. I do not recognize that vehicle or license plate number.

4

16. I have read this document more than once very carefully. Every statement in this document is completely truthful and accurate and I have given this declaration under my own free will.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in _Tamarac Florida_, on August _14_, 2023.

By: _____
Carlos Melendez