# Exhibit 2

# Meredith Firetog

| | |
|---|---|
| **From:** | Jeanne M. Christensen |
| **Sent:** | Tuesday, September 19, 2023 6:14 PM |
| **To:** | Susan Estrich; jacquelinestykes@quinnemanuel.com |
| **Cc:** | Meredith Firetog |
| **Subject:** | Redactions |
| **Attachments:** | Declaration of ▮▮▮▮ redactions.pdf; Declaration of Carlos Melendez, Redactions.pdf |
| | |
| **Categories:** | Filed to ND |
| **FilingIndicator:** | -1 |

We highlighted what we believe should be redacted.
The reason part of para. 10 is redacted is there is no allegation that Elizabeth took our client to an adult sex party.
If you want to talk about anything please just call my office line or cell.

**Jeanne M. Christensen**
Partner

212 257 6800
85 Fifth Avenue
New York, NY 10003

[wigdorlaw.com](http://wigdorlaw.com)





 Please consider the environment before printing this e-mail

This communication may contain Confidential or Attorney-Client Privileged Information and/or Attorney Work Product. If you are not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail or phone. Thank you.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

        Plaintiff,

v.

LEON BLACK,

        Defendant.

Case No. 1:23-cv-06418-JGLC

**DECLARATION OF** ▮

1. I, ▮ hereby declare under penalty of perjury that the following is true and correct:

1. I am over 18 years of age, of sound mind and otherwise competent to make this Declaration. The statements in this Declaration are based upon my personal knowledge.

2. My name is ▮. My date of birth is ▮. I live in ▮.

3. I first met the Plaintiff in the above-captioned action when she was in high school. Plaintiff participated in a recreational cheerleading program with an organization called ▮, for which I was a volunteer.

4. The cheerleading program was open to youth of all ages. It was not reserved for 8–12-year-olds, as alleged in the Complaint in this action. Plaintiff participated in a program for ~~high school-aged~~ girls [handwritten: ♀ girls], ~~and was approximately the same age as the other girls in her group~~ [handwritten: up to age 14]. The cheerleading program did not involve overnight trips.

5. When she participated in the cheerleading program as a high school student, Plaintiff's physical development was normal. She could not have fit into a uniform for 8–12-year-old children.

6. Plaintiff and I became friendly during and after her participation in the cheerleading program. Plaintiff appeared to be emotionally troubled, and looked to me to provide support. I cared for her and wanted her to be successful and happy. Among other things, I helped Plaintiff with her college applications.

7. I met Plaintiff's mother and got along fine with her. I believe Plaintiff had a stable home life.

8. After Plaintiff graduated from high school in 2003, and with parental permission, I took her on a trip to the Bahamas with my son and a female friend of mine. That was the first and only overnight trip I ever took with Plaintiff. I never traveled with her to New York City, Palm Beach, or the Virgin Islands, and I am not aware of her ever traveling to any of those places while she was in high school or college.

9. After graduating high school in 2003, Plaintiff enrolled at ▮▮▮▮▮ ▮▮▮▮▮ I lived closer to ▮▮▮▮▮ than Plaintiff's family, and, as a favor, I offered to let her live with me while she attended college. Plaintiff's parents were aware of and fine with this arrangement.

10. At the time, I lived with my then-13-year-old son. My now-▮▮▮▮▮, did not live with me then. ▮▮▮▮▮ has only met Plaintiff a few times.

11. Plaintiff moved out of my house within a few months, saying that she missed her parents and being at home with her sister. I had also grown concerned that Plaintiff was spending

2

a lot of her time going out with friends back home in ▮▮▮▮ and did not appear to be appropriately focused on her college education.

12. To be clear, Plaintiff never lived with me or stayed overnight with me while she was in high school; she only stayed with me for several months while she was in college.

13. I have not spoken with Plaintiff by phone or in person since she moved out. The last time I had any contact with her was ▮▮▮▮ several years ago.

14. I have read the Complaint in the above-captioned action, and believe that the allegations concerning "Elizabeth" refer to me. ▮▮▮▮

15. Other than the fact of Plaintiff's participation in a cheerleading program while in high school, none of the allegations concerning "Elizabeth" are true. Specifically:

- Plaintiff participated in a cheerleading program for high school aged girls, not for 8–12-year-old children.

- Plaintiff did not live with me while she was in high school. She moved in with me for a brief period in 2003 after she graduated and while she was attending ▮▮▮▮ Plaintiff was 18 years old at the time. Plaintiff had her own bedroom.

- I never physically, sexually, or psychologically abused Plaintiff. I never punched or kicked her, dragged her up the stairs, deprived her of food or water, made her dress in small children's clothing, or forced her to work out at a gym.

- I did not own a gun at the time Plaintiff lived with me. I never threatened Plaintiff with violence, or that she would "go missing" if she disobeyed me.

- My now-husband ▮▮▮▮ did not live with me at the time, ~~and has only met Plaintiff once or twice~~. ▮▮▮▮ was not in his "late forties" at the time—he is two years younger than me and therefore would have been in his mid-thirties at the time.

- Neither I nor ▮▮▮▮ ever forced Plaintiff to watch us have sex ▮▮▮▮

- Neither ▮▮▮▮ nor I have ever met Ghislaine Maxwell, Jeffrey Epstein, Sarah Kellen, or Leon Black.

3

- Neither I nor my ever "shipped out" Plaintiff to Palm Beach, the Virgin Islands, New York City, or any other place. Plaintiff did not take any flights or travel to any of those places during the time she lived with me, and I am not aware of her doing so while she was in high school.

16. To my knowledge, Plaintiff was not diagnosed with either autism or Mosaic Down syndrome prior to the time I knew her. In my view, she did not engage in or display the characteristics of either condition when she was in the cheerleading program or during the brief period when she lived with me while attending college. The first time I became aware that she claimed to have autism was years later when she mentioned it in a post on Facebook.

17. During the entire time I knew her, Plaintiff never mentioned Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, or Leon Black. I have no reason to believe she has ever met any of them, let alone that she was abused by them as alleged in her Complaint. Plaintiff has never made any allegations to me of being abused, molested, or raped by anyone.

18. A few weeks ago, I was approached by an investigator who stated that he was working for Plaintiff. The investigator stated that he was researching Plaintiff's background, and asked me questions about her state of mind and well being. The investigator did not ask me any questions about the allegations in the Complaint. He took notes but did not, to my knowledge, record our conversation.

19. The investigator referred to me as "███" and never mentioned the name "Elizabeth." He asked me if I knew Leon Black, but did not mention this lawsuit or provide me with a copy of the Complaint.

20. I first became aware of this lawsuit when I met with Carlos Melendez on August 19, 2023. Mr. Melendez provided me with a copy of the Complaint. As stated above, other than the fact of Plaintiff's participation in a cheerleading program while in high school, the allegations in the Complaint concerning "Elizabeth" (if they in fact refer to me) are completely untrue.

21.  I have read this Declaration more than once very carefully. Every statement in this Declaration is completely truthful and accurate and I have given this Declaration under my own free will. I have not been threatened in any way or offered any money to make this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in █████████████████████, on August 22, 2023.

By: ███████████████████

Witness to the above signature:

By: _____
Richard Restrell
082223

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

        *Plaintiff*,

v.

LEON BLACK,

        *Defendant*.

Case No. 1:23-cv-06418-JGLC

## DECLARATION OF CARLOS MELENDEZ

    I, CARLOS MELENDEZ, do hereby declare under penalty of perjury that the following is true and correct:

    1.    I am fully familiar with all matters set forth in this Declaration based on personal knowledge about the facts and matters below. I am over the age of 18 years and not laboring under any disabilities.

    2.    My name is Carlos Melendez. My date of birth is October 7, 1939. I am 83 years old.

    3.    I am a retired U.S. Army Infantry Officer with 20 years of military service. I enlisted in the U.S. Army in 1961 and was honorably discharged in 1981.

    4.    During my military service, I received the following awards and decorations, among others: (i) Distinguished Flying Cross; (ii) Air Medal with 28 Oak Leaf Clusters; (iii) Bronze Star with 3 Oak Leaf Clusters; (iv) Army Commendation Medal with 3 Oak Leaf Clusters; (iv) Joint Commendation Medal; (v) Good Conduct Medal; (vi) Combat Infantry Badge; (vii) Expert Infantry Badge; (viii) Parachute Badge, Ranger Tab; (ix) Army Aviator Badge;

(x) Senior Army Aviator Badge; (xi) National Defense Service Medal; and (xii) Vietnamese Service Medal.

5. I have several investigatory designations, including: (i) Certified Fraud Examiner; (ii) Certified International Investigator, CII; (iii) Private Investigator, Class C License #0001855, Florida; and (iv) Private Investigative Agency, Class A License #A0002225.

6. I have substantial experience with investigations and private security. I have served as an Independent Contractor Investigator for investigative agencies, corporate, insurance, and law firm clients. I have served as a security director for The Green Companies in Miami, Florida, and a security consultant for the Miami International Boat Show and several property managers in Miami, Florida.

7. I was engaged to investigate the claims and allegations made by Jane Doe in the above-captioned litigation.

8. In connection with that investigation, I conducted in-person interviews with several individuals with close affiliations with Ms. Doe, including her mother, father, sister, aunt, and cousin, as well as the ▓▓▓ of Ms. Doe's ▓▓▓▓▓▓. In addition, I conducted an in-person interview with ▓▓▓▓▓▓▓▓ the cheerleading coach identified as "Elizabeth" in the Complaint, and also interviewed several other people with knowledge of Ms. ▓▓▓ interactions with Ms. Doe, including Ms. ▓▓▓ husband, ex-boyfriend, and son. I also conducted interviews with several individuals who attended high school with Ms. Doe.

9. When I met with a witness, I was accompanied by a second investigator. These interviews lasted, in total, approximately 12 hours. In each instance that someone agreed to speak with me, I recorded the conversation, including confirming on the recording that the individual

knew he or she was being recorded, consented to it, and was speaking with me voluntarily and with no coercion or inducement.

10. While I was interviewing Ms. Doe's mother and father, Ms. Doe's mother offered to call ▮ to meet the investigators. ▮ entered the room and joined the conversation. Ms. Doe's mother informed me that ▮ Ms. Doe's mother volunteered to invite ▮ to speak to me. Ms. Doe's mother also volunteered to call and invite her other daughter over—Ms. Doe's sister—who also came over to join in the interview.

11. During the conversation, Ms. Doe's mother voluntarily showed me and my team pictures of Ms. Doe. Based on photographs I observed, Ms. Doe appeared to be of average weight and developmentally age appropriate when she was in high school, and it was unlikely that she could fit into a uniform for 8–12 year-old children at that time.

12. While I was speaking with Ms. Doe's aunt, Jeanne Christensen of Wigdor LLP was texting her, trying to put a stop to the voluntary conversation. Ms. Christensen then called the witness during the interview; at which time I heard Ms. Doe's aunt tell Ms. Christensen that she did not like Ms. Christensen's attitude and that I and my team had been "nothing but polite and very reasonable."

13. The recordings of my interviews demonstrate that one or more of the individuals I interviewed told me, in sum or substance, the following information:

- Ms. Doe, who has used a series of different names and personas, has a history of making up alternate realities, particularly when they might gain Ms. Doe attention; ▮ and invents things that "become her reality."

- ▮

- Ms. Doe lived at home throughout high school, and did not travel to Florida, New York, or the Virgin Islands during that time. While in high school, she did not travel out of town on weekends or weekdays.

3

- Ms. Doe's younger sister stated that when Ms. Doe was a senior in high school, ▇▇▇ Ms. Doe drove her sister to school nearly every day.

- Ms. Doe graduated high school on time, did not fail any classes, and did not miss school for any significant amounts of time ▇▇▇.

- Ms. Doe participated in a recreational county cheerleading program, called ▇▇▇ when she was a senior in high school—not when she was 15 or 16. The program was open to high school students, and was not restricted to children aged 8–12. The cheerleading program did not involve overnight trips.

- At the time she participated in the cheerleading program, Ms. Doe appeared to be of average weight and developmentally age appropriate. Every interviewee who knew Ms. Doe during that time period stated unequivocally that Ms. Doe could not have fit into the uniform of a 12-year-old child.

- ▇▇▇ Ms. Doe took a single trip with Ms. ▇ Ms. ▇ teenage son, and a female friend of Ms. ▇ to the Bahamas.

- For a brief period while Ms. Doe was enrolled as a freshman at ▇▇▇ at the age of 18, Ms. Doe lived with Ms. ▇ Ms. ▇ lived closer to ▇▇▇ than Plaintiff's family and so, as a favor, offered to let Plaintiff live with her while she attended college. Ms. Doe had her own bedroom while living with Ms. ▇.

- Ms. Doe was not diagnosed with either autism or Mosaic Down Syndrome during her childhood or while she lived at home throughout high school and did not display symptoms or behaviors of either condition. Instead, Ms. Doe became aware of and studied those behaviors and began intentionally displaying them in her twenties in order to present herself as a person with autism. For example, she once noted that people with autism do not look other people in the eye, and thereafter began to avoid looking people in the eye—a behavior she had never before displayed. The first time her family heard Ms. Doe claim to have Mosaic Down Syndrome was when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome and received positive support and attention. Ms. Doe has a history of seeking attention through any means available to her.

- Recently, Ms. Doe posted on social media that she had been abused by Jeffrey Epstein. She had never made such allegations before. Her family told her that they did not believe this to be true, and Ms. Doe's mother told her to delete the posts and she deleted them.

4

14. I have read this document more than once very carefully. Every statement in this document is completely truthful and accurate and I have given this declaration of my own free will.

I declare under penalty perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tamarac, Florida, on September 19, 2023.

By: _____
Carlos Melendez