# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

        *Plaintiff,*

v.

LEON BLACK,

        *Defendant.*

Case No. 1:23-cv-06418-JGLC

## DECLARATION OF CARLOS MELENDEZ

I, CARLOS MELENDEZ, do hereby declare under penalty of perjury that the following is true and correct:

1. I am fully familiar with all matters set forth in this Declaration based on personal knowledge about the facts and matters below. I am over the age of 18 years and not laboring under any disabilities.

2. My name is Carlos Melendez. My date of birth is October 7, 1939. I am 83 years old.

3. I am a retired U.S. Army Infantry Officer with 20 years of military service. I enlisted in the U.S. Army in 1961 and was honorably discharged in 1981.

4. During my military service, I received the following awards and decorations, among others: (i) Distinguished Flying Cross; (ii) Air Medal with 28 Oak Leaf Clusters; (iii) Bronze Star with 3 Oak Leaf Clusters; (iv) Army Commendation Medal with 3 Oak Leaf Clusters; (iv) Joint Commendation Medal; (v) Good Conduct Medal; (vi) Combat Infantry Badge; (vii) Expert Infantry Badge; (viii) Parachute Badge, Ranger Tab; (ix) Army Aviator Badge;

(x) Senior Army Aviator Badge; (xi) National Defense Service Medal; and (xii) Vietnamese Service Medal.

5. I have several investigatory designations, including: (i) Certified Fraud Examiner; (ii) Certified International Investigator, CII; (iii) Private Investigator, Class C License #0001855, Florida; and (iv) Private Investigative Agency, Class A License #A0002225.

6. I have substantial experience with investigations and private security. I have served as an Independent Contractor Investigator for investigative agencies, corporate, insurance, and law firm clients. I have served as a security director for The Green Companies in Miami, Florida, and a security consultant for the Miami International Boat Show and several property managers in Miami, Florida.

7. I was engaged to investigate the claims and allegations made by Jane Doe in the above-captioned litigation.

8. In connection with that investigation, I conducted in-person interviews with several individuals with close affiliations with Ms. Doe, including her mother, father, sister, aunt, and cousin, as well as the ▮▮▮ of Ms. Doe's ▮▮▮ In addition, I conducted an in-person interview with ▮▮▮ the cheerleading coach identified as "Elizabeth" in the Complaint, and also interviewed several other people with knowledge of Ms. ▮▮▮ interactions with Ms. Doe, including Ms. ▮▮▮ husband, ex-boyfriend, and son. I also conducted interviews with several individuals who attended high school with Ms. Doe.

9. When I met with a witness, I was accompanied by a second investigator. These interviews lasted, in total, approximately 12 hours. In each instance that someone agreed to speak with me, I recorded the conversation, including confirming on the recording that the individual

knew he or she was being recorded, consented to it, and was speaking with me voluntarily and with no coercion or inducement.

10. While I was interviewing Ms. Doe's mother and father, Ms. Doe's mother offered to call ████████████████████████ to meet the investigators. ██ entered the room and joined the conversation. Ms. Doe's mother informed me that ████████████ Ms. Doe's mother volunteered to invite ██ to speak to me. Ms. Doe's mother also volunteered to call and invite her other daughter over—Ms. Doe's sister—who also came over to join in the interview.

11. During the conversation, Ms. Doe's mother voluntarily showed me and my team pictures of Ms. Doe. Based on photographs I observed, Ms. Doe appeared to be of average weight and developmentally age appropriate when she was in high school, and it was unlikely that she could fit into a uniform for 8–12 year-old children at that time.

12. While I was speaking with Ms. Doe's aunt, Jeanne Christensen of Wigdor LLP was texting her, trying to put a stop to the voluntary conversation. Ms. Christensen then called the witness during the interview; at which time I heard Ms. Doe's aunt tell Ms. Christensen that she did not like Ms. Christensen's attitude and that I and my team had been "nothing but polite and very reasonable."

13. The recordings of my interviews demonstrate that one or more of the individuals I interviewed told me, in sum or substance, the following information:

- Ms. Doe, who has used a series of different names and personas, has a history of making up alternate realities, particularly when they might gain Ms. Doe attention; ████████ ████████████████████████ and invents things that "become her reality."

- ████████████████████████████████████████████

- Ms. Doe lived at home throughout high school, and did not travel to Florida, New York, or the Virgin Islands during that time. While in high school, she did not travel out of town on weekends or weekdays.

3

- Ms. Doe's younger sister stated that when Ms. Doe was a senior in high school, ▇▇▇▇ Ms. Doe drove her sister to school nearly every day.

- Ms. Doe graduated high school on time, did not fail any classes, and did not miss school for any significant amounts of time ▇▇▇▇.

- Ms. Doe participated in a recreational county cheerleading program, called ▇▇▇▇ when she was a senior in high school—not when she was 15 or 16. The program was open to high school students, and was not restricted to children aged 8–12. The cheerleading program did not involve overnight trips.

- At the time she participated in the cheerleading program, Ms. Doe appeared to be of average weight and developmentally age appropriate. Every interviewee who knew Ms. Doe during that time period stated unequivocally that Ms. Doe could not have fit into the uniform of a 12-year-old child.

- ▇▇▇▇ Ms. Doe took a single trip with Ms. ▇ Ms. ▇ teenage son, and a female friend of Ms. ▇ to the Bahamas.

- For a brief period while Ms. Doe was enrolled as a freshman at ▇▇▇▇ at the age of 18, Ms. Doe lived with Ms. ▇. Ms. ▇ lived closer to ▇▇ than Plaintiff's family and so, as a favor, offered to let Plaintiff live with her while she attended college. Ms. Doe had her own bedroom while living with Ms. ▇.

- Ms. Doe was not diagnosed with either autism or Mosaic Down Syndrome during her childhood or while she lived at home throughout high school and did not display symptoms or behaviors of either condition. Instead, Ms. Doe became aware of and studied those behaviors and began intentionally displaying them in her twenties in order to present herself as a person with autism. For example, she once noted that people with autism do not look other people in the eye, and thereafter began to avoid looking people in the eye—a behavior she had never before displayed. The first time her family heard Ms. Doe claim to have Mosaic Down Syndrome was when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome and received positive support and attention. Ms. Doe has a history of seeking attention through any means available to her.

- Recently, Ms. Doe posted on social media that she had been abused by Jeffrey Epstein. She had never made such allegations before. Her family told her that they did not believe this to be true, and Ms. Doe's mother told her to delete the posts and she deleted them.

14. I have read this document more than once very carefully. Every statement in this document is completely truthful and accurate and I have given this declaration of my own free will.

I declare under penalty perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tamarac, Florida, on September 19, 2023.

By: _____
Carlos Melendez