# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LEON D. BLACK,

Plaintiff,

v.

GUZEL GANIEVA, WIGDOR LLP, AND
JOHN DOES 1-3,

Defendants.

Index No. _____

**COMPLAINT**

Jury Trial Demanded

Plaintiff Leon D. Black, by his undersigned attorneys Quinn Emanuel Urquhart & Sullivan, LLP, and Estrich Goldin LLP[1], upon personal knowledge except where otherwise stated, alleges as follows:

<b><u>INTRODUCTION</u></b>

1.      This case arises out of the "regrettable" (his word) and consensual sexual relationship between the Plaintiff and Defendant Guzel Ganieva.  The relationship began in 2008; was sporadic; and ended when she left the country in 2014, although she continued to profess her love for Mr. Black after she left through numerous text messages and other communications to him.  Ms. Ganieva returned to the United States in 2015 and demanded $100 million, expressly threatening to disclose and distort their relationship to Mr. Black's wife and the board of the public company he ran, as well as the press, if he did not pay her this extraordinary sum.  This overt extortion was but the first step in the racketeering scheme that brings this case to federal court, a scheme that continues through today with the knowledge and cooperation of Ms. Ganieva's co-Defendants.

---

[1] Application for *Pro Hac Vice* status forthcoming.

2.      Mr. Black agreed, grudgingly, to pay.  And Ms. Ganieva in turn agreed not to make good on her threat to destroy him.  He forgave close to $1 million in loans he had given her; he pledged £2 million to help secure immigration rights in the United Kingdom for her and her son; and he agreed to pay her $100,000 every month for fifteen years, and had taken no steps to stop doing so when she decided to up the ante by gradually making good on her threat to destroy him.

3.      The Enterprise created to extort and destroy Mr. Black went public in March of 2021 when Ms. Ganieva took to Twitter for her first time to call him a sexual predator under the guise of the #MeToo movement.  In April, she repeated those charges to the *New York Post*.  In June, by then publicly represented by Defendant Wigdor LLP, she sued Mr. Black in New York Supreme Court, bringing three escalatingly salacious and fraudulent complaints that, as a result of her lawyers' fomentation, became instant press releases in the Enterprise's effort to extort even more from Mr. Black.

4.      But she faced a problem:  when she had begun extorting Mr. Black in 2015, he had recorded their conversations and saved their text messages, and he could therefore disprove her lies.  When Mr. Black responded to each complaint with contemporaneous documentary evidence showing the truth about their relationship and her extortion, she and her counsel responded by amending her complaint with even wilder allegations; by inciting scandalous and defamatory press coverage of her accusations; and even by fomenting baseless allegations to law enforcement designed to generate even more damaging press.

5.      The first complaint (the "Original Complaint")—which centered on Ms. Ganieva's allegation that Mr. Black burst into her apartment and raped her—was contradicted by her own texts, which invited Mr. Black to bring wine and tuck her in on that night, and professed her love for him the next morning.  The second complaint (the "Amended Complaint"), which alleges that

Mr. Black kidnapped her and trafficked her to Jeffrey Epstein at his Florida home for purposes of a threesome, is contradicted not only by recordings but also by flight logs: Mr. Black's plane never touched down in the State of Florida during the month he supposedly kidnapped her and took her to Epstein's house in Palm Beach. And the third complaint, which is still at the proposed stage (and which should not even be permitted to be filed), adds a host of blatantly prejudicial, irrelevant, and false allegations about Epstein, including a supposed $5,000 payment to an unnamed Jane Doe whom Mr. Black supposedly met for a massage at Epstein's house 20 years ago who—a Jane Doe who, according to Defendant Wigdor LLP, has not come forward to join Ms. Ganieva's suit because the statute of limitations has run.

6. The complaints are shams. There is no factual basis for any of these claims, which are fraudulently designed to mislead the New York State court and (more directly) to defame and bully Mr. Black into adding to the extortionate payments he already has made to prevent Ms. Ganieva from further destroying him. The Defendants here created an Enterprise to extort and cancel one of the world's most prominent business leaders. They duped and manipulated the media and the courts, using the mails and the wires, to orchestrate an assassination of Mr. Black on every level: to humiliate his family; damage his company; threaten his ability to do business; and even suggest he was guilty of a crime when they know he is not. Knowing that one way to hurt Mr. Black was to hurt him financially, they set about to do it. Knowing that to him, and in his world, reputation matters, they set about to destroy him and make him pay anything to make them stop. And they are planning to line their own pockets with the results.

7. This is not a case of simple, if sophisticated, vexatious litigation. Merely dropping a series of fantastical complaints in the court hopper—even complaints with scandalous keywords like "rape" and "Jeffrey Epstein"—would not cause the furor that these Defendants have

unleashed.  That took an Enterprise as skilled in social and mainstream media as it was in law; an Enterprise well-funded enough to take on a billionaire; an Enterprise that convinced Ms. Ganieva to forgo the $100,000 Mr. Black was paying her each month to publicly smear Mr. Black's name and squeeze even more out of him; an Enterprise that understood how the business world, and especially Mr. Black's world, worked.

8.      This is not a "he said-she said" situation.  It is not a "me too" case.  Mr. Black has said repeatedly that the relationship was "regrettable."  But Ms. Ganieva did not work for him.  He did not harass her, fire her, or condition her employment on sex.  He never promised to support her.  They went months at a time without even seeing each other.  The relationships of consenting adults outside the workplace are, by law, private matters.  Extortion is not a private matter.  Fraud is not a private matter.  And the operation of an Enterprise that unites money, litigation, and media into a machine for financial, and personal, extortion and cancellation is indeed a federal matter.

9.      The Defendants have used and abused the resources of the New York courts not to redress legitimate grievances but to try to immunize an organized campaign of fraud, extortion, and public humiliation, all aimed at the personal and financial destruction of Mr. Black and the corrupt financial gain to Ms. Ganieva and her cohorts.  Were it not for the fact that so many women have indeed been the victims and survivors of unlawful conduct, Defendants would never have been able to get the attention—and inflict the harm—that they have with accusations that are utterly fabricated.  That they have bootstrapped their fraudulent, extortionate, and defamatory claims onto the legitimate movement to protect women against true harassment and abuse is reprehensible.  Destruction by accusation—improperly pressing the justice system into service as a vehicle—does nothing to help the millions of women who continue to deal with real sexual harassment, and will find nothing in common with Ms. Ganieva or her co-conspirators.

10.     This is not the work of one woman.  Ms. Ganieva needed her lawyers to file the phony complaints, packaging the lies as pleadings in an attempt to protect them from defamation claims, and abusing the attorney client privilege to hide the work they did together to invent these stories and conceal her earlier extortion of Mr. Black.  She and Wigdor LLP, in turn, needed the professional services of experienced public relations agents—in the vernacular, top level "Flacks"—to draft the Tweets with the right hashtags, and to make sure that the lies were then sold to the media, the right reporters were recruited, the right interviews were set up, the right calls were made, and the right materials were distributed to inflict the maximum amount of damage and extort the maximum amount of money from Mr. Black.  And somewhere lurks a Funder, someone who can go head-to-head with a billionaire on what he must know is the kind of litigation that Mr. Black will fight with all of his resources; someone who is willing to cover costs (a question Ms. Ganieva and Wigdor LLP have pointedly refused to address), and even to compensate Ms. Ganieva herself for the millions she might still be receiving had she not joined forces with the other Defendants to try to get even more from Mr. Black—or destroy him in the process.

11.     This Enterprise understands exactly how to put maximum pressure upon a man in Mr. Black's position.  A CEO with supposed "ethical issues"—however baseless—is presumed to be a liability.  Today, the personal behavior of business leaders is under such a spotlight that even the specter of any such problems—especially when those fires are fanned by unethical actors— has irreparable personal and professional consequences.  Here, those consequences included, by the Enterprise's design, severe damage to the reputation and stock price of Mr. Black's company— Apollo—and with it, Mr. Black's substantial personal holdings in Apollo.  Indeed, after the filing of just one of Defendants' complaints, Apollo's stock price dropped almost 10%, and it continued to lag behind its peers in the ensuing weeks and months.  The point is not that accusations will

drive Mr. Black out of business, but that even someone as successful as Mr. Black has been hurt financially and continues to be.

12.     RICO was passed by Congress in 1970 because, as Attorney General Robert Kennedy had warned before his death, of the special danger posed when formal and informal groups agree to work together to do wrong.  Groups are more likely to succeed, and to escalate, and to do more harm than an individual can acting alone.  A group such as this one, which uses the courts as the unwitting vehicle for fraud, extortion, and old-fashioned character assassination, lawyers as its architects, and the media as the mouthpieces, obstructs the working of the very system we depend upon to do justice.

13.     One of the earliest decisions interpreting RICO rejected the argument that it should apply only to what is traditionally thought of as "organized crime."  RICO is not limited by formal structure, and not restricted to groups that are themselves unlawful.  While adopting a broad definition of RICO in this respect, courts have been equally careful to restrict the civil RICO prohibitions so as not to turn every wrong into a federal case.  But the courts in this Circuit have specifically rejected the argument, which the Defendants are sure to make here as well, that the Court "adopt a bright-line rule that mail and wire fraud committed in the course of litigation . . . cannot, as a matter of law, constitute predicate acts for RICO purposes. . . .  [T]he Second Circuit and courts in this district have allowed RICO claims to proceed where the alleged predicate acts involved litigation activities."  *Mayfield v. Asta Funding Inc.*, 95 F. Supp. 3d 685, 698 (S.D.N.Y. 2015) (Preska, J.); *see also U.S. v. Eisen*, 974 F.2d 246, 253–54 (2d Cir. 1992); *Sykes v. Mel S. Harris & Assocs. LLC*, 757 F. Supp. 2d 413, 425 (S.D.N.Y.2010).  Had Ms. Ganieva and Wigdor LLP done no more than legitimate litigation activity, had they not joined forces with the Flacks and Funder, had their goal been to redress grievances in the court of law rather than to cancel an

individual—harming his family, his foundation, his company, and his career—and to threaten even more in an effort to extort more money, they just would have failed. But this Enterprise operated not to increase the chance of success *in* court, but to increase the pressure to pay, to brand the target, and to convict and punish him before any proceedings at all on the merits.

14.     The Enterprise was comprised of Client, Firm, Flacks, and Funder. They worked together. They committed extortion and fraud. They knew and they helped—that is, they aided and abetted and hoped to profit. They waged war on multiple fronts and had multiple goals— among them, to get more money through extortion or a fraudulently induced litigation award; to destroy the reputation of Mr. Black and his business; to undermine his career; to interfere with his business relationships; and to raise concerns about his leadership of the company he created and nurtured for the last thirty years. And, although they could not put him out of business, as happens to some executives who find themselves the subject of complaints, they could make it more difficult and more expensive, even for him. No one is immune, one more reason such conduct should not be allowed. Enterprises like this one are dangers. They will, if allowed, drag the courts down as well, undermining the respect which is the primary means by which the rule of law is enforced.

15.     Ms. Ganieva's reemergence in March 2021 was carefully orchestrated by the Enterprise. Upon information and belief, one or more of the Defendants actively marketed the story of Mr. Black's payments to Jeffrey Epstein, first reported by the *New York Times* in October 2020. Although the payments were made for estate planning and tax advice in connection with Mr. Black's family office, and a later investigation would confirm that Mr. Black had nothing to do with the misconduct Epstein had been engaging in behind the scenes, there was a literal explosion of publicity, the likes of which generally requires (as here) expert coordination.

Hundreds of stories were written, many of them, upon information and belief, at the instigation of members of the Enterprise, in the hopes that they would be read and relied upon by those in the industry—if not as evidence of a fire, at least as proof that Mr. Black was engulfed in smoke.

16.     Mr. Black responded by inviting the independent directors of Apollo to retain counsel to investigate him, knowing they would find no wrongdoing.  That counsel's report, the Dechert Report, found no wrongdoing.  The Defendants ignored the report's conclusions, contacting reporters to foment public speculation about who should replace Mr. Black.

17.     Ms. Ganieva's reemergence on Twitter shortly thereafter was equally professionally orchestrated.  A woman who had never tweeted, before or since, suddenly took to Twitter with three clearly recruited media-industry followers and three carefully crafted tweets. The tweets, detailed below, complete with the appropriate attention-getting hashtags, identified Mr. Black and his company, and associated Ms. Ganieva with the "#MeToo" movement.  When the tweets did not themselves generate further publicity, notwithstanding the best efforts of the Flacks, an interview was arranged for Ms. Ganieva with the New York Post.  On information and belief, that interview, the Twitter account, and the tweets themselves were arranged, written, and/or or approved by the Defendants, including Wigdor LLP and the Flacks, who then recruited additional Twitter followers for Ms. Ganieva and arranged for her tweets to be publicized, including eventually on Wigdor LLP's website.

18.     Notably, Wigdor LLP deployed an entirely new playbook to handle this case, one that is flatly at odds with its handling of its other cases.  Seemingly without fail, Wigdor LLP takes cases on contingency, signs protective orders where appropriate to obtain information from its accused targets, and resolves most of its cases without so much as filing an initial complaint. Wigdor LLP's clients have their greatest leverage—and Wigdor LLP has its biggest profit

margins—when the firm can quietly trade away claims whose embarrassment potential is usually far greater than their legal force. This time, taking on a client who had already won a pot of gold, Wigdor LLP refused to sign a routine protective order which would have immediately led to the production of evidence proving to the firm what it must have known (that Ms. Ganieva's allegations in the complaints were squarely contradicted by tape recordings, texts, and other evidence of the true nature of her relationship with and eventual extortion of Mr. Black). Wigdor LLP knew that Ms. Ganieva was extorting Mr. Black—or, at minimum, was willfully blind to that fact—but nevertheless insisted on aggressively pursuing a campaign of public destruction against him.

19.     What is to stop such abuse of the system? Lawyers. Ethics. And the rule of law. Under these protections, defendants cannot immunize their criminal enterprise, including from RICO, by cloaking their predicate acts as litigation activities. That is why this is a RICO case brought in a federal court with the power to enforce the federal laws. "RICO is to be read broadly" and should "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985) (quotation marks and citation omitted). While the extortion and fraudulent pursuit of Mr. Black may not look like a traditional RICO case, machines like this Enterprise, which operate in secret, across state lines, invisibly wreaking havoc unique to our cultural and technological times, are a more modern tool of destruction with even greater potential to disrupt our economy and our social mores than the racketeers of old.

20.     The litigation privilege is just that: a privilege, not an absolute right, which does not apply if—as here—it is abused. It does not apply to sham complaints. It does not apply where lawyers or reporters act in bad faith in making or repeating those claims. Complaints must be investigated and must be the product of due diligence; otherwise we, as lawyers, join the unlawful

enterprise or even worse, are responsible for creating it.  Where the legitimacy of the judicial process is at issue, where reputations can be destroyed because the kinds of charges that were overlooked for too long can now permanently damn a person, guilty or not, if allowed to fester, the litigation privilege does not confer a right to defraud the system.

21.     The New York Supreme Court has yet even to decide whether to accept Ms. Ganieva's most recent pleading, but the court of public opinion has been operating at full throttle for the last year.  Mr. Black, for most of that time, operated on the (sadly naïve) assumption that having been generous, albeit foolish, having obeyed the law, having kept his family office entirely separate from Apollo, having literally invited the sort of independent investigation of himself that most CEOs avoid at all costs, he had nothing to fear.  He was wrong.  Mr. Black will ultimately be vindicated in the courts.  In the meantime, however, Mr. Black is being publicly attacked with the imprimatur of a well-known law firm and the New York Supreme Court in a way that goes directly to his humanity.  Of course he must fight back.  This complaint, which primarily rests on RICO but also asserts claims under state defamation and other laws, is how Ms. Ganieva, Wigdor LLP, the Flacks, and the Funder will be held accountable for their vicious, ongoing scheme.

**PARTIES**

22.     Plaintiff Leon Black resides in New York County, in the State of New York.

23.     Upon information and belief, Defendant Guzel Ganieva is a Russian national.  She currently resides in New York County, in the State of New York.

24.     Upon information and belief, Defendant Wigdor LLP maintains its principal place of business in New York County, in the State of New York.

25.     Upon information and belief, Defendants John Doe 1 and 2 (the "Flacks") are public relations and social media professionals whose role in the Enterprise was to craft, market, and magnify the personal and professional attacks aimed at Mr. Black.  Upon information and

belief, John Doe 1 and John Doe 2 were recruited and/or paid by John Doe 3 to participate in the Enterprise and perpetuate a campaign of lies aimed at extorting Mr. Black.

26. Upon information and belief, Defendant John Doe 3 (the "Funder") is covering some or all of the costs, including the cost(s) for the Flack(s), litigation costs, and the compensation that Ms. Ganieva would have received had she simply continued to do nothing and collect $100,000 per month as the reward for her extortion.

27. Upon information and belief, it was the Funder who recruited the Flacks and paid them; and it was the Funder who provided the needed assurance to Ms. Ganieva and Wigdor LLP before they went public with her fraudulent state court complaints and public statements.

28. Collectively, Ms. Ganieva, Wigdor LLP, John Does 1–3, and such others as shall be disclosed or discovered, shall be referred to as the Defendants or the Enterprise.

29. Mr. Black is one of the most successful financiers in the world, the youngest child in a family known for its philanthropy, accomplishments in business, and contributions to the arts. He is a graduate of Dartmouth College and Harvard Business School.

30. In 1990, he founded what would become Apollo Global Management just shy of his 39th birthday, with a number of former colleagues from Drexel Burnham Lambert. Apollo went public on the New York Stock Exchange in 2011.

31. Mr. Black has been as driven in his personal philanthropy as he has been in his financial efforts, determined to play a positive role in the community. He spent ten years on the Board of Trustees at Dartmouth. A year ago, he was the Chairman of the Board of the Museum of Modern Art ("MoMA") and one of its most generous supporters. At the outset of the pandemic, Mr. Black and his family funded $20 million for the Healthcare Heroes campaign, providing meals for front-line workers at the hundreds of hospitals around the five boroughs of New York City.

32.     Mr. Black and his wife also co-founded, some 14 years ago, the Melanoma Research Alliance, the largest private funder of melanoma research worldwide.  Melanoma is the most deadly form of skin cancer, the fastest-growing cancer in the world, and a cancer that had been, for too many, a hopeless diagnosis.  The Melanoma Research Alliance has directly invested more than $131 million to advance cutting edge research into immunotherapy for melanoma. Through that funding, the Melanoma Research Alliance has supported clinical trials and patent applications, leading to more than 13 new FDA-approved therapeutic approaches for melanoma.

33.     Mr. Black has long prided himself on his reputation, personal and professional, and with good reason.  He enjoyed the respect of his peers in the business world, in the arts community, at his alma mater, and among Jewish leaders.  All that changed in the last year as he faced a never ending and ever consistent barrage of unsupported and unsupportable charges orchestrated by the Defendants, and felt hamstrung in his ability to defend himself.  He had no wish to become engaged in a public battle, and no interest in attacking the reputation of a woman he tried to be kind to. That is why, notwithstanding all his reservations about caving to unlawful threats, he fell victim to extortion.  But not to have his reputation, his life's work, his philanthropy and his family tossed on the trash heap.  Those things that matter more than money are what is now at stake.

## JURISDICTION AND VENUE

34.     Venue is proper in the District under 28 U.S.C. § 1391(b)(2) as a substantial number of the events giving rise to this action occurred in this District.

35.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and under 18 U.S.C. § 1964.  This suit is seeking monetary damages in excess of $75,000.

## FACTUAL ALLEGATIONS

**Ms. Ganieva Successfully Extorts Mr. Black:  "I'm Dying to Talk to Press About It..."**

36.     The relationship between Ms. Ganieva and Mr. Black began at a party both attended in 2008, continued sporadically—while Mr. Black rented a luxurious apartment for Ms. Ganieva on the Upper East Side, he never had the keys to that apartment, and came only when invited—and ended when Ms. Ganieva left the country in July 2014.  She told Mr. Black at the time that she was leaving the country for immigration-related reasons.

37.     From the time she left New York in July 2014, up until she returned in June 2015, Ms. Ganieva continued to send text messages to Mr. Black telling him that she missed him and loved him.  On June 8, 2015, however, the tone changed, and Ms. Ganieva sent a much more formal note insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important."  Based on statements later made by Ms. Ganieva to Mr. Black, this sudden shift appears to have coincided with her failure to gain legal status in the United Kingdom.

38.     The two met in person on June 24, 2015 for the first of a number of times.  Ms. Ganieva warned Mr. Black that if he did not pay her $100 million, she would go public with their affair.  As Ms. Ganieva put it during a later meeting, "*the more, the longer I wait, the more sure I become that I actually, I prefer to go public*," and "*I'm dying to talk to press about it.*"  Ms. Ganieva made her demands clear:  "*I will not agree to anything less than $100 million.*"

39.     Understanding that he was being extorted, either by Ms. Ganieva acting alone or in concert with others, Mr. Black consulted attorneys, including criminal defense counsel, and thereafter recorded their conversations.   Asked (on tape) to explain her sudden demands, Ms. Ganieva claimed that the $100 million was justified based on a news report she saw about a woman who had been fired after sleeping with her boss four times and had received $18 million.

Of course, Mr. Black was not her boss, nor was he her husband, nor has even Ms. Ganieva been able to manufacture evidence of an agreement to support her for life. Ms. Ganieva also claimed that various prominent people—from international philanthropist Len Blavatnik to former New York Mayor Michael Bloomberg to ailing publisher and developer Mort Zuckerman—were following or harassing her at Mr. Black's direction, musings that she herself called "paranoid." But never once in these conversations, laced as they were by extravagant fantasies of victimhood, did Ms. Ganieva ever so much as suggest that Mr. Black had physically or sexually assaulted her.

40. At a lunch meeting at the Four Seasons restaurant in New York on October 19, 2015, Mr. Black and Ms. Ganieva finalized the terms they had discussed, including payments by Mr. Black to Ms. Ganieva of $100,000 monthly for 15 years, and forgiveness of approximately $1,000,000 in loans. Mr. Black also agreed that he would provide £2,000,000 for Ms. Ganieva to use toward obtaining legal status in the United Kingdom. In exchange, Ms. Ganieva agreed not to disclose their relationship to anyone, and she agreed to release all claims against Mr. Black relating to their relationship. This agreement was memorialized during that October 19, 2015 meeting in a one-page release and confidentiality agreement (the "Agreement").[2]

41. For the next five and a half years, Mr. Black paid the ransom for his privacy and deposited $100,000 each month in Ms. Ganieva's account, without her objection.

**Ms. Ganieva Reconsiders Her Agreement And Attempts To Extort Mr. Black Even More.**

42. On October 15, 2019, Ms. Ganieva texted Mr. Black out of the blue regarding the Agreement. On October 16, 2019, she followed up with a threatening message falsely accusing

---

[2] In contrast to Ms. Ganieva's claims that she did not understand the agreement she signed with Mr. Black, the recording from that day shows that Ms. Ganieva—a graduate of Columbia University—carefully read the agreement and discussed it with Mr. Black for 12 minutes before signing. She in fact negotiated with Mr. Black, demanding £2,000,000 instead of the £1,500,000 he offered. And, of course, she *accepted* the fruits of her bargain with Mr. Black for years.

Mr. Black of "sexually harrass[ing]" her, "sex traffick[ing]" her, "rap[ing]" her, "blacklist[ing]" her, and "forc[ing] [her] to sign" the Agreement "under duress" without permitting her to read it. Mr. Black ignored these messages, which were plainly intended to intimidate and extort him into providing Ms. Ganieva additional consideration beyond the $100,000 per month that he was already paying her.

43.     On March 6, 2020, attorneys representing Ms. Ganieva (different from Wigdor LLP) sent a letter to Mr. Black stating that they had been retained "to investigate certain matters related to [Mr. Black's] prior interactions with [Ms. Ganieva]" and requested copies of the Agreement.   On information and belief, this letter was sent in order to demand additional consideration from Mr. Black in exchange for Ms. Ganieva not publicizing her affair with Mr. Black and her false allegations against Mr. Black.  Mr. Black did not respond to the letter.

**Ms. Ganieva Takes to Twitter. For One Day. With Three Followers.**

44.     Mr. Black's rejection of her veiled efforts to reopen her extortion negotiation apparently did not sit well with Ms. Ganieva.  By early 2021, she had a perfect opportunity to turn up the pressure on Mr. Black, who was at that time the focus of scrutiny for his business relationship with Jeffrey Epstein.  Upon information and belief, members of her current Enterprise had planted the seeds in the press and elsewhere to connect Mr. Black to Epstein in order to harm his personal and business reputation.  With Ms. Ganieva, they would have yet another weapon with which to go after him.

45.     Specifically, in October of 2020, the New York Times for the first time tied Mr. Black to Epstein, who he had paid for tax advice.  While Mr. Black is among the wealthiest men to be associated with Epstein, he has not been accused or sued by any of the Epstein plaintiffs (a sign that the plaintiffs' bar, at least, does not believe Mr. Black to have been involved in Mr. Epstein's illegal conduct).  What followed was not only hundreds of negative articles (Mr. Black

is well known in the business community, but he is hardly a household name), but also "concerned" investor calls and even a round of calls and stories carefully planted on the subject of who would replace Mr. Black, all orchestrated by the John Doe Defendants, before Ms. Ganieva was brought out on Twitter with her accusations.

46.     Pointedly referring to Mr. Black as "Apollo Global Management's CEO and Chairman, Leon Black," and including the hashtags #MeToo and #LeonBlack, Ms. Ganieva tweeted (i) that she had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, I was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women."  All of these tweets were posted on March 17, 2021.

47.     The Enterprise knew that these statements, coupled with the particular hashtags, would trigger the scrutiny of Mr. Black's team, and even if they did not, Ms. Ganieva's three followers would understand their meaning.  How could they not?  Those three followers were all reporters who covered the #MeToo movement and Apollo, and had been recruited by the Enterprise to follow Ms. Ganieva in advance of her explosive tweets.

48.     The Enterprise surely hoped that at least one of the three followers they had recruited would follow up with a story repeating the false charges—even if they were totally unsupported and inconsistent with Ms. Ganieva's own conduct.  When the reporters all passed on what was clearly *not* a true story, an interview was arranged for Ms. Ganieva with the one reporter they knew, based on his past reporting, would not pass.  He did not.  An interview with Ms. Ganieva was published in the *New York Post* on April 8, 2021, including her claim that "Black's abuse 'was over a long period of time and it was tragic.'"  Josh Kosman, *Leon Black's surprise*

*Apollo Global exit came amid sexual harassment allegation*, N.Y. POST (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/.

49. In response, Mr. Black, concerned that the story would not only damage him and his family but also the company he spent 30 years building, admitted his mistake to a reporter for the business publication, Bloomberg: "I foolishly had a consensual affair with Ms. Ganieva that ended more than seven years ago" adding that her allegations were "completely fabricated"; and "I have been extorted by Ms. Ganieva for many years and I made substantial monetary payments to her . . . ." Gillian Tan, *Leon Black says he paid to hide affair, denies it led to Apollo exit*, BLOOMBERG NEWS NETWORK (Apr. 8, 2021), https://www.bnnbloomberg.ca/leon-black-says-he-paid-to-hide-affair-denies-it-led-to-apollo-exit-1.1588031.

**The Original Complaint: An Alleged Sexual Assault.**

50. On June 1, 2021, Ms. Ganieva and Wigdor LLP filed the first of three escalatingly salacious (and wildly different) complaints in New York Supreme Court, New York County. (Ex 1, June 1, 2021 Complaint.) The Original Complaint asserted four claims: two for defamation based on Mr. Black's public statement rebutting her defamatory tweets; a claim for intentional infliction of emotional distress based on abuse Mr. Black supposedly heaped on her during the duration of their affair; and a claim under the New York City Gender Motivated Violence Act based on a purported sexual assault, the centerpiece of the Original Complaint. (*Id.* ¶¶ 91-130.)

51. The assault supposedly took place on July 6, 2014, when the Original Complaint alleges that Mr. Black "barged" into Ms. Ganieva's apartment "suddenly" and without warning. (*Id.* ¶ 47.) This event followed a text from Ms. Ganieva to Mr. Black a week earlier, on June 28, in which she appealed to him, "Baby... I'm all alone. Let's get together soon. I miss you. Xoxo." (Ex. 2, Answer ¶ 49.) In her Original Complaint, Ms. Ganieva claimed that after sending this text, she then became unwell: "[i]n the days leading up to the July 4, 2014 weekend, Ms. Ganieva

became sick and was home for a number of days unable to go to the store or cook for herself." (Ex. 1, Compl. ¶ 47.) She claimed that she was "limp and unable to move" when Black came "barg[ing] in." (*Id.* ¶¶ 47, 51.)

52. According to Wigdor LLP partner, Jeanne Christensen, on the Wigdor LLP website, "[t]his case is the epitome of why #MeToo exists." But the central allegation of the Original Complaint, the alleged July 6, 2014 rape, was the very antithesis of the #MeToo movement. It was complete fiction—a fraud filed with the New York Supreme Court designed to humiliate Mr. Black and extort him into paying even more shakedown money than Ms. Ganieva had already extorted from him.

53. A false accusation of criminal wrongdoing generally amounts to defamation, and may also give rise to claims for mental and emotional distress. False accusations *may* be subject to the litigation privilege if made in the course of litigation brought and prosecuted in good faith, or in statements made about judicial proceedings. *But there is nothing magical about packaging lies in a court filing.* A "sham pleading"—a sham complaint, or answer, or other statement about litigation—does not protect the lies it contains from being actionable. Under the sham pleading doctrine, a defamation claim may lie based on claims made in litigation "where the underlying lawsuit was a sham action brought solely to defame the defendant." *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 638 (1st Dep't 2015); *see Williams v. Williams*, 23 N.Y.2d 592, 596 (1969). A defamation claim based on the sham pleading doctrine is actionable against both the plaintiff in the underlying lawsuit and their attorneys. *See, e.g.*, *Flomenhaft*, 127 A.D.3d at 634, 639; *Halperin v. Salvan*, 117 A.D.2d 546 (1st Dep't 1986).

**The Truth: "This is Love."**

54. Mr. Black responded to the Original Complaint with an Answer filed on July 19, 2021. The Answer contradicted the Original Complaint's claims with Ms. Ganieva's own words.

A week before the supposed assault, on June 28, Ms. Ganieva sent the text suggesting she and Mr. Black should get together "soon." Then, on July 6, *the very day of the supposed assault*, it was Ms. Ganieva who wrote to Mr. Black, unsolicited: "*This is love. I need you.*" (Ex. 2, Answer ¶ 49 (emphasis added).)

55.     In response, Mr. Black said that he would be driving back to New York City the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" (*Id.*) She not only agreed. She asked for wine. "Aaah. Can you please bring a bottle of wine if you can?" (*Id.*) He agreed, as she knew he would. And he arrived earlier, at her invitation.

56.     Ms. Ganieva reached out to Mr. Black first thing the next morning with a message of thanks and love: "*Good morning. It was very nice to see you last night. I already feel better..... I love you and thank you!!! Xoxoxoxoxo and more love.*" (*Id.* ¶ 52 (emphasis added).) And on July 9, she thanked Mr. Black again, asked if he wanted to get together, and sent "lots of love." (*Id.* ¶ 53.) When Mr. Black did not respond, Ms. Ganieva reached out yet again the next day to try again to get together. (*Id.*)

57.     Contrary to the claim in the Original Complaint that "[a]fter this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black" (Ex. 1, Compl. ¶ 55), Ms. Ganieva and Mr. Black saw each other several times, at *her* request, between July 6, when Mr. Black supposedly raped her, and July 30, when she texted him from the plane as she was departing: "I love you and miss you already" (Ex. 2, Answer ¶ 58). Mr. Black's Answer—entirely corroborated by contemporaneous text messages—showed the fraudulent allegation of sexual assault to be a sham.

58.     Ms. Ganieva's defamation claims are no less of a sham. Truth is an absolute defense to defamation. The extortion was captured on tape. Ms. Ganieva repeatedly warned that

if Mr. Black did not pay her the money she demanded, she would report their affair to Mr. Black's wife, the board of his company, and the press.  This is, of course, the very definition of extortion.

59.     Ms. Ganieva has alleged that she was threatened by Mr. Black, that he forced her to agree to the extortion against him.  Her Original Complaint offers supposed direct quotations from Mr. Black in this regard:  "**If you do not take the money, I will put you in prison**" and "**If you do not take the money, I will destroy your life.**"  (Ex. 1, Compl.¶ 3 (emphasis in original); *see also id.* ¶ 63.)  Mr. Black never said anything of the sort.  Here and elsewhere, Defendants' pleadings liberally and seemingly randomly placed quotation marks around certain words, turns of phrase, and full sentences, as though they were verbatim quotes but without even bothering to craft any context for when or where they were alleged stated.  They were simply never said.

60.     And, again, Ms. Ganieva's recorded contemporaneous statements tell the real story about how she viewed her extorted agreement with Mr. Black.  After concluding their final in-person discussion about the terms of her shakedown, Ms. Ganieva spent approximately 45 minutes finishing her lunch, sharing a Grand Marnier soufflé with Mr. Black, discussing her investment and travel plans, and laughing about the fact that she was "a woman of means now."  (Ex. 2, Answer ¶ 40.)  Shortly after their meeting, she texted him: "[t]hank you for everything. Talk soon xoxo."  (*Id*. ¶ 41.)

**The Amended Complaint: "Finding Jeffrey Epstein."**

61.     While the Original Complaint clocked in at 90 paragraphs, Defendants' Amended Complaint ballooned to some 244 paragraphs—an additional 154 new paragraphs of never-before-seen material focused largely on Jeffrey Epstein.  None of these new allegations arose from anything that happened after the filing of the Original Complaint.  Had there been even the slightest kernel of truth to any of them—which there is not—they logically would have appeared in the Original Complaint.  And there is no reason, legally speaking, for their inclusion at any point.  The

newfound allegations regarding Epstein appear nowhere in any of the actual Causes of Action asserted in any iteration of the complaint. They are part of the extortion campaign, not any litigation effort.

62. For the Amended Complaint, Ms. Ganieva suddenly remembered being kidnapped by Mr. Black in 2008, flown against her will to Palm Beach, Florida on Mr. Black's private plane, taken to Epstein's home there, and coerced into a meeting with Epstein, Mr. Black, and one of Epstein's alleged associates, Sarah Kellen, for the purpose of gratifying Mr. Epstein's sexual desire. (Ex. 3 , Am. Compl. ¶¶ 75-108.) During that meeting, Ms. Kellen supposedly told Ms. Ganieva that Epstein and Mr. Black were "sex addicts," among other lurid, gratuitous, and inflammatory things. (*Id.* ¶ 97.)

63. Although the Amended Complaint contains boldfaced, block-text quotations supposedly from Ms. Kellen, it identifies no documentation, recordings, or other memorialization of the alleged conversation between Ms. Ganieva and Ms. Kellen some 13 years ago. (*Id.*) On information and belief, Ms. Kellen will testify at the appropriate time that she took part in no such meeting, and had no such conversation.

**The Truth: "Jeffrey Who?"**

64. In his Answer to the Amended Complaint (Ex. 4), Mr. Black used flight manifests to establish that Mr. Black and Ms. Ganieva never took the six-hour trip to Florida in October 2008 that is described in the Amended Complaint. In fact, they never flew to Florida together at any point that entire year.

65. Moreover, the contemporaneous recordings of Mr. Black and Ms. Ganieva from the summer of 2015, shortly after she began extorting him, call into question the Amended Complaint's allegation that Ganieva *ever even met* Epstein, let alone that their meeting was the

result of a kidnapping by Mr. Black—which certainly explains his late appearance as the centerpiece of this case.

66.     At one point during a recorded conversation, Ms. Ganieva brought up Epstein's name in the context of one of the convoluted conspiracy theories she accused Mr. Black of orchestrating against her.  Mr. Black questioned whether Ms. Ganieva had ever even met Epstein. In response to that question, Ms. Ganieva initially told Mr. Black that she had never met Epstein and mentioned *nothing* about Mr. Black's supposed kidnapping of Ms. Ganieva to take her to Epstein's house for a threesome, as she later alleged in her Amended Complaint.

67.     The Amended Complaint also made abhorrent accusations that Mr. Black subjected Ms. Ganieva to yet additional sexual assaults and abuse, that he threatened to plant heroin on her, and that he threatened to manufacture evidence against her and even kill her if she did not do his bidding.  *None of* these terrible accusations were even alluded to in the Original Complaint, much less stated outright.  And none of the alleged "facts" underlying these purported grievances were unknown or unknowable to Defendants when the Original Complaint was filed.  The obvious explanation for their debut in the Amended Complaint is that Defendants, after realizing that the central rape and coercion allegations in the Original Complaint had been completely debunked by unrebuttable evidence, felt they had no choice but to double down and come up with yet a new slate of scandalous, headline-grabbing accounts in order to keep their extortion scheme alive.

**The Proposed Second Amended Complaint Doubles Down Again.**

68.     After being confronted yet again with Ms. Ganieva's own words, this time in Mr. Black's second Answer, Defendants moved to amend the complaint once again on September 20,

2021.[3]   Defendants' proposed Second Amended Complaint (Ex. 5) reached a new low for fraudulent pleading.   In it, they offered outrageous allegations, including a story involving Mr. Black, Epstein, and an anonymous Jane Doe.   With zero connection to Ms. Ganieva's claims, Defendants alleged that Mr. Black sexually assaulted this anonymous woman at Mr. Epstein's home and then provided her $5,000.   In 2001.

69.   Defendants cannot credibly claim that this unfounded, isolated, and distinct alleged incident somehow proves a pattern of bad behavior that supports Ms. Ganieva's accusations. Regardless, these events have absolutely nothing in common with one another—an alleged single encounter between strangers versus a multi-year affair; a supposed payoff of $5,000 20 years ago versus more than $9,000,000 in payments until just last March; an unknown Jane Doe versus a woman sending her love—are being used not to prove anything, but to smear someone and again escalate the Enterprise's extortionate threats.   Like everything else Ms. Ganieva has alleged, the allegations about Jane Doe are a fabrication.

70.   Defendants also added yet another completely gratuitous new section to their proposed Second Amended Complaint called "Other Evidence of Black's Close Ties to Epstein's Private Conduct."   These allegations have *nothing* to do with Ms. Ganieva, nor do they have anything to do with the tax and estate advice for which Mr. Black hired Epstein.

71.   Defendants included an image of a document that purports to show that someone requested someone named "Leon's" telephone number from Epstein.   Not Leon who? Not Leon why?   Inclusion in the Epstein rolodex hardly appears, in retrospect, a mark of exclusivity. Mr. Black invited Apollo's independent directors to investigate his relationship with Epstein

---

[3] Mr. Black reserves all rights with respect to the proposed Second Amended Complaint, including but not limited to opposing the motion for leave to amend, or seeking sanctions based upon its filing.

because he knew they would find no wrongdoing. And that is precisely what happened. After reviewing over 60,000 documents, the report by the independent Dechert firm absolved Mr. Black of any wrongdoing in connection with Jeffrey Epstein.

**Ms. Ganieva and Wigdor LLP Deliberately Stall.**

72.     Nothing material happened in the state case until September 27, 2021 when an in-person conference was called because Mr. Black's lawyers were simply being ignored. They wrote letters. No one answered. They asked for phone calls. No luck. Discovery deadlines came and went. Nothing. Fights about nothing—the signing of a boilerplate protective order—have become excuses by Wigdor LLP to block discovery. Meanwhile, more and more stories, full of unverified, untrue, and scurrilous character assassination, are being spread in the mainstream and social media by the Enterprise.

73.     Ms. Ganieva's determination to avoid confronting the weaknesses in her own case is understandable; they are no surprise to her. But it is hardly typical conduct for a plaintiffs' firm (especially one allegedly acting on contingency), confronted with its own clients' texts and recordings directly and explicitly contradicting the claims included by counsel in a complaint, to decline the opportunity to review the transcripts, to listen to the tapes, to find out if their client's claims are bogus. There is only one conclusion: they already know the answer and do not care.

74.     There are myriad examples of Wigdor LLP litigating Ms. Ganieva's state court case in a manner designed to maximize its extortionate impact while stalling the actual litigation of her claims. One stark illustration is how they have refused to enter into a reasonable standard protective order as a pretext for receiving the evidence disproving her claims. Wigdor LLP attempts to justify this willful blindness by claiming that the firm *never* signs Protective Orders to govern the disclosure of sensitive materials, claiming that this is something "*which Wigdor LLP does not do*." Except that it does. *See, e.g.*, Stipulation and Order, *Kafenbaum v. Soulcycle Inc.*,

20-cv-06315 (AT) (OTW) (S.D.N.Y. Apr. 21, 2021); Stipulation and Order, *Chase v. Reed Smith LLP*, 20-CV-06121 (JPO) (S.D.N.Y. Jan. 28, 2021); Stipulation and Order for the Production and Exchange of Confidential Information, *Mann v. MLB Advanced Media, L.P.*, 651503/2018 (Sup. Ct. N.Y. County Aug. 23, 2018); Stipulation and Order for the Production and Exchange of Confidential Information, *Town Total Holdings v. Conte*, 656194/2016 (Sup. Ct. N.Y. County Apr. 10, 2017).

**The Enterprise Abuses The Criminal Justice Process.**

75.     Ms. Ganieva is guilty of a crime.  She extorted Mr. Black.  And Mr. Black, as he has publicly stated, reported this crime to the New York County District Attorney's Office.  He has cooperated fully with that office in every respect.

76.     The Enterprise has taken a different approach.  Ms. Ganieva and the lawyers have apparently made false reports of criminal conduct by Mr. Black to government prosecutors, and the Flacks have coopted members of the press to publicize a criminal investigation that they alone fomented.

77.     In particular, on October 25, 2021, a reporter from *Vanity Fair*—Gabriel Sherman—contacted representatives for Mr. Black asking them if they would like to comment on a story that that magazine was planning to publish imminently on the existence of a supposed criminal investigation by the Manhattan District Attorney regarding accusations of rape and sexual assault by Mr. Black.  There was, as an aside, nothing surprising about the fact that Mr. Sherman, of all journalists, was the one pushing this "story."  On information and belief, he has long been working on a screenplay about Epstein, and had previously published stories in *Vanity Fair* grossly distorting the connection between Epstein and Mr. Black.

78. In any event, Wigdor LLP and the Flacks knew they had a willing mouthpiece in Mr. Sherman and took full advantage by feeding him distorted information concerning Ms. Ganieva's self-serving complaint to the Manhattan District Attorney concerning Mr. Black.

79. Anyone, of course, can make a complaint, whether it has any factual basis or not. In Ms. Ganieva's case, if she did register a complaint against Mr. Black, it was, like the rest of her allegations, a fraudulent concoction designed to escalate the pressure of her extortion campaign. The timing alone of the purported complaint raises serious questions about its bona fides. Ms. Ganieva alleges she was raped several years ago. She made her tweets about Mr. Black some seven months ago. And she filed her lawsuit against Mr. Black nearly five months ago. Why did she not make her criminal complaint (and leak it to the press) at any of those other points in time? The answer is that she, her lawyers, and others working in concert with her did so only when their backs were up against a wall in Ms. Ganieva's lawsuit against Mr. Black, sending them on a hunt for a new line of fraudulent attack against Mr. Black.

80. Indeed, Defendants knew that the truth here did not matter. They understood that the Manhattan District Attorney as a matter of policy was obligated to look into any complaint alleging sex crimes regardless of whether the complaint was true, much less whether it ended up leading to charges or a conviction. And, they surely understood that, if contacted by the press, the Manhattan District Attorney's Office would not comment on whether there was an investigation ongoing—which is in fact what happened when the article came out. This, of course, gave *Vanity Fair* and Mr. Sherman cover, at least in their perception, to say in their article, published only a matter of hours after Mr. Sherman had reached out to Mr. Black's representatives purportedly seeking comment on a supposed investigation Mr. Black knew nothing about, that unspecified "sources say" such an investigation was occurring.

81.     Needless to say, no other details on this alleged investigation were reported in Mr. Sherman's article—fomented by Defendants themselves—presumably because Defendants told Mr. Sherman only that they had made a complaint on behalf of Ms. Ganieva and that the Manhattan District Attorney's Office was required to look into it.  That was all the fodder they needed, and, once published, the article—with its mere pretense of criminal wrongdoing by Mr. Black—did the rest of their dirty work for them.

82.     In short, while still resisting legitimate discovery in the underlying action and once again confronted with the fact that their allegations had been disproven before most discovery had even begun, Defendants pressed the prosecutor's office into their service and then conspired with a reporter who did no honest diligence into the story Defendants spoon-fed him.

                              *          *          *

83.     It is not a sham to bring a lawsuit in good faith, even if it ultimately is not possible to prove liability by a preponderance of the evidence.  That has been true in the context of sexual assault, and women have been blamed, and victimized, by a system that visited upon the women victims of sexual assault a level of distrust and skepticism to make it all but impossible to convict appropriate men—powerful men, husbands, bosses—of wrongdoing in appropriate cases.

84.     #MeToo was, in the view of many, including members of prominent juries, long overdue.  A correction was needed, and the statistics suggest it still is.  But in the process, of course, there is a danger that juries—the real ones—will continue to make mistakes at both extremes.  The recognition that we have too long overlooked sexual assault and harassment can also lead to a tendency to reach conclusions too quickly, in particular to be too quick to credit accounts that are not well founded.  And here, what makes Defendants' conduct so reprehensible is that they have attempted to capitalize and profit from these tendencies—and subverted the

#MeToo movement—to extort Mr. Black and convict him in the court of public opinion long before a court of law will exonerate him.

85.     This is not a case at the edge, a borderline fact pattern, a maybe yes or maybe no. The consensual sexual relationship ended years ago; this has been a financial arrangement, a criminal one celebrated over Grand Marnier soufflé at the Four Seasons by a woman who toasted her newly and unlawfully acquired wealth, and then—for reasons known only to her and her co-conspirators—publicly renounced it on Twitter, then in the *New York Post*, and then in a series of fraudulent court filings and related public statements designed to show Mr. Black that $100,000 per month was no longer enough to prevent her from making good on her extortionate threats.

86.     Had there been physical abuse, harassment, or neglect, that would be the law's business.    Instead, here, what is the law's business was blackmail, extortion, and fraud. Ms. Ganieva was caught red handed.    And there is no way her co-Defendants did not know this before picking up and continuing her extortionate and fraudulent scheme.    Ms. Ganieva has already profited from her extortion, and she and Wigdor LLP hope to increase these ill-gotten gains by extorting Mr. Black through their escalating campaign of fraudulent litigation and publicity.    The Flacks are being paid for their participation, knowing that the statements they are pushing are fraudulent.    And the Funder is bankrolling and facilitating all of this to assist Ms. Ganieva to extort even more money from Mr. Black while gratuitously destroying his reputation in the process.

**FIRST CAUSE OF ACTION**

**<u>Civil RICO, 18 U.S.C. § 1962(c)</u>**

**(Against All Defendants)**

87.     Mr. Black incorporates all of the above allegations as if they were fully stated here.

88.     Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 ("Section 1962").

89.     Ms. Ganieva, Wigdor LLP, the Flacks, and the Funder, together, comprise an associated-in-fact Enterprise.

90.     Ms. Ganieva, Wigdor LLP, the Flacks, and the Funder are also all persons within the meaning of 18 U.S.C. § 1961(3) and separate from the Enterprise.

91.     Ms. Ganieva was a willing and critical participant in the racketeering scheme.  Ms. Ganieva encouraged and enabled the Enterprise by, among other things:

a.  threatening to reveal her affair with Mr. Black to his family and the public if Mr. Black did not pay her money;

b.  threatening to make false allegations to the public that Mr. Black abused and harassed her if Mr. Black did not pay her money;

c.  accepting from Mr. Black (i) a £2 million payment, (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively, and (iii) monthly payments of $100,000 from October 2015 through March 2021, in exchange for not revealing her affair with Mr. Black to his family and the public and not making false allegations of abuse or harassment to the public;

d.  attempting to extort and fraudulently induce Mr. Black into providing additional consideration by sending Black a threatening text message on October 16, 2019, in which she falsely accused him of "sexually harrass[ing]" her, "sex traffick[ing]" her, "rap[ing]" her, "blacklist[ing]" her, and "forc[ing] [her] to sign" the Agreement "under duress" without permitting her to read it;

29

e.  causing lawyers other than Wigdor LLP to send a letter to Mr. Black on March 6, 2020 regarding the Release and Confidentiality Agreement, on information and belief, in order to demand additional consideration from Mr. Black in exchange for not publicizing her affair with Mr. Black and false allegations against Mr. Black;

f.  making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely posting on Twitter on March 17, 2021 that she was "sexually harassed and abused by [Mr. Black] for years," that "[i]t started in 2008 when [she] met with [Mr. Black] to discuss work," that she "refused [Mr. Black's] sexual advances," that Mr. Black "bullied, manipulated, threatened, and coerced" her, that Mr. Black "forced [her] to sign an NDA in 2015," and that Mr. Black engaged in "predatory behavior";

g.  making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely stating in an interview with the *New York Post* that Mr. Black had "abuse[d]" her "over a long period of time and it was tragic," which statements were published in an April 8, 2021 news article. Josh Kosman, *Leon Black's surprise Apollo Global exit came amid sexual harassment allegation*, N.Y. POST (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/;

h.  making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by causing Wigdor LLP to file a complaint seeking damages on her behalf on June 1, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

i.   making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by causing Wigdor LLP to file an Amended Complaint seeking damages on her behalf on August 9, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

j.   making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by causing Wigdor LLP to file a Proposed Second Amended Complaint seeking damages on her behalf on September 20, 2021 in which she publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

k.   making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by, on information and belief, causing the Flacks to disseminate the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and

l.   making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by, on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

92.   Wigdor LLP was a willing and critical participant in the racketeering scheme. Wigdor LLP encouraged and enabled the Enterprise by, among other things:

a.  making good on Ms. Ganieva's extortionate threats, of which Wigdor LLP had knowledge or to which Wigdor LLP was willfully blind, and assisting Ms. Ganieva in her attempt to extort and fraudulently induce Mr. Black into providing additional consideration by filing a complaint seeking damages on Ms. Ganieva's behalf on June 1, 2021, which publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

b.  ignoring recordings and other evidence quoted in Mr. Black's Answer, dated July 19, 2021, demonstrating Ms. Ganieva's scheme of extortion and fraudulent inducement of payments and contradicting the false allegations in the Original Complaint;

c.  refusing invitations by Mr. Black's counsel to review, pursuant to a standard protective order, recordings and other evidence of Ms. Ganieva's scheme of extortion and fraudulent inducement of payments or that otherwise contradicts the false allegations in the Original Complaint;

d.  making good on Ms. Ganieva's extortionate threats, of which Wigdor LLP had knowledge from Mr. Black's Answer, and assisting Ms. Ganieva in her attempt to extort and fraudulently induce Mr. Black into providing additional consideration by filing an Amended Complaint seeking damages on Ms. Ganieva's behalf on August 9, 2021, which publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

e.  ignoring recordings and other evidence quoted in Black's Amended Answer and Affirmative Defenses, dated September 8, 2021, demonstrating Ms. Ganieva's scheme of extortion and fraudulent inducement of payments and contradicting the false allegations in the Amended Complaint;

f.  refusing invitations by Mr. Black's counsel to review, pursuant to a standard protective order, recordings and other evidence of Ms. Ganieva's scheme of extortion and fraudulent inducement of payments or that otherwise contradicts the false allegations in the Amended Complaint;

g.  making good on Ms. Ganieva's extortionate threats, of which Wigdor had knowledge from Mr. Black's Answer and Amended Answer and Affirmative Defenses, and assisting Ms. Ganieva in her attempt to extort and fraudulently induce Mr. Black into providing additional consideration by filing a Proposed Second Amended Complaint seeking damages on Ms. Ganieva's behalf on September 20, 2021, which publicized her affair with Mr. Black and falsely accused Mr. Black of abuse, harassment, and sexual assault, among other outrageous and false accusations;

h.  making good on Ms. Ganieva's extortionate threats and assisting Ms. Ganieva in her attempt to extort and fraudulently induce Mr. Black into providing additional consideration by, on information and belief, causing the Flacks to disseminate the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations;

    i.   making good on Ms. Ganieva's extortionate threats and assisting Ms. Ganieva in her attempt to extort and fraudulently induce Mr. Black into providing additional consideration by, on information and belief, assisting Ms. Ganieva in making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her and causing the Flacks to tell the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black; and

    j.   on information and belief, accepting payments and/or promises to pay from the Funder as consideration for Wigdor LLP's representation of Ms. Ganieva in *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021) and Wigdor LLP's filing and public dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein.

93.    The Flacks were willing and critical participants in the racketeering scheme. The Flacks encouraged and enabled the Enterprise by, among other things:

    a.   on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely posting on Twitter on March 17, 2021 that she was "sexually harassed and abused by [Mr. Black] for years," that "[i]t started in 2008 when [she] met with [Mr. Black] to discuss work," that she "refused [Mr. Black's] sexual advances," that Mr. Black "bullied, manipulated, threatened, and coerced" her, that Mr. Black "forced [her] to sign an NDA in 2015," and that Mr. Black engaged in "predatory behavior";

b. on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by falsely stating in an interview with the *New York Post* that Mr. Black had "abuse[d]" her "over a long period of time and it was tragic," which statements were published in an April 8, 2021 news article. Josh Kosman, *Leon Black's surprise Apollo Global exit came amid sexual harassment allegation*, N.Y. POST (Apr. 8, 2021), https://nypost.com/2021/04/08/leon-black-accused-of-sexual-harassment/;

c. on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations;

d. on information and belief, assisting Ms. Ganieva in making good on her extortionate threats and attempting to extort and fraudulently induce Mr. Black into providing additional consideration by telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black; and

e. on information and belief, accepting payments and/or promises to pay from the Funder as consideration for the Flacks' dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media.

94.     The Funder was a willing and critical participant in the racketeering scheme.  The Funder encouraged and enabled the Enterprise by, among other things:

    a.  on information and belief, providing payments and/or promises to pay to Wigdor LLP as consideration for Wigdor LLP's representation of Ms. Ganieva in *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021) and Wigdor LLP's filing and public dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein; and

    b.  on information and belief, providing payments and/or promises to pay to the Flacks as consideration for the Flacks' dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media.

95.     Defendants' scienter is established by the pattern of intentional and knowing material misrepresentations described above.

96.     Defendants committed extortion, in violation of both federal and state law, including, without limitation, violations of the Hobbs Act, 18 U.S.C. § 1951.

    a.  **Ms. Ganieva**.  Ms. Ganieva threatened to publicize her affair with Mr. Black and make false allegations to the public that he harassed or abused her.  Ms. Ganieva engaged in this unlawful conduct with the intent to extort money from Mr. Black; if Mr. Black did not pay money to Ms. Ganieva, she would carry out her threat to cause substantial financial, reputational, and emotional damage to Mr. Black.  Ms. Ganieva exploited Mr. Black's fear of economic, reputational, and emotional harm, by causing Mr. Black to make payments to Ms. Ganieva or risk exposing himself to such harm.

b. As a result of her extortionate threats, Ms. Ganieva accepted from Mr. Black (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021. Some of the monthly payments were made and accepted through interstate and international wires. Each acceptance of such payments by Ms. Ganieva constituted a predicate act within the meaning of RICO.

c. Ms. Ganieva then made good on her extortionate threats and attempted to extort Mr. Black into providing additional consideration by: (i) making the false posts on Twitter, described above; (ii) making false statements to the New York Post, described above; (iii) causing the filing and dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages, and the false allegations contained therein; and (iv) on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

d. **Wigdor LLP**. Wigdor LLP assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by: (i) filing the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages on Ms. Ganieva's behalf; (ii) on information and belief, causing the Flacks to disseminate the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (iii) on information and belief, assisting Ms.

Ganieva in making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her and causing the Flacks to tell the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

e. **The Flacks**.  The Flacks assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by: (i) on information and belief, assisting Ms. Ganieva in making the false posts on Twitter, described above; (ii) on information and belief, assisting Ms. Ganieva in making false statements to the New York Post, described above; (iii) on information and belief, disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (iv) on information and belief, telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

f. **The Funder**.  The Funder assisted Ms. Ganieva in making good on her extortionate threats and attempting to extort Mr. Black into providing additional consideration by: (i) on information and belief, providing payments and/or promises to pay to Wigdor LLP as consideration for Wigdor LLP's representation of Ms. Ganieva in *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021) and Wigdor LLP's filing and public dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages and the false allegations therein; and (ii) on information and belief, providing payments and/or promises to pay to the Flacks as consideration for the Flacks' dissemination

of the Original Complaint, the Amended Complaint, and the Proposed Second
Amended Complaint and the false allegations therein to members of the media.

97. Defendants committed mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

a. **Ms. Ganieva**. Ms. Ganieva used interstate and international mails and wires to
obtain money from Mr. Black under fraudulent pretenses. Ms. Ganieva threatened
to publicize her affair with Mr. Black and make false allegations to the public that
he harassed or abused her. Ms. Ganieva engaged in this unlawful conduct with the
intent to obtain money from Mr. Black under fraudulent pretenses; if Mr. Black did
not pay money to Ms. Ganieva, she would carry out her threat to unlawfully cause
substantial financial, reputational, and emotional damage to Mr. Black.

b. As a result of her threats, Ms. Ganieva accepted from Mr. Black under fraudulent
pretenses (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that
had been accruing interest at 5% per annum for two and four years, respectively;
and (iii) monthly payments of $100,000 from October 2015 through March 2021.
Some of the monthly payments were made and accepted through interstate and
international wires. Each acceptance of such payments by Ms. Ganieva constituted
a predicate act within the meaning of RICO.

c. Ms. Ganieva then made good on her threats and attempted to induce Mr. Black into
providing additional payments under fraudulent pretenses through interstate mails
and/or wires by: (i) making the false posts on Twitter, described above; (ii) making
false statements to the New York Post, described above; (iii) causing the filing and
dissemination of the Original Complaint, the Amended Complaint, and the
Proposed Second Amended Complaint seeking damages, and the false allegations

contained therein; and (iv) on information and belief, making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her.

d. **Wigdor LLP**. Wigdor LLP assisted Ms. Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) filing the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages on Ms. Ganieva's behalf; (ii) on information and belief, causing the Flacks to disseminate the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (iii) on information and belief, assisting Ms. Ganieva in making a false report to the Manhattan District Attorney's Office that Mr. Black sexually assaulted her and causing the Flacks to tell the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

e. **The Flacks**. The Flacks assisted Ms. Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) on information and belief, assisting Ms. Ganieva in making the false posts on Twitter, described above; (ii) on information and belief, assisting Ms. Ganieva in making false statements to the New York Post, described above; (iii) on information and belief, disseminating the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media in an effort to publicize those allegations; and (iv) on information and belief,

telling the press that the Manhattan District Attorney's Office had opened a criminal investigation into Mr. Black.

f. **The Funder**. The Funder assisted Ms. Ganieva in making good on her threats and attempting to induce Mr. Black into providing additional payments under fraudulent pretenses through interstate mails and/or wires by: (i) on information and belief, providing payments and/or promises to pay to Wigdor LLP as consideration for Wigdor LLP's representation of Ms. Ganieva in *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021) and Wigdor's filing and public dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint seeking damages and the false allegations therein; and (ii) on information and belief, providing payments and/or promises to pay to the Flacks as consideration for the Flacks' dissemination of the Original Complaint, the Amended Complaint, and the Proposed Second Amended Complaint and the false allegations therein to members of the media.

98.    The racketeering acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of common goals, including to extort and fraudulently induce Mr. Black into providing payments to prevent or stop the spread of false and outrageous allegations against him; (b) used similar methods to perpetrate the frauds, including making and making good on threats to spread false and outrageous allegations against Mr. Black; (c) had similar participants; and (d) had the same victim.

99.    Defendants' racketeering acts were a regular way of conducting their ongoing business regarding Mr. Black and of conducting or participating in the ongoing RICO enterprise. The racketeering acts were sufficiently continuous to form a pattern of racketeering activity.

100.     Defendants' racketeering acts pose a threat of continuing criminal activity. *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct., N.Y. Cty. 2021) remains an active case, and, upon information and belief, Defendants will continue to make and disseminate filings containing false and outrageous accusations regarding Mr. Black.  The media likewise continues to publish articles regarding Ms. Ganieva's litigation and the false accusations she has made against Mr. Black.  *See, e.g.*, Gabriel Sherman, *Billionaire Leon Black is Being Investigated by the Manhattan D.A., Sources Say*, VANITY FAIR (Oct. 25, 2021), https://www.vanityfair.com/news/2021/10/billionaire-leon-black-is-being-investigated-by-the-manhattan-da.  There is no end in sight to Defendants' multi-faceted and multi-purposed scheme to enrich themselves and destroy Mr. Black's reputation and financial condition.

101.     Mr. Black has been injured in business or property as a result of Defendants' racketeering scheme.  For example, Defendants' fraudulent and extortionate conduct caused Mr. Black to suffer damages insofar as he provided Ms. Ganieva (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021.  Mr. Black likewise has incurred substantial costs defending against Defendants' sham lawsuits and media campaign.

102.     As a result of Defendants' violations of 18 U.S.C. § 1962(c), Mr. Black is entitled to treble damages, plus interest, costs, and attorneys' fees

### SECOND CAUSE OF ACTION

### <u>Civil RICO Conspiracy, 18 U.S.C. § 1962(d)</u>

### (Against All Defendants)

103.     Mr. Black incorporates all of the above allegations as if they were fully stated here.

104.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

105.    The frauds that were perpetrated, and the continuance of this scheme, could not have occurred without the consent and knowing connivance of Defendants together.

106.    As part of and in furtherance of their conspiracy, Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each of Defendants' actions are attributable to the other.

107.    No Defendant has withdrawn, or otherwise disassociated itself, from the conspiracy at issue or the other conspirators.

108.    Mr. Black has been injured in business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).  For example, Defendants' fraudulent and extortionate conduct caused Mr. Black to suffer damages insofar as he provided Ms. Ganieva (i) a £2 million payment; (ii) forgiveness of two loans of $480,000 that had been accruing interest at 5% per annum for two and four years, respectively; and (iii) monthly payments of $100,000 from October 2015 through March 2021.  Mr. Black likewise has incurred substantial costs defending against Defendants' sham lawsuits and media campaign.

109.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Mr. Black is entitled to treble damages, plus interest, costs, and attorneys' fees.

## THIRD CAUSE OF ACTION

## Defamation *Per Se*

## (Against All Defendants)

110.    Mr. Black incorporates all of the above allegations as if they were fully stated here.

111.    Ms. Ganieva publicly accused Mr. Black of sexual harassing and abusing her for years on Twitter, knowing that those accusations were false, with the intent to cause Mr. Black severe reputational, professional, and economic harm.

112.    Aware of Ms. Ganieva's lies, John Doe 1 and 2 pushed stories and articles to promote her lies, including setting up an interview with the New York Post.  In that interview, Ms. Ganieva claimed that Mr. Black abused her "over a long period of time and it was tragic."  These continued lies that Mr. Black sexually abused Ms. Ganieva were made to cause Mr. Black reputational, professional, and economic harm.

113.    Wigdor LLP's pleadings (actual and proposed) filed on behalf of Ms. Ganieva were shams.  Wigdor LLP and Ms. Ganieva knew that the pleadings had no basis in fact and included in them defamatory and libelous statements about Mr. Black that were made (i) without any good faith basis, (ii) without conducting anything akin to a remotely adequate investigation (if any investigation was done at all), (iii) in direct defiance and conscious disregard of contemporaneous documentary evidence, (iv) in bad faith and with malice, and (v) with the sole purpose of causing Mr. Black severe reputational, professional, and economic harm.

114.    Wigdor LLP filed those complaints on behalf of Ms. Ganieva and in coordination with the John Does not because they had a good faith basis to reasonably believe that their client had any passably legitimate claim for redress, but because they wanted to publicize and disseminate lurid, scandalous and calumnious accusations about Mr. Black.

115.    With each pleading, Wigdor LLP and John Does 1 and 2 communicated the filing and substance of that filing to the press.  On information and belief, John Doe 3 funded and actively encouraged these actions.

116.    Defendants are in no way entitled to any protections, immunities or privileges with respect to the allegations in their complaints because those filings were made exclusively for the purpose of attempting to cloak the allegations in them with the appearance of such protections, immunities, or privileges.

117.    In addition, the allegations in the complaints were not in any way made in furtherance of any bona fide litigation objective.

118.    The allegations in all three iterations of the complaint are written defamatory and libelous statements of purported fact concerning Mr. Black, and were and are utterly false, as conclusively shown by contemporaneous documentary evidence that Wigdor LLP has never even meaningfully attempted to obtain, much less rebut.

119.    The allegations in the complaints amount to defamation and libel *per se* under the law as they are direct attacks on Mr. Black's professional and personal reputation, and thus damages are presumed.

120.    The allegations in the complaints amount to defamation and libel *per se* under the law as they allege that Mr. Black committed serious crimes, including sexual assault, and thus damages are presumed.

121.    The defamatory statements in Defendants' pleadings include, but are not limited to, that Mr. Black raped Ms. Ganieva, that Mr. Black "sexually harassed and abused" Ms. Ganieva "for years"; that Mr. Black "bullied, manipulated, threatened, and coerced" Ms. Ganieva; that Mr. Black kidnapped her and flew her to Epstein's home for purported sex trafficking; that Mr. Black

previously raped an unidentified woman that he met through Epstein; that Mr. Black is a "sadist" and a "sex addict"; and that Mr. Black threatened Ms. Ganieva to sign the NDA, saying "If you do not take the money, I will put you in prison" and "If you do not take the money, I will destroy your life."

122.    Defendants' statements to the public and the press also amount to defamation and libel *per se* under the law as they allege that Mr. Black committed serious crimes, including sexual assault, and thus damages are presumed.  These allegations include, but are not limited to, Ms. Ganieva's tweets accusing Mr. Black of "sexually harass[ing] and abus[ing]" her; Ms. Ganieva's statements to the New York Post that Mr. Black abused her "over a long period of time and it was tragic"; Ms. Christensen's statement branding Mr. Black as a "sexual predator[]" and inviting prosecutors to "go after" him, invoking the "#MeToo" movement; Ms. Christensen's participation in telephone interviews with news organizations, including a statement to Forbes accusing Mr. Black of "heinous conduct" towards Ganieva and of "intimidating" her; and allegations that Mr. Black raped a Jane Doe twenty years ago.

123.    The allegations in the pleadings were published without privilege or authorization to a third party.

124.    In publishing those defamatory and libelous allegations, and repeating those lies to the press and the public, the Defendants wrongfully and willfully intended by such publication to injure Mr. Black's personal and business reputation.

125.    At the time Defendants uttered and caused to be published the defamatory and libelous matter set out above, Defendants acted with actual malice because they knew the allegations in the pleadings were false or, in the alternative, they failed to take any reasonable steps

to ascertain the accuracy of the allegations and instead published them with reckless or grossly negligent disregard for whether they were true or not.

126.   As a direct result of the foregoing defamatory and libelous statements, in Defendants' sham pleadings and to the press, Mr. Black has suffered injury to his personal and business reputation.

127.   In addition, because of the wanton, willful, and malicious nature of the foregoing wrongful conduct, Mr. Black is also entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (Against Ms. Ganieva)

128.   Mr. Black incorporates all of the above allegations as if they were fully stated here.

129.   Mr. Black and Ms. Ganieva entered into a contract on October 19, 2015.

130.   The contract consists of a one page document entitled "Release and Confidentiality Agreement" that was signed by Ms. Ganieva.

131.   Under the agreement, Mr. Black agreed to forgive two loans of $480,000 that he had made to Ms. Ganieva that had been accruing interest at 5% per annum for two and four years, respectively; make a simultaneous payment to Ms. Ganieva of $100,000; and to provide Ms. Ganieva with "other consideration," which Mr. Black and Ms. Ganieva agreed that day would consist of £2 million to secure Ms. Ganieva a United Kingdom visa, as well as payments of $100,000 a month for fifteen years.

132.   In exchange, Ms. Ganieva agreed to release Mr. Black from "all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement,

contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

133.    Ms. Ganieva further agreed "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Mr. Black], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Mr. Black] in connection with the signing of this Agreement and (iii) any other matters that could damage [Mr. Black's] career, reputation and relationship with others."

134.    Before signing the contract, Ms. Ganieva read the document for as long as she wanted.  She asked questions about its terms, which Mr. Black answered.  And she negotiated the amount of money she would receive from Mr. Black.

135.    Mr. Black faithfully performed under the agreement for more than five years, from October 2015 through March 2021.

136.    On March 17, 2021, Ms. Ganieva failed to perform under the contract by publicly tweeting that Mr. Black had "sexually harassed and abused" her for years and that she "was forced to sign an NDA in 2015."

137.    Ms. Ganieva has thereafter breached the agreement on numerous occasions, including by making or authorizing the statements and legal claims in the court filings and press statements pleaded herein.

138.    By breaching their agreement, Ms. Ganieva caused Mr. Black damages.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

### (Against Ms. Ganieva)

139. Mr. Black incorporates all of the above allegations as if they were fully stated here.

140. Pursuant to the agreement, Mr. Black paid Ms. Ganieva $9,251,084.00 from October 2015 through March 2021.

141. Ms. Ganieva was enriched by these payments, at Mr. Black's expense.

142. Ms. Ganieva willfully broke the terms of the agreement, depriving Mr. Black of what he had bargained for—that is, Ms. Ganieva's silence as to their affair and the resolution of their agreement.

143. It is against equity and good conscience for Ms. Ganieva to be allowed to keep the money she extorted from Mr. Black after breaking the terms of their agreement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Leon D. Black hereby requests judgment against Defendants Guzel Ganieva, Wigdor, LLP, John Doe 1, and John Doe 2 as follows:

a) Enter judgment on the claims in Mr. Black's favor;

b) Award Mr. Black damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Black for all monetary and/or economic damages;

c) Award Mr. Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus prejudgment interest;

d)      Award punitive damages for the Defendants' gross wanton, malicious, and outrageous misconduct in an amount to be determined at trial;

e)      Award Mr. Black treble damages;

f)      Award attorneys' fees, costs, and disbursements incurred as a result of this action; and

g)      Award such other, further, and different relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Mr. Black demands a jury trial for all claims and issues in this action that are triable as a matter of right to a jury.

Dated: New York, New York
        October 28, 2021

By:  _/s/ John B. Quinn_____
     John B. Quinn
     QUINN EMANUEL URQUHART & SULLIVAN,
        LLP
     865 S. Figueroa St., 10th Floor
     Los Angeles, CA 90017
     (213) 443-3200
     johnquinn@quinnemanuel.com

     Michael B. Carlinsky
     Jennifer J. Barrett
     Ryan A. Rakower
     QUINN EMANUEL URQUHART & SULLIVAN,
        LLP
     51 Madison Avenue, 22nd Floor
     New York, NY 10010
     (212) 849-7000
     michaelcarlinsky@quinnemanuel.com
     jenniferbarrett@quinnemanuel.com
     ryanrakower@quinnemanuel.com

     Susan Estrich (*pro hac vice* forthcoming)
     ESTRICH GOLDIN LLP
     699 W Exposition Boulevard
     Los Angeles, CA 90089
     (212) 399-2132
     susan@estrichgoldin.com

     *Attorneys for Plaintiff Leon Black*