# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEON D. BLACK,

                                    Plaintiff,

            -v-

GUZEL GANIEVA, *et al.*,

                                    Defendants.

21 Civ. 8824 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves motions to dismiss the First Amended Complaint ("FAC") of plaintiff Leon Black.

Black brings claims against (1) Guzel Ganieva, with whom he had been in a lengthy extramarital relationship and who in 2021 sued Black in New York State Supreme Court; (2) Wigdor LLP, Ganieva's counsel in the state court litigation; (3) Josh Harris, a former co-worker and alleged rival of Black's at the investment management firm Apollo Global Management ("Apollo"); and (4) Steven Rubenstein, a public relations executive. Black brings substantive and conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against Ganieva, Harris, and Rubenstein (the "RICO defendants"); defamation claims against all defendants; and breach of contract and unjust enrichment claims against Ganieva.

All defendants have moved to dismiss. For the following reasons, the Court grants the motions to dismiss the RICO claims, the sole basis for federal jurisdiction. The Court declines to exercise supplemental jurisdiction over the FAC's remaining state-law claims, and therefore dismisses these, without prejudice to Black's right to pursue them in state court.

## I.    Background[1]

The following background is pertinent to the motions to dismiss.  Because the RICO claims center on Ganieva's state-court lawsuit, which Black's FAC portrays as the work of a cabal constituting a RICO enterprise and aimed at damaging him, the Court recounts that lawsuit at length.

### A.    The Parties

Black is a financier and Apollo's founder.  FAC ¶ 1.  In 2008, he began an extramarital relationship with Ganieva, which continued, on and off, through 2014.  *Id.* ¶¶ 2, 32.  In the years following 2014, Black paid or agreed to pay Ganieva several million dollars.  *Id.* ¶ 2.

Ganieva is a Russian national who lives in New York.  *Id.* ¶ 25.

Wigdor LLP ("Wigdor") is a law firm based in New York.  *Id.* ¶ 26.

Harris, a Florida resident, was a business partner of Black's who began working with him in the 1980s and later was designated a co-founder of Apollo.  *Id.* ¶¶ 3, 27.

Rubenstein, a New York resident, is president of an eponymous public relations firm.  *Id.* ¶ 28.  At all relevant times, the firm did work for Apollo, although Rubenstein himself, allegedly, separately schemed against Black.  *Id.*

---

[1] These facts are drawn from the FAC and the exhibits attached thereto.  *See* Dkt. 46 ("FAC"). For the purpose of resolving the motions to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court takes judicial notice of documents attached to, integral to, or referred to in the FAC, including the filings in Ganieva's state court action against Black.  Dkts. 46-1 ("State Compl."); 46-2 ("Ans."); 46-3 ("State FAC"); 46-4 ("FAC Ans."); 45-5 ("State SAC").  *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).

**B.  Ganieva's State-Court Lawsuit Against Black**

**1.  Ganieva's Complaint and Black's Answer**

On June 1, 2021, Ganieva filed suit in New York State Supreme Court in Manhattan against Black. *Id.* ¶ 72; State Compl.; *Ganieva v. Black*, Index No. 155262/2021 ("State Dkt."), Dkt. 1.  Her Complaint recounted Black and Ganieva's relationship, its deterioration—punctuated by an alleged violent sexual assault—and Black's coercion of Ganieva to conceal their relationship.  Its claims of defamation and intentional infliction of emotional distress ("IIED") were largely based on Black's public statements about Ganieva.  Its claims of gender-motivated violence were based on an alleged rape of Ganieva by Black.

According to Ganieva's Complaint, in March 2008, Black and Ganieva, then working as a model, met at an event for International Women's Day.  State Compl. ¶ 20.  Black began taking Ganieva out to dinner and courted her, including arranging professional opportunities.  *Id.* ¶¶ 21, 23.

Soon after the relationship began, and continuing for several years, Black allegedly "forced sadistic sexual acts on [Ganieva]."  *Id.* ¶ 26; *see id.* ¶¶ 27–28.  Ganieva "would tell Black to never speak to her or contact her again," but Black would "induce her to meet him again," including by promising to be her mentor, support her child, fund a movie, purchase a townhouse and convert it into a museum that she could run, and help with her application to Harvard Business School.  *Id.* ¶¶ 29–30.  Throughout, Black "engaged in textbook harasser behavior."  *Id.* ¶ 31.

In 2011, Ganieva's Complaint alleged, she began coursework towards an undergraduate degree in math, as part of an effort to distance herself from Black—which also included cutting off most of her hair to make herself less attractive.  *Id.* ¶¶ 32–33.  On June 2, 2011, Ganieva and Black agreed that he would loan her $480,000 over five years at a 5% interest rate.  *See id.* ¶¶

35–37. On May 24, 2013, they agreed to another, identical loan. *See id.* ¶ 39. These loans were Black's way of "excusing himself" from the harm he had inflicted on Ganieva. *Id.* ¶ 40. Ganieva's Complaint also alleged that Black told Ganieva: "If you do not take the money, I will put you in prison" and, "If you do not take the money, I will destroy your life." *Id.* ¶ 3 (emphasis omitted).

In May 2014, after Ganieva graduated, she accepted Black's offer to help her find a job in finance. *Id.* ¶¶ 41, 43. But, Ganieva's Complaint alleged, none of the interviews Black arranged "were meant to be legitimate"; they were "part of Black's sick plan to make her feel grateful to him . . . [and] allow him to belittle and humiliate her after each job rejection." *Id.* ¶ 42. After several rejections, Black told Ganieva that "he is the 'only one' who can help her escape her 'miserable life.'" *Id.* ¶ 46.

On July 6, 2014, Ganieva's Complaint alleged, Black sexually assaulted Ganieva while she was "in a weakened state, having been sick for almost a week." *Id.* ¶ 49; *see id.* ¶¶ 47–54. Ganieva then "took her son and left New York." *Id.* ¶ 55. Ganieva still felt threatened by Black, who would call her to tell her he knew where she had recently been, with whom she had been, and what she had been wearing. *Id.* ¶ 56.

In 2015, Ganieva's Complaint alleged, she asked to meet with Black in New York City. The loan from 2011 was coming due, and she "wanted to know what she could do to be able to live her life without his continued involvement." *Id.* ¶ 58. On October 18, 2015, the two met. Ganieva signed an agreement that forgave her loans but which she later learned contained a non-disclosure agreement. She did not receive a copy of the document and is unsure as to its terms. *Id.* ¶¶ 64–66, 71. From then until April 2021, Ganieva received regular payments from Black.

4

*Id.* ¶ 72. During this period, Ganieva unsuccessfully asked Black for a copy of what she signed on October 18, 2015. *Id.* ¶ 74.

On October 15 and 16, 2019, Ganieva's Complaint alleged, she texted Black to ask again for a copy of the agreement, while accusing him of sexual harassment, sex trafficking, rape, and blacklisting. *See id.*

On February 18 and March 6, 2020, Ganieva's then-counsel (not Wigdor) sent Black letters seeking a copy of the agreement. *Id.* ¶ 75.

On October 29, 2020, during an Apollo earnings call, Black allegedly stated that there had never been any allegations that he "engaged in any wrongdoing, because [he] did not." *Id.* ¶¶ 6, 77 (emphasis omitted). That statement, Ganieva's Complaint alleged, was a "tipping point" for her. Having begun law school, it alleged, Ganieva had a better understanding of her rights and wanted to hold Black accountable. *Id.* ¶ 7.

On March 17, 2021, Ganieva publicly tweeted that Black was a "predator" who had "sexually harassed and abused" her for years. *Id.* ¶ 9. The following day, Ganieva's Complaint alleged, Black texted Ganieva and told her to call him immediately. She refused. *Id.*

On April 8, 2021, an article quoted Black as describing his relationship with Ganieva as consensual. It termed fabricated Ganieva's allegations that he had engaged in harassment or inappropriate behavior. It alleged that Ganieva had extorted him and that, to spare his family embarrassment, he had paid her to deter her from going public about their relationship. *Id.* ¶¶ 1–2, 82. Ganieva's Complaint alleged that Black's statement was knowingly false and made with malice, and that Black caused it to be published with reckless disregard for the truth. *Id.* ¶¶ 84–86. It further alleged that Black's false and defamatory statements caused her emotional distress. *Id.* ¶¶ 88–90.

Ganieva's Complaint brought claims—all under state law—of defamation, defamation *per se*, IIED, and gender-motivated violence in violation of the New York City Gender Motivated Violence Act ("GMVA"), N.Y.C. Admin Code § 8-901 *et seq.*

On July 19, 2021, Black filed an answer. Among other things, it quoted text exchanges between him and Ganieva. These, the answer asserted, revealed a consensual relationship, and refuted Ganieva's claims of assault and unlawful threats. *See* FAC ¶¶ 75–88; Ans.; State Dkt. 4.

### 2.    Ganieva's First Amended Complaint and Black's Answer

On August 9, 2021, Ganieva filed a First Amended Complaint ("State FAC") in New York state court. It added a claim of retaliation under the GMVA. *See* FAC ¶¶ 82–84; State FAC ¶¶ 245–89; State Dkt. 26. It also added three new sets of allegations.

First, it alleged "violent sexual acts" by Black against Ganieva. As publicly filed in state court (and in this litigation), those allegations are heavily redacted. The publicly unredacted allegations claimed that Black intentionally caused Ganieva pain, that he sought to keep confidential his "abnormal and atypical sexual needs," and that Ganieva feared—and continued to fear—that that Black would physically harm her. State FAC ¶¶ 33–49.

Second, it alleged facts about Black's relationship with sexual predator Jeffrey Epstein. It noted that, at the time of his death, Epstein was facing substantive and conspiracy charges of sex trafficking. *Id.* ¶¶ 53–55. According to Ganieva's State FAC, Black viewed Epstein as "a friend worthy of trust" and his "best friend" and had paid Epstein $158 million between 2012 and 2017, even though Epstein had pled guilty in 2008 to soliciting an underage prostitute. *Id.* ¶¶ 53, 63, 65, 68, 73, 83. Black spoke adoringly of Epstein's lifestyle, in which he surrounded himself with young women and girls. Black reported to Ganieva that Epstein had given him advice about managing Ganieva. *Id.* ¶¶ 109, 110, 115–16, 118. In mid-to-late October 2008, Ganieva's State FAC alleged, Black flew Ganieva to Epstein's home in Florida, while Epstein

was on "work release" from his 2008 conviction, told her not to tell anyone, and told her that he would plant drugs on her if she spoke about it. *Id.* ¶¶ 75, 85–86. During the visit, which lasted about two hours, Black and Epstein's associate Sarah Kellen sought to coerce Ganieva into having sex with Epstein. Ganieva refused to do so. *Id.* ¶¶ 94, 97–98, 101–06.

Third, Ganieva's State FAC alleged, the defense in Black's answer that Ganieva was extorting him by threatening to reveal his infidelity was false. In fact, Black had "made no attempt to keep secret"—even from his family—"the many women" with whom he was having extramarital affairs. *Id.* ¶¶ 130–32. Black was publicly involved with "young, Russian-speaking models"; and Ganieva had attended events attended by Black and his wife, at which "Black openly pursued Ms. Ganieva . . . in front of his wife," including at an event in the Hamptons in summer 2011. *Id.* ¶¶ 133–34. At that event, Ganieva's State FAC alleged, Black had also been affectionate with and hugged another young Russian woman, Jane Doe 3. *Id.* ¶ 145. Black also allegedly brought Ganieva to his homes in the Hamptons and in Bedford, New York, including while his wife was present. On one occasion, Black and Ganieva ran into Black's wife on the street leaving his studio apartment, which was across the street from Black's family's apartment. *Id.* ¶¶ 135–38. Ganieva's State FAC also claimed that Ganieva had met several women with whom Black was involved, including Jane Doe 2—who met Black through Epstein—and Jane Doe 4, and that Black had not tried to conceal his relationship with them. As with Ganieva, Black paid Doe 4's tuition money and bought her a piano. *Id.* ¶¶ 140–43, 148–53. Black had "chastise[d] and tr[ied] to guilt Ms. Ganieva" into sexual conduct with him and Doe 4. *Id.* ¶ 154.

On September 8, 2021, Black filed an answer and counterclaims. FAC Ans. Among other things, Black's answer denied Ganieva's allegations about the trip to Florida and, citing a recorded conversation, disputed that Ganieva ever met Epstein. FAC ¶¶ 85–88.

7

### 3. Ganieva's Second Amended Complaint

On September 20, 2021, Ganieva filed a proposed second amended complaint ("State SAC"). *See id.* ¶ 89; Dkt. 1-5 ("State SAC"). It added two new categories of factual allegations.

First, it added allegations based on recently unsealed documents about Black's relationship with Epstein. *See* State SAC ¶¶ 145–50. Second, it added allegations by an anonymous Jane Doe. FAC ¶¶ 89–92; State SAC ¶¶ 50–85. As to the latter, it alleged that Doe, then having financial troubles, met with Epstein in 2000 via a person named "Maxwell." State SAC ¶¶ 52–55. Doe gave Epstein massages, and Epstein attempted to coerce her into performing sexual acts on him. *Id.* ¶¶ 57–59. Doe allegedly met Black in early 2002. *See id.* ¶¶ 60–65. Black allegedly assaulted Doe with a "violent and aggressive sexual act" that Ganieva's SAC termed rape, and which caused Doe "terrible pain," such that she "was in such agony that she could barely breathe." *Id.* ¶¶ 69–71. Afterwards, Black allegedly said to Doe: "Black, my name is Leo [*sic*] Black." *Id.* ¶ 74.

Ganieva's SAC alleged that Doe had suffered extreme physical consequences from Black's sexual assault. *Id.* ¶ 75. Afterwards, Doe told a friend what happened; the friend responded that "if she told anyone what Black had done, no one would believe her." *Id.* ¶ 85. Several weeks after the assault, Black called Doe, and insisted that they meet for lunch. *Id.* ¶¶ 76–77. At the restaurant, "Doe became upset when she saw Black and started reliving the rape and sexual assault," whereupon "Black was visibly concerned that Ms. Doe was making a scene and tried to get her to calm down." Doe left. *Id.* ¶ 77. A few weeks later, they met again, in a hotel lobby; Black told Doe he wanted to give her something. *Id.* ¶ 78. Black gave her $5,000, which Black said was to help with Doe's credit card debt; later, when Black asked to see her again, Doe asked, "if he was trying to give her more money"; when Black responded, "I just gave you $5,000!," Doe refused to see him again. *Id.* ¶¶ 80–82.

On September 29, 2021, Black opposed Ganieva's motion for leave to file the State SAC. State Dkt. 58. On March 6, 2022, the state supreme court granted Ganieva's motion. Dkt. 116; State Dkts. 152, 155.[2]

## C.   Black's Federal-Court Lawsuit, Under RICO, Against Ganieva and Others

### 1.   Black's Initial Complaint

On October 28, 2021, Black filed the original Complaint in this action. Dkt. 1 ("Compl."). It brought substantive and conspiracy claims under RICO, and claims of defamation *per se*, against Ganieva, Wigdor, and "John Doe" defendants; it also brought breach of contract and unjust enrichment claims against Ganieva.

Salient here, the RICO claims posited that an enterprise, led by Ganieva and with the participation of Wigdor and unnamed persons, had committed a campaign of "extortion" and "fraud" against Black. One part of this campaign, it alleged, was Ganieva's assertedly baseless state-court lawsuit. Another was a "carefully orchestrated" public relations campaign to smear Black. *See id.* ¶¶ 3–15. The Complaint labeled the John Doe defendants as the "Funder" (for financially backing Ganieva's state court litigation) and the "Flacks" (for arranging the PR campaign against Black).

On January 7, 2022, Wigdor and Ganieva filed motions to dismiss. Dkts. 30–31, 41, 44 (corrected filings). That day, the Court issued an order directing Black, by January 28, 2022, either to file an amended complaint or oppose the motions to dismiss. Dkt. 32.

### 2.   Black's First Amended Complaint

On January 24, 2022, Black filed the FAC—the operative complaint today. Dkt. 46. Among other modifications, it replaced the John Doe defendants with Harris (previously, "the

---

[2] On June 2, 2022, Black appealed from that decision. *See Ganieva v. Black*, 2022-02357 (1st Dep't App. Div.).

Funder") and Rubenstein (previously, a "Flack"). *See id.*[3] The FAC also reconstituted the RICO

claims. It dropped Wigdor—which had filed a motion for Rule 11 sanctions against Black and

his counsel based largely on its inclusion as a RICO defendant, *see* § I.D *infra*—as a RICO

defendant. The FAC instead alleges that the RICO enterprise consisted solely of Ganieva, Harris

and Rubenstein, who, it alleges, had led a multi-dimensional plot to damage and extort money

from Black. FAC ¶ 1. As had his original Complaint, Black's FAC disputes Ganieva's claim

that he had sexually assaulted and threatened her. It alleges that text messages and recorded

conversations between the two refute these claims and reveal that their relationship was

consensual. *See, e.g., id.* ¶¶ 13–14, 80. The following summarizes the FAC.

> a. *Ganieva's initial alleged extortion (2015–2020)*

Ganieva and Black began their relationship in 2008. It "continued sporadically" until

July 2014, when Ganieva left the country. *Id.* ¶¶ 2, 32. While Ganieva was in the United States,

Black had paid for an apartment for her on the Upper East Side of Manhattan. *Id.* ¶ 32. Between

July 2014 and June 2015, Ganieva continued to send Black text messages, "telling him that she

missed him and loved him." *Id.* ¶ 33.

On June 8, 2015, Ganieva sent Black "a much more formal note," asking to meet with

him. *Id.* The FAC alleges that this change in tone "coincided with" Ganieva's failure to gain

legal immigration status in the United Kingdom. *Id.*

---

[3] *See* Dkt. 98 (transcript of initial conference, held March 10, 2022) at 49–50 (counsel for Black, acknowledging that Harris was the John Doe "Funder" and Rubenstein was among the John Doe "Flacks" pled as defendants in the complaint).

On June 24, 2015, Black and Ganieva met.  Ganieva told Black that if he did not pay her $100 million she would go public about their relationship. *Id.* ¶ 34.[4]  Thus began what the FAC contends became a campaign of actual and attempted extortion, in which Ganieva "threaten[ed] to disclose and distort their relationship" to Black's wife, the board of Apollo, and the press. *Id.* ¶ 2.  After that conversation, Black consulted lawyers and began recording Ganieva, believing he was being extorted, by Ganieva or by others working with her. *Id.* ¶ 35.[5]

On or about October 19, 2015, Black and Ganieva met for lunch.[6] *Id.* ¶ 37.  Black agreed to pay Ganieva $100,000 monthly for 15 years; forgive approximately $1 million in loans; and give her £2 million to help her secure legal immigration status in the United Kingdom, in exchange for Ganieva's keeping their relationship confidential. *Id.*  After Black and Ganieva finalized the agreement, which the FAC implies was in writing, *see id.* ¶¶ 39, 113(d), they allegedly spent 45 minutes sharing dessert and "discussing [Ganieva's] investment and travel plans," during which conversation she described herself as newly "a woman of means." *Id.* ¶ 81 (quoting Ans. ¶ 40).

---

[4] The FAC, claiming to draw on a recorded conversation, alleges that Ganieva justified her $100 million demand to Black by citing "a news report she saw about a woman who had been fired after sleeping with her boss four times and had received $18 million" and "community property principles." FAC ¶ 35.

[5] In some of these recorded conversations, the FAC alleges that Ganieva made claims that she herself described as "paranoid."  These included that business magnate Len Blavatnik, former New York City Mayor Michael Bloomberg, and publisher Mort Zuckerman all "were following or harassing her" at Black's direction.  She also allegedly accused Black of responsibility for her son's having choked on a piece of meat at a restaurant. FAC ¶ 36.

[6] Black and Ganieva disagree about the date on which they met in October 2015. *See* FAC ¶ 37 ("At a lunch meeting at the Four Seasons restaurant in New York on October 19, 2015 . . . ."); State Compl. ¶ 64 ("At the Four Seasons hotel on October 18, 2015 . . . .").

Black's payments continued for five and a half years and ultimately totaled $9.2 million. *Id.* ¶ 38.

In October 15 and 16, 2019, Black's FAC alleges, Ganieva allegedly complained to him via text about their arrangement. She "claim[ed] that he had forced her to sign the agreement" under duress. *Id.* ¶ 39. In March 2020, counsel for Ganieva (not yet Wigdor) sent a letter to Black and "requested copies of their agreement." *Id.* The FAC alleges that Ganieva's texts and this letter were sent as part of a plot to extort additional money from Black. *Id.* Black ignored the letter and continued to pay her $100,000 a month. *Id.*

### b.  *Harris's exploitation of Ganieva's claims to attempt to rise within Apollo and to retaliate against Black (2020–2021)*

The FAC alleges that Harris sought to succeed Black as Apollo's CEO. After that failed, it alleges, Harris sought "to retaliate and destroy [Black] by, among other things, weaponizing Ms. Ganieva" to assassinate Black's character and continue extorting him. In that scheme, the FAC alleges, Harris worked with Rubenstein. *Id.* ¶ 1.

Harris and Black met in the 1980s, at the investment firm Drexel Burnham Lambert, where Black was a manager. *Id.* ¶ 3. After attending business school, Harris, in 1991, joined Apollo. *Id.* In 2007, Black designated Harris as an Apollo co-founder. *Id.* Harris openly aspired to become Apollo's CEO. *Id.* In 2015, Black's FAC alleges, Harris asked for the post; Black "rebuffed" him. *Id.* Black's chosen successor was instead Marc Rowan. *Id.* After Harris realized that Rowan would become CEO and that Black would remain chairman, Harris, viewing his dreams as "crushed," became enraged and wrathful. *Id.* ¶ 4. He—in collusion with Ganieva and Rubenstein—allegedly took several actions in retaliation, attempting to undermine Black, Apollo, and its board. *Id.*

       i.     Black, Epstein, and the commissioning of the Dechert Report

First, the FAC alleges, Harris attempted to capitalize on Black's association with Epstein, who had allegedly been Black's financial adviser. *Id.* ¶ 3. In October 2020, "members of the Enterprise and Mr. Harris's team" disseminated a *New York Times* report that Black had paid Epstein "some $50 million for tax advice" to the media, spurring "hundreds of negative articles." *Id.* ¶ 40. The Enterprise also allegedly orchestrated "'concerned' investor calls" and planted stories about who might be Black's successor. *Id.*

The FAC highlights one article, published on October 31, 2020, in the *Wall Street Journal*. A profile of Harris, it featured the headline: "A $433 Billion Wall Street Giant Has a Reputation Problem. It's Josh Harris's Job to Fix It." *Id.* ¶ 41. The FAC alleges that the article had been "promoted and placed by some of the very PR advisers who shaped the cancellation campaign of Mr. Black." *Id.* The FAC portrays the Enterprise, in an attempt to set a "canny trap," as having "shaped and framed the problem" and "positioned" Harris to supply "the fix." *Id.* However, the FAC alleges, in a twist Harris did not foresee, Apollo turned to the law firm Dechert LLP to investigate Black's relationship with Epstein. *Id.* ¶¶ 3, 42. Dechert's findings were ultimately summarized in what the FAC terms the "Dechert Report."

       ii.    Harris's "war council" and its attempt to sabotage the Dechert Report

On January 7, 2021, while Dechert's investigation was ongoing, Harris created what the FAC calls a "fully assembled" "war council," to give him the names of litigators "to take on Mr. Black and perhaps even Apollo." *Id.* ¶ 43.[7] Harris strategized there how "to evict Mr. Black"

---

[7] Although the FAC does not state the year of this meeting, that it was 2021 follows from the FAC's allegation that the meeting occurred approximately two weeks before the Dechert Report was released, on January 23, 2021. *See* FAC ¶¶ 43, 50.

from Apollo. *Id.* Harris later added "more crisis managers and public relations experts" to the "war council." *Id.* ¶ 44.[8] The group ultimately consisted of three public relations firms—Rubenstein (led by individual defendant Rubenstein), BerlinRosen, and Finsbury Glover Hering—and three "prominent law firms." *Id.* ¶¶ 4, 45.

On January 23, 2021, immediately before the Dechert Report was presented to the Apollo board, Harris talked to at least two independent directors. Acting out of "bitterness that he was about to be passed over as CEO," and seeking to undermine Black, Harris told them the Dechert Report "was a whitewash, not thorough enough, [and] inadequate to support its conclusions." *Id.* ¶ 50. The same day, A.B. Krongard, an independent director of Apollo—one of the three who commissioned the report—told Harris that this was "not his first rodeo" and urged Harris to stop trying to undermine the report without any new factual allegations. *Id.* ¶¶ 7, 51. Nevertheless, even though new allegations did not turn up, Harris's war council continued to seek out "additional allegations" about "LB." *Id.* ¶ 7.

On or about January 24, 2021, the Dechert Report was presented to Apollo's board. *Id.* ¶ 49; *see also id.* ¶ 61. The report, the FAC alleges, did not find any improprieties at Apollo or by Black. *Id.* ¶¶ 3, 49; *see also* Spagnoletti Decl., Ex. 1 (attaching report). It also allegedly "cleared the way" for Rowan to succeed Black as CEO while Black remained chairman. FAC ¶¶ 3, 54.

The FAC alleges that, in the days surrounding the release of the Dechert Report, Harris's "war council" worked "intensively," meeting on Zoom "daily" and "literally round the clock." The group also allegedly tried to avoid creating a paper trail. *Id.* ¶¶ 5, 45. It did so, the FAC

---

[8] Contradictorily, this occurred approximately a week after the FAC describes the war council as "fully assembled." *See* FAC ¶¶ 43, 44.

alleges, in recognition that "its activities were wrongful." *Id.* ¶ 47. To this end, the FAC quotes an email from Harris's chief of staff, Evan Zemsky, directing the email's (unnamed) recipients to communicate with "Josh" or "JH" over Slack, a medium which the FAC alleges allows for "self-destructing messages." *Id.* ¶¶ 5, 47. The group also allegedly "spoke in code." *Id.* ¶ 48. In support, the FAC quotes an email from Zemsky asking: "hi – any new thinking on the matter earlier discussed" and "[a]nother" email (with unnamed author and recipient(s)) that read "No knowledge of additional allegations but as previously reported didn't think [Black] should be at the co anymore." *Id.* The FAC alleges that the "clear inference" of this email is that Harris was trying to dig up "dirt" and "find people with dirt [] to throw at Black." *Id.* The war council also allegedly monitored social media for Harris, Rowan, and Black, surveyed the press, employed "media advisors," and "interviewed litigators with the intention of launching or fomenting litigation" against Black. *Id.* ¶¶ 6, 46. The war council also allegedly worked to find a sympathetic board member for Apollo and "plant[ed] fake news stories . . . attacking" other board members. *Id.* ¶¶ 6, 56–58. The team also "reached out to numerous media outlets . . . to attempt to undermine the" Dechert Report and Black. *Id.* ¶ 53.

        iii.    Harris's board member appointments and counter-campaign

According to the FAC, after the Board accepted the Dechert Report, Harris's efforts to unseat Black "intensified," *id.* ¶ 55, and included an attempt to engineer a strategic board appointment adverse to Black, among other subterfuge. On or about January 24, 2021, Harris began corresponding "in secret" with a future (unnamed) board member. *Id.* ¶ 56. This person had suggested that Harris choose directors who would appreciate that Harris was the right person to be CEO, and asked "if there are any interesting boards you want someone like me on." *Id.* "Soon thereafter," Harris caused this person to be appointed to the Apollo board. *Id.*

On January 27, 2021, a person whose board appointment Harris had engineered sent Harris an email identifying two potential board candidates.[9] *Id.* ¶ 52. The email added: "If things break, they break fast. Everything correlates. Consider what happened to Harvey Weinstein's firm." *Id.* ¶¶ 7 (emphasis omitted), 52. The clear implication of the email, the FAC alleges, is that it was strategically worthwhile to "exploit[] Mr. Black's relationship with Ms. Ganieva to fabricate a Weinstein-like situation" even though "none actually existed." *Id.* ¶ 7.

Working in conjunction with Rubenstein, the FAC alleges, Harris also worked to take down Black's board appointees. Black had appointed two independent directors, Siddhartha Mukherjee, a physician, and Pamela Joyner, a businessperson. *Id.* ¶¶ 57–58. In response, the FAC alleges on information and belief, Rubenstein and his team "planted a hit job" in the *New York Post* that "attack[ed] Mr. Mukherjee and question[ed] his independence." *Id.* ¶ 57. Two months later, Mukherjee said he would step down, having been "damage[d]" by the *Post* story. *Id.* The same *Post* journalist who wrote the "hit job" on Mukherjee allegedly "baselessly impugn[ed] [Joyner's] independence and the propriety of her" service as a board member. *Id.* ¶ 58. That was similarly "at the behest of the Enterprise." *Id.*

> c.     *Ganieva, Harris, Rubenstein, and Wigdor's collusion (2021)*

Beginning in 2021, the FAC alleges, Harris and his allies, including Rubenstein, "made common cause with" Ganieva, "join[ing] forces" in what the FAC terms an "unholy alliance" in which Harris sought to "leverage" to his own advantage Ganieva's allegations against Black. *Id.* ¶¶ 8, 104. In these efforts, which began as early as January 2021, Harris and his allies "frame[d] and spread" Ganieva's allegations, allegedly to extort more money from and destroy Black. *Id.* ¶ 9.

---

[9] It is not clear whether this appointee was the same one with whom Harris had corresponding on January 24, 2021. *See* FAC ¶ 56.

       i.      Finding counsel for Ganieva and the PR campaign against Black

One manifestation of the alliance between Ganieva, Harris, and Rubenstein, the FAC alleges, were the efforts of Harris's group to find a lawyer for Ganieva and to orchestrate a media campaign on her behalf. After the Dechert Report was released, Harris's group, acting "for an unidentified shadowy internal faction at Apollo that was involved in 'cagey business,'" sought lawyers who could represent interests adverse to Black. *Id.* ¶¶ 9, 61. One lawyer whom the group approached was Alex Spiro, Esq., of the law firm Quinn Emanuel Urquhart & Sullivan, LLP. Although the group originally did not name the potential client, stating only that the client was a woman, the conversations revealed "the outlines of the Enterprise" and, at a later point, identified "the woman . . . as Guzel Ganieva." *Id.* ¶¶ 9, 60–61.[10]

    In March 2021, Ganieva tweeted about Black, *id.* ¶ 10, in a manner which, the FAC alleges, reflects her collusion by then with Harris and a media relations professional. Ganieva's tweet described Black as "Apollo Global Management's CEO and Chairman, Leon Black," used the hashtags "#MeToo" and "#LeonBlack." As synopsized in the FAC, the tweets claimed:

> (i) that [Ganieva] had been "sexually harassed and abused" by Mr. Black "for years"; (ii) that Mr. Black "could not understand me when I refused his sexual advances"; (iii) that she had been "bullied, manipulated, threatened, and coerced" by Mr. Black; (iv) that, "under duress, [she] was forced to sign an NDA in 2015"; and (v) that she did "not want this type of predatory behavior to continue happening to other women."

*Id.* ¶ 63. Ganieva's followers included three reporters, each of whom had allegedly covered the #MeToo movement. *Id.* ¶ 64. The FAC alleges that these reporters were recruited for the

---

[10] Quinn Emanuel originally represented Black in this action, but filed a motion to withdraw the day the FAC was filed. *See infra* § I.D; Dkts. 51, 54.

purpose of viewing Ganieva's tweets. *Id.* Another early follower, the FAC alleges, was Wigdor partner Jeanne Christensen, Esq., who represents Ganieva in her state court suit. *Id.* ¶ 10.

About a week after these tweets, the FAC alleges, two "investigators" came to Ganieva's home, showing her doorman "badges" or "some form of law enforcement identification." *Id.* ¶¶ 11, 62–63. They allegedly told Ganieva that she should sue Black and gave her the name of Mr. Spiro, the Quinn Emanuel partner—the same one whom an associate of Harris's had contacted, in search of a lawyer who could be adverse to Black. *Id.* ¶¶ 11, 62.

At this point, however, no stories about Black had appeared in response to Ganieva's tweet appeared, including by any of the three journalists who, the FAC alleges, the Enterprise had caused to follow Ganieva's Twitter account. *Id.* ¶¶ 64, 65. As a result, the FAC alleges, the Enterprise "went to an old friend," the same *New York Post* reporter who had previously written critical pieces about Black. On April 8, 2021, he published an article about Ganieva. *Id.* ¶ 66. The same day, Black reported to *Bloomberg* that he had had a consensual affair with Ganieva and that she had been extorting him. *Id.* ¶ 67.[11]

Ganieva ultimately retained Wigdor to represent her. The FAC does not allege that Harris's group arranged for Ganieva's representation by Wigdor or recommended Wigdor to her. But, it alleges, Wigdor, on information and belief, had been "working closely with one of the members of Mr. Harris's war council on another high profile case." *Id.* ¶ 11. Inferring from the fact that a different law firm, in 2019, had written Black on behalf of Ganieva, the FAC alleges that Ganieva's retention of Wigdor had come about "in the wake of the outreach by Mr. Harris's

---

[11] Black's allegation to *Bloomberg* of extortion is a part of the basis for Ganieva's state-court defamation claims against Black. *See* FAC ¶ 72; State Compl. ¶¶ 2–5.

emissary." *Id.*; *see id.* ¶ 60 (Harris associates' contacting law firm was a "search that ultimately ended when" Ganieva retained Wigdor).

On March 23, 2021, the FAC alleges, "a technology and digital consulting firm evidently working on Mr. Harris's behalf sent an email to his Apollo employees," who are not named, with a sentiment tracking report describing, "among other things," press reports about Black and his association with Epstein. *Id.* ¶ 68. This, the FAC alleges, reflected that "Harris and his minions [had] kicked their monitoring of press . . . into high gear." *Id.*

ii.      Instigating Ganieva's state-court lawsuit

The FAC relatedly alleges that Ganieva was assisted by the Enterprise in bringing the state court lawsuit against Black. *Id.* ¶ 20. Ganieva's claims there, it alleges, are "fraudulent, extortionate, and defamatory" and improperly bootstrap on the #MeToo movement's legitimate claims of harassment and abuse. *Id* ¶ 19. The state court lawsuit, the FAC alleges, is a "weapon[] . . . deployed to destroy" Black and "scurrilous garbage wrapped in pleading paper." *Id.* ¶¶ 13, 15, 18. And, it alleges, the Enterprise's members (Ganieva, Black, and Harris) do not intend to attempt to win the state court litigation, but instead to use it to increase the pressure on Black to "pay the blackmailer [Ganieva] out of court," "to brand the target" (Black), and "to extort [Black]. . . by convicting him in the court of public opinion." *Id.* ¶ 107 (emphasis omitted). The FAC draws this inference—that Ganieva does not intend to pursue the state-court litigation—from (1) her and her counsel's lack of interest in evidence that allegedly explicitly exposes Ganieva's state-court allegations as false, and (2) Ganieva's and Wigdor's litigation conduct.

***Falsity of Ganieva's state court allegations.*** The FAC alleges that Ganieva's sexual assault and related accusations against Black were made in court pleadings to avoid exposing her to liability for defamation, and that this gambit abused the attorney-client privilege. *Id.* ¶ 20.

19

In support, the FAC, first, cites texts and recordings of conversations between Ganieva and Black that allegedly flatly contradict her account of a sexual assault on July 6, 2014. *Id.* ¶¶ 13–15. According to the FAC, these reveal that Ganieva asked Black to come over that night, told Black the next morning that she loved him, saw and texted Black repeatedly between July 6 and July 30, and never made any claim of rape in any recorded conversation with Black. *Id.* ¶¶ 13–14, 73, 75–78. The FAC alleges that, although alerted to the substance of these communications and offered the opportunity to review them, Wigdor, tellingly, forewent the opportunity to do so. *Id.* ¶ 96; *see id.* ¶ 141.

Next, the FAC alleges that the Ganieva's state-court allegations about her visit to Epstein are contradicted by tape recordings, in which Ganieva stated that she wasn't sure that she had ever met Epstein, and by flight logs of Black's plane. *Id.* ¶¶ 16, 85–88. The FAC also alleges that these claims are "entirely gratuitous"—and that Ganieva and the Enterprise "designed" the state-court claim to include them "to inflict maximum harm and character assassination" and for maximal extortionate impact. *Id.* ¶¶ 16, 82 (describing Epstein-related allegations as "part of the extortion campaign, not any litigation effort"). The FAC relatedly alleges that the account in Ganieva's state-court complaint of a conversation between Kellen (Epstein's associate) and Ganieva is fabricated, and that Kellen will so testify. *Id.* ¶ 84.

Finally, the FAC alleges that Ganieva's state-court allegations about Doe's massage of Epstein are false, extraneous, and added solely to defame and enhance Ganieva's leverage over Black. *Id.* ¶¶ 89–90. The state-court complaint's other allegations about Black and Epstein are likewise, the FAC alleges, "completely gratuitous" and included for "extra-judicial impact[]." *Id.* ¶ 91. The FAC embraces the Dechert Report's account of Black and Epstein's relationship, which does not include such allegations, as comprehensive. *Id.* ¶ 92.

*Ganieva and Wigdor's litigation conduct*.  The FAC alleges that, in various ways, Ganieva and her counsel have engaged in stall tactics and attempted to prevent Black from taking discovery. *Id.* ¶ 17.  They have blocked the release of Ganieva's phone records, which it projects "will reveal coordination with the Enterprise."  And the Rubenstein firm, "stonewalling," has also refused to search for phone records with Ganieva. *Id.* ¶¶ 17, 94.  Also suggestive, Wigdor, contrary to its customary litigation "playbook," filed the state court complaint without making settlement demands. *Id.* ¶¶ 70–71.  It also refused to enter into a protective order that would have enabled it to review the transcripts and tapes that Black represents contradict Ganieva's core allegations. *Id.* ¶¶ 95–96.[12]  Meanwhile, the FAC alleges, PR representatives of Ganieva have spread "scurrilous character assassination" about Black. *Id.* ¶ 93.

The FAC alleges, finally, that "Harris's PR team" assisted Ganieva" to "[s]ell[] her story" about Black, and that Harris has paid or promised to pay, "all of them"—presumably meaning Ganieva, Wigdor, and Rubenstein—for assisting in publicly damaging Black. *Id.* ¶ 20.  The FAC also alleges that the Enterprise encouraged Ganieva to file a "false police report" accusing Black of the 2014 rape, and thereafter to promote the news story that Black was being criminally investigated for rape, which had no basis other than the fact that the Manhattan DA customary investigates every complaint made to it of sexual abuse. *Id.* ¶¶ 98–99.

### D.    Pertinent Procedural History

*Motions to dismiss*:  On March 4, 2022, the defendants each moved to dismiss the FAC for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6), and filed, *inter alia*, a

---

[12] On May 9, 2022, Justice Cohen granted Black's motion for a confidentiality order. *See* Dkt. 116-1; State Dkt. 152.

memorandum of law in support. *See* Dkts. 80, 81 ("Harris Mem."), 82 ("Spagnoletti Decl."), 83, 84 ("Ganieva Mem."), 85, 86 ("Gershenoff Decl."), 87 ("Wigdor Mem."), 88, 89 ("Rubenstein Mem."). On April 4, 2022, Black filed a memorandum in opposition. Dkt. 101 ("Opp.").[13] On May 5, 2022, defendants each filed a reply. Dkts. 112 ("Wigdor Reply"), 113 ("Ganieva Reply"), 114 ("Harris Reply"), 115 ("Rubenstein Reply").

*Initial pretrial conference*: On March 10, 2022, the Court held an initial pretrial conference. *See* Dkt. 98 ("Tr."). For reasons including the substantial possibility that it would dismiss Black's federal claims for failure to state a claim and thereafter decline to exercise supplemental jurisdiction over the state-law claims, the Court stayed discovery pending resolution of the motions to dismiss. *Id.* at 92–101.

---

[13] Also on April 4, 2022, Black filed a letter stating that he intended to file a Second Amended Complaint ("SAC") and had requested a meet and confer to determine whether defendants would consent. Black promised to file a letter "notify[ing] the Court of the parties' positions following a meet and confer on the foregoing issues." Dkt. 102. On April 18, 2022, Black filed a motion for leave to file a SAC, Dkt. 103, and, in support, a memorandum of law, Dkt. 104, and the declaration of Susan Estrich, Esq., Dkt. 105. That motion did not state whether a meet-and-confer had occurred. On April 19, 2022, the Court directed defendants to submit a letter answering that question and setting out their positions on Black's motion for leave to file a SAC, while staying defendants' reply deadline—then April 22, 2022. Dkt. 106. On April 22, 2022, defendants submitted that letter. They stated that, although the parties had a teleconference on April 8, 2022, it had not been useful because Black's counsel had refused to provide defendants' counsel with a copy of the proposed amended pleading. Having now reviewed the proposed SAC as filed, defendants stated, they opposed Black's motion for leave to amend, for various reasons. Dkt. 107.

On April 25, 2022, the Court denied Black's motion for leave to file a SAC, stating that, were it to grant any motion(s) to dismiss, it would determine then whether and to what extent any dismissals were to be with prejudice. The Court also extended defendants' time to file their replies. Dkt. 108. On April 27, 2022, Black filed a letter in response to the Court's denial of his motion for leave to file a SAC, Dkt. 109; the following day, Wigdor filed a letter in response, Dkt. 110. On May 2, 2022, the Court issued an order stating that its previous order denying leave, Dkt. 108, stood, and that further letters on the subject would be unproductive. Dkt. 111.

*Rule 11 sanctions motion*:  Coincident with the motion to dismiss, the Court has received briefing on Wigdor's motion for Rule 11 sanctions against Black and his counsel who assisted him in filing the original Complaint.  *See* Dkts. 33, 49–50, 55–56, 66–67, 92, 95, 100.  Wigdor there principally argues that it was sanctionable to name Wigdor as a RICO defendant.  In a separate decision issuing today, the Court—narrowly—denies the motion.

## II.   Applicable Law

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

As to claims alleging fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard.  Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), a complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Berman v. Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  Specifically, "the complaint must: (1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

292–93 (2d Cir. 2006) (internal quotation marks omitted).

## III.   Discussion

Defendants move to dismiss all claims.  For the following reasons, the Court dismisses

the FAC's RICO claims—which allege substantive and conspiracy violations—and declines to

exercise supplemental jurisdiction as to the remaining claims, which arise under state law.

### A.   Civil RICO Claims

Section 1962(c) of Title 18 makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity or collection of unlawful debt."  To establish a violation of

§ 1962(c), *i.e.*, a substantive violation of the RICO statute, a civil plaintiff "must show that he

was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d

Cir. 1999) (quoting *Azrielli v. Cohen Law Offs.*, 21 F.3d 512, 520 (2d Cir. 1994)).

Section 1962(d) of Title 18, as relevant here, makes it a crime to conspire to violate

§ 1962(c).  To establish a violation of § 1962(d), *i.e.*, a RICO conspiracy, a civil plaintiff must

demonstrate that the alleged coconspirators "knew about and agreed to facilitate" a pattern of

racketeering activity. *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003) (quoting *Salinas v.

United States*, 522 U.S. 52, 65 (1997)).  To plead such a conspiracy, a complaint must allege that

a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering

activity. *United States v. Yannotti*, 541 F.3d 112, 121 (2d Cir. 2008); *New York Dist. Council of

Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013).  As the Second

Circuit has stated, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). And where a RICO conspiracy claim does not adequately plead an agreement to conduct which, if completed, would satisfy the elements of the substantive RICO statute, "the conspiracy claim under § 1962(d) also fails." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 363 (S.D.N.Y. 2014) (citation omitted). However, "the existence of a RICO enterprise is not a required element of a RICO conspiracy claim." *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (summary order) (citing *United States v. Applins*, 637 F.3d 59, 76 (2d Cir. 2011)).

A failure to plead any element of a claim, of course, requires its dismissal. Here, Harris, Ganieva, and Rubenstein—the defendants named in the RICO claims—argue that the FAC does not adequately allege numerous elements of a substantive RICO claim or viably plead a RICO conspiracy. The Court considers defendants' arguments in turn.

### 1. Enterprise

Defendants first argue that the FAC does not adequately allege a cognizable enterprise. A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62 (2001)). A RICO enterprise may be a lawful entity or an association-in-fact. *Boritzer v. Calloway*, No. 10 Civ. 6264 (JPO), 2013 WL 311013, at *5 (S.D.N.Y. Jan. 24, 2013).

In positing an enterprise comprising three otherwise disparate individuals—model Ganieva, banker Harris, and publicist Rubenstein—the FAC necessarily pursues a theory that the three constituted an association-in-fact: "a group of persons associated together for the common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583. To qualify as such, a grouping must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). But, as defendants correctly parse the FAC, it fails to viably plead at least the first two of these features.

### a. Absence of common purpose

The RICO defendants argue that the FAC does not allege that the members of the alleged enterprise acted with a common purpose. Ganieva's goal was to obtain millions of dollars from Black; Harris's goal was to elevate himself within Apollo at Black's expense; and Rubenstein, as alleged, did not have a freestanding agenda with respect to Black. *See* Ganieva Mem. at 11; Harris Reply at 5; Rubenstein Mem. at 6. And, as Harris notes, there was antagonism between Ganieva's goal and his interests. Insofar as Ganieva's state lawsuit and smear campaign against Black stood to harm, distract, and behead Apollo, it stood, too, to injure Harris, Apollo's second-largest shareholder. Harris Mem. at 12–13. To the extent there was common ground among them, the defendants argue, it was hostility to Black. But, the defendants note, "mutual antipathy" to a third party among defendants pursuing separate agendas is not a recognized common purpose of a RICO enterprise. *Id.* at 13; Harris Reply at 5; Rubenstein Reply at 2.

Black counters that, according to the FAC, the defendants each sought to "take down" and "destroy" him. He argues that this common objective, even if arrived via motivations personal to each defendant, is sufficient. Opp. at 18 (citing, *e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173 (D. Mass. 2003) and *Boyle*, 566 U.S. at 944).

Defendants' critique hits the mark. "[F]or an association of individuals to constitute an enterprise," the Second Circuit has held, "the individuals must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." *Satinwood*, 385 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994)) (emphasis added). Following *Satinwood*, district courts in this Circuit have held that the common purpose element requires that the enterprise's members have had a common intent to violate RICO or to act unlawfully. A separate purpose or objective that does not involve illegal conduct will not do. *See, e.g.*, *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 299 (E.D.N.Y. 2017) ("[F]ailing to allege that members of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim.") (citing *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013); *First Nationwide Bank*, 820 F. Supp. at 98). "Individuals or entit[i]es that do not share such a common purpose cannot be considered part of a RICO enterprise as a matter of law." *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 351 (S.D.N.Y. 2010) (citing *Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 203–04 (E.D.N.Y. 2006); *Godlewska v. Human Dev. Ass'n*, No. 03 Civ. 3985, 2005 WL 1667852, at *7 (E.D.N.Y. Jul. 18, 2005)).

Here, the FAC does not allege that Ganieva, Harris, and Rubenstein shared any common intent to violate the law, by fraud or otherwise.

At the threshold, the links of any kind that the FAC draws among these three dissimilar individuals—from different walks and plying different trades—are tenuous, to say the least. There is no allegation of any meeting or communication among all three enterprise members. There are scant allegations of any contact of any kind between any two of the three. And the

central thesis that Black conjures—that Harris allied with Ganieva to assist her to harm Black—hangs on the slenderest of threads: the alleged attempt by unnamed Harris associates to persuade attorney Spiro to represent a then-unnamed woman later "identified as Guzel Ganieva." FAC ¶¶ 9, 61. The FAC goes on to allege—also hazily, without sourcing, and via the passive voice—that although Ganieva did not retain Spiro, her ensuing retention of Wigdor "only came about, surely not coincidentally, in the wake of the outreach by Mr. Harris's emissary." *Id.* ¶ 11. Wigdor, in turn, is alleged later to have used Rubenstein to publicly promote Ganieva's allegedly baseless claims against Black, with the goal of extorting money from him.

These nebulous and overtly conjectural allegations do not come close to knitting Ganieva, Harris, and Rubenstein together in any solid or coherent way in concerted acts towards a common end. They do not allege, other than by conjecture, that the three supposed members of the enterprise had a common goal to violate the law, let alone in a manner qualifying as a RICO predicate.

Most patently, even if it were well pled that Harris had known and approved of Ganieva's lawsuit—and Black pleads such only by speculative *ipse dixit*—that would be insufficient to plead that Harris shared her purpose to use the state lawsuit as a lever in an illegal extortion-by-defamation plot. *See D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (summary order) (allegations of common purpose "f[e]ll short of supporting a plausible inference that an association-in-fact enterprise existed" where alleged common goal was "a naked assertion devoid of further factual enhancement," where complaint lacked specific allegations about many defendants' intent, and where complaint failed to suggest why the goal was shared among RICO defendants) (cleaned up); *Malester v. Adamo*, No. 09 Civ. 9347 (GBD), 2010 WL 5065865, at *4 (S.D.N.Y. Dec. 8, 2010) (where complaint did not allege facts suggesting participation other than

knowledge of allegedly illicit activities, it failed to allege an enterprise); *Moss*, 258 F. Supp. 3d at 299–300.

Moreover, far from plausibly alleging a shared illegal purpose, the FAC alleges facts underscoring that the ostensible enterprise participants had strategic ends distinct to themselves. These personal ends plausibly explain the few acts each participant is alleged to have taken. Ganieva is alleged to have sought to file her complaints and to get media attention for them, in the hope that doing so would pressure Black to pay her to relent.  FAC ¶ 103.  To this end, she tweeted about Black, spoke to the *New York Post*, and made filings in her lawsuit, with the goal "to show Mr. Black that $100,000 per month was no longer enough to prevent her from making good on her extortionate threats."  *Id.*  Harris is alleged to have sought "to destroy Mr. Black and win the top job at Apollo."  *Id.* ¶ 20.  To this end, he allegedly convened a group to discuss public relations and legal strategy to take against Black, engineered favorable Apollo board appointments, tried to undermine Black's account of his relationship with Epstein, including by depicting the Dechert Report as a whitewash.  But there is no allegation that, in pursuing these self-interested goals, either Harris or Ganieva shared or embraced the other's agenda.

Therefore, even assuming that Ganieva and Harris were well-pled to have taken illegal action in support of their own agendas, facts are not pled under which they acted with a common purpose. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 498 (S.D.N.Y. 2009) ("defendants who allegedly constitute an illegal enterprise and engage in predicate offenses in furtherance of the defendants' own affairs or purposes, as opposed to the affairs or purposes of their common 'enterprise,' would fail to satisfy the requirements of RICO") (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); *Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 449 (S.D.N.Y. 2006)); *Godlewska*, 2005 WL 1667852, at *7 (actionable RICO claim not pled where "it does not appear

from the allegations in the complaint that [two sets of defendants] were even aware of the extortionate conduct of [another set of defendants]"). And as to Rubenstein, the ostensible third member of the three-legged enterprise, the FAC is devoid of any non-speculative allegation that he shared Ganieva's or Harris's agenda—or had any cause to make war on Black.

Black correctly notes one point of common ground among at least Harris and Ganieva: ill-will towards Black. But, as defendants correctly argue, RICO's common purpose requirement demands more than general synchronicity or shared enmity. *See, e.g., J.T. v. de Blasio*, 500 F. Supp. 3d 137, 169 (S.D.N.Y. 2020) ("[N]umerous courts have held that allegations of parallel conduct alone cannot [] support the inference that RICO defendants are joined together for a common purpose.") (citing *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, No. 15 Civ. 3784 (PKC), 2016 WL 6110565, at *6–7 (S.D.N.Y. Aug. 4, 2016); *In re Ins. Brokerage Antitr. Litig.*, 618 F.3d 300 (3d Cir. 2010)); *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019) (dismissing RICO claim where enterprise's alleged common goal to elect Donald Trump was not unlawful or fraudulent) (citing *Purchase Real Estate Grp. v. Jones*, No. 05 Civ. 10859 (LAP), 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010)); *Beter v. Murdoch*, No. 17 Civ. 10247 (GBD), 2018 WL 3323162, at *6 (S.D.N.Y. June 22, 2018) ("Because Plaintiff has failed to provide 'information from which it could be concluded that Defendants function as a unit or that they shared a common purpose,' she has failed to plead the existence of a RICO enterprise, which is fatal to her substantive RICO claim.") (quoting *BWP Media*, 69 F. Supp. 3d at 360) (citing *D. Penguin Bros.*, 587 F. App'x at 669), *aff'd*, 771 F. App'x 62 (2d Cir. 2019) (summary order); *Naugler v. Air Line Pilots Ass'n, Int'l*, No. 05 Civ. 4751, 2008 WL 857057, at *11 (E.D.N.Y. Mar. 27, 2008) (where complaint "contains conclusory allegations as to the existence of a RICO enterprise" and "that the entities shared common fraudulent purposes

and plans," it did not state a RICO claim). And Black, in his brief defending his claims, implicitly reveals that what—in his telling—united the RICO defendants was not an illegal plot, but aversion to Black. The three, he states, all sought to "spread[] lies about, "injur[e], "bring[] down," and "cancel" Black. Opp. at 19. But without more, antisocial conduct toward another, however unseemly, does not qualify as a RICO predicate. And an agreement to engage in such conduct does not establish the common purpose required of a viable RICO enterprise.[14]

> b.    *Absence of relationship among enterprise participants*

As a separate challenge to the FAC's enterprise allegations, the three RICO defendants argue that the FAC fails to allege "any interpersonal relationship" among them. They emphasize that there is no non-conclusory allegation that Ganieva ever communicated with either Harris or Rubenstein. Ganieva Mem. at 10; Harris Mem. at 11 (emphasis omitted). Indeed, they note, the FAC lacks concrete allegations of actual coordination or communication among any of the three enterprise participants. Instead, it alleges that unnamed Harris associates—without Ganieva's foreknowledge or approval—looked for a lawyer to represent her, and that the firm that Ganieva ultimately chose, Wigdor, was *not* one that those associates or their unnamed agents who came

---

[14] *Lupron*, on which Black relies, is not to the contrary. In the passage on which Black relies, the district court stated that "'[c]ommon purpose' does not mean commonality of motive, it means coordinated activity in pursuit of a common objective." 295 F. Supp. 2d at 173. But *Lupron* is consistent with the doctrine, above, requiring that the enterprise participants have a common illegal purpose, as opposed to a common general goal such as profit or greed. *Lupron* itself stated that "[s]imilarity of goals and methods does not suffice to show that an enterprise exists," and that an enterprise requires "evidence of systematic linkage." *Id.* (quoting *Libertad v. Welch*, 53 F.3d 428, 443 (1st Cir. 1995)). On that basis, it held that the evidence did not support that the defendants—"thousands of doctors who benefitted from discounted purchases or free samples of Lupron"—"were associated together in any meaningful sense" or "were even aware of one another's existence as participants in a scheme to defraud." *Id.* at 173–74. To hold otherwise, the district court held, would permit a RICO enterprise to be pled against persons with a common occupation and a common motive such as "greed." *Id.*

31

to Ganieva's home suggested.[15]  Ganieva Mem. at 10.  In the same vein, Rubenstein emphasizes the absence of facts non-speculatively associating him with Ganieva.  Rubenstein Mem. at 6.  The FAC's hyperbolic accusations of a "war cabinet" and an "unholy alliance," he argues, should not obscure this shortcoming.  *Id.* (quoting FAC ¶¶ 4, 8).  Black counters that the FAC alleges a relationship among the three, because "Harris or one of his surrogates solicited legal representation for Ganieva," and "Rubenstein spoke to the press about Ganieva's case and may have been key" to arranging Ganieva's *Post* interview.  Opp. at 20.  And, Black notes, because RICO conspiracies are "inherently secretive," his pre-discovery pleadings projecting what the evidence might show should be given latitude.  *Id.* at 21.

On this required enterprise element, too, defendants' argument carries the day.

"[R]elationships among those associated with the enterprise" are essential structural features of a RICO association-in-fact.  *Boyle*, 556 U.S. at 946.  To allege such an association, "a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme."  *New York v. United Parcel Serv., Inc.*, No. 15 Civ. 1136 (KBF), 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) (citing *Freund v. Lerner*, No. 09 Civ. 7117 (HB), 2010 WL 3156037, at *8 (S.D.N.Y. Aug. 10, 2010); *Automated Teller Mach. Advantage LC v.*

---

[15] Harris seizes on a point in Black's opposition brief, in which Black claims that Wigdor and Ganieva had been in communication as early as October 2020, months before Harris and his cohort allegedly tried to set up counsel for her.  This, Harris argues, "disproves [Black's] own flawed conspiracy theories."  Harris Reply at 3.  The Court, however, disregards Black's factual proffers in his legal brief, as "[i]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."  *In re Bystolic Antitr. Litig.*, No. 20 Civ. 10087 (LJL), 2022 WL 323945, at *21 (S.D.N.Y. Feb. 2, 2022) (quoting *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453 n.11 (S.D.N.Y. 2021)) (alteration in original) (further quotation and citations omitted).  In all events, the decisive issue is whether the FAC plausibly pleads a relationship between the RICO defendants.  It does not.

*Moore*, No. 08 Civ. 3340 (RMB) (FM), 2009 WL 2431513, at *7 (S.D.N.Y. Aug. 6, 2009)). In

evaluating whether a complaint pleads the required association, courts examine factors including

> (i) whether members of the alleged enterprise have interpersonal relationships; (ii)
> where the members are located, and whether the complaint explains how they came
> to an agreement to act together or how they knew one another; (iii) whether the
> members are symbiotic—in other words, whether they depend on one another, act
> to benefit one another, or rely on one other's activities; and (iv) whether the alleged
> predicate acts could be accomplished without the assistance of the other members
> of the alleged enterprise.

*Dynarex Corp. v. Farrah*, No. 18 Civ. 7072 (VB), 2019 WL 2269838, at *3 (S.D.N.Y. May 28,

2019) (citation omitted).

Here, strikingly, the FAC does not allege—at any time—*any* interpersonal relationship,

agreement, collective action, or symbiosis between either (1) Ganieva and Harris or (2) Ganieva

and Rubenstein.[16] It papers over the absence of concretely pled facts indicative of a relationship

between the supposed enterprise's central figure and her two supposed lead backers through the

use of vague claims to the effect that the three made "common cause" in an "unholy alliance."

FAC ¶ 8. Under the governing case law, these pleadings—more creative writing than factual

averment—fall well short.

***Ganieva and Harris***: The FAC alleges, elusively, that Harris's confederates were

looking for a woman who was "[e]ventually . . . identified" as Ganieva, *id.* ¶ 9; *see id.* ¶ 61, the

implication being that they were seeking a woman prepared to make defamatory claims against

Black. It does not allege, however, that Ganieva knew about, encouraged, or requested such

efforts—or even that she, personally, was ultimately receptive to them. Nor does the FAC claim

that Wigdor, the law firm that Ganieva retained, had ties to Harris.

---

[16] As to Harris and Rubenstein, the FAC alleges an interpersonal relationship in that Harris
retained Rubenstein's firm for his "war council" and Rubenstein acted as Harris's "longtime
media advisor." FAC ¶¶ 4, 44.

Instead, the FAC seeks to conjure an illusion of a nexus between supposed enterprise figures Ganieva and Harris by stating, obliquely: "Ms. Ganieva's law firm change only came about, surely not coincidentally, in the wake of the outreach by Mr. Harris's emissary." *Id.* ¶ 11; *see id.* ¶ 60 (search for counsel "ultimately ended when Ms. Ganieva retained the Wigdor firm"). This insinuation is a far cry from a declarative and specific factual allegation. In a similar vein, the FAC alleges, generally, that Wigdor, on information and belief, "was working closely with one of the members of Mr. Harris's war council on another high profile case." *Id.* ¶ 11. This allegation, however, stops well short of alleging any contact between Ganieva and Harris, or even between their representatives. The same is so of the FAC's statement that when Ganieva "needed help" selling her story to the press, she eventually "got it, thanks to Mr. Harris's PR team." *Id.* ¶ 20.

These allegations regarding Ganieva's relationship with Harris are conclusory, vague, indirect, clever, and cute. They are not factual, concrete, specific, declarative, or trustworthy. The FAC's insinuations of a relationship between these two central members of the triadic enterprise it conjures, unbolstered by specific factual allegations, are insufficient to plausibly allege a relationship, agreement, coordination, or collective action between Ganieva and Harris. *See, e.g., Dynarex Corp.*, 2019 WL 2269838, at *3 (where allegations of relationships among defendants were "entirely conclusory," there were "no factual allegations suggesting that [the three sets of defendants] . . . were even aware of each other's existence," and there were no allegations of symbiosis or assistance by enterprise members, complaint failed to state a claim); *Elavon, Inc. v. Ne. Advance Techs., Inc.*, No. 15 Civ. 7985 (KBF), 2017 WL 4876300, at *10 (S.D.N.Y. Oct. 27, 2017) ("Without allegations that any alleged conspirator acted for the benefit of another conspirator, that any had relationships with one another, or that their actions were

34

anything except 'isolated and independent,' an 'enterprise' is not sufficiently plead.") (quoting *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007)); *Gucci Am., Inc.*, 2016 WL 6110565, at *8 (explaining that *Boyle*'s relationship requirement "demands plausible allegations that individuals operating within the ecosystem coordinated their conduct to accomplish a common purpose," and that such allegations were missing, *inter alia*, where complaint failed to allege that defendants were aware of each other's existence and obtained common benefits); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (finding insufficient allegations of RICO enterprise where complaint failed to plead, *inter alia*, interpersonal relationships, agreement, how defendants knew each other, or that they knew each other).

***Ganieva and Rubenstein***: The FAC similarly flits around the possibility that Ganieva consorted or plotted with Rubenstein to generate publicity adverse to Black. But, as with Ganieva and Harris, it ultimately does not recite any concrete facts to support the thesis of a relationship. The FAC generically alleges that Rubenstein "promot[ed] Ms. Ganieva's story to the press." FAC ¶ 28. However, it does not say when or how—and it does not allege any instance of interaction between the two.

Instead, the FAC repeatedly uses grammatical locutions that blur events and causation. For instance, using the passive voice, the FAC alleges that, after Ganieva had tweeted about Black, she had trouble finding media coverage, until "[a]n interview was arranged with Josh Kosman . . . who was particularly close to Rubenstein." *Id.* ¶ 66. The FAC, however, does not allege that Rubenstein played any role in arranging the interview, let alone that he did so with Ganieva's knowledge or consent.

Similarly, the FAC suggestively alleges that Rubenstein "does not deny speaking about [Ganieva's] case to the press," *id.* ¶ 17. But it nowhere cites any affirmative statement by Rubenstein to the effect that he did so. The FAC's statement that Rubenstein may have phone records connecting him to Ganieva that he refuses to search for, *id.*, is similarly non-cognizable, as it is rank speculation. The FAC therefore is devoid of any concrete allegations supporting that Rubenstein ever acting on Ganieva's behalf, or with her knowledge, awareness, or agreement.

The FAC's allegations thus flagrantly fail to show a relationship among the personnel whom it depicts as the core of the association-in-fact enterprise. Only by speculation does it connect Ganieva to either of her alleged co-venturers. This defect, like the failure to plead facts indicative of a common purpose among the three, requires dismissal of the FAC's substantive RICO claims. *See, e.g.*, *Wade Park Land Holdings, LLC v. Kalikow*, No. 21 Civ. 1657 (LJL), 2022 WL 657664, at *22 (S.D.N.Y. Mar. 4, 2022) (plaintiffs failed to plead RICO enterprise where "they d[id] not plead relationships to assert that [set of defendants] as a group formed an ongoing organization" and where "the allegations to which they point merely describe separate actions involving various pairs of defendants"); *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 12, 2012) ("[T]he Amended Complaint's failure to plead with any specificity as to the nature of the defendants' common interests and the mechanics of the alleged ongoing working relationship among defendants is fatal."); *Elsevier Inc.*, 692 F. Supp. 2d at 307 (dismissing RICO claims where "[n]othing in the Complaint explains how these particular people, located in different parts of the country, came to an agreement to act together—or even how they knew each other. Indeed, the Complaint does not even allege *that* they knew each other[.]") (emphasis in original); *Cedar Swamp Holdings, Inc.*, 487 F. Supp. 2d at 451 (where RICO defendants "appear to have

had no relationship to one another, and their actions and involvement in [alleged] schemes appear to have been isolated and independent . . . there is no indication that this group was an 'ongoing organization' as opposed to an ad hoc collection of entities and individuals who each happened to have been involved in one scheme or another against Prince Jefri," the individual plaintiff).[17]

### 2.    Predicate Acts

In an independent challenge to the substantive RICO claim, the RICO defendants argue that the FAC fails to plead any legally cognizable predicate acts.

"To be liable under the RICO statute, a defendant must commit 'at least two acts of racketeering activity.'" *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 405 (S.D.N.Y. 2013) (quoting 18 U.S.C. § 1961(5)) (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).  The statute broadly defines "racketeering activity" "to encompass a variety of state and federal offenses including, inter alia, murder, kidnapping, gambling, arson, robbery, bribery and extortion." *DeFalco*, 244 F.3d at 306 (citing 18 U.S.C. § 1961(1)).

Further, "[b]ecause RICO does not apply to isolated or sporadic criminal acts," the predicate acts must be related. *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) (internal quotation

---

[17] A RICO enterprise must also be "separate from the pattern of racketeering activity" and "distinct from the person conducting" the enterprise's affairs." *Satinwood*, 385 F.3d at 173. Ganieva and Rubenstein argue that the enterprise as pled fails this "distinctness" requirement, because "there are no allegations to suggest that the purported association-in-fact enterprise exists separately from the named defendants" or any existence outside of the pattern of racketeering activity.  Ganieva Mem. at 12; *see* Rubenstein Mem. at 5–6 (no alleged enterprise separate from alleged racketeering acts and no association outside of campaign against Black). Black does not respond substantively, save to declare, conclusorily, that the FAC "allege[s] an association-in-fact enterprise that is distinct from a pattern of racketeering." Opp. at 17.  This critique by defendants appears substantial.  However, the Court—in light of the RICO claims' other fatal defects as recounted here—does not have occasion to definitively rule on that challenge.

marks omitted). The relatedness requirement pertains to the acts' relationship to each other, or "horizontal relatedness," and to the enterprise as a whole, or "vertical relatedness." *Id.* (citing *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)). Horizontal relatedness requires that acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). For an association-in-fact, horizontal relatedness "can be established simply by linking each act to the enterprise." *Reich*, 858 F.3d at 61 (citing *United States v. Coppola*, 671 F.3d 220, 243 (2d Cir. 2012)). Vertical relatedness requires "that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) (citing *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006)) (per curiam).

Here, the FAC identifies the predicate acts that the defendants committed in connection with the enterprise as Hobbs Act extortion, and mail and wire fraud. A violation of these laws, however, is not viably pled.[18]

---

[18] Rubenstein and Harris argue that the FAC does not allege the jurisdictional requirements of these offenses. Rubenstein Mem. at 10–11, 12; Harris Mem. at 18. The Court's dismissal of the RICO claims does not adopt this critique. Jurisdiction under the Hobbs Act "may be satisfied by a showing of a very slight effect on interstate commerce" and "[e]ven a potential or subtle effect on commerce will suffice." *United States v. Farrish*, 122 F.3d 146, 148 (2d Cir. 1997) (quoting *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir. 1981)). Jurisdiction under the mail and wire fraud statutes requires showing, respectively, that a defendant used the mails, or interstate or foreign wire communications, in furtherance of scheme to defraud. 18 U.S.C. §§ 1341, 1343; *see Cofacredit*, 187 F.3d at 243. For the purposes of the ensuing discussion, the Court focuses on whether the non-jurisdictional elements of the predicate acts are plausibly pled, and assumes *arguendo* that these modest jurisdictional standards would have been satisfied by well-pled allegations of the remaining elements.

a.     *Hobbs Act extortion*

The Hobbs Act prohibits "robbery or extortion—including conspiracy and attempt—that affect interstate commerce." *United States v. Kirsch*, 903 F.3d 213, 221 (2d Cir. 2018) (citing 18 U.S.C. § 1951(a)).  Relevant here, it defines "extortion" as "[1] the obtaining of property from another, [2] with his consent, [3] induced by wrongful use of actual or threatened force, violence or fear, or under color of official right."  18 U.S.C. § 1951(b)(2); *see United States v. Gigante*, 39 F.3d 42, 45 (2d Cir. 1994), *vacated and superseded in part on denial of reh'g*, 94 F.3d 53 (2d Cir. 1996).  "To establish extortion, a plaintiff must demonstrate that the person committing the act either pursued or received something of value that he could exercise, transfer, or sell." *Spiteri v. Russo*, No. 12 Civ. 2780, 2013 WL 4806960, at *47 (E.D.N.Y. Sept. 7, 2013) (cleaned up), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015) (summary order).

Here, the FAC alleges that the three RICO defendants participated in attempted extortion, and that Ganieva engaged in actual extortion, in connection with the enterprise.

i.     Ganieva

Ganieva argues that the FAC does not plausibly plead the predicate act of Hobbs Act extortion.

First, she argues, to the extent the FAC alleges that she extorted Black in 2015 by demanding money in exchange for not disclosing the affair, this long predated the alleged enterprise, which did not come into being until 2021, or any relevant conduct by Harris or Rubenstein.  *See* Ganieva Mem. at 16–17; *see also* Harris Mem. at 20–21 n.15.  Black does not respond to this argument, and it is clearly meritorious.  Whether or not Ganieva's 2015 conduct as pled may have been prosecutable as extortion, it is not plausibly linked to the later-arising RICO enterprise or pled as a RICO predicate.

39

Second, Ganieva argues, her recent alleged actions are not plausibly pled to violate the Hobbs Act either. The FAC casts Ganieva's tweets, statements to the *Post* reporter, state court complaints, and report to the DA as constituting Hobbs Act extortion. FAC ¶ 117(c). But, she notes, the Hobbs Act, in pertinent part, is violated not by words or acts damaging a victim's reputation, but by obtaining or attempting to obtain the victim's money or property through extortionate means (threats or force). And, she notes, the FAC does not allege that Ganieva or anyone on her behalf made any monetary demand on or threat to Black since the onset of the enterprise. Ganieva Mem. at 17–18.

Black does not respond to this well-founded critique. Instead, he hearkens back to Ganieva's solo attempt in 2015 to extort money from him. He casts Ganieva's recent tweets, press statements, pleadings, and reports to the DA as "ma[king] good" on her earlier attempt to extort money from him. Opp. at 28–29 (quoting FAC ¶ 117(c)). But as pled, Ganieva's extortion was complete long before the FAC alleges the enterprise came into being. The FAC does not allege any demands of Black for money, or any threats to Black to reveal his secrets if he did not pay money, in 2021, after the ostensible Ganieva-Harris-Rubenstein enterprise took shape. If anything, Ganieva's decision in 2021 to publicly reveal Black's misdeeds—disarming herself of these secrets—limited or terminated her capacity to extort Black by these means.

Viewed on its own terms, Ganieva's communications and other conduct in 2021—her tweets, press statements, report to the DA, and state-court lawsuit against Black—do not, as pled, form the *actus reus* of extortion. And the FAC does not plead, either, that Ganieva, in 2021, took these actions with the requisite *mens rea*: an intent to extort. Rather, as pled, from 2015 through 2021, Black paid money to Ganieva, to buy her silence. *See* FAC ¶ 39. But in March 2021, after her revelatory tweets about Black, his payments to her stopped. *Id.* ¶¶ 10, 63, 113(c).

Ganieva then, as alleged, began publicly savaging Black in multiple fora—filing suit against Black in June 2021, *id.* ¶¶ 12, 72, reporting or causing unspecified others to report Black to the Manhattan DA for sexual assault, *see id.* ¶ 99, and bringing civil suit against him, *see id.* ¶ 69.[19] But the FAC tellingly does not allege that, before taking these actions, Ganieva demanded anew money from Black. On the contrary, the FAC pointedly alleges that Ganieva and her counsel, Wigdor, did not make any pre-litigation demand of him. *See id.* ¶¶ 2 (describing Ganieva "publicly attack[ing]" Black in "lawsuits filed without even making a settlement demand first"), 15 (noting Wigdor's failure "*ever* to make a settlement demand before filing the complaint") (emphasis in original), 71 (Wigdor "sacrific[ed] all its leverage by going public" with the original complaint).

The FAC itself terms Ganieva's conduct in 2021 attacking Black and exposing his misdeeds, causing him to *cease* paying her, as "economically irrational." *Id.* ¶ 2. Such pleading bolsters that her conduct did not constitute Hobbs Act extortion. It did not entail a threat to money, property, or reputation; a demand of any kind; or an intent to leverage money via a threat. As such, the FAC's factual allegations as to Ganieva do not plead a predicate act of Hobbs Act extortion. *See, e.g., McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992)

---

[19] The defense argues that Ganieva and Wigdor's litigation activity as pled is protected, so as to be off limits as a potential RICO predicate. *See* Ganieva Mem. at 18; Rubenstein Mem. at 9–10; *see also* Opp. at 32–33. The Court addresses this issue in analyzing Black's claims of mail and wire fraud as a predicate act. The Court does not address this issue in connection with the Hobbs Act, because the FAC falls far short of pleading a violation even if Ganieva and Wigdor's litigation activity were considered in full. That said, the case authority is that, where a lawsuit is "filed by lawful means," it is not "'wrongful,' as defined by the Hobbs Act." *See, e.g., Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 320 (S.D.N.Y. 2016) (cleaned up) (quoting *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 562 (S.D.N.Y. 2014)); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 577 (S.D.N.Y. 2014) ("As long as a lawsuit is pursued by lawful and proper means, it is not extortion, in the criminal sense, because the means are not wrongful."), *aff'd*, 833 F.3d 74 (2d Cir. 2016).

(extortion allegations failed where plaintiffs did not explain how defendant "forced" anything on them or "identif[ied] any threats made" by defendant); *Entretelas Americanas S.A. v. Soler*, No. 19 Civ. 3658 (LAK) (RWL), 2020 WL 9815186, at \*10 (S.D.N.Y. Feb. 3, 2020) ("The absence of allegations of force, violence or fear is fatal to Entretelas's extortion claim.") (collecting cases), *aff'd*, 840 F. App'x 601 (2d Cir.) (summary order), *as amended* (Jan. 7, 2021); *Spiteri*, 2013 WL 4806960, at \*48 ("There is no allegation in the Complaint that the Attorney Defendants received or attempted to receive something tangible from Plaintiff and therefore his extortion claim fails."); *Rini v. Zwirn*, 886 F. Supp. 270, 299 (E.D.N.Y. 1995) (complaint failed to plead extortion where allegation "is wholly devoid of any pleaded facts which give an indication of the vaguest sort as to when the alleged extortion demands occurred, who made them, or to whom they are made"; "[p]leadings which fail to indicate the persons, dates and methods of extortion . . . are plainly inadequate to support a civil RICO predicate act").

## ii. Harris

Harris argues that the conduct of which the FAC accuses him and his unnamed agents—investigating lawyers who potentially could represent Ganieva, giving her unspecified litigation assistance in her state-court action, or soliciting PR support for her—does not constitute Hobbs Act extortion. Harris Mem. at 14–15. Black rejoins that to the extent Harris's argument is that such conduct is not inherently unlawful, under Hobbs Act doctrine, conduct that is not illegal *per se* can qualify as "wrongful means of obtaining property," if the perpetrator did not have a legal right to the property. Opp. at 29–30 (citing *Viacom Int'l Inc. v. Icahn*, 747 F. Supp. 205, 211 (S.D.N.Y. 1990), *aff'd*, 946 F.2d 998 (2d Cir. 1991); *United States v. Clemente*, 640 F.2d 1069,

1077–78 (2d Cir. 1981)).[20] Here, Black argues, Harris engaged in Hobbs Act extortion of Black to obtain a leadership post at Apollo to which he was not entitled. *Id.* at 31. Harris is right and Black is wrong.

The FAC's allegations fall far short of pleading a violation of the Hobbs Act by Harris. As with Ganieva, these allegations—stripped of rhetoric—do not allege any use of force, threats or fear towards Black as a means of obtaining property. That is so even treating the CEO post at Apollo, to which Harris allegedly aspired, as property. The FAC does not allege, for example, that Harris or his agents ever threatened Black in any way for blocking Harris's rise. Instead, the FAC, read charitably to Black, alleges at most, that Harris—after being passed over for CEO—embarked on a unilateral campaign of retaliation and revenge. FAC ¶¶ 3–4. Initially, the FAC alleges, Harris, having learned of Black's association with Epstein, "began a renewed effort to depose him and take over as CEO." *Id.* ¶ 3. Then, after Harris was again rejected, he "kicked into high gear his campaign to destroy Black." *Id.* ¶ 4. The FAC alleges that Harris, from that point forward, was driven not by pursuit of the CEO post, but by bitterness and revenge. *Id.* ¶¶ 50 (Harris called directors about the Dechert Report "because of his bitterness that he was about to be passed over as CEO"), 54 ("Upon learning that he would be neither CEO nor co-CEO, Mr. Harris spurred his now fully constituted war council on to undermine the Apollo Board . . . and

---

[20] In *Viacom*, the plaintiff alleged that the defendants had "intentionally exploited plaintiff's fear" through the use of "greenmail": "the purchase of a block of stock, the threat of a tender offer, and the acceptance of a buyout." 747 F. Supp. at 211. While recognizing that greenmail is not "inherently unlawful," Judge Patterson held that it may constitute a "wrongful means of obtaining property" where it is used "to obtain property to which defendants have no lawful claim." *Id.* at 211–12; *see also Clemente*, 640 F.2d at 1077 ("Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its 'use' is wrongful.").

destroy Mr. Black."). Absent from this narrative are acts of extortion—threats or shows of force to leverage Black to relinquish property or money to another.

Harris's few other activities, as pled, do not fill this void. And these are largely alleged to have been *concealed* from Black. The FAC alleges, for example, that Harris cultivated a relationship with board members to enhance his prospects for promotion, *id.* ¶¶ 7, 55–56, and convened a secret "war council" for this purpose, *id.* ¶¶ 4, 9, 43–47, 55. But these acts were "[u]nbeknownst to Mr. Black." *Id.* ¶ 4; *see id.* ¶¶ 47 ("The war council . . . conducted its internal activities in secret, making concerted efforts to avoid any detection of them by Apollo or others."), 48 (alleging that when group members did communicate, "they deliberately spoke in code"). Such machinations—even assuming they otherwise bore some relation to the Hobbs Act's elements—cannot be the basis for a Hobbs Act claim, because, as pled, they were unknown to the victim. *See Cain*, 671 F.3d at 283 ("The essential requirement to establish extortion is thus that the victim retained 'some degree of choice in whether to comply with the extortionate threat, however much of a Hobson's choice that may be.'") (quoting *United States v. Zhou*, 428 F.3d 361, 371 (2d Cir. 2005)).

The FAC accordingly does not adequately allege Hobbs Act extortion by Harris, either.

### iii. Rubenstein

Rubenstein similarly argues that the FAC does not allege that he in any way obtained or attempted to obtain any property from Black, or made any demands to Black. As Rubenstein notes, the FAC does not allege any contact by him with or communications to Black, let alone his use of a threat or force to obtain money or property. Rather, as Rubenstein notes, as to him, the FAC solely alleges that, once Ganieva's allegations were already public, Rubenstein spread them further, and notified the press that the Manhattan DA had opened an investigation into Black's conduct. *See* Rubenstein Mem. at 11; FAC ¶¶ 28, 98, 114. This conduct, Rubenstein

argues, is far afield from a Hobbs Act violation. Black counters, as with respect to Harris, that acts not inherently lawful, can become, in context, "wrongful means of obtaining property"; Black posits that Rubenstein wrongfully used damaging publicity about Black in attempt to assist Harris to get the CEO post at Apollo. Opp. at 29–30.

The FAC's theory of a Hobbs Act violation by Rubenstein is easily put aside, as its factual pleadings fall far short of plausibly pleading this predicate offense. The FAC's allegations are essentially that Rubenstein attempted to discredit Black by revealing scandals and misdeeds as-yet unknown, in the hope that this "media narrative" "would help force Mr. Black out" as Apollo's chairman. FAC ¶ 28. To this end, the FAC alleges that Rubenstein and his "team" "planted a hit job story" attacking an Apollo board member allied with Black, *id.* ¶ 57; and disseminated Ganieva's civil case filings and information about the DA's investigation of Black to the press, *id.* ¶¶ 114–15.

Critically, though, as alleged, these salvos at what remained of Black's good name were unaccompanied by any threat or demand. Nowhere does the FAC allege that Rubenstein gained or attempted to gain any property from Black, or made any demands of Black or for his money or property. Rubenstein's negative media campaign thus is not plausibly alleged to constitute Hobbs Act extortion. *See Murrey v. Minc*, No. 21 Civ. 320 (AT) (JLC), 2022 WL 1910127, at *3 (S.D.N.Y. June 3, 2022) ("To the extent that Plaintiff is referring to a fear of reputational harm from allegedly defamatory statements, such a fear is insufficient to state an extortion claim under RICO."); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 137 (E.D.N.Y. 2010) ("Plaintiff's allegations of extortion are . . . insufficient because RICO applies to extortionate acts only where they are induced by wrongful use of actual or threatened force, violence, or fear, or under color

of official right. Therefore, plaintiff's allegations that defendants threatened to defame him are insufficient for plaintiff's RICO claim.") (internal citation and quotation marks omitted).

>    b.    *Mail and wire fraud*

"To state a RICO claim predicated on mail or wire fraud, a complaint must 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" *Babb v. Capitalsource, Inc.*, 588 F. App'x 66, 68 (2d Cir. 2015) (summary order) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)) (citing Fed. R. Civ. P. 9(b)). A complaint must also identify the purpose of the allegedly fraudulent communication "within the defendant's fraudulent scheme" and "facts that give rise to a strong inference of fraudulent intent." *Moore*, 189 F.3d at 173 (internal citation and quotation marks omitted). Each RICO defendant argues that the FAC fails to state a claim of mail and wire fraud. Each is correct.

>    i.    Litigation activities

At the threshold, because the FAC's theories of mail and wire fraud pivot on allegations about Ganieva's state-court litigation against Black, the RICO defendants argue that, as a matter of law, such litigation activity may not be considered in determining whether a RICO predicate has been.

The Second Circuit has not definitively resolved what a complaint must plead for litigation activity to be the basis of a RICO predicate act. In *Kim v. Kimm*, the Circuit affirmed the dismissal of a RICO claim against an attorney defendant. 884 F.3d 98, 105 (2d Cir. 2018). The Circuit "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless." It "conclude[d] only that where, as here, a plaintiff alleges that a

defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.*

Applying *Kim*, courts have generally required that, for a litigation activity to serve as a RICO predicate act, a plaintiff allege facts beyond that a lawsuit was brought by legitimate means. Rather, a complaint must allege more concerted abuse of the legal system. Accordingly, where a complaint's allegations about litigation activity boil down to the fact of the lawsuit itself, such cannot constitute a RICO predicate act. *See, e.g., Brock v. Zuckerberg*, No. 20 Civ. 7513 (LJL), 2021 WL 2650070, at *5 (S.D.N.Y. June 25, 2021) ("Plaintiff's claims, which stem from the Defendants' motion to transfer the action pursuant to Facebook's Terms of Service, must fail because they arise purely out of a litigation action."), *aff'd*, No. 21-1796, 2022 WL 1231044 (2d Cir. Apr. 27, 2022); *Carroll v. U.S. Equities Corp.*, 18 Civ. 667, 2020 WL 11563716, at *8–9 (N.D.N.Y. Nov. 30, 2020) (abusive litigation tactics are not themselves predicate act, but, combined with "abusive litigation activities involving conduct beyond a single lawsuit," may constitute RICO predicate act), *reconsideration denied*, 18 Civ. 667, 2021 WL 4472513 (N.D.N.Y. Sept. 30, 2021); *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 72 (E.D.N.Y. 2020) ("plaintiff cannot rely on defendants' litigation activities in the NJ Action to plead the predicate acts of mail or wire fraud for his civil RICO claim"); *LCS Grp., LLC v. Shire LLC*, No. 18 Civ. 2688 (AT), 2019 WL 1234848, at *10 (S.D.N.Y. Mar. 8, 2019) ("litigation activities 'in the absence of corruption'—including the preparation and filing of sworn declarations—'cannot constitute a RICO predicate act'") (quoting *Kim*, 884 F.3d at 103–05), *judgment aff'd, appeal dismissed in part*, No. 20-2319, 2022 WL 1217961 (2d Cir. Apr. 26, 2022).

As these courts have recognized, rarely are such abusive litigation tactics or corruption successfully pled, and such tactics cannot be inferred from the quotidian fact of the filing of a

lawsuit—much more is required. *Kim* cited *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418–20 (S.D.N.Y. 2010) as a rare example of a complaint successfully alleging that litigation activity contributed to pleading a viable civil RICO predicate act. There, defendants allegedly bought debt portfolios in bulk and filed an average of 133 debt collection actions per day over three years in civil court, without serving the defendant individuals. This led to mass, and unwarranted, default judgments. *Kim*, 884 F.3d at 105. Thus, the "gravamen" of the alleged racketeering activity in *Sykes* "was not so much litigation activities"—the filing of the actions— "as it was the use of courts to obtain default judgments *en masse* against defendants who had not been served." *Rajaratnam*, 449 F. Supp. 3d at 71 & n.17 (noting that in *Sykes*, the then-district judge, Judge Chin, did not explicitly hold that litigation activities may constitute a predicate act of mail and wire fraud).

The FAC here falls far short of these standards. Instead, it assails Ganieva and Wigdor for conduct intrinsic to the litigation itself. It does not allege collateral conduct abusive of the litigation process, like the deliberate failures to serve, followed by the pursuit of bogus default judgments, as in *Sykes*. Instead, the FAC's essential thesis is that Ganieva's legal claims against Black were baseless, and refuted by texts and other recorded communications. Even if so, and if Black's version of events is accurate such that Ganieva's lawsuit is frivolous and sanctionable, it does not remove that lawsuit from the *Kim* bar. The FAC's rhetorical claims to the effect that Ganieva's lawsuit abused the judicial system, *see, e.g.*, FAC ¶ 105, do not embed facts to this effect within the meaning of the *Kim* line of authority. *See Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) ("Butcher's allegations that the private defendants made false statements in their various filings" and in testimony "cannot support a claim of a substantive RICO violation" under *Kim*); *Dekom v. Fannie Mae*, 846 F. App'x 14, 21 (2d Cir.) (summary order) (where plaintiff

alleged that defendants "attempted to obtain an illicit double recovery by filing a second

foreclosure action" he failed to state a RICO claim under *Kim*) (internal quotation marks

omitted), *cert. denied sub nom. Dekom v. Fed. Nat'l Mortg. Ass'n*, 142 S. Ct. 100 (2021);

*Smulley v. Fed. Hous. Fin. Agency*, 754 F. App'x 18, 23 (2d Cir. 2018) (summary order) ("[T]o

the extent Smulley alleges that any Defendants made false representations and filed false

documents in Smulley's state court action(s), those acts do not constitute RICO predicates.")

(citing *Kim*, 884 F.3d at 104); *Weaver v. Boriskin*, 751 F. App'x 96, 98 (2d Cir. 2018) (summary

order) (where plaintiff "alleged the defendants engaged in various fraudulent litigation activities

related to the foreclosure action," such allegations "are insufficient to show a RICO predicate

act") (citing *Kim*, 884 F.3d at 104); *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F.

Supp. 3d 451, 460 (S.D.N.Y. 2014) ("[C]ourts have consistently refused to recognize as wire or

mail fraud even litigation activities that rise to the level of malicious prosecution simply because

the mail or wires were used."); *Brock*, 2021 WL 2650070, at *5 (complaint failed to state RICO

claim where alleged predicate acts "arise purely out of a litigation action") (citing *Kim*, 884 F.3d

at 105); *Rajaratnam*, 449 F. Supp. 3d at 70–72 (dismissing RICO claim based on litigation

activity as a predicate act; court follows *Kim* and distinguishes plaintiff's cases).[21]

Accordingly, Ganieva's state-court lawsuit—even though pled to be frivolous—cannot be

the basis of a predicate act of mail and wire fraud.

---

[21] *Carroll*, *supra*, is far afield. The district court there distinguished *Kim*, explaining that the
defendant's predicate acts had not been "limited to fraudulent activities" in a court case the
defendant filed, but also included extrinsic "activities necessary to support [a] massive fraud
scheme." *See* 2021 WL 4472513, at *9 (noting that plaintiff had pled "predicate acts of mail and
wire fraud that purportedly occurred thousands of times pursuant to an expansive fraud
scheme").

ii.    Other statements and actions

The FAC's stray remaining allegations pertinent to the predicate acts of mail and wire

fraud do not come close to plausibly pleading these offenses.  Each defendant rightly identifies

deficiencies in the fraud claims as made against them.

As Harris notes, the FAC does not allege that he made any misrepresentation.  Harris

Mem. at 16.  Black counters that the FAC is not required to prove that he personally did so, or

that specific misrepresentations were made, provided that the FAC viably plead a "scheme to

defraud."  Opp. at 35 (citing *Schmuck v. United States*, 489 U.S. 705, 715 (1989)).  The FAC,

however, does not do so.  With Ganieva's state-court-litigation excised as non-cognizable, the

FAC does not allege a scheme sounding in fraud.  At very most, it alleges a collective effort to

damage Black's reputation.  But, as pled, this effort, even treating the damaging statements about

Black as false, are not alleged to have been part of a scheme to obtain money or property, a *sine*

*qua non* of the federal anti-fraud statutes.  And a scheme to defame, standing alone, does not

qualify as mail or wire fraud.  *See Hollander v. Pressreader, Inc.*, No. 19 Civ. 2130 (AJN), 2020

WL 2836189, at *4 (S.D.N.Y. May 30, 2020) ("At bottom, Hollander's wire fraud allegations

are—at best—thinly clothed defamation claims.  And it is firmly established that defamation and

many other similar allegations do not provide the requisite predicate for RICO violations.")

(cleaned up) (citing *Kimm v. Lee*, 04 Civ. 5724 (HB), 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13,

2005), *aff'd sub nom. Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14 (2d Cir. 2006)

(summary order)); *Kimm*, 2005 WL 89386, at *5 (collecting cases).

So, too, for Rubenstein.  The FAC ties him, as a PR executive, more closely than Harris

to the "media narrative" concerning Black that the defendants allegedly fabricated.  It alleges,

generally, that Rubenstein planted a "hit job" with the media, and that he disseminated to the

press Ganieva's false accusations about Black's sexual offenses and word of the Manhattan

DA's investigation arising from them. *See* FAC ¶ 114. But, with Ganieva's lawsuit removed

from the mix, this media campaign is not pled as a scheme to defraud, as required by the mail

and wire fraud statutes. It instead is pled as an effort to defame Black and thereby injure his

name and prospects. Such a smear campaign may or may not be otherwise actionable, *e.g.*, as

the state-law tort of defamation, but, without more, it is not mail or wire fraud. *See, e.g., Kimm*,

2005 WL 89386, at *4 ("Kimm has not alleged a 'scheme to defraud.' Instead, he has

merely alleged that the false information was transmitted via the wires and mails to harm his

business and reputation. It is plain that intent to injure is not the equivalent of intent to

defraud.") (cleaned up); *Albano v. DiggDejected*, No. 19 Civ. 3048, 2021 WL 101111, at *3

(E.D.N.Y. Jan. 11, 2021) (it is "well established" that defamation is not a RICO predicate, citing

*Conte*, 703 F. Supp. 2d at 137 n.8); *see also Nygård v. Bacon*, No. 19 Civ. 1559 (LGS), 2021

WL 3721347, at *3 (S.D.N.Y. Aug. 20, 2021) ("courts typically reject efforts to shoehorn what

are effectively defamation claims into the RICO framework").[22]

Finally, as to Ganieva, with her litigation activities excised from the analysis, the FAC's

mail and wire fraud claims reduce to the claim that she made a false complaint to the Manhattan

---

[22] In a related critique, Harris and Rubenstein argue that the FAC fails to allege that they acted with intent to defraud. *See* Harris Mem. at 17–18 (noting that FAC does not allege facts showing that Harris knew Ganieva's lawsuit claims about Black were lies); Rubenstein Mem. at 12. That critique is on the mark, too. Assuming *arguendo* that Ganieva's litigation activities were fair grist for the RICO claim's mail and wire fraud predicates, the FAC's theory of fraud would appear to be that Ganieva fabricated her claim of Black's sexual misconduct as a means to obtain, in litigation, money and property from him. But although *Ganieva*—on Black's version of events—would have been aware that these claims were false, the FAC does not recite a nonconclusory basis for its claim that *Harris and Rubenstein* also appreciated that these allegations about Black were untrue. *See United States v. Greenberg*, 835 F.3d 295, 305–06 (2d Cir. 2016) (wire fraud statute "demands a showing that the defendant possessed a fraudulent intent") (citation omitted).

DA and caused her false allegation of sexual assault to be circulated to the press. But that alleged conduct from 2021, however vile, is not pled to have been part of a scheme to defraud or to obtain money or property.

Separately, the allegation that Ganieva disseminated falsehoods to the police and press is not pled with the particularity required by Rule 9(b). The FAC alleges generally that "the Enterprise arranged not only for the filing of a false police report by Ms. Ganieva, but for a new and enhanced round of publicity claiming that Mr. Black was being criminally 'investigated' for rape," FAC ¶ 98, states that Ganieva made a false report, *id.* ¶¶ 113(k), 117(c), 118(c), that Rubenstein circulated that news, *id.* ¶¶ 114(b), 117(d), 118(d), and that Harris paid or promised to pay Rubenstein and his "flacks" for that service, *id.* ¶¶ 115(c), 117(e), 118(e). Notably missing, however, are the where or the when of these actions—in particular, Ganieva's filing of the false report, and Rubenstein's ensuing dissemination of it to the media. *See Gilfus v. Vargason*, No. 04 Civ. 1379, 2006 WL 2827658, at *7 (N.D.N.Y. Sept. 30, 2006) ("Plaintiffs' Complaint fails to identify any specific person as the one who filed the allegedly false police report . . . it is only by inference that Plaintiffs' Complaint alleges that any police reports were filed. Moreover, Plaintiffs' Complaint fails to specify the allegedly fraudulent contents of such reports. Plaintiffs' claim of a fraudulent police report fails to hurdle Rule 9(b)'s strict pleading guidelines."); *Cady v. S. Suburban Coll.*, 310 F. Supp. 2d 997, 1001 (N.D. Ill. 2004) (where predicate acts alleged under RICO included causing "unnamed persons to file unspecified phony police reports," complaint failed to plead, *inter alia*, 9(b) requirements), *aff'd as modified*, 152 F. App'x 531 (7th Cir. 2005) (summary order).

For the above reasons, the FAC does not plead viable mail or wire fraud predicates. A plaintiff may not "attempt[] to recast defamatory statements as mail and wire fraud,"

*Rajaratnam*, 449 F. Supp. 3d at 73–74, without adhering to the pleading requirements of those offenses. The FAC fails to do so here.

### 3.     Continuity

The RICO defendants also argue that the Complaint fails to adequately plead continuity, and for that reason too does not allege a pattern of racketeering activity. "For such a pattern to exist, the acts of racketeering activity 'must be related and continuous.'" *Kalimantano*, 939 F. Supp. 2d at 406 (quoting *H.J. Inc.*, 492 U.S. at 239). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. A complaint that properly alleges either satisfies the continuity requirement of the pattern element. *See Kalimantano*, 939 F. Supp. 2d at 406; *Cont'l Petroleum Corp.*, 2012 WL 1231775, at *7 (citing *Satinwood*, 385 F.3d at 181). Relevant here, "[o]pen-ended continuity is established when 'an inherently unlawful act is performed at the behest of an enterprise whose business is racketeering activity [as] there is a threat of continued criminal activity.'" *Ritter v. Klisivitch*, No. 06 Civ. 5511, 2008 WL 2967627, at *12 (E.D.N.Y. July 30, 2008) (quoting *DeFalco*, 244 F.3d at 323) (alteration in *Ritter*).

Black appears to concede—rightly—that the FAC does not plead closed-ended continuity. *See* Opp. at 37. He argues, however, that it pleads open-ended continuity because the enterprise's goals—"coercing Black into paying even larger sums of money and further damaging him personally and professionally—have yet to be achieved." Black remains, he posits, at risk of being defamed and subjected to sham litigation. *Id.*

Because the Court has found that the activities Black names—being defamed and being subjected to a baseless lawsuit—have not been plausibly pled as extortion or mail or wire fraud and hence as racketeering predicate acts, it follows that the FAC also fails to plead continuity.

Put differently, having not plausibly pled qualifying criminal activity, Black has not plausibly pled a threat of continuing criminal activity from the RICO defendants.

Even if this were not so, Black's plea of well-pled continuity would founder. RICO caselaw disfavors finding continuity where the alleged scheme targeted few victims (here there is one: Black) and is inherently terminable (as is the case with Ganieva's lawsuit and alleged smear campaign). *See, e.g., Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 606 (2d Cir. 2019) (summary order) ("While Grace attempts to magnify the racketeering scheme by expanding the number of victims and predicate acts, in reality this is one scheme with one clear victim. That is clearly insufficient to establish a pattern for the purposes of RICO."); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 186 (2d Cir. 2008) ("[T]he amended complaint alleges only 'a serious, but discrete and relatively short-lived scheme to defraud a handful of victims,' which is insufficient to establish open-ended continuity.") (quoting *Cofacredit*, 187 F.3d at 244); *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 228 (S.D.N.Y. 2001) ("[C]ourts have held that where a Plaintiff alleges a single scheme promulgated for the limited purpose of defrauding a single victim, continuity cannot be established.") (collecting cases); *id.* (no open-ended continuity where "[t]he alleged fraud involved was designed to extract money from the Plaintiff. Given this limited goal, the scheme was inherently terminable."); *Lefkowitz v. Bank of New York*, No. 01 Civ. 6252 (VM), 2003 WL 22480049, at *9 (S.D.N.Y. Oct. 31, 2003) ("There is no indication in Lefkowitz's RICO counts that Defendants will continue their alleged scheme once the probate proceedings in the Marshes' estates are completed. Thus, the Court finds that there is no open-ended continuity sufficiently asserted here."), *aff'd in part, rev'd in part on other grounds and remanded*, 528 F.3d 102 (2d Cir. 2007). Black does not cite apposite contrary authority.

Accordingly, for this independent reason, the FAC fails to state a substantive RICO claim.

### 4.   Injury

In a final challenge to substantive RICO claim, the RICO defendants argue that the FAC does not allege a cognizable injury.

"To satisfy RICO's standing requirements, a plaintiff must demonstrate, "(1) a violation of [18 U.S.C. §] 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (per curiam) (quoting *Hecht*, 897 F.2d at 23); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("A RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'") (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)) (further citation omitted). "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank*, 27 F.3d at 768 (citing *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989)).

The RICO defendants argue that Black's claimed injuries do not qualify. They note that, because only injuries incurred after the enterprise took root are cognizable, Black's payments to Ganieva in response to her 2015 demands must be put aside. That leaves Black's costs of defending against Ganieva's lawsuit and the "loss of business opportunities" he asserts as a result of defendants' alleged smear campaign. And these injuries, defendants argue, are too speculative and pled too vaguely to state a claim for RICO injury. Ganieva Mem. at 22; Harris Mem. at 22; Rubenstein Mem. at 17 n.6.

Defendants are again correct. Legal fees proximately caused by a RICO violation can be cognizable. *See Angermeir v. Cohen*, 14 F. Supp. 3d 134, 152–53 (S.D.N.Y. 2014) (collecting

cases). But here, as the Court has held, Ganieva's civil lawsuit cannot be the basis for a RICO

predicate act. That eliminates the legal fees—or adverse judgment—Black may incur as a result

of that lawsuit. And Black's historical payments to deter Ganieva from going public about the

affair indeed predate the alleged Ganieva-Harris-Rubenstein enterprise and for that reason are

out of bounds.

That leaves Black's claimed injuries to his business[23] from the alleged smear campaign.

But, as pled, those injuries have yet to materialize—in RICO terms, they are not "clear and

definite." As the Second Circuit explained in *Bankers Trust*, Congress "tied the right to sue for

damages under § 1964(c), not to the time of the defendant's RICO violation, but to the time

when plaintiff suffers injury to 'his business or property' from the violation." 859 F.2d at 1103.

The Circuit accordingly excluded monetary damages that had not yet crystallized—there, the

---

[23] The FAC also alleges reputational injury to Black and Apollo traceable to defendants' smear campaign. *See* FAC ¶¶ 117, 123–24. But, as Harris and Rubenstein note, reputation is not a cognizable property interest under civil RICO, and Black cannot sue on Apollo's behalf. Rather, concrete injury to the individual's business or property must be alleged. *Nygård*, 2021 WL 3721347, at *4 ("While damage to a business's reputation is a cognizable RICO injury, it is an injury to the business. An individual cannot bring a RICO action on behalf of a business, even if he is a shareholder of an injured corporation."); *id.* at *5 (noting that while the Circuit "has not ruled on the precise extent to which reputational harm resulting in business harm is a cognizable injury to a plaintiff under the civil RICO statute . . . [c]ourts in this district and others have persuasively concluded that reputational harm resulting in the loss of business opportunities is a cognizable RICO injury if the pecuniary losses from the missed opportunities are quantifiable and non-speculative") (collecting cases). The FAC does not allege non-speculative or quantifiable injuries to Black's reputation. *See Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) (summary order) (no RICO injury where "the generalized reputational harms alleged, including the risk of future lost business commissions, are too speculative to constitute an injury to business or property," as required under RICO) (citing *Hecht*, 897 F.2d at 24); *Kerik*, 64 F. Supp. 3d at 561 ("[R]eputational injuries are insufficient to support a civil RICO claim."); *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 19 Civ. 1861, 2021 WL 960394, at *12 (E.D.N.Y. Mar. 15, 2021) (allegations failed to plausibly allege injury for civil RICO where they "fail to identify specific instances of lost business and only conclusorily allege potential lost clients based on reputational harm") (collecting cases), *aff'd*, No. 21-847, 2022 WL 480475 (2d Cir. Feb. 17, 2022); *see also* Harris Mem. at 22; Rubenstein Mem. at 17. Black does not contest this point. *See* Opp. at 39–40.

costs of tracing lost assets and incurring ongoing fees in a bankruptcy proceeding—on the

ground that "Bankers [Trust] has not yet suffered injury." *Id.* at 1106. Black's as yet-unrealized

injuries similarly fail this "ripeness requirement." *Sky Med. Supply Inc. v. SCS Support Claims

Servs., Inc.*, 17 F. Supp. 3d 207, 231 (E.D.N.Y. 2014) (quoting *DLJ Mortg. Cap., Inc. v.

Kontogiannis*, 726 F. Supp. 2d 225, 237 (E.D.N.Y. 2010)).

       To be sure, future developments could in theory cure this particular pleading deficiency,

but as pled, the FAC's failure to plead a ripe injury independently requires its dismissal. *See id.*

at 243 n.4 (plaintiff's RICO claims not ripe "to the extent plaintiff seeks to recover attorneys'

fees and costs incurred by litigating [unripe] claims in state court and arbitration"; the "amount

of these RICO damages [is] not yet clear and definite"); *NYKCool A.B. v. Pac. Int'l Servs., Inc.*,

No. 12 Civ. 5754 (LAK) (AJP), 2012 WL 5462611, at *6 (S.D.N.Y. Nov. 9, 2012) ("With

respect to the RICO claim for attorneys' fees, the Second Circuit held that Bankers Trust may

recover past legal fees incurred for attempts to collect its judgment, but not future legal fees.");

*see also Cruden v. Bank of New York*, 957 F.2d 961, 977 (2d Cir. 1992) ("Causes of action for

future damages become viable, *i.e.,* accrue, when the damages actually occur.").

       For this reason, too, the FAC fails to state a substantive RICO claim.

       **5.     Conspiracy**

       Finally, the RICO defendants each argue that the FAC does not viably allege that they

engaged in a racketeering conspiracy. As noted, to bring such a claim a plaintiff must plead, and

to prevail on such a claim must establish, that the defendant "knew about and agreed to

facilitate" a pattern of racketeering activity, *Baisch*, 346 F.3d at 377. A plaintiff must establish

"(1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the

conspiracy; (3) that the co-conspirator knowingly participated in the same." *Valenti v. Penn

Mutual Life Ins.*, No. 10 Civ. 3325 (JGK), 2012 WL 1034535, at * 4 (S.D.N.Y. Mar. 28, 2012)

(quoting *Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001)).

The FAC's RICO conspiracy allegations, as pled, are entirely derivative of its allegations of a substantive RICO violation. Here, substantially for the compounding reasons that the FAC fails to plead a substantive RICO violation, it fails to plead a RICO conspiracy. *See Satinwood*, 385 F.3d at 164 ("[B]ecause Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the District Court's dismissal of the RICO conspiracy claims."); *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 626 (2d Cir. 2020) (summary order) ("Plaintiffs' failure to state a claim for a substantive RICO violation is fatal to their RICO conspiracy claim under § 1962(d), given that Plaintiffs rely on the same factual predicate to plead both the substantive RICO violation and the conspiracy claim against JPMorgan.") (citing *Satinwood*, 385 F.3d at 164). The FAC does not adequately plead, *inter alia*, viable RICO predicate acts, a pattern of racketeering, or a relationship among the three alleged enterprise participants: Ganieva, Harris, and Rubenstein. It follows that the FAC does not adequately plead an agreement among these same persons to facilitate a pattern of racketeering activity. The Court accordingly dismisses the RICO conspiracy claim.

**B.     State Law Claims**

The Court's dismissal of the FAC's racketeering claims eliminates all federal claims. The Court accordingly must determine whether to exercise supplemental jurisdiction over the remaining state law claims. These allege defamation against all defendants and breach of contract and unjust enrichment against Ganieva.

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522

U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction" if,

as relevant here, it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. §

1367(c)(3).

In deciding whether to exercise supplemental jurisdiction, a district court is to balance the

traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon*

*Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both the Second Circuit and the Supreme Court have

held that, as a general rule, "when the federal claims are dismissed the 'state claims should be

dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998)

(quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Had the FAC's federal claims proceeded past the motion to dismiss stage into fact

discovery, there would have been some basis in judicial economy for the Court to exercise

supplemental jurisdiction over Black's state law claims. But Black's federal claims have been

dismissed at the threshold, with fact discovery having been stayed pending resolution of the

motions to dismiss. The Court's investment of time in this matter has been limited to resolving

these motions, and, in a decision rendered today, Wigdor's motion for Rule 11 sanctions based

on Black's original Complaint. There are thus no economies to be garnered by the Court's

retention of jurisdiction over Black's state-law claims.

If anything, the traditional factors of economy, convenience, and comity affirmatively

disfavor exercising supplemental jurisdiction here. That is because there is an ongoing state

court action—Ganieva's—in which (or in consolidation with which) Black's state-law claims

against Ganieva and her ostensible allies could be litigated. *See, e.g., Kidder, Peabody & Co. v.*

*Maxus Energy Corp.*, 925 F.2d 556, 564 (2d Cir. 1991) (finding that "[t]he strong interests of

59

federalism and comity in this case pointed toward divestiture of pendent jurisdiction" where the

record showed that Texas state court proceedings "were moving along and were almost at the

discovery stage" and "[s]everal pre-trial motions had been made and disposed of by that court");

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 654 (S.D.N.Y. 2017)

(declining supplemental jurisdiction where, "[d]espite the torrent of letters the parties filed

during the pendency of the motion to dismiss," the case was in the early stages of litigation and

discovery had not begun "in earnest," and there were ongoing state court actions in Delaware

Chancery Court); *Chenensky v. New York Life Ins. Co.*, 942 F. Supp. 2d 388, 395 (S.D.N.Y.

2013) (declining supplemental jurisdiction where "the relationship between the state and federal

claims, the nature of the state law claims, and the pending companion case in state court all favor

declining jurisdiction," and, "[a]s the state court companion case demonstrates, the number of

parties and claims in this case do not present a problem to re-filing in state court"); *Brooklyn

Heights Ass'n v. Nat'l Park Serv.*, 818 F. Supp. 2d 564, 571 (E.D.N.Y. 2011) ("[J]udicial

economy would be disserved by the exercise of this Court's supplemental jurisdiction, since a

parallel and concurrent state court proceeding on an almost identical cause of action is well-

advanced."); *Philip Morris Inc. v. Heinrich*, No. 95 Civ. 0328 (LMM), 1998 WL 122714, at *2

(S.D.N.Y. Mar. 19, 1998) (considering as factor counseling against the exercise of supplemental

jurisdiction under 28 U.S.C. § 1367(c)(4) that "there is currently another action in existence in a

New Jersey state court, addressing the same claims as those alleged in [a defendant's] proposed

third-party complaint"); *see also FindTheBest.com, Inc.*, 20 F. Supp. 3d at 461 (declining to

exercise supplemental jurisdiction over state law claims where RICO claims were dismissed

because "[t]his litigation is at an early stage; discovery has not yet commenced, and principles of

judicial economy do not counsel in favor of the exercise of jurisdiction").

Black counters that his state-law claims, if brought now in state court, would be barred by the statute of limitations. Opp. at 60–61. That is wrong. The Court has no occasion to opine whether Black's state-law claims were timely at the time they were brought in this Court. But, assuming they were, the Court's dismissal of these here incident to a decision not to exercise supplemental claims gives Black time to bring them in state court. *See* 28 U.S.C. § 1367(d) (claim brought under supplemental jurisdiction "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"); *Artis v. D.C.*, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.*, to stop the clock."). Should Black re-file these claims in state court, it will be for the state supreme court, upon an appropriate application, to determine how most efficaciously to consolidate supervision of Ganieva's lawsuit with Black's. *See Zohar*, 286 F. Supp. 3d at 654 (describing "substantial overlap between the factual legal and questions invoked by each of the parties' claims" in pending state court actions and noting that "all such claims are pending before the same judge"); *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 465 (S.D.N.Y. 2013) (remand to related state court proceedings was appropriate, particularly where discovery was stayed in instant action and "the parties have already begun to exchange responsive materials" in state court, which would allow parties to avoid duplication of discovery), *adhered to on denial of reconsideration*, No. 13 Civ. 1419 (PKC), 2013 WL 6182949 (S.D.N.Y. Nov. 18, 2013), *and aff'd*, 788 F.3d 98 (2d Cir. 2015).

The Court accordingly finds that no circumstances favor the exercise of supplemental jurisdiction over Black's remaining, state-law, claims, and declines to exercise such jurisdiction.

These claims are dismissed without prejudice to Black's ability to timely pursue these in state court.[24]

## CONCLUSION

For the aforementioned reasons, the Court dismisses with prejudice the FAC's claims of substantive and conspiracy violations of RICO.

The Court declines to exercise supplemental jurisdiction over the remaining, state-law, claims in this case, and dismisses these, without prejudice to Black's right to timely pursue such claims in state court.

The Clerk of the Court is respectfully directed to close the motions pending at dockets 41, 44, 80, 83, 85, and 88. Upon the issuance of the Court's decision on Wigdor's motion for sanctions later today, the Clerk of the Court will be respectfully directed to close this case.

---

[24] The Court's dismissal of Black's RICO claims is, however, with prejudice. On January 7, 2022, following Ganieva's and Wigdor's motions to dismiss Black's initial complaint, the Court ordered Black to file any amended complaint by a date certain, noting that "[n]o further opportunities to amend will ordinarily be granted." Dkt. 32; *see Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 43 (S.D.N.Y. 2016) (denying leave to replead without basis that repleading, following opportunity to amend, would cure deficiencies); *Thomas v. Shiloh Indus., Inc.*, No. 15 Civ. 7449 (KMW), 2018 WL 4500867, at *7 (S.D.N.Y. Sept. 19, 2018) (denying leave to replead where plaintiffs had opportunity to amend and were made aware of complaint's deficiency that had not been cured). Black did so in filing the FAC.

Moreover, the Court has found the FAC's claims glaringly deficient in fundamental respects, and thus finds that it would be futile to allow repleading. The Court accordingly denies leave to amend and dismisses such claims with prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Albany Ins. Co. v. Esses*, 831 F.2d 41, 45 (2d Cir. 1987) (affirming denial of leave to replead RICO claims); *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 383–84 (S.D.N.Y. 1997) (denying leave to replead RICO claims as futile); *Commc'n Opportunity, Inc. v. Davis*, No. 97 Civ. 3604 (NG), 1998 WL 240527, at *3 (E.D.N.Y. Apr. 28, 1998) ("[P]articularly in the case of pleading a claim under a statute such as RICO, which sets forth exacting pleading requirements, leave to replead can be denied where granting it would be futile.") (citing *In re Am. Exp. Co. S'holder Litig.*, 39 F.3d 395, 402 (2d Cir. 1994)).

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 30, 2022
       New York, New York