Exhibit 4

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

GUZEL GANIEVA,

　　　　　　　*Plaintiff,*

　　　v.

LEON BLACK,

　　　　　　　*Defendant.*

---

Index No. 155262/2021

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS**

Motion Sequence No. 14

Hon. David B. Cohen

**DEFENDANT LEON BLACK'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION FOR SANCTIONS**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

PERRY GUHA LLP
E. Danya Perry
1740 Broadway, 15th Floor
New York, NY 10019
(212) 399-8330

ESTRICH GOLDIN LLP
Susan Estrich (pro hac vice pending)
8605 Santa Monica Blvd, Suite 92780
West Hollywood, CA 90069
(212) 399-2132

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................3

      A.     Ganieva's Affair With  Black .....................................................................3

      B.     The Initial Ganieva Complaint And Answer ............................................5

      C.     The Amended Ganieva Complaint And Answer ......................................7

      D.     Jane Doe And The Pierson Complaint ....................................................8

LEGAL STANDARD .............................................................................................11

ARGUMENT .........................................................................................................11

I.       WIGDOR'S CONDUCT WAS INTENDED TO MALICIOUSLY HARASS
        AND INJURE  BLACK .................................................................................12

II.     WIGDOR ASSERTED MATERIAL FALSE STATEMENTS AND FAILED TO
       ADEQUATELY INVESTIGATE THE BASIS OF ITS CLAIMS ...................14

      A.     The *Ganieva* Complaints Are Replete With False Factual Statements .................14

      B.     Wigdor Failed To Conduct A Reasonable Inquiry Into Its Clients'
           Allegations ............................................................................................16

      C.     Wigdor Abused The Judicial System ....................................................20

III.    SUBSTANTIAL SANCTIONS AGAINST WIGDOR ARE WARRANTED .................20

CONCLUSION ......................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bridgeport Cap. Servs., Inc. v. Ruby Tuesday, Inc.*,
  6 Misc. 3d 50 (2d Dep't 2004) ................................................ 21

*Capetola v. Capetola*,
  96 A.D.3d 612 (1st Dep't 2012) ............................................. 21

*Chase v. Reed Smith LLP*,
  20-cv-06121 (S.D.N.Y. Jan. 28, 2021) ..................................... 7

*Guttridge v. Schwenke*,
  155 Misc. 2d 317 (Sup. Ct. Mar. 27, 1992), *aff'd*, 203 A.D.2d 242 (1994) ........................ 21

*Jason v. Chusid*,
  78 N.Y.2d 1099 (1991) ....................................................... 20

*Kafenbaum v. Soulcycle Inc.*,
  20-cv-06315 (S.D.N.Y. Apr. 21, 2021) .................................... 7

*Kornfeld v. NRX Techs., Inc.*,
  93 A.D.2d 772 (1st Dep't 1983) ............................................ 16

*Levy v. Carol Management Corporation*,
  260 A.D.2d 27 (1st Dep't. 1999) ..................................... 11, 20

*LVNV Funding LLC v. Guest*,
  (City Ct. May 29, 2012) ..................................................... 21

*Mann v. MLB Advanced Media, L.P.*,
  651503/2018 (N.Y. Sup. Ct., N.Y. Cty. Aug. 23, 2018) ...................... 7

*Martinez v. Est. of Carney*,
  129 A.D.3d 607 (1st Dep't 2015) ........................................... 21

*Mascia v. Maresco*,
  39 A.D.3d 504 (2d Dep't 2007) ............................................. 20

*Matter of Winston*,
  243 A.D.2d 638 (2nd Dep't 1997) .......................................... 21

*Midland Funding LLC v. Austinnam*,
  46 Misc. 3d 1207(A) (City Ct. Jan. 6, 2015) .............................. 14

*Navin v. Mosquera*,
  30 A.D.3d 883 (3d Dep't 2006) ............................................. 22

*New York City Hous. Auth. v. Jenkins*,
  66 Misc. 3d 1212(A) (N.Y. Civ. Ct. 2020) ................................. 21

*Ross & Cohen v. Kurtz Steel Corp.*,
  237 A.D.2d 172 (1st Dep't 1997) ........................................... 21

ii

*Sakow ex rel. Columbia Bagel, Inc. v. Columbia Bagel, Inc.*,
6 Misc. 3d 939 (Sup. Ct. Dec. 1, 2004) ............................................................... 22

*Tina X. v. John X.*,
156 A.D.3d 1152 (3d Dep't 2017) ......................................................................... 20

*Town Total Holdings v. Conte*,
656194/2016 (N.Y. Sup. Ct., N.Y. Cty. Apr. 10, 2017) ........................................ 7

*Treasures London Ltd. v. Keswani*,
2020 WL 6149793 (N.Y. Sup. Ct. Oct. 20, 2020) ............................................... 22

*U.S. Bank Nat. Ass'n v. Gonzalez*,
99 A.D.3d 694 (2d Dep't 2012) ............................................................................ 22

*Vahdat v. Capdel LLC*,
2019 WL 3080948 (N.Y. Sup. Ct. July 15, 2019) ................................................ 22

### Statutory Authorities

N.Y. Civ. Prac. L. & R. § 214-j ................................................................................ 2

### N.Y.C. Charter and Administrative Code

N.Y.C. Admin. Code § 8-903 ........................................................................... passim

### Rules and Regulations

22 NYCRR §130-1.1 ..................................................................................... passim

22 NYCRR § 130-1.2 .......................................................................................... 11

22 NYCRR § 202.8 .............................................................................................. 24

### Additional Authorities

*Wigdor LLP Partner Jeanne Christensen Writes About The Momentum Building For The
ASA In The NY Daily News,* (Nov. 16, 2022), https://www.wigdorlaw.com/wigdor-llp-
partner-jeanne-christensen-writes-about-the-momentum-building-for-the-asa-in-the-
ny-daily-news/ ...................................................................................................... 10

Alexandra Tremayne-Pengelly, *A New Act Allowing Suits from Decades-Old Sexual
Assaults is a Windfall for New York Law Firms,* N.Y. OBSERVER, (Dec. 8, 2022),
https://observer.com/2022/12/a-new-act-allowing-suits-from-decades-old-sexual-
assaults-is-a-windfall-for-new-york-law-firms/ ..................................................... 13

*Leon Black Sued For Rape Under The Adult Survivor's Act*, (Nov. 28, 2022),
https://www.wigdorlaw.com/leon-black-sued-for-rape-under-the-adult-survivors-act/ .... 10, 13

*Wigdor LLP Calls On The New York State Assembly To Pass The Adult Survivors Act*,
(June 7, 2021), https://www.wigdorlaw.com/pass-adult-survivors-act-new-york-state-
assembly/. ......................................................................................................... 10, 13

iii

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 6 of 29

Defendant Leon Black respectfully submits this memorandum of law in support of his motion for sanctions against Wigdor LLP and Ganieva, pursuant to 22 NYCRR §130-1.1.[1]

## PRELIMINARY STATEMENT

Wigdor—a law firm that is no stranger to sanctions motions—has through its clients Guzel Ganieva in this case, and Cheri Pierson in another case, repeatedly abused the court system to launder frivolous, unsubstantiated, and damaging accusations of sexual assault against Black across two lawsuits. Wigdor has done so in a carefully orchestrated, and ongoing, malicious campaign intended not to redress any legitimate legal grievances but to harass him and attempt to destroy a well-earned and sterling reputation built over decades of professional and charitable endeavors. It is sanctionable conduct to wantonly file complaints without reasonable investigation and that counsel knows are devoid of legal or factual merit. Each time Black showed the allegations were false, with contemporaneous documentary evidence that Wigdor has never seriously contested, Wigdor doubled down, filing another even more lurid pleading containing all of the demonstrably false allegations as well as new false and inflammatory claims.

In June 2021, Wigdor brought allegations against Black on behalf of Ganieva, who had a sporadic, consensual affair with Black from 2008-2014, and signed an agreement in 2015 promising to keep it private. Shortly after the Ganieva complaint was filed, Black's attorneys notified Wigdor of incontrovertible evidence showing Ganieva's claims were complete fiction, including recorded conversations of Ganieva extorting Black for $100 million in exchange for keeping their affair secret, and offered to share this evidence with Wigdor. Rather than withdrawing its claims, or even accepting Black's offer to show them the evidence, Wigdor not

---

[1]  Mr. Black is filing identical motions in this case and in *Cheri Pierson v. Leon Black*, *et al.*, Index No. 952002/2022. If these actions are consolidated, Mr. Black will assert a consolidated sanctions motion.

only repeated the allegations that had been conclusively disproven, but also added new unsupported, and inflammatory ones. When Black's attorneys showed that these allegations, too, were contradicted by documentary evidence, Wigdor doubled down yet again. In its third complaint in the Ganieva case, Wigdor added lurid allegations concerning a "Jane Doe"—now identified in the newest filed lawsuit as Pierson. Although there was no evidence Ganieva knew Jane Doe or had anything to do with her, Jane Doe—and her claim that a massage she gave Black twenty years earlier ended with an assault—became a key piece of the operative Ganieva lawsuit.

Even a cursory review of public records would have put Wigdor on notice of facts completely undermining the credibility of Pierson, and raised serious red flags about airing her decades-old accusations in a public court filing. Pierson's long history of vexatious litigation and the issues raised by the 35 or so lawsuits in which she has been involved over the years would call into question her entire account. Coming on the heels of—and in connection with—the Ganieva lawsuit, and the evidence showing Ganieva's suit was a fabrication, a responsible attorney would have dug in and concluded Pierson was using the court system to pursue a frivolous suit for financial gain. But her value in creating additional leverage against Black in the *Ganieva* litigation, in which the firm had invested heavily, and promoting the firm's work for survivors of sexual assault under the new Adult Survivors Act, CPLR § 214-j (the "ASA"), an important business opportunity for Wigdor, overrode what should have been natural concerns about the weakness of the claim and the ethics of bringing it.

In a continuation of its pattern of harassing and frivolous conduct, Wigdor added the lurid Jane Doe allegations to its complaint in the *Ganieva* case, and then filed the separate *Pierson* complaint. Consciously disregarding the obvious evidentiary flaws including the absence of any corroborative evidence and the glaring credibility issues, Wigdor first included Pierson's

2

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 8 of 29

allegations as the newest component of the *Ganieva* suit, and then filed the Pierson lawsuit on the first business day after the ASA went into effect. Wigdor did so in the face of Black's staunch denials, and counsel's fair warning. It was irresponsible for Wigdor to bring Ganieva's frivolous claims against Black knowing of evidence directly contradicting her allegations, and to reassert them in the face of clear documentary evidence showing them to be fabrications. It was equally irresponsible for Wigdor to include the Jane Doe allegations and then file Pierson's frivolous complaint, which repeats many of the frivolous allegations from the *Ganieva* lawsuit, without conducting a reasonable inquiry into the truth of Pierson's allegations. It was even more irresponsible for Wigdor to do so in light of its track record in the *Ganieva* case and the evidence discrediting Ganieva's claims that Black's counsel brought to Wigdor's attention. As evidence of its improper motives and tactics, Wigdor has, outside of a litigation context, tried doggedly to dig up "dirt" on Black, but has come up short. Wigdor's improper campaign must end, and Wigdor should be sanctioned for its wrongful conduct.

## **BACKGROUND**

### A.  **Ganieva's Affair With Black**

On June 1, 2021, Ganieva, through her counsel Wigdor, filed suit against Black, alleging defamation, defamation per se, intentional infliction of emotional distress and gender-motivated violence under the GMVA, N.Y.C. Admin. Code § 8-903. She brought her lawsuit after extorting some $9.2 million from Black by threatening to expose an ill-advised, yet consensual affair, and despite signing a release and confidentiality agreement barring her claims.

The relationship between Ganieva and Black began at a party both attended in 2008 (155262/2021, NYSCEF Doc. No. 155 ¶20), continued sporadically, and ended in 2014, when she told Black she was leaving the country for immigration-related reasons. (155262/2021, NYSCEF Doc. No. 36 ¶¶12-13, 15.) From the time she left New York until she returned in June 2015, she

3

continued to send text messages to Black telling him she missed and loved him. (*Id.* ¶19.) Her tone changed when she returned in 2015, insisting she meet with him about a matter that was "both urgent and important." (*Id.* ¶20.)

The matter was extortion. This was not a "MeToo" case. That movement was never intended as a vehicle for the sort of blackmail that is at the heart of Ganieva's case, a holdup by another name, conducted with the assistance of counsel. Ganieva warned Black she would go public with their affair unless he paid her $100 million. (*Id.* ¶23.) In a recorded conversation, she told him: "The more, the longer I wait, the more sure I become that I actually prefer to go public…. I'm dying to talk to press about it." (*Id.*)

Understanding he was being extorted, Black consulted attorneys and began recording their conversations. (*Id.* ¶22.) Asked on tape to explain her demands, Ganieva claimed some form of palimony or community property law gave her rights, and she complained various prominent people were harassing her at Black's direction, musings she herself described as "paranoid." (*Id.* ¶¶28, 66.) Never once, however, did she ever suggest Black sexually assaulted her. (*Id.* ¶31.)

For five and a half years, including while attending law school and later while represented by counsel, Ganieva willingly accepted (and spent on her lifestyle) monthly payment of $100,000, further recognizing the binding legal effect of, and repeatedly ratifying, the agreement she had signed to keep their affair private. During this time, she began consulting Douglas Wigdor, the name partner of Wigdor LLP, in connection with her media outreach. (Affirmation of Michael Carlinsky ("Aff") ¶2-3.) That outreach clearly violated the agreement she had signed. (Aff. ¶4.) Specifically, Mr. Wigdor spoke about Ganieva's relationship with Black to New York Times

4

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 10 of 29

reporter Matthew Goldstein with Ganieva's permission. (*Id.* ¶3.) It was while being advised by Mr. Wigdor that Ganieva decided to falsely accuse Black of sexual abuse on Twitter.[2]

### B.     The Initial Ganieva Complaint And Answer

Wigdor filed the first of three sham complaints on behalf of Ganieva and against Black on June 1, 2021, in New York Supreme Court. (155262/2021, NYSCEF Doc. No. 1.) The centerpiece of the complaint was a purported sexual assault that supposedly took place on July 6, 2014, when Black "barged" into her apartment "suddenly" and without warning. (*Id.* ¶47.) Ganieva claimed that, at the time, she was "debilitated" and "in a weakened state, having been sick for almost a week"—so weak she could "barely walk." (*Id.* ¶¶48-49.)

Ganieva must have assumed that by asserting claims seven years later, any private text messages between her and Black were long discarded. Fortunately for Black, he kept the texts, and they put the lie to her claim. The supposed assault followed a text from Ganieva saying, "Baby, I'm all alone. Let's get together soon. I miss you. Xoxo." (155262/2021, NYSCEF Doc. No. 4 ¶49.) On July 6, the day of the alleged assault, Ganieva wrote to Black, unsolicited: "This is love. I need you." (*Id.*) In response, Black said he would be driving back to New York City that evening, and inquired if he could "come over and tuck you in at 10:30?" (*Id.*) She not only agreed, she asked him to bring wine. He came earlier, at her invitation. (*Id.*) She reached out again first thing the next morning with a message of thanks and love. "Good morning. It was very nice to see you last night. I already feel better. I love you and thank you!!! Xoxoxoxoxo and more love." (*Id.* ¶52.)

---

[2]  Ganieva's and Wigdor's conduct is now the basis of a separate lawsuit filed by Black for breach of contract and tortious interference with contract, respectively. *Black v. Ganieva*, Index. No. 654108/2022.

5

Contrary to the claim in Ganieva's complaint that "[a]fter this rape, Ms. Ganieva took her son and left New York to physically distance herself from Black" (155262/2021, NYSCEF Doc. No. 1 ¶55), Ganieva and Black saw each other several times, at her request, between July 6, when Black supposedly raped her, and July 30, when she texted him from the plane as she was departing: "I love you and miss you already" (155262/2021, NYSCEF Doc. No. 4 ¶¶52-58).  Black's answer demonstrated the allegation of sexual assault was a sham.

In addition to the alleged rape, Ganieva claimed she was threatened and coerced into signing a non-disclosure agreement in 2015 and accepting "regular payments" in exchange for her silence, and was now "bravely" speaking out against Black for the first time.  (155262/2021, NYSCEF Doc. No. 1, ¶¶7-9, 58-72, 79-81.)  This, too, was a wholesale fabrication.  Ganieva and her lawyers also were not initially aware that Black had secretly recorded her extortion, and those recordings further expose the falsity of her allegations. As Black's answer showed, it was Ganieva who threatened Black, demanding $100 million or else she would go public about their relationship, never did she claim he had abused her.  Her extortion is documented in numerous recorded conversations. (155262/2021, NYSCEF Doc. No. 4 ¶¶18-29.) Those recordings further demonstrate Black never made any of the threats alleged in Ganieva's complaint—including those she recounted in purported direct quotations.  (*Id.*)  And far from being "coerced," Ganieva gladly and voluntarily signed a release and confidentiality agreement in exchange for millions of dollars, including payments of $100,000 per month.  (*Id.* ¶¶30-43.)  After she signed the agreement in 2015, she proceeded to discuss her investment and travel plans, laughing that she was now "a woman of means."  Ganieva accepted her monthly payments for more than five years, and never once sought to repudiate their agreement or return the millions of dollars she had received.  (*Id.* ¶42.)

6

Once the initial Ganieva complaint was filed, and then a second and third, Black's lawyers offered to make the texts, tape recordings, and the release and confidentiality agreement signed in 2015 available to Wigdor. (Aff. ¶5.) Wigdor inexplicably declined, falsely claiming—contrary to undisputed evidence[3]—that the firm did not sign protective agreements. (*Id.*) Wigdor preferred to stick its head in the sand, rather than face the truth about its client and her bogus allegations.

## C.    The Amended Ganieva Complaint And Answer

On August 9, 2021, Wigdor, on behalf of Ganieva, filed an amended complaint. In apparent recognition of the weakness of the original allegations, the amended complaint ballooned from 90 to 244 paragraphs. The disproven allegations remained in the amended complaint, along with 154 paragraphs of purely gratuitous new material, the majority of which focused almost entirely on Jeffrey Epstein. (155262/2021, Doc. 26 ¶¶50-129.) None of these new allegations were based on anything that happened after the original complaint, nor was there any explanation as to why they were only appearing in the amended complaint. Indeed, the one new claim in Ganieva's amended complaint had nothing to do with the new Epstein allegations.

In the amended complaint, Ganieva seems suddenly to have spontaneously "remembered" being kidnapped by Black and taken to Florida for a supposed threesome with Epstein. Ganieva claimed she was flown purportedly against her will to Palm Beach, Florida on Black's private plane and taken to Epstein's home there where she supposedly had a lurid conversation with his associate Sarah Kellen. Never mind that Ganieva's newly minted allegations didn't explain how she was somehow forced to travel to an airport, board a plane, fly to Florida, and then deplane, all

---

[3]  The Wigdor firm has often entered protective orders in the past. *See, e.g.*, Stipulation and Order, *Kafenbaum v. Soulcycle Inc.*, 20-cv-06315 (S.D.N.Y. Apr. 21, 2021); Stipulation and Order, *Chase v. Reed Smith LLP*, 20-cv-06121 (S.D.N.Y. Jan. 28, 2021); Stipulation and Order, *Mann v. MLB Advanced Media, L.P.*, 651503/2018 (N.Y. Sup. Ct., N.Y. Cty. Aug. 23, 2018); Stipulation and Order, *Town Total Holdings v. Conte*, 656194/2016 (N.Y. Sup. Ct., N.Y. Cty. Apr. 10, 2017).

7

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 13 of 29

the while with staff around but without any protestations from Ganieva.  Nor, does the complaint identify a single one of what would have had to be multiple eyewitnesses to this purportedly forcible airborne multistate abduction—and return.  There is also no specification of any individuals with whom Ganieva contemporaneously shared her supposed ordeal.

As Black demonstrated in his answer to Ganieva's amended complaint, the flight manifests for Black's plane conclusively established Ganieva never took the October 2008 flight to Florida as described in the Amended Complaint.  (155262/2021, NYSCEF Doc. No. 36 ¶81.)  If called, Black is confident Kellen will testify she never met Ganieva, much less had any conversation with her.  (*Id.*)  Moreover, in 2015, Ganieva couldn't even remember whether she had ever met Epstein. (*Id.* ¶80.).  When his name came up in a recorded conversation in the context of one of her convoluted conspiracy theories, Black asked her if she had ever met Epstein.  (*Id.*)  Far from saying she'd been kidnapped, she first told Black she'd *never met* Epstein and then said he may have called her at one point.  (*Id.*)

### D.  Jane Doe And The Pierson Complaint

Undeterred, Wigdor doubled down yet again, filing a second amended complaint in the Ganieva case.  (155262/2021, NYSCEF Doc. Nos. 45-49, 155.)  This time, a Jane Doe—now identified as Pierson—was the principal new addition.  Ganieva's latest complaint detailed a horrific assault allegedly suffered by Jane Doe at the hands of Black years before Ganieva even met Black.  According to the new allegations, Jane Doe—now identified as Pierson—who was approximately 40 years old at the time, had visited Epstein's townhouse on multiple occasions and given Epstein massages where she was in a bikini and he was naked.  (155262/2021, NYSCEF Doc Nos. 155 ¶¶57-59.)  She alleges, each time, Epstein masturbated in front of her, yet she returned multiple times.  (*Id.* ¶58.)  She then alleges she accepted an invitation to return to Epstein's townhouse a few months later, where she agreed to give a massage to Black who allegedly

8

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 14 of 29

assaulted her.  (*Id.* ¶¶63-74.)  In the *Ganieva* lawsuit, the story was that Black assaulted her with "a painful object."  (*Id.* ¶71.)  In the *Ganieva* complaint, there were no witnesses to the assault, and Jane Doe did not tell anyone for weeks.  (*Id.* ¶85.)  The *Ganieva* complaint alleged Jane Doe met Black for lunch at 9 West 57th Street, and a few weeks later met him on a Sunday night in the lobby restaurant of the St. Regis Hotel, where he allegedly gave her an envelope containing $5,000 cash.  (*Id.* ¶¶77-80.)

Ganieva's complaint did not assert any new claims based on the Jane Doe allegations.  Rather, they were clearly included in the *Ganieva* complaint to create additional leverage against Black in the hope of salvaging Ganieva's disproven claims.  Unable to rebut Black's evidence, they turned to Pierson—a serial litigant whom Black does not know—to create additional leverage.

To further increase the public pressure on Black and smear his reputation, Wigdor filed an independent complaint on behalf of Pierson on November 28, 2022—the first business day after the ASA went into effect.  (952002/2022, NYSCEF Doc. No. 1.)  The allegations in this new complaint are similar to those already asserted in the *Ganieva* action.  In her complaint, Pierson claims Black sexually assaulted her in Epstein's Manhattan townhouse more than twenty years ago while Pierson was giving him a massage.  (*Id.* ¶¶3-4.)  However, there are some notable inconsistencies in her new account:  Pierson no longer claims Black assaulted her with "a painful object."  In the *Ganieva* complaint, it is alleged that she met Black at a restaurant located at 9 West 57th Street, the address of Apollo's offices.  But after Black's lawyers pointed out that Apollo was not at that address at the time of the supposed lunch, her story changed yet again.  (Ex. 1.[4])  She now states they met at a midtown restaurant.  (952002/2022, NYSCEF Doc. No. 1 ¶99.)  Other

---

[4]  "Ex." refers to exhibits to the Affirmation of Michael Carlinsky.

inconsistencies exist between Pierson's version of events in the *Ganieva* complaint and her recently filed complaint, raising further blatant red flags that Wigdor ignored.

The *Pierson* complaint also served to broadcast Wigdor as one of the first firms to file an ASA action.  Wigdor, whose practice involves significant numbers of sexual assault and harassment lawsuits, lobbied the New York State Assembly for the passage of the ASA.[5]  The *Pierson* lawsuit serves as an advertisement for Wigdor's services in this space, and Wigdor has prominently advertised its claims against Black on its website.[6]  The article quotes attorney Jeanne Christensen, lead counsel for Pierson and Ganieva, and links related media articles.  Wigdor's website also advertises an OpEd by Christensen in the Daily News regarding the ASA[7] and links to a new website, adultsurvivorsactrights.com, encouraging potential clients to contact to Wigdor for legal advice regarding ASA claims.

It is worth noting that Wigdor has threatened on multiple occasions to file yet another amended complaint against Black in the *Ganieva* action, this time with new claims under the ASA. Despite purportedly having evidence to assert these claims from inception, and despite that Wigdor has known since at least May 2022 that the ASA would be effective in November, it still has not filed an amended complaint.  Still coasting on the press bump from the *Pierson* complaint filing, Wigdor is no doubt waiting to ensure optimal press coverage with which to continue its marketing blitz.

---

[5] *Wigdor LLP Calls On The New York State Assembly To Pass The Adult Survivors Act*, (June 7, 2021), https://www.wigdorlaw.com/pass-adult-survivors-act-new-york-state-assembly/.

[6] *Leon Black Sued For Rape Under The Adult Survivor's Act*, (Nov. 28, 2022), https://www.wigdorlaw.com/leon-black-sued-for-rape-under-the-adult-survivors-act/.

[7] *Wigdor LLP Partner Jeanne Christensen Writes About the Momentum Building for the ASA in the NY Daily News* (Nov. 16, 2022), https://www.wigdorlaw.com/wigdor-llp-partner-jeanne-christensen-writes-about-the-momentum-building-for-the-asa-in-the-ny-daily-news/.

10

## LEGAL STANDARD

Under 22 NYCRR 130-1.1(a), "the court, in its discretion may impose financial sanctions upon any party or attorney in a civil action or proceeding who engages in frivolous conduct as defined in this Part." Conduct is "frivolous" if: (1) "it is completely without merit in law"; (2) "it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another;" or (3) "it asserts material factual statements that are false." 22 NYCRR § 130-1.1(c). "[T]he court shall consider, among other issues the circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct; and whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party." *Id.*

Every pleading and filing "shall be signed by an attorney." 22 NYCRR § 130-1.1a(a). "By signing a paper, an attorney or party certifies that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, (1) the presentation of the paper or the contentions therein are not frivolous as defined in section 130-1.1(c) of this Subpart[.]" 22 NYCRR § 130-1.1a(b).

In New York, "[s]anctions are retributive, in that they punish past conduct," and "also are goal oriented, in that they are useful in deterring future frivolous conduct[.]" *Levy v. Carol Mgmt. Corp.*, 260 A.D.2d 27, 34 (1st Dep't 1999) (affirming sanctions when "good-faith is simply absent in the case before us"). "The goals include preventing the waste of judicial resources, and deterring vexatious litigation and dilatory or malicious litigation tactics[.]" *Id.*

## ARGUMENT

This Court should issue an order to "award costs or impose sanctions or both" against Wigdor for its frivolous conduct in this action. 22 NYCRR § 130-1.2. Wigdor filed two baseless

11

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 17 of 29

actions as part of a campaign to maliciously harass Black, ruin his reputation, and obtain a financial windfall. It had plenty of time to conduct a thorough investigation, but willfully opted not to, and it persisted in larding its complaints with material false statements even after being put on notice that those allegations were contradicted by clear documentary evidence.

## I. WIGDOR'S CONDUCT WAS INTENDED TO MALICIOUSLY HARASS AND INJURE BLACK

In both *Ganieva* and *Pierson*, Wigdor has engaged in a pattern of malicious, bad faith conduct, which can only be explained as an intentional effort to ruin Black's reputation, increasing leverage against Black with a view toward a financial windfall, and shamelessly promoting itself. Wigdor's entire course of conduct, properly viewed in context across these complaints, warrants sanctions.

Wigdor filed the first of Ganieva's complaints knowing Ganieva had signed a release and confidentiality agreement with Black. Wigdor was willing to proceed notwithstanding that, and notwithstanding Ganieva's acknowledged acceptance of monthly payments from Black for more than five years—including while she was being advised by Wigdor in her outreach to the press and another law firm prior to that—which constituted clear ratification and completely undercut her allegations of duress in her initial complaint. Stranger still, Wigdor filed its complaint without ever reaching out to Black and attempting to negotiate a private settlement—contrary to Wigdor's established playbook.

Black's attorneys offered to provide Wigdor with documentary evidence conclusively disproving Ganieva's allegations and showing her claims to be meritless. But Wigdor refused, falsely asserting that it did not enter into standard confidentiality agreements. Then, despite now being on notice of the false statements in Ganieva's complaint, Wigdor doubled down and filed an amended complaint, replete with new lurid, inflammatory, and irrelevant allegations and repeating

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 18 of 29

all the false claims that had already been debunked.  And when these new allegations too were shown to be false, Wigdor doubled down yet again in Ganieva's second amended complaint.

Wigdor's conduct makes perfect sense—and indeed, only makes sense—as an improper effort to salvage a meritless case.  Each time it became clear Ganieva's allegations were provably false—including by her own words—Wigdor upped the ante with new allegations that served only to further smear Black's already damaged reputation.  By doing so, Wigdor sought to create additional leverage, and increase pressure on Black to settle Ganieva's claims and pay Wigdor and its client an undeserved financial windfall.  When that, too, failed, Wigdor filed Pierson's complaint, ensuring a fresh round of press coverage and increased publicity for the false claims Wigdor had already included in Ganieva's second amended complaint.

In addition to harming and harassing Black, Wigdor's course of conduct served another purpose: self-promotion.  By filing Pierson's complaint on the first business day after the effective date of the ASA, Wigdor could broadcast itself as one of the first firms to file an action under the statute.  Wigdor provided financial and other support for the primary organization that lobbied the New York State Assembly to pass the ASA.[8]  Wigdor is now using Pierson's lawsuit to advertise Wigdor's services, proudly trumpeting her claims against Black on its website.[9]  As a result of Wigdor's self-serving and bad faith conduct, Pierson, who was purportedly so concerned about her privacy that she was identified only as "Jane Doe" in Ganieva's second amended complaint

---

[8]  Alexandra Tremayne-Pengelly, *A New Act Allowing Suits from Decades-Old Sexual Assaults is a Windfall for New York Law Firms*, N.Y. OBSERVER (Dec. 8, 2022), https://observer.com/2022/12/a-new-act-allowing-suits-from-decades-old-sexual-assaults-is-a-windfall-for-new-york-law-firms/; *see also Wigdor LLP Calls On The New York State Assembly To Pass The Adult Survivors Act*, (June 7, 2021) https://www.wigdorlaw.com/pass-adult-survivors-act-new-york-state-assembly/.

[9]  *Leon Black Sued For Rape Under The Adult Survivor's Act*, (Nov. 28, 2022), https://www.wigdorlaw.com/leon-black-sued-for-rape-under-the-adult-survivors-act/.

(and indeed, remains so identified) and Wigdor flatly refused to disclose her identity in discovery, has now been publicly named and is being used by Wigdor to drum up new business.

Wigdor's bad faith conduct, beginning in the *Ganieva* case and continuing into the *Pierson* case, was clearly intended to harass and maliciously injure Black. Accordingly, Wigdor's conduct was frivolous under Part 130 and the Court should impose sanctions.

## II. WIGDOR ASSERTED MATERIAL FALSE STATEMENTS AND FAILED TO ADEQUATELY INVESTIGATE THE BASIS OF ITS CLAIMS

The *Ganieva* and *Pierson* complaints contain material statements of fact that Wigdor knew, or should have known, were false when made, and for which the utter lack of legal or factual basis was either apparent, or would have been apparent if Wigdor performed even a minimal amount of due diligence.

### A.    The *Ganieva* Complaints Are Replete With False Factual Statements

By signing each of the complaints, Wigdor certified they were made "after an inquiry reasonable under the circumstances" which "establishes that the claim asserted in the complaint has merit in law and asserts truthful factual allegations," and that they satisfied their "obligation to obtain the required [proof] substantiating a prima facie case … prior to filing the instant action." *Midland Funding LLC v. Austinnam*, 46 Misc. 3d 1207(A) at *5-6 (Mount Vernon City Ct. 2015) ("commencing [an] action without having proof of its merit" was "frivolous within the meaning of 22 NYCRR § 130-1.1(c)"). Those certifications were false and wholly improper.

Black quoted extensively from the texts, tape recordings, and release and confidentiality agreement Ganieva signed in 2015 in his answer to the initial complaint, and offered to make this evidence available to Wigdor. But Wigdor declined to enter into the confidentiality agreement necessary to exchange these documents, in an effort to avoid learning the truth about the material false statements in Ganieva's complaint. Rather than withdrawing the now disproven allegations,

14

Wigdor filed an amended complaint including all of the false statements from the initial complaint and doubled down with additional false allegations—a pattern it would repeat when those allegations too were shown to be false. To take but one small example, the complaint alleges Black uttered certain words, placed in quotes, on certain occasions; despite that the recordings prove such words were never spoken, later iterations of the complaint continue to allege these exact same purported quotations. That pattern continued in Pierson's complaint, which relies heavily on Ganieva's pleadings and duplicates numerous allegations verbatim. *Compare* 155262/2021, NYSCEF Doc. No. 155 ¶¶52-110 *with* 952002/2022, NYSCEF Doc. No. 1 ¶¶30-57, 63-108.

However, Pierson's complaint contains a few notable discrepancies from Ganieva's that call her reliability into question. *Compare* 155262/2021, NYSCEF Doc. No. 155 ¶¶67-68 (Black "took off all of his clothes" and "made several vulgar and disgusting comments"), *with* 952002/2022, NYSCEF Doc. No. 1 ¶84 (Black "took off his pants, left his socks on, and unbuttoned his white dress shirt"). For example, one of the few details in the Jane Doe allegations in Ganieva's complaint, the restaurant address where Pierson allegedly met Black (155262/2021, NYSCEF Doc. No. ¶77), was plainly wrong; and indeed prior to its filing Black's attorneys pointed out that the address was the office building Apollo moved into *after* the lunch in question allegedly took place (Ex. 1 at 2). In an effort to hide this inaccuracy, Pierson's complaint simply states that they met at a midtown restaurant. (952002/2022, NYSCEF Doc. No. 1. ¶99.) For another, Ganieva's complaint alleges Black assaulted Pierson with "a painful object" (155262/2021, NYSCEF Doc. No. 155 ¶71), but that inflammatory allegation is nowhere in Pierson's complaint.

15

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 21 of 29

## B.  **Wigdor Failed To Conduct A Reasonable Inquiry Into Its Clients' Allegations**

Wigdor's apparent failure to conduct a reasonable investigation into Ganieva's and Pierson's allegations is also grounds for sanctions.  *See Kornfeld v. NRX Techs., Inc.*, 93 A.D.2d 772, 773 (1st Dep't 1983) ("unsubstantiated assertions" that "are neither genuine nor real … are frivolous" when "clearly refuted by documentary proof which had been offered").  Counsel for Black informed Wigdor of the evidence debunking Ganieva's claims against Black, including recorded conversations in which Ganieva extorts millions from Black in exchange for keeping their affair secret.  But Wigdor took pains to avoid reviewing this evidence, and instead doubled down and persisted in asserting provably false allegations about Black.

Similarly, Black's attorneys informed Wigdor, in advance of filing Pierson's claims, her "allegations are not only patently false but in fact totally fabricated out of whole cloth." (*See* Ex. 1.)  They further warned that, should Wigdor file a complaint on behalf of Jane Doe, Black would "pursue any and all remedies, including by asserting claims for defamation and/or seeking sanctions." (*Id.*)  In addition, they informed Wigdor that Black staunchly denied the allegations aired by "Jane Doe" in Ganieva's second amended complaint, and key details in that account were simply wrong.  Black's unequivocal denial, his attorney's identification of factual inaccuracies in Jane Doe's account, and the lack of any corroboration, should have put Wigdor on notice and prompted further investigation of those allegations.

Black did not know at that time that the Jane Doe who was planning to sue him—Pierson—had a long record of vexatious litigation, including interpersonal battles raising mental health and other issues that bear heavily on her trustworthiness.  (Aff. ¶6.)  Those facts are easily obtained from a public records search.  Wigdor either knew this information and proceeded anyway, or failed to conduct the most rudimentary investigation about their client and her allegations.  In either

16

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 22 of 29

event, Wigdor plowed ahead with reckless disregard for the falsity of the complaint it was filing.

At minimum, Wigdor's track record in Ganieva's case, and the volume and content of court records

associated with Pierson, should have given it pause, and subjected Pierson's claims to heightened

scrutiny.

The Criminal Docket.  In 1998, Pierson was arrested and charged in New Jersey with felony

possession of a controlled substance; according to the docket, she was charged with possession of

crack cocaine, cocaine, marijuana and hashish.  (Ex 2.)  In 2004, she was charged with an unknown

misdemeanor in Marin County, California (Ex 3.); and in 2006, she was charged with misdemeanor

battery in Miami-Dade County (Ex 4.).  Also in 2006, and also in Miami, she was charged with

practicing as a massage therapist without a license; she entered a pretrial diversion program

involving participating in a "values course."  (Ex 5.)

The Civil Docket.  Pierson has been in court at least *35 times* for disputes with friends,

neighbors, and employers; for suits with shopkeepers and motorists, stores where she claims to

have slipped and fell, hairdressers who allegedly wronged her, a boyfriend who left her.  (Exs 3-

20; Aff. ¶¶7-26.)  She has been sued dozens of times, many for unpaid bills and financial debts,

but almost as often by those whose path she crossed as a tenant or neighbor.  (Aff. ¶26.)

Disputes with Friends.  In 2003, Pierson filed a civil lawsuit in New York alleging her

boyfriend Richard Petak was a drug addict and an alcoholic who physically and emotionally

abused her.  (Ex 6.)  Pierson sought more than $20 million from Petak for intentional infliction of

emotional distress and slander.  (*Id*.)  Pierson alleged Petak slandered her when he told her daughter

in a voicemail message that Pierson was "fucking men" at a "whore house," and told Pierson she

was a "hooker."  (*Id*.)

17

<u>Disputes with Employers.</u>  In a 2008 lawsuit filed in Florida, Timeshares Direct Inc., a timeshare sales company, alleged Pierson, a former sales representative, made copies of her "client contact sheets" and used them to develop business for her new company.  (Ex 7.)  The case was dismissed three years later.  (*Id.*)

<u>Disputes with Neighbors.</u>  Between 2011 and 2016, when she was evicted, Pierson was involved in multiple cases in which her neighbors complained Pierson harassed them, stalked them, and threatened to kill them.  (Ex 8.)  One of these neighbors was granted an order of protection still in force.  (*Id.*)  These neighbors accused Pierson of being a hoarder who exhibited frequent erratic behavior including yelling for hours at dawn, stopping cars at random to complain about her neighbors and accusing them of stealing her phone so she could not call police.  (Exs 8-10.)  Among other things, her threats included (i) telling a neighbor "You're dead … [my father] will take you out;" (ii) threatening to urinate in the food of a neighbor's ex-wife; (iii) telling another neighbor that she was "going to get her gun licenses" and kill the neighbor.  (*Id.*)

<u>Mental Health Issues.</u>  On August 15, 2016, Pierson's landlord sought to evict her from the apartment unit where she was fighting with her neighbors and not paying rent.  (Ex 9.)  In her hand-written answer, Pierson claimed she was a "disabled American citizen with TBI (Traumatic Brain Injuries)" and anxiety, who took medication to keep her awake in the day and medication to help her sleep at night.  (*Id.*)  She wrote that some of her neighbors were drug addicts and alcoholics and one of them, who she alleged was the landlord's close friend, somehow had her apartment key.  (*Id.*)  She claimed her neighbors went into her apartment, moved furniture around and made it dirty, and that they did this to make Pierson look like a "hoarder."  (*Id.*)  She also referenced being in Imperial Point Hospital for seven days, saying the hospital "changed the Baker Act to

18

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 24 of 29

admission by my signature" (the Baker Act is a Florida law that encourages the voluntary admission of individuals for psychiatric care). (*Id.*)

Pierson responded to the suits against her, and to the judgment of eviction, by suing both the neighbor who had received an order of protection, and another neighbor who had supported it. (Exs 11-12.) Pierson's complaint alleged her neighbor and her boyfriend tried to run Pierson down with their car and entered her apartment and moved her furniture around. (Ex 11.) As for the neighbor who supported the claim that Pierson was dangerous and a harasser, Pierson alleged she chased her around the apartment complex and told her mechanic not to fix her car because Pierson was crazy. (Ex 12.)

Personal Injuries. In May 1990, Pierson sued a bar called Baby Dolls, claiming she had been hit by a beer bottle, and could not complete a modeling job that was to pay $3500. (Ex 13.) In 1994, she sued a hair salon for $600 (Aff. ¶21); in 1997, she sued a taxicab company in New York for personal injuries. (Ex 5.) In July 2000, Pierson was sued by a man who suffered personal injuries when Pierson drove her car into a parked vehicle. (Ex 16.) Two years after he filed suit, Pierson filed the first of two lawsuits against him, claiming more than $1 million in personal injuries. (Exs 17-18.) In 2018, Pierson sued E & M Munchies, seeking more than $15,000 in damages for injuries suffered when she "slipped and fell on an abandoned container lid" on defendant's property. (Ex 19.)

Financial Delinquency. Between 1989 and 2018, Pierson was sued more than a dozen times by medical clinics, apartment complexes, and credit card companies for unpaid bills and debts. (Aff. ¶26, Ex 14.) All of these actions and all of these judgments are found in a public records search. (Aff. ¶27.)

19

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 25 of 29

## C.  **Wigdor Abused The Judicial System**

Abuse of the judicial system is another ground for sanctions. *Jason v. Chusid*, 78 N.Y.2d 1099, 1100 (1991).  That applies with even more force when, as here, the misconduct spans across actions and goes unchecked across two suits and a year and a half.  The Court of Appeals has approved of sanctions where the nature and repetition of plaintiffs' litigation tactics resulted in four separate adjudications and "constitute[d] a strategy of dilatory, harassive, abusive and frivolous conduct." *Id.*; *see Levy*, 260 A.D.2d at 34-36.  Wigdor's conduct constitutes clear abuse of the judicial system by filing baseless complaints accusing Black of sexual assault, and laundering what would otherwise be blatant defamation through the litigation privilege.

## III.  **SUBSTANTIAL SANCTIONS ARE WARRANTED**

New York courts routinely award costs and impose sanctions for conduct as frivolous as the conduct in question here. *First*, costs and sanctions are routinely imposed for conduct "undertaken primarily … to harass or maliciously injure another." 22 NYCRR § 130-1.1(c); *see Mascia v. Maresco*, 39 A.D.3d 504, 506 (2d Dep't 2007) (affirming sanctions when "the plaintiffs' conduct in commencing this action and in continuing to advance their claims, appears to have been intended primarily to harass the defendant" with "entirely invalid claims").  As shown above, Wigdor has pressed baseless claims and refused to disavow demonstrably false allegations. Instead, it has taken every opportunity to assert increasingly inflammatory and damaging claims, engaging in a campaign of harassment in an improper effort to leverage a financial windfall for itself and its clients.

*Second*, sanctions are appropriate for making false or intentionally misleading material statements of fact. *See Tina X. v. John X.*, 156 A.D.3d 1152, 1153-54 (3d Dep't 2017) (concluding "completely false" testimony about a settlement conference was frivolous, particularly when "controverted by the mother's own testimony" and "the testimony of numerous other

20

individuals"); *Martinez v. Est. of Carney*, 129 A.D.3d 607, 609 (1st Dep't 2015) (sanctions were proper for an attorney's "willful failure to inform" the court of new material facts that "allowed the court to render its decision on incorrect facts"); *Capetola v. Capetola*, 96 A.D.3d 612, 613 (1st Dep't 2012) (affirming sanctions for a "deliberately misleading representation" which "failed to disclose" material relevant facts).  Sanctions have been granted when the complaint and other filings included false material factual statements, and when a "baseless action was commenced against defendant and then aggressively prosecuted despite having been advised that there was no legal or factual basis to find defendant liable[.]"  *Bridgeport Cap. Servs., Inc. v. Ruby Tuesday, Inc.*, 6 Misc. 3d 50, 52 (App. Term. 2d Dep't 2004); *see Ross & Cohen v. Kurtz Steel Corp.*, 237 A.D.2d 172, 172–73 (1st Dep't 1997) (attorney properly sanctioned for asserting claims "that were completely without merit in fact").

*Third*, courts will sanction attorneys who fail to reasonably investigate false factual assertions before asserting or certifying them.  *See, e.g.*, *Matter of Winston*, 243 A.D.2d 638, 639 (2nd Dep't 1997) (affirming sanctions for "making baseless accusations … without checking into the accuracy of the underlying factual predicate"); *LVNV Funding LLC v. Guest*, 35 Misc. 3d 1232(A) at *5-6 (Mount Vernon City Ct. 2012) (counsel failed "to obtain either the requisite documentation or other first party certification substantiating the [claim's] merits"); *Guttridge v. Schwenke*, 155 Misc. 2d 317, 320 (Sup. Ct. Westchester Cty. 1992) ( "[T]he failure of plaintiffs to perform any reasonable inquiry into the facts before asserting the second cause of action and the failure to admit incontrovertible facts constituted frivolous conduct."), *aff'd*, 203 A.D.2d 242 (2d Dep't 1994); *see also New York City Hous. Auth. v. Jenkins*, 66 Misc. 3d 1212(A) (N.Y. Civ. Ct. Bronx Cty. 2020) (conduct was frivolous when "counsel did not make an 'inquiry reasonable under

21

the circumstances' as required by 22 NYCRR 130-1.1a(b)," particularly when the issue was apparent from "[a] simple search of the court database, or of petitioner's records").

Sanctions are particularly appropriate where the frivolous conduct continues after the defects become apparent. *See, e.g.*, *U.S. Bank Nat. Ass'n v. Gonzalez*, 99 A.D.3d 694, 695 (2d Dep't 2012) (affirming sanctions against plaintiff who "persisted in making that representation after it knew or should have known it to be false"); *Austinnam*, 46 Misc. 3d 1207(A) at *6-8 ("plaintiff's counsel failed to obtain the requisite documentation substantiating the merits" before filing and "continued to assert the validity of plaintiff's claim"); *Navin v. Mosquera*, 30 A.D.3d 883, 883-84 (3d Dep't 2006) (plaintiffs' "continued pursuit of their claim became frivolous as the action progressed"); *Sakow ex rel. Columbia Bagel, Inc. v. Columbia Bagel, Inc.*, 6 Misc. 3d 939, 943 (Sup. Ct. N.Y. Cty. 2004) ("plaintiff unnecessarily protracted this matter even after it became apparent that she did not have sufficient proof").  Wigdor has not withdrawn any of the false allegations in either action, and has persisted in asserting those false statements even after being put on notice of their falsity.

Given the egregious nature of Wigdor's frivolous conduct, Black is entitled to reimbursement of his attorneys' fees and other costs incurred in bringing this motion.  *See Treasures London Ltd. v. Keswani*, 2020 WL 6149793, at *8 (Sup. Ct. N.Y. Cty. Oct. 20, 2020) ("[C]ounsel refuses to acknowledge and take any responsibility for these repeated missteps and this type of practice cannot be encouraged or even tolerated."); *Vahdat v. Capdel LLC*, 2019 WL 3080948, at *2 (Sup. Ct. N.Y. Cty. July 15, 2019) (awarding reasonable attorneys' fees where the plaintiff offered "no legal support whatsoever for his meritless opposition").

22

## **CONCLUSION**

For the above reasons, the Court should grant Black's motion and impose sanctions on Wigdor and Ganieva, including costs and reasonable attorneys' fees incurred in bringing this motion.

Dated: December 16, 2022        Respectfully submitted,
      New York, New York

QUINN EMANUEL URQUHART
& SULLIVAN, LLP


_/s/ Michael B. Carlinsky_
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, NY 10010
michaelcarlinsky@quinnemanuel.com
jenniferbarrett@quinnemanuel.com
Telephone: (212) 849-7000

PERRY GUHA LLP
E. Danya Perry
1740 Broadway, 15th floor
New York, NY 10019
dperry@perryguha.com
Telephone: (212) 399-8330
Facsimile: (212) 399-8331

ESTRICH GOLDIN LLP
Susan Estrich (pro hac vice pending)
8605 Santa Monica Blvd, Suite 92780
West Hollywood, CA 90069
Telephone: (212) 399-2132


*Attorneys for Defendant Leon Black*

23

Case 1:23-cv-06418-JGLC    Document 61-4    Filed 10/18/23    Page 29 of 29

## **ATTORNEY CERTIFICATION PURSUANT TO 22 NYCRR 202.8**

I, Michael B. Carlinsky, an attorney duly admitted to practice law before the courts of the State of New York, hereby certifies that this document, Defendant's Motion for Sanctions, complies with the word count limit set forth in 22 NYCRR 202.8-b because it contains 6974 words, excluding the parts of the memorandum exempted by the rule. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: December 16, 2022
      New York, New York

                                            */s/ Michael B. Carlinsky*
                                            Michael B. Carlinsky