# Exhibit 8

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2     Case 1:23-cv-06418-JGLC     Document 61-7     Filed 10/18/23     Page 2 of 30     RECEIVED NYSCEF: 10/31/2022

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| LEON D. BLACK, | Index No. ___ |
| Plaintiff, | **COMPLAINT** |
| v. | **Jury Trial Demanded** |
| GUZEL GANIEVA AND WIGDOR LLP, | |
| Defendants. | |

Plaintiff Leon D. Black, by and through his undersigned attorneys, alleges on personal knowledge, except as noted or third-party sources are referenced:

<u>**SUMMARY OF THE ACTION**</u>

1.      This matter arises out of the misconduct of three bad actors:  (1) Defendant Guzel Ganieva, who previously had a consensual affair with Plaintiff Leon D. Black and has now, years after the fact and against a barrage of documentary evidence contradicting her claims, made false allegations that Plaintiff assaulted and abused her, in violation of a confidentiality and release agreement, under which Plaintiff had paid her millions; (2) Defendant Wigdor LLP, Ganieva's attorneys, who procured her contractual breaches of a binding confidentiality agreement and used its public relations acumen and contacts to ensure that her violative and malicious disclosure of information she and Black contracted to keep confidential was broadly disseminated; and (3) Josh Harris, who Black designated as a co-founder of Apollo and who, in that capacity, undertook obligations of trust and loyalty to Plaintiff that are subject to arbitration.  Among other things, their collective misconduct has cost Plaintiff the chairmanship of the company he founded, took public, and ran for some 30 years.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                                        RECEIVED NYSCEF: 10/31/2022

Case 1:23-cv-06418-JGLC   Document 61-7   Filed 10/18/23   Page 3 of 30

2. More specifically, the claims brought here arise out of a Release and Confidentiality Agreement (the "Agreement") signed by Ganieva, which prohibits Ganieva from disclosing her relationship with Plaintiff and also releases all claims against him.  A copy of the Agreement is attached as Exhibit 1 to this Complaint.  Ganieva then ratified the Agreement over the course of almost six years by accepting payments from Black each month that together totaled more than $9 million.  She accepted these payments during the time that  she was enrolled in law school, and while she was represented and advised by counsel.  Ganieva, with the assistance and at the direct urging of Wigdor, breached these provisions.  At the same time, well before Wigdor was engaged as her counsel, the firm used its press contacts to provide Ganieva with widespread media access that she had been unable to obtain on her own, assisting her in publicizing her relationship and breaching the Agreement .

3. Wigdor and Ganieva did not stop there.  To the contrary, after Wigdor was retained as Ganieva's counsel, Wigdor then brought a complaint brimming with manufactured allegations that it later amended on two separate occasions.  All the while, both Wigdor and Ganieva either knew, or intentionally chose to remain ignorant of the fact), upon information and belief, that Ganieva had signed the Agreement with Plaintiff, which barred the causes of action and the allegations asserted in all three complaints.  Indeed, Wigdor amended Ganieva's complaint twice even *after* counsel for Plaintiff cited the Agreement (including directly quoting all of the non-disclosure and release language) and provided evidence of the falsity of Ganieva's claims, including quoting contemporaneous text messages that Ganieva sent Black.

4. Under the Agreement, Black agreed to forgive outstanding loans he had made to Ganieva, provide her with additional support for a renewed round of immigration applications in the United Kingdom, and pay her additional consideration in the form of $100,000 per month for

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

15 years.  In exchange, Ganieva agreed to (1) fully release any purported claims she had or might in the future have against Black and (2) keep her relationship with him strictly confidential.

5.      On March 17, 2021, Ganieva—a first-time Twitter user with only three followers, each a prominent member of the press—posted a series of tweets in which she falsely accused Black of sexual harassment and abuse.  To make sure that Apollo would become aware of her missive, Ganieva referred to Black as "Apollo Global Management's CEO and Chairman" and included the hashtag #LeonBlack.  On information and belief, Wigdor induced, encouraged and assisted Ganieva to publicize this information, which violated the non-disclosure provisions in the Agreement.

6.      Following Ganieva's public statements, and in light of the organized campaign against him, Black had no choice but to resign to protect Apollo, losing the considerable financial and other benefits he was entitled to as Chairman and CEO.

7.      Ganieva and Wigdor subsequently commenced litigation against Black in a bad-faith violation of the Agreement's release and non-disclosure obligations.  In June 2021, Wigdor—which was formally retained as Ganieva's counsel in April 2021 but had been advising her since the preceding fall—filed the first of three objectively false complaints.  Ganieva claimed, among other things, that Black had raped Ganieva in 2014, on a night when her own contemporaneous texts show that she invited him to visit, asked him to bring wine, and then professed love and gratitude to him the very next day.

8.      Wigdor markets itself as skilled in leveraging the specter of the litigation process to extract *pre-complaint* settlements.  As Wigdor's website states:  "Because we have a reputation for obtaining multi-million dollar verdicts, we are able to settle the majority of our cases without the need for even filing complaints."  While widely known for its playbook of quietly trading away

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

purported claims before even filing a lawsuit, Wigdor curiously filed a scandalous public complaint in this case without *ever* making a settlement demand, and then persistently declined the repeated invitations from Plaintiffs' counsel to review the records that would prove its client's complete unreliability and disprove the allegations they publicly filed in the original complaint.

9.     The pattern continued:  Plaintiff's amended complaint added allegations based on an October 2008 flight to Florida—a supposed kidnapping to Jeffrey Epstein's house—that contemporaneous flight records confirm never happened.  Her  second amended complaint added allegations about an unidentified Jane Doe who supposedly gave Black a massage at Epstein's home more than 20 years ago and long before Ganieva ever met Black.  Notably, Ganieva is recorded on tape years before she ever filed her lawsuit equivocating as to whether she had ever even met Epstein, let alone that their meeting was the result of any supposed "kidnapping" by Black.  As for Jane Doe, she is someone whose fabricated story was included to further tarnish Black's reputation.  Black will demonstrate that these allegations are false, but succeeding in court was never Ganieva's or Wigdor's objective with these complaints.  They were instead intended simply to harm and humiliate Black, as they did, resulting in his resignation from his positions at Apollo and from other high-profile positions he held at other institutions.

10.     Ganieva and Wigdor acted maliciously and with the intent to harm Black after Ganieva had already collected millions of dollars and effectively ratified her contractual promise not to inflict the precise harm caused here.

## **PARTIES**

11.     Plaintiff Leon D. Black resides in New York County, in the State of New York. Black founded Apollo Global Management, Inc. in 1990 and since that time has been Apollo's

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

4

largest shareholder. For more than 30 years, until March 21, 2021, Black served as Apollo's CEO and as the Chairman of its Board of Directors.

12.     In addition to his work at Apollo, Black has spent the last three decades working as a dedicated philanthropist and one of our nation's leading benefactors of the arts, education, and cancer research. He served for 20 years on the Board of Mt. Sinai Hospital, 15 years on the Board of the Metropolitan Museum of Art, and 10 years on the Board of Trustees of Dartmouth College. Black served as a Trustee of the Museum of Modern Art ("MoMA") for approximately 25 years, and from 2016 to 2021 served as co-Chairman or Chairman of MoMA. He has also been one of MoMA's most generous supporters. Some 14 years ago, Black and his wife, Debra, co-founded the Melanoma Research Alliance, which became the largest private funder of melanoma research in the world. The Melanoma Research Alliance has directly invested more than $130 million to advance cutting edge research into immunotherapy for melanoma and some 30 other forms of cancer.

13.     Guzel Ganieva is a Russian national who, on information and belief, resides in New York County, in the State of New York.

14.     Defendant Wigdor LLP is registered in New York State and maintains its principal place of business in New York County, in the State of New York. Wigdor was formally retained as counsel for Ganieva in April 2021, but was advising her on media related to her allegations against Black and other matters many months earlier.

## JURISDICTION AND VENUE

15.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules section 301, and venue is proper in this county pursuant to Civil Practice Law and Rules section 503, because Plaintiff and Defendants reside in New York.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## FACTUAL ALLEGATIONS

### Apollo Global Management

16.     Black founded Apollo, a Delaware corporation, in 1990 to manage investment capital on behalf of institutional investors, focusing on leveraged buyouts, corporate restructurings, and credit positions, as well as taking minority positions in growth-oriented companies.

17.     Black spearheaded Apollo's phenomenal growth from a shared office in 1990 into one of the nation's preeminent alternative asset managers.  This success was the direct result of Black's strategy of creating a contrarian, value-oriented investment approach to private equity, credit-oriented capital markets, real estate, and distressed investments.  Apollo compiled a stunning track record of investment success, including a gross internal rate of return of 39% in its traditional private equity funds from inception through December 31, 2020.

18.     Apollo was one of the first private equity companies to go public, and, as importantly, became the largest global alternative asset manager of credit platforms.  In addition, Apollo was one of the first private equity firms to transition to permanent capital, building the Athene and Athora Holding Ltd. insurance platforms under the leadership of Marc Rowan and James Belardi.  All of these transformative changes in the last 30 years were first-mover initiatives by Apollo under Black's leadership, and they are now all broadly emulated by most of the other major players in the alternative investment world.

### Black's Prior Relationship With Ganieva

19.     Black met Ganieva at a party that both attended in 2008.  From 2008 until 2014, Black and Ganieva engaged in a sporadic, consensual affair.

20.     Ganieva's communications with Black between 2008 and 2014 were marked by consistent expressions of love and affection on her part.  Black paid for Ganieva's apartment but never had the key.  He also paid for her acting lessons, financed expensive vacations, paid for a

6

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

$40,000 portrait of her, and purchased a Steinway & Sons piano for her son. He made a series of

loans to her, and attempted to assist her in finding employment in the finance industry.

21.     In July 2014, Ganieva told Black she needed to leave the country for immigration-

related reasons, and departed for Russia on July 31, 2014. From the plane, Ganieva texted Black,

"I love you and miss you already." This was shortly *after* he supposedly raped her, according to

her complaints. For the next eleven months, Ganieva sent texts to Black from abroad telling him

that she missed him and longed to be together.

22.     On June 8, 2015, Ganieva sent Black a formally worded note insisting that she

needed to meet with him in person about a matter that she characterized, without detail, as "both

urgent and important." Based on statements she later made to Black, this sudden shift in tone

appears to have coincided with her failure to gain legal status in the United Kingdom.

23.     On June 24, 2015, Ganieva met Black in person in New York City. Ganieva

threatened Black, telling him that if he did not pay her $100 million, she would disclose their

personal and sexual relationship to the board of Apollo and to the media.

24.     Black understood Ganieva to be extorting him and recorded future conversations

with Ganieva.

25.     On August 12, 2015, Ganieva met Black a restaurant in New York City. Ganieva

again demanded money from Black, threatening that, "the longer I wait, the more sure I become

that I actually, I prefer to go public," and that, "I'm dying to talk to press about it." Ganieva

repeated her demand for $100 million. She claimed that various prominent people—from

international philanthropist Len Blavatnik to former New York Mayor Michael Bloomberg to

ailing publisher and developer Mort Zuckerman—were following or harassing her at Black's

direction, musings that she herself suggested were paranoid. She somehow blamed Black for the

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

7 of 29

bullying her son received in school and camp, and even said Black was responsible for her son choking on a piece of meat at a restaurant.

26.     On August 14, 2015, Ganieva met Black at another restaurant in New York City. Ganieva again informed Black that "I will not agree to anything less than $100 million." Ganieva justified her demand for $100 million by referencing a news report she saw about a woman who received $18 million when she was fired after sleeping with her boss, a "Wall Streeter," on four occasions. Ganieva explained that, in her view, her demand for $100 million was justified because she believed her sporadic affair with Black was "like a marriage." Never once in any of these conversations did Ganieva ever suggest that Black had raped her.

27.     Over the course of the next few months, Ganieva and Plaintiff discussed and negotiated the terms that would be contained in the Agreement. In particular, they negotiated the amount of payments that Plaintiff would make to Ganieva, settling on the monthly $100,000 payments, loan forgiveness, and £2,000,000 lump sum payments that would appear in the final Agreement.

28.     On October 19, 2015, Ganieva again met Black at a restaurant in New York City. During that meeting, she reviewed and executed the Agreement at her own pace, raising several questions regarding the Agreement that Black answered.

29.     In the Agreement, Ganieva agreed to give up her claims and not to publicly disclose their affair. In exchange for her dropping her threats, Black agreed to pay Ganieva $100,000 per month for 15 years, forgive $1,000,000 in loans, and provide £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom.

30.     The Agreement states that Ganieva "has made certain allegations and asserted certain claims against [Black], which she made under extreme stress and which she now concedes

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:23-cv-06418-JGLC        Document 61-7        Filed 10/18/23        Page 10 of 30

are not true, and which allegations and claims, if made public, would damage [Black's] career, reputation and relationships with others."  Exhibit 1.

31.    Ganieva also agreed to release all claims—past, present, or future—against Black relating to their relationship, and "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Black], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Black] in connection with the signing of this Agreement and (iii) any other matters that could damage [Black's] career, reputation and relationships with others."  *Id.*

32.    Contrary to Ganieva's false allegations in her complaints, during the negotiations, Black never uttered the following phrases that Wigdor and Ganieva claim to be direct quotes:  "If you do not take the money, I will put you in prison"; "If you do not take the money, I will destroy your life"; or "I will be paying you so long as you keep your mouth shut."  The recordings prove that.

33.    Instead, after taking the time to read the one-page agreement, Ganieva signed it and proceeded to discuss her investment and travel plans, laughing about the fact that she was now "a woman of means."  Shortly after leaving the meeting, Ganieva texted Black:  "Thank you for everything.  Talk soon xoxo."

34.    In October 2019, after four years in which there was no direct contact between Black and Ganieva and during which she accepted the $100,000 payments each month, continually re-ratifying the Agreement, Ganieva sent Black a text message complaining about their arrangement, and falsely claiming that he had forced her to sign the Agreement under duress. Ganieva had never made that claim during the preceding four years.  Black did not respond.  He continued to pay her $100,000 per month, and Ganieva continued to accept the payments as she

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

had in the past, while attending law school and while represented by counsel, never once seeking to repudiate or void the Agreement.

35.     On February 18, 2020, David Liston, an attorney, sent Black a letter stating that Ganieva "has retained our firm to investigate certain matters related to your prior interactions with her and to advise and represent her in connection with same."  Liston sent a follow-up letter on March 6, 2020.  Black, uncertain whether this was a legitimate demand from Ganieva's counsel, and concerned about whether the request reflected a continuation of Ganieva's extortion, did not respond.  Black continued to pay Ganieva $100,000 per month, and Ganieva continued to accept the payments while represented by counsel.

36.     Recent press reports appear to shed light upon Ganieva's conduct toward Black.  On March 28, 2022, the Defence Intelligence of the Ministry of Defence of Ukraine published a list entitled "Employees of the FSB of Russia participating in the criminal activities of the aggressor country on the territory of Europe."  https://gur.gov.ua/content/sotrudnyky-fsb-rossyy-uchastvuiushchye-v-prestupnoi-deiatelnosty-stranyahressora-na-terrytoryy-evropy.html.

37.     The FSB (Federal Security Service of the Russian Federation) is the principal security agency of the Russian Federation, and one of the main successor agencies of the former Soviet Committee of State Security (KGB).

38.     Ukrainian intelligence has reportedly identified Number 139 on that list, an individual named Maria Gennadievna Guchapsheva, as Defendant Guzel Ganieva.  On July 2, 2022, an internet-based publication, the Estonian Free Press, reported that, with respect to Russia's intelligence networks to destabilize Europe and the U.S., "one agent is GUCHAPSHEVA MARIA GENNADIEVNA. . . .  She is also known as GUZEL KING, GUZEL GANIEVA, GUZEL GUPSCHEVA or GUZEL OGANEZOV."  *Ukrainian intelligence exposes Russia's networks to destabilize Europe and the US*, Estonian Free Press (July 2, 2022), available at

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:23-cv-06418-JGLC   Document 61-7   Filed 10/18/23   Page 12 of 30

https://estonianfreepress.com/intelligence/ukrainian-intelligence-exposes-russias-networks-to-destabilize-europe-and-the-us/.  On September 23, 2022, journalist Dennis Rice reported in an internet-based publication, *National Security News*, that "Ganieva is one of the 620 FSB employees whose names appear in the list of Putin-controlled intelligence assets operating around the world.  Ganieva's alleged entry has her name slightly mis-spelled, and her date of birth is different.  The Ukrainian intelligence service is, however, adamant she and the spy on the list are the same person."   Dennis Rice, *A downed Wall Street tycoon, a furious and very public court battle, and now allegations of Russian espionage added into the mix*, National Security News (Sept. 23, 2022), available at https://nationalsecuritynews.com/2022/09/a-downed-wall-street-tycoon-a-furious-and-very-public-court-battle-and-now-allegations-of-russian-espionage-added-into-the-mix/.  Ukrainian press have also reported on certain of these allegations, attributing them to Ukrainian intelligence officials.  *See, e.g.*, *FBI and Ukrainian military intelligence exposed a network of Russian spies in the United States, media reports*, Censor.net (Sept. 29, 2022), available at https://censor.net/ua/photo_news/3370434/fbr_ta_ukrayinska_viyiskova_rozvidka_vykryly_mereju_rosiyiskyh_shpyguniv_u_ssha_zmi_foto ("According to Ukrainian intelligence, Ganieva is number 139 on the list of 620 FSB agents.").  This reporting may provide context and explanation for Ganieva's actions, including her relationship with Black, her monetary requests throughout their relationship, her extortion of Black that led to the Agreement, and finally her subsequent decision to breach the Agreement through ruinous public statements and lawsuits which resulted in significant disruption of Black's personal life and career at Apollo.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                                RECEIVED NYSCEF: 10/31/2022

Case 1:23-cv-06418-JGLC    Document 61-7    Filed 10/18/23    Page 13 of 30

### Ganieva's Engagement with Wigdor

39.    Prior to her involvement with Wigdor, Ganieva had repeatedly attempted to publicize details of her relationship with Black through contact with various journalists. None of these efforts were successful, on information and belief, because of reporters' concerns that her allegations were unsubstantiated and potentially libelous.

40.    In addition, and as noted above, before working with Wigdor, Ganieva worked with at least one attorney, who was aware of the existence of the Agreement and who did not file any claims or make or support any public allegations that would have violated the Agreement's terms.

41.    On October 12, 2020, The *New York Times* published a story detailing Black's relationship with Jeffrey Epstein. The article, authored by Matthew Goldstein, reported that Black had paid Epstein "at least $50 million" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black."

42.    As early as September 29, 2020, Ganieva had initiated contact with Goldstein, the author of that article. Upon information and belief, Wigdor and Goldstein subsequently began communicating regarding Ganieva's claims. This was despite the fact that, on information and belief, Wigdor already knew or should have known that Ganieva was subject to a valid release and confidentially agreement with Black. In speaking to the media on her behalf, encouraging her to make public statements about Black, and filing claims she had clearly released in exchange for millions of dollars, Wigdor induced Ganieva to, and helped her, repeatedly breach her agreement with Black.

43.    Once Wigdor began working with Ganieva, it facilitated a broad audience for her claims, paying no heed to the terms of the Agreement or the falsity of her allegations.

44.    On information and belief, Wigdor was motivated to publicize the case for its own self-promotion, namely, to obtain notoriety for the firm by publicizing a high-profile case against

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

a prominent individual such as Black. And it later did so—broadcasting its claims against Black on its website and in interviews—despite the fact that it knew that Ganieva had entered into the Agreement with Black and that she was prohibited by its terms from discussing her relationship with Black, or from bringing any claims against him.

45. On October 1, 2020, Ganieva sent Goldstein a text message on WhatsApp, asking whether sharing her "story" anonymously was an option. Goldstein informed her, "[i]t is possible for us not to use your name but we would still need to document everything. All the text messages you have from Leon and would need to talk to any friends you talked to about the situation. We need to do that to assure the reader your story stands up and can be backed up by contemporaneous factors."

46. On October 30, 2020, Ganieva sent a WhatsApp message to Goldstein, stating: "Did you speak to Wigdor? He is reaching out about a reporter wanting to speak to me." Ganieva's message referred to Douglas Wigdor, the co-founder and principal of Wigdor LLP.

47. Goldstein responded to Ganieva's message about Wigdor, writing, "[w]e are supposed to talk. But not sure if there is another reporter on this too from another publication." Goldstein continued, "[t]ho I'm pretty certain it's me. Are you ok with him talking to me on background."

48. On November 5, 2020, Ganieva wrote to Goldstein, "I will let [W]igdor know that if you want to speak with him you can."

49. On November 10, 2020, Goldstein confirmed his plans to speak to Wigdor, writing to Ganieva, "[h]ey there. Talking to Wigdor tomorrow afternoon. He wanted to review his notes. Let's talk on Wednesday if you are free or Thursday sorta wanted to wait until I spoke to Doug."

50. On November 16, 2020, Goldstein informed Ganieva, again via WhatsApp message, that he "[h]ad good chat with Wigdor over the weekend."

13

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

51.     On January 10, 2022, in connection with (now-dismissed) racketeering and other claims that Black brought in federal court against various parties, including Wigdor and Ganieva, Wigdor represented to the United States District Court for the Southern District of New York that it was "frivolous" for Black to argue that it had conspired with public relations professionals on Ganieva's behalf as early as March 2021 (when Ganieva took to Twitter) because that was "before Ms. Ganieva ever retained Wigdor." At that time, Wigdor represented that Ganieva formally retained the firm in April 2021. Thus, according to Wigdor, its communications with the press in the Fall of 2020 on behalf of Ganieva—who was not its client—were not within the scope of its duty as attorneys. Wigdor was not acting as Ganieva's counsel when it spoke with the press about Ganieva's relationship with Plaintiff, all the while knowing, upon information and belief, that Ganieva had signed an NDA. Wigdor also knew, on information and belief, that the Agreement was signed in a public place and was not entered into under duress, and that Ganieva had ratified the Agreement over the course of many years, including by accepting monthly payments until 2021. Wigdor was actively communicating with Ganieva as early as October 2020 and was speaking with the press in a capacity other than as her counsel, an obvious violation of any NDA ever drafted. As such, Wigdor was inducing Ganieva to breach the Agreement as early as October 2020.

### Ganieva's False Public Statements About Black

52.     On or about March 11, 2021, the Twitter account @GuzelGanieva3 was created.

53.     Ganieva, with encouragement and help from Wigdor, on information and belief, composed a series of tweets in which she would publicly and falsely accuse Black of sexual abuse, threats, harassment, and other unlawful behavior.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

54.     Before Ganieva posted any tweets, only three other Twitter users, all of them prominent journalists, followed her account: Ronan Farrow of The New Yorker, Richard McHugh, then of NBC, and Matthew Goldstein of The New York Times.

55.     Given that Wigdor spoke with Matthew Goldstein on Ganieva's behalf in November 2020 and Wigdor's apparent role in encouraging and helping to draft the tweets, there is reason to believe that Wigdor and Goldstein discussed a plan for Ganieva to publicize her allegations via Twitter, where they would find a receptive audience with Goldstein, who could use his prominent outlet to amplify her false allegations.

56.     On March 17, 2021, Ganieva posted three tweets. The word choice and style of the tweets was decidedly unlike Ganieva's typical voice and appears to invoke legal precepts. She posted: "Although I am a private person, in light of the recent media coverage, I think I have an obligation to make a statement regarding Apollo Global Management's CEO and Chairman, Leon Black. I was sexually harassed and abused by him for years. It started in 2008 when I met with him to discuss work. While he understood my career aspirations, he could not understand me when I refused his sexual advances. I was bullied, manipulated, threatened, and coerced. Similarly, under duress, I was forced to sign an NDA in 2015. I am breaking my silence now because I do not want this type of predatory behavior to continue happening to other women. #MeToo #LeonBlack." On information and belief, Ganieva's tweets were intended to pressure Apollo to remove Black as CEO and Chairman as soon as possible.

57.     Still, none of Ganieva's three Twitter followers published anything in response to Ganieva's false allegations. Similarly, Julie Brown of the *Miami Herald*, who was responsible for breaking the Epstein story, and to whom Ganieva emailed her false accusations on multiple occasions, including in the weeks before the tweets, published nothing. Neither did Jodi Kantor of *The New York Times*, whom Ganieva contacted in 2019. Ganieva may have been ready and

15

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

willing to violate the non-disclosure provisions of the Agreement on her own, but she was unable to do so in a way that would damage Black without assistance. Wigdor was critical to her actual breach.

58.     Black learned about Ganieva's tweets shortly after March 17, 2021.

59.     Given the campaign against Black that began in Fall 2020 and was spurred on by Defendants, Black and Marc Rowan, his chosen successor, concluded that Apollo must be protected. On March 21, 2021, Black resigned as CEO, Director, and Chairman, forcing a transition ahead of schedule, and ending his tenure as Chairman. As a result, Black lost his position, health insurance, and other valuable benefits.

60.     On information and belief, Wigdor helped to arrange an interview of Ganieva by Josh Kosman, a reporter at the *New York Post* who was a regular target of Wigdor's leaks. On April 8, 2021, Kosman published an "exclusive interview" with her. The *New York Post* article included Ganieva's false claim that "Black's abuse 'was over a long period of time and it was tragic.'" This disclosure violated the Agreement. Wigdor has leaked information concerning Plaintiff to Kosman on other occasions. For example, Kosman contacted Plaintiff for comment on Ganieva's filings before they had been publicly filed.

61.     On or about April 8, 2021, Black issued a statement regarding his relationship with Ganieva that said, "I foolishly had a consensual affair with Ganieva that ended more than seven years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." Black also stated that Ganieva had extorted him for years and that he had "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment."

16

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Ganieva and Wigdor File a Series of False Complaints that Breach the Agreement**

62.     On April 9, 2021, after Ganieva's tweets and the day after the Kosman interview was published, Ganieva formally retained Wigdor.  Given that Wigdor had been advising Ganieva since at least as early as October 2020, it is not clear why Wigdor and Ganieva waited until April 2021 to execute a formal engagement letter, or whether anyone other than Ganieva was involved in that decision.  The timing of the engagement—exactly one day *after* Ganieva's disparaging remarks were published by Kosman—is noteworthy, given that Wigdor had already been advising Ganieva for at least five months.

63.     Upon information and belief, Wigdor waited until after Ganieva's tweets and the Kosman interview were published to formalize its relationship with Ganieva because Wigdor knew that Ganieva's tweets and comments to Kosman were in violation of her confidentiality and release agreement with Black.  By officially coming on as Ganieva's attorneys *after* her tweets and her interview, and by publicly proclaiming that it was not engaged as counsel until April 9, 2021, upon information and belief, Wigdor sought to conceal its role in having assisted Ganieva in her contractual breaches before that date.  Indeed, Wigdor made repeated efforts to hide its prior involvement and that of its principal, Douglas Wigdor.  For example, Wigdor stated in a September 21, 2021, letter to Black's counsel that "Doug Wigdor is not working on this case."  Wigdor likewise argued in a December 16, 2021 court filing that Wigdor's conduct could not "ha[ve] any bearing on the veracity" of an April 8, 2021 statement by Black because "Wigdor LLP did not even represent Ms. Ganieva until ***after Black made his statement***" (emphasis in original).

64.     Contrary to its usual protocol, Wigdor did not reach out to Black before filing Ganieva's complaint, nor did it make a settlement demand.  Wigdor would go on to file not one but three different versions of its baseless and fraudulent complaint on behalf of Ganieva.  Each

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

version was laden with lies disproven by Ganieva's own statements, which Black had recorded and preserved and offered to Wigdor for their review.

65.     Wigdor repeatedly declined to review these tapes and transcripts, claiming— falsely—that it did not sign routine protective orders that would protect confidentiality.  In fact, the record demonstrates that Wigdor routinely signs such orders. *See, e.g.*, Stipulation and Order, *Kafenbaum v. Soulcycle Inc.*, 20-cv-06315 (AT) (OTW) (S.D.N.Y. Apr. 21, 2021); Stipulation and Order, *Chase v. Reed Smith LLP*, 20-CV-06121 (JPO) (S.D.N.Y. Jan. 28, 2021); Stipulation and Order for the Production and Exchange of Confidential Information, *Mann v. MLB Advanced Media, L.P.*, 651503/2018 (Sup. Ct. N.Y. County Aug. 23, 2018); Stipulation and Order for the Production and Exchange of Confidential Information, *Town Total Holdings v. Conte*, 656194/2016 (Sup. Ct. N.Y. County Apr. 10, 2017).  Its reluctance to do so in this case—even as it was filing three false complaints—supports the conclusion that Wigdor consciously avoided evidence that its client was entirely unreliable, and that it acted in bad faith and outside the scope of any legitimate duty to represent its client.

66.     On June 1, 2021, Ganieva and Wigdor filed the first of these complaints in New York Supreme Court, New York County.  *See Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. June 1, 2021) ("Original Complaint").  The Original Complaint asserted four claims: two for defamation based on Black's public statement rebutting the tweets; a claim for intentional infliction of emotional distress based Black's allegedly defamatory statement and extortion accusation; and a claim under the New York City Gender Motivated Violence Act ("GMVA") based on a purported sexual assault.  *Id.* ¶¶ 91-130.

67.     On information and belief, Wigdor encouraged or induced Ganieva to breach the release provisions in the Agreement by filing the Original Complaint, an action that no other attorney had taken.

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:23-cv-06418-JGLC    Document 61-7    Filed 10/18/23    Page 20 of 30

68.     The alleged assault supposedly took place seven years earlier, on July 6, 2014, when the Original Complaint alleges that Black "barged" into Ganieva's apartment "suddenly" and without warning. *Id*. ¶ 47.[1]  Ganieva alleged that she was so unwell that she was "limp and unable to move." *Id.* ¶¶ 47, 51.  Ganieva made these allegations even though contemporaneous text messages show that she had invited Black to her apartment.  Ganieva had texted Black, "Baby . . . I'm all alone.  Let's get together soon.  I miss you.  Xoxo," and on the evening of July 6, had asked Black to bring her a bottle of wine.  *See* Answer, *Ganieva v. Black*, No. 155262/2021, ¶ 49 (N.Y. Sup. Ct. July 19, 2021) ("Answer").  The next morning, she thanked him and professed her love. *Id.*

69.     Within hours of Wigdor filing Ganieva's Original Complaint, Kosman published yet another article quoting Ganieva's false allegations at length.  Kosman's sources commented that the "silver lining" of Ganieva's suit was that it did not "mention Epstein, and therefore doesn't provide grounds for digging into matter pertaining to the dead pedophile."

70.     Black's Answer to the Original Complaint, filed on July 19, 2021, put the lie to the Original Complaint's claims with Ganieva's own words.  A week before the supposed assault, on June 28, 2014, Ganieva sent the text suggesting she and Black should get together "soon."  Then, on July 6, 2014, earlier on the day of the supposed assault, it was Ganieva who wrote to Black, unsolicited: "This is love.  I need you."  Answer ¶ 49.  In response, Black said that he would be driving back to New York City the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?"  *Id.*  Ganieva responded, "[a]aah.  Can you please bring a bottle of wine if you can?"  *Id.*  He agreed.

---

[1] The complaint was filed in June of 2021.  Ganieva alleges that she was raped in July 2014, just barely within the seven-year limitations period for GMVA claims.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                          RECEIVED NYSCEF: 10/31/2022

Case 1:23-cv-06418-JGLC   Document 61-7   Filed 10/18/23   Page 21 of 30

71.     Ganieva reached out to Black first thing the following morning with a message of thanks and love: "Good morning. It was very nice to see you last night. I already feel better . . . I love you and thank you!!! Xoxoxoxoxo and more love." *Id.* ¶ 52.  And on July 9, she thanked Black again, asked if he wanted to get together, and sent "lots of love." *Id.* ¶ 53.  When Black did not respond, Ganieva reached out yet again the next day to try to get together. *Id.*

72.     Contrary to the claim in the Original Complaint that "[a]fter this rape, Ganieva took her son and left New York to physically distance herself from Black" (Original Compl. ¶ 55), Ganieva and Black saw each other several times, at her request, between July 6, when Black supposedly raped her, and July 30, when she texted him from the plane as she was departing: "I love you and miss you already" (Answer ¶ 58).  Black's Answer—entirely corroborated by contemporaneous text messages—exposed the allegation of sexual assault as false.

73.     Ganieva's claims that Black defamed her in a public statement in which he accurately described her extortion were no less false.  Ganieva's extortion is captured on tape. Ganieva repeatedly warned that if Black did not pay her $100 million, she would report their affair to the Apollo Board, Black's family, and the press.  Her intent to harm Black's relationship with Apollo was explicit.

74.     Ganieva also alleged that she was threatened by Black and that he forced her to sign the Agreement.  Her Original Complaint offers supposed direct quotations from Black in this regard: "If you do not take the money, I will put you in prison," and "[i]f you do not take the money, I will destroy your life."  Original Compl. ¶ 3; *see also id.* ¶ 63.  Black's recordings of his conversations with Ganieva demonstrate the falsity of these claims.  There are no such threats, nor any need for any.  Ganieva wanted the money; in fact, she wanted more.  The recordings make clear that Ganieva was pleased with the arrangement.  After agreeing to accept millions of dollars

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 1:23-cv-06418-JGLC    Document 61-7    Filed 10/18/23    Page 22 of 30

in exchange for not speaking publicly about their affair, she discussed her investment and travel plans, and laughed about the fact that she was "a woman of means now." Answer ¶ 40. Shortly after the meeting in which they entered into the Agreement, she texted Plaintiff: "[t]hank you for everything. Talk soon xoxo." *Id*. ¶ 41.

75.     In Plaintiff's original Answer, filed on July 19, 2021, Plaintiff quoted all of the relevant language of the parties' Agreement—specifically the full text of its release and non-disclosure provisions.

76.     Yet, faced with the clear falsity of the complaint they filed and with the clear terms of the Agreement, on August 9, 2021, Ganieva and Wigdor filed an Amended Complaint almost twice as long as the original, complete with all of the allegations whose falsity had been demonstrated and was now consciously avoided. *See* Am. Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Aug. 9, 2021) ("Am. Compl."). The newly added allegations focused almost entirely on Jeffrey Epstein, who was barely mentioned in the Original Complaint. Ganieva did not assert any new legal claims premised on these allegations, and indeed the newfound allegations regarding Epstein appear nowhere in any of the actual Causes of Action asserted in any iteration of Ganieva's complaints.

77.     In her Amended Complaint, Ganieva—with Wigdor's assistance, encouragement and at its inducement—again breached the Agreement provisions regarding confidentiality and waiver. In addition to all of her previous false allegations, she now alleged being kidnapped by Black in October 2008, flown against her will to Palm Beach, Florida on Black's private plane, taken to Epstein's home there, and coerced into a meeting with Epstein, Black, and one of Epstein's associates, Sarah Kellen, for the supposed (but never articulated) purpose of gratifying Epstein's sexual desire. Am. Compl. ¶¶ 75-108. During that meeting, Kellen supposedly told Ganieva that Epstein and Black were "sex addicts." *Id*. ¶ 97. Although the Amended Complaint contained

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:23-cv-06418-JGLC   Document 61-7   Filed 10/18/23   Page 23 of 30

boldfaced, block-text quotations supposedly from Kellen, it identified no documentation, recordings, or other memorialization of the alleged conversation between Ganieva and Kellen some 13 years ago. *Id*. And, just like the block quotes wrongly attributed to Black, on information and belief, the alleged quotations from Kellen are fabrications.

78.     Black's Answer to the Amended Complaint (Answer to Am. Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Sept. 8, 2021)), conclusively debunked Ganieva's new lies. Black used flight manifests to establish that he and Ganieva never took the same-day round trip flight to Florida in October 2008 that is described in the Amended Complaint. Moreover, the contemporaneous recordings of Black and Ganieva from the summer of 2015, shortly after she began extorting him, call into serious question the Amended Complaint's allegation that Ganieva ever even met Epstein, let alone that their meeting was the result of a kidnapping by Black.

79.     Despite facing documentary evidence that the additional allegations in the Amended Complaint were fabricated, on September 20, 2021, Wigdor sought permission to file yet another complaint, adding even more new lies to the old ones. *See* Second Amended Compl., *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct. Sept. 20, 2021) ("Second Am. Compl."). This pleading too violated the confidentiality and waiver provisions of the Agreement, and was filed with Wigdor's assistance and encouragement and at its inducement. The new round of gratuitous allegations included a tale of an assault of another, unnamed woman at Epstein's Manhattan home some two decades ago for which the woman was supposedly paid $5,000. *Id.* ¶¶ 51-85. It also included an entire section labeled, "Other Evidence of Black's Close Ties to Epstein's Private Conduct," *id.* ¶¶ [145-50. The causes of action remained unchanged since the Original Complaint, except for the addition of a claim for "retaliation" under the GMVA, which Wigdor and Ganieva made up out of whole cloth.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

80.     On November 12, 2021, Black produced, under an embargo agreement between the parties, a copy of the Agreement and transcripts of all of the recordings cited in Black's Answers. As of that moment, there can be no doubt that Wigdor and Ganieva knew the exact language of the Agreement and that it prohibited their lawsuit.  They also knew that a significant number of the allegations that they made in their Complaints, including some of the purported quotes that they attribute to Black, were objectively and demonstrably false.  Despite this, they took no action to withdraw or correct their pleadings.

81.     Wigdor's conduct was malicious and done in bad faith in that Wigdor publicly smeared Black despite knowing that Ganieva's claims were prohibited by the Agreement.  Wigdor continued to pursue and ultimately to file false allegations against Black, even after it knew the allegations were demonstrably false.

82.     On its website, Wigdor trumpets its involvement in Ganieva's case as "the epitome of why #MeToo exists."  #MeToo does not exist to turn a sporadic, consensual affair into a nine figure pay off, enforced through threats of personal and professional destruction, which is precisely what Guzel Ganieva has tried to do.  This case is the epitome of how the #MeToo movement can be hijacked and abused.  That is not what #MeToo is about.

## COUNT ONE
### (Breach of Contract Against Ganieva)

83.     Plaintiff repeats and realleges the allegations in paragraphs 1-82 as if fully set forth herein.

84.     Plaintiff and Ganieva entered into the Agreement on October 19, 2015.

85.     The Agreement is a valid, binding, and enforceable contract between Plaintiff and Ganieva.  As the recorded conversations make clear, Ganieva was under no duress in signing the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Agreement, and indeed was pleased to have entered into it. Ganieva ratified the Agreement by accepting payments totaling $9.2 million over a period of more than five years.

86.     Under their Agreement, Plaintiff agreed to: forgive two loans of $480,000 that he had made to Ganieva that had been accruing interest at 5% per annum for two and four years, respectively; make a simultaneous payment to Ganieva of $100,000; and provide Ganieva with "other consideration," which Plaintiff and Ganieva agreed that day would consist of £2 million to secure Ganieva a United Kingdom visa, as well as payments of $100,000 a month for 15 years.

87.     In exchange, Ganieva agreed to release Plaintiff from "all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

88.     Ganieva further agreed "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Plaintiff], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Plaintiff] in connection with the signing of this Agreement and (iii) any other matters that could damage [Plaintiff's] career, reputation and relationship with others."

89.     Ganieva took her time reading the document, reading some of it aloud, and asking questions as to its meaning, particularly with respect to the confidentiality clause. She laughed about the fact that she was now "a woman of means," and shortly after signing, thanked Plaintiff.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 1:23-cv-06418-JGLC   Document 61-7   Filed 10/18/23   Page 26 of 30

90.      Plaintiff faithfully performed under the Agreement for more than five years, from October 2015 through March 2021.

91.      Ganieva never repudiated or sought to rescind the Agreement. To the contrary, she ratified the Agreement by accepting monthly payments of $100,000, including while attending law school, and while represented by counsel. She continued to ratify the contract during and following the fall of 2020 even as she and Wigdor were discussing her false and disparaging allegations against Black with journalists and revealing information regarding Black, in plain violation of the Agreement.

92.      On March 17, 2021, Ganieva breached the nondisclosure provision of the Agreement by publicly tweeting that Plaintiff had "sexually harassed and abused" her for years and that she "was forced to sign an NDA in 2015."

93.      On June 1, 2021, Ganieva breached the release provision of the Agreement by filing her Original Complaint and commencing a lawsuit against Black in New York Supreme Court, and subsequently by filing amended complaints.

94.      Ganieva separately and independently breached the Agreement on other occasions detailed herein, including by making or authorizing the statements and legal claims in the court filings and press statements pleaded herein.

95.      By breaching the Agreement, Ganieva caused Plaintiff damages, including, but not limited to, forcing his resignation from Apollo, depriving him of the considerable financial benefits he would have received as CEO until July and as Chairman going forward.

**COUNT TWO**
**(Unjust Enrichment Against Ganieva)**

96.      Plaintiff repeats and realleges the allegations in paragraphs 1-82 as if fully set forth herein.

25

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

97.    Pursuant to the Agreement, Plaintiff paid Ganieva at least $9,251,084.00 from October 2015 through March 2021.

98.    Ganieva was enriched by these payments at Plaintiff's expense.

99.    Ganieva willfully broke the terms of the Agreement, depriving Plaintiff of what he had bargained for—that is, Ganieva's silence as to their sexual relationship and the resolution of their agreement.

100.    It contravenes equity and good conscience for Ganieva to be allowed to keep the money that she extorted from Black after breaking the terms of their Agreement.

101.    This count is brought in the alternative to Count One of this Complaint in the event that the Agreement is found to be void.

## COUNT THREE
### (Tortious Interference with Contract against Wigdor)

102.    Black repeats and re-alleges the allegations in paragraphs 1 through 82 as if fully set forth herein.

103.    The Agreement is a valid and enforceable contract between Black and Ganieva.

104.    Upon information and belief, Wigdor knew of the existence of the Agreement at all relevant times, and has been in possession of a copy of the Agreement since at least November 2021 (and of the relevant language since July 2021 when Black filed his original Answer in the case brought by Ganieva).

105.    Upon information and belief, knowing that its client had signed an agreement with Black that released her claims and promised confidentiality—as every agreement of this kind does, something Wigdor knows because it has drafted and litigated countless such agreements—Wigdor induced and encouraged Ganieva to repeatedly breach that contract, including by speaking with the press in November 2020 about her false allegations, publishing her tweets in March of 2021,

26

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

speaking with a reporter about her false allegations in April 2021, and by filing three complaints against Black containing those same false allegations.

106.    Wigdor's conduct was the proximate cause and the but-for cause of Ganieva's breaches of the Agreement.    Wigdor intentionally, improperly, and without justification encouraged and induced her to make false public statements about Black, her relationship with Black, her financial arrangement with Black, and false allegations of abuse, in violation of the confidentiality provision of the Agreement.  Wigdor also schemed to ensure that a *New York Times* reporter would be ready and waiting to report on Ganieva's public statements on Twitter, intending that his prominent position would amplify the reach and harmful effects of her tweets.

107.    Wigdor further encouraged, induced, and facilitated Ganieva's breach of the release provision of the Agreement by instituting and maintaining a baseless lawsuit against Black containing false allegations about Black, Ganieva's relationship with Black, and her agreement with Black.

108.    As described in detail herein, Wigdor's tortious interference with contract was malicious, in bad faith, and motivated by a self-interested desire to obtain an undeserved financial windfall by publicly smearing Black's reputation and pressuring him into settling a baseless lawsuit.

109.    Wigdor's conduct went beyond the scope of its legitimate role as Ganieva's attorneys, and indeed Wigdor undertook many of its tortious actions before it even represented Ganieva.

110.    Wigdor's tortious interference with contract caused, and continues to cause, financial loss and damage to Black, for which Wigdor must compensate Black in an amount to be determined at trial.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

111.     In addition, because of the wanton, willful, and malicious nature of the foregoing wrongful conduct, done with reckless disregard for Black's rights, Black is also entitled to recover punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby requests judgment against Defendants as follows:

(a)     Enter judgment on the claims in Black's favor;

(b)     Award Black damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Black for all monetary and/or economic damages;

(c)     Award Black damages for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income and related harm, in an amount to be determined at trial, plus prejudgment interest;

(d)     Award punitive damages for Defendants' gross wanton, malicious, and outrageous misconduct in an amount to be determined at trial;

(e)     Award attorneys' fees, costs, and disbursements incurred as a result of this action; and

(f)     Award such other, further, and different relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff Leon Black hereby demands a trial by jury on all issues.

Dated:   October 31, 2022
         New York, New York

Respectfully submitted,

_____
Michael B. Carlinsky
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, NY 10010

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

t: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
jenniferbarrett@quinnemanuel.com

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice* forthcoming)
699 W Exposition Boulevard
Los Angeles, CA 90089
t: (212) 399-2132
susan@estrichgoldin.com

*Counsel for Plaintiff Leon Black*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.