Exhibit 8

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

LEON D. BLACK,

          Plaintiff,

     v.

WIGDOR LLP AND GUZEL GANIEVA,

          Defendants.

Index No. 158062/2023

**AMENDED COMPLAINT**

**Jury Trial Demanded**

---

Plaintiff Leon D. Black, by and through his undersigned attorneys, alleges on personal knowledge, except as noted or third-party sources are referenced:

## SUMMARY OF THE ACTION

1.    Defendant Wigdor LLP ("Wigdor") has a unique business model:  it threatens to sue defendants with scandalous allegations that can be avoided only at the cost of a large settlement, of which Wigdor takes a substantial cut.  When Plaintiff Leon Black had the temerity to reject this scheme, Wigdor sought to teach him a lesson by three separate headline-grabbing lawsuits which it knew, or should have known, were false.

2.    *First*, Wigdor filed a lawsuit on behalf of Defendant Guzel Ganieva, who previously had a consensual relationship with Black and signed an NDA and release agreement barring all claims against him.  Wigdor filed suit anyway.  That case has since been dismissed and is now the subject of the instant malicious prosecution claim.  *Second*, Widgor filed a lawsuit against Black based on actions allegedly occurring more than 20 years ago on behalf of Cheri Pierson, a serial litigator who has been involved in over 35 previous lawsuits, has an extensive criminal record, and has been publicly accused of harassment, stalking, and threatening to kill

1

others.  Black has never even met Pierson.  Wigdor filed suit anyway.  *Third*, and most recently, Wigdor filed a lawsuit against Black on behalf of a "Jane Doe," who, again, Black has never even met, and, again, based on completely uncorroborated allegations involving alleged decades-old conduct.  Evidence has already been uncovered, including from key figures in Doe's past, that proves these claims are made up from whole cloth.  Upon information and belief Wigdor was warned by others prior to filing that Doe's claims were fraudulent.  Wigdor filed suit anyway.  Wigdor's pattern of willfully filing false, life-ruining allegations without properly investigating their merit, or even worse filing despite knowing their falsity, must be stopped.

3.      Plaintiff's instant claim for malicious prosecution arises out of Wigdor's unethical and unlawful filing of a series of false and malicious complaints on behalf of Ganieva.  Defendants unethically filed these complaints, which lacked even a shred of probable cause and were wholly contradicted by evidence Plaintiff made available to Defendants.  From the onset of the underlying litigation, Defendants' claims stood no chance of success because the factual allegations were barred by a release and confidentiality agreement (the "Agreement") that Ganieva willingly executed, and were refuted by contemporaneous text messages and audio recordings.

4.      Ganieva previously had a consensual affair with Plaintiff.  Years after the affair ended and against a barrage of documentary evidence contradicting her claims, Ganieva initiated a frivolous proceeding and made false allegations that Plaintiff assaulted and abused her, in violation of the Agreement, under which Plaintiff had paid her millions.  Ganieva's allegations have since been dismissed by this Court and rejected by the Appellate Division as "inflammatory," "scandalous and prejudicial," and "palpably insufficient."

5.      Wigdor is a firm with a history of questionable ethics disguised as advocacy, and has been subject to numerous sanctions motions and the suspension of a former named partner as

2

a result. Wigdor encouraged and filed Ganieva's fictitious lawsuit on her behalf and used their public relations acumen and contacts to ensure that her lies were broadly disseminated.

6.     No ethical or reasonable attorney would have brought such claims. But Wigdor did. Even more, instead of withdrawing their baseless claims, Wigdor and Ganieva amended Ganieva's complaint twice even *after* counsel for Black cited the Agreement (including directly quoting all of the non-disclosure and release language) and provided evidence of the falsity of Ganieva's claims, including quoting contemporaneous audio recordings and text messages that Ganieva sent Black indicating she was aware she signed the Agreement and understood its provisions. They filed their Second Amended Complaint after the Agreement and the recording transcripts were produced to Widgor and Ganieva in discovery. Notably, after filing these three frivolous complaints, Wigdor withdrew as counsel for Ganieva citing a "breakdown" in their relationship. As an initial matter, Ganieva's claims never had any chance of success because they were barred by the Agreement signed by Ganieva, which prohibits Ganieva from disclosing her relationship with Plaintiff and releases all claims against him arising out of or relating to their relationship. The Agreement was clear on its face, as follows:

NOW, THEREFORE, the undersigned agrees as follows:

1. GG hereby releases, remises and forever discharges LDB from all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement.

Ex. 1. (emphasis added)

7.     Any ethical, reasonable person—and particularly an attorney—would have recognized Ganieva's claims as prohibited by the Agreement and completely without merit.

8.      Indeed, this Court has held both that the Agreement is enforceable and that it "clearly and unambiguously covers all claims arising out of the parties' relationship, past or future, and thus there is no merit to [Ganieva's] argument in that regard."  *Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct. N.Y. Cty. May 24, 2023), NYSCEF Doc. No. 292 ("MTD Decision") at 11.  This Court has also found that "it is undisputed that [Ganieva] received benefits pursuant to the NDA of approximately $9.5 million over almost six years, and she did not repudiate or contest it during that time period, thereby ratifying it and barring her from alleging duress."  *Id.* at 10. Ganieva accepted these payments while she was enrolled in law school, after she texted Black years later claiming that she signed the Agreement under "duress," and while she was represented and advised by counsel.

9.      Further, Defendants filed a complaint brimming with manufactured allegations, ignored irrefutable evidence proving the falsity of these allegations and later amended the complaint on two separate occasions, doubling down on their false claims and each time adding additional lurid, prejudicial, and irrelevant allegations.  In their initial complaint, Defendants claimed, among other things, that Black had raped Ganieva on July 6, 2014, on a night when her own contemporaneous texts show that she invited him to visit, asked him to bring wine, and then professed love and gratitude to him the very next day:



**Me:** How are you feeling luv? xoxo
Sent: Jul 2, 2014, 3:20 PM
**Guzel:** Much better. Thanks. I was just thinking about you. How are you? I think I will be done by tonight.
Sent: Jul 2, 2014, 3:23 PM
**Guzel: This is love. I need you...**
Sent: Jul 6, 2014, 11:27 AM
**Me:** Hi dear...driving back from the Hamptons tonight...can I come over and tuck you in at 10:30?  xoxoxoxoxo xoxoxoxo
Sent: Jul 6, 2014, 12:37 PM
**Guzel:** Ok
Sent: Jul 6, 2014, 12:40 PM

***

4

**Guzel:** Aaah. Can you please bring a bottle of wine if you can?
Sent: Jul 6, 2014, 1:49 PM

**Me:** Avec plaisir...
Sent: Jul 6, 2014, 2:50 PM

**Me:** Hi dear...just back...O.K. to come over earlier...with wine...say 9:45? Looking forward. ..xoxoxo xoxoxoxo
Sent: Jul 6, 2014, 9:23 PM

**Guzel:** Sure
Sent: Jul 6, 2014, 9:24 PM

**Guzel:** Good morning. It was very nice to see you last night. I already feel better. And there no money on my bank account... I love you and thank you!!! Xoxoxoxoxo and more love
Sent: Jul 7, 2014, 9:35 AM

**Guzel:** Thank you very much. Let me know if you want to get together soon. Lots of love, g
Sent: Jul 9, 2014, 10:01 PM

10.     Defendants alleged in their fictitious complaints that Black threatened Ganieva, stating "If you do not take the money, I will put you in prison"; "If you do not take the money, I will destroy your life"; or "I will be paying you so long as you keep your mouth shut."  Black never uttered these phrases.  To the contrary, audio recordings prove Ganieva was the one threatening Black to go public with their affair stating, "the longer I wait, the more sure I become that I actually, I prefer to go public," and that, "*I'm dying to talk to press about it*."  Ganieva threatened that if Black did not submit to her demands, she would sue him for "a billion dollars" and damage his business and personal life.  Never once, however, did she ever suggest Black sexually assaulted her.

11.     Audio recordings also show that on October 19, 2016, after taking the time to read the one-page Agreement, Ganieva signed it and celebrated the deal over Grand Marnier souffle while discussing her investment and travel plans with Black and laughing that she was now "a woman of means."  Shortly after leaving the meeting the Ganieva thanked Black, showing signs of affection:

**Me:** Dear Guzel...you have 2 tickets to the ballet for Thursday night at 7:30...the tickets are under your name at the David Koch theatre at Lincoln Center...happy to share grand marnier souffles together and come to an agreement this afternoon...Best, L.
Sent: Oct 19, 2015, 2:16 PM

**Guzel:** Thank you for everything. Talk soon xoxo
Sent: Oct 19, 2015, 2:18 PM

12.     Douglas Wigdor, Wigdor's co-founder and principal, admits that "when [Wigdor] write[s] [its] complaints, there's an effort on our part to make it as colorful as possible."  Felix Gillette, *The Trump-Loving Lawyer Who Won't Stop Suing Fox News,* Bloomberg, (September 22,

2017), https://www.bloomberg.com/news/features/2017-09-22/the-trump-loving-lawyer-who-won-t-stop-suing-fox-news. But here, Wigdor's complaint was more than colorful—it was a lie. Defendants filed it anyway and continued to amend and inflate their allegations despite clear evidence that the claims were both barred by the Agreement and false.

13.      Both this Court and the Appellate Division rejected Ganieva and Wigdor's frivolous complaints. The Appellate Division has held that Ganieva should not have been granted leave to file her second amended complaint and that numerous scandalous, prejudicial, and unsupported allegations from the first amended complaint should have been stricken. *Ganieva v. Black*, 216 A.D.3d 424, 425 (1st Dep't 2023). Further, this Court has since dismissed Ganieva's lawsuit in its entirety, holding that all of her claims were barred by the Agreement. MTD Decision at 12.

14.      Wigdor markets itself as skilled in leveraging the specter of litigation to extract *pre-complaint* settlements. As Wigdor's website states: "Because we have a reputation for obtaining multi-million dollar verdicts, we are able to settle the majority of our cases without the need for even filing complaints." While widely known for its playbook of quietly trading away purported claims before even filing a lawsuit, Wigdor curiously filed a scandalous public complaint in the underlying case here without *ever* making a settlement demand, and then persistently declined the repeated invitations from Black's counsel to review the records that would prove its client's complete unreliability and disprove the allegations they publicly filed in the original complaint.

15.      The pattern continued: Ganieva's first amended complaint added allegations based on an October 2008 flight to Florida—a supposed kidnapping to Jeffrey Epstein's house—that contemporaneous flight records confirm never happened. Notably, Ganieva is recorded on tape years before she filed her lawsuit equivocating as to whether she had ever even met Epstein, let alone that their meeting was the result of a supposed "kidnapping" by Black. The Appellate

Case 1:23-cv-06418-JGLC     Document 61-8     Filed 10/18/23     Page 8 of 35

Division held that many of the allegations in Wigdor's first amended complaint were "scandalous and prejudicial and not necessary to establish any element of plaintiff's causes of action" and that numerous "inflammatory factual allegations from the first amended complaint" should have been stricken. *Ganieva*, 216 A.D.3d at 425. Ganieva's second amended complaint added allegations about a Jane Doe who supposedly gave Black a massage at Epstein's home more than 20 years earlier, long before Ganieva met Black. The Appellate Division held that the allegations in the second amended complaint were so "palpably insufficient" that Ganieva should never have been granted leave to amend. *Id.*

16.     The Estate of Jeffrey Epstein created a victim fund that, according to public reports, paid out over $121 million to approximately 150 individuals who submitted claims that Epstein had abused them. Notably, despite Wigdor discussing Epstein ad nauseum in each of the *Ganieva*, *Pierson*, and *Doe* complaints, upon information and belief, none of these women ever filed claims against Epstein's Estate—which casts doubt about whether any of them even knew Epstein. Indeed, 26 months after it first filed the *Ganieva* action, Wigdor has not substantiated a single allegation in any of the complaints it has filed. Wigdor has shown itself to be nothing but a bottom-feeder, who represents claimants and asserts claims that no plaintiff's firm with even a shred of legitimacy ever would.

17.     Black will demonstrate that all these allegations are false, but succeeding in court has never been Ganieva's or Wigdor's objective. They instead intended simply to harm and humiliate Black, resulting in his resignation from his positions at Apollo and from other high-profile positions he held at other institutions.

Case 1:23-cv-06418-JGLC    Document 61-8    Filed 10/18/23    Page 9 of 35

## PARTIES

18.     Plaintiff Leon D. Black resides in New York County, in the State of New York. Black founded Apollo Global Management, Inc. in 1990 and since that time has been Apollo's largest shareholder.  For more than 30 years, until March 21, 2021, Black served as Apollo's CEO and as the Chairman of its Board of Directors.

19.     In addition to his work at Apollo, Black has spent the last three decades working as a dedicated philanthropist and one of our nation's leading benefactors of the arts, education, and cancer research.  He served for 20 years on the Board of Mt. Sinai Hospital, 15 years on the Board of the Metropolitan Museum of Art, and 10 years on the Board of Trustees of Dartmouth College. Black served as a Trustee of the Museum of Modern Art ("MoMA") for approximately 25 years, and from 2016 to 2021 served as co-Chairman or Chairman of MoMA.  He has also been one of MoMA's most generous supporters.  Some 14 years ago, Black and his wife, Debra, co-founded the Melanoma Research Alliance, which became the largest private funder of melanoma research in the world.  The Melanoma Research Alliance has directly invested more than $150 million to advance cutting edge research into immunotherapy for melanoma and some 30 other forms of cancer.

20.     Defendant Wigdor LLP is registered in New York State and maintains its principal place of business in New York County, in the State of New York.  Wigdor was formally retained as counsel for Ganieva in April 2021, but was advising her on media strategy related to her allegations against Black as early as October 2020.

21.     Defendant Guzel Ganieva is a Russian national who, on information and belief, resides in New York County, in the State of New York.

Case 1:23-cv-06418-JGLC    Document 61-8    Filed 10/18/23    Page 10 of 35

## JURISDICTION AND VENUE

22.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules section 301, and venue is proper in this county pursuant to Civil Practice Law and Rules section 503, because Plaintiff and Defendants reside in New York.

## FACTUAL ALLEGATIONS

### Black's Prior Relationship With Ganieva

23.     Black met Ganieva at a party that both attended in 2008.  From 2008 until 2014, Black and Ganieva engaged in a sporadic, consensual affair.

24.     Ganieva's communications with Black between 2008 and 2014 were marked by consistent expressions of love and affection on her part.  Black paid for Ganieva's apartment but never had the key.  He also paid for her acting lessons, tuition, financed expensive vacations, paid for a $40,000 portrait of her, and purchased a Steinway & Sons piano for her son.  He made a series of loans to her and attempted to assist her in finding employment in the finance industry.

25.     In July 2014, Ganieva told Black she needed to leave the country for immigration-related reasons and departed for Russia on July 31, 2014.  From the plane, Ganieva texted Black, "I love you and miss you already."  This was shortly *after* he supposedly raped her, according to her complaints.  For the next eleven months, Ganieva sent texts to Black from abroad telling him that she missed him and longed to be together.

26.     On June 8, 2015, Ganieva sent Black a formally worded note insisting that she needed to meet with him in person about a matter that she characterized, without detail, as "both urgent and important."  Based on statements she later made to Black, this sudden shift in tone appears to have coincided with her failure to gain legal status in the United Kingdom.

9

Case 1:23-cv-06418-JGLC     Document 61-8     Filed 10/18/23     Page 11 of 35

27.     On June 24, 2015, Ganieva met Black in person in New York City.  Ganieva threatened Black, telling him that if he did not pay her $100 million, she would disclose their personal and sexual relationship to the board of Apollo and to the media.

28.     Black understood Ganieva to be extorting him and recorded future conversations with Ganieva.

29.     On August 12, 2015, Ganieva met Black at a restaurant in New York City.  Ganieva again demanded money from Black, threatening that, "the longer I wait, the more sure I become that I actually, I prefer to go public," and that, "I'm dying to talk to press about it."  Ganieva threatened that if he did not submit to her demands she would sue him for "a billion dollars" and damage his business and personal life.  Ganieva claimed that various prominent people—from international philanthropist Len Blavatnik, to former New York Mayor Michael Bloomberg, to ailing publisher and developer Mort Zuckerman—were following or harassing her at Black's direction, musings that she herself suggested were paranoid.  She blamed Black for the bullying her son received in school and camp, and even said Black was responsible for her son choking on a piece of meat at a restaurant.

30.     On August 14, 2015, Ganieva met Black at another restaurant in New York City. Ganieva again informed Black that "I will not agree to anything less than $100 million."  Ganieva justified her demand for $100 million by referencing a news report she saw about a woman who received $18 million when she was fired after sleeping with her boss, a "Wall Streeter," on four occasions.  Ganieva explained that, in her view, her demand for $100 million was justified because she believed her sporadic affair with Black was "like a marriage."  Never once in any of these conversations did Ganieva ever suggest that Black had raped or otherwise sexually assaulted or abused her.

31.     Over the course of the next few months, Ganieva and Plaintiff discussed and negotiated the terms that would be included in the Agreement.  In particular, they negotiated the amount of the payments that Plaintiff would make to Ganieva, settling on the monthly $100,000 payments, loan forgiveness, and £2,000,000 lump sum payments that would appear in the final Agreement.

32.     On October 19, 2015, Ganieva again met Black, this time at the Four Seasons Restaurant in New York City.  During that meeting, which was recorded, she reviewed and executed the Agreement at her own pace, raising several questions regarding the Agreement that Black answered.

33.     In the Agreement, Ganieva agreed to give up any and all claims against Black and not to publicly disclose their affair.  In exchange for her dropping her threats, Black agreed to pay Ganieva $100,000 per month for 15 years, forgive $1,000,000 in loans, and provide £2,000,000 for Ganieva to use toward obtaining legal status in the United Kingdom.

34.     Ganieva does not dispute these facts.

35.     Ganieva admits she received £2,000,000 after signing the Agreement. *Ganieva v. Black,* Index No. 155262/2021 (Sup. Ct. N.Y. Cty.), Feb. 28, 2023 Hr. Tr. 38:19-39:2 ("Hr. Tr.") ("At some point, I don't believe it was when this agreement was signed, contemporaneous with this agreement.  At some point in time, I believe it was in 2016, she received money to help obtain a UK visa.  And there are allegations about that in there and she doesn't dispute that Black is the one that gave her the money for that visa.").

36.     Ganieva admits she received $100,000 a month from Black for a period of five to six years.  *Id.* 39:5-11 ("The Court: She did get $100,000 a month for a period of five to six years? Five— around five—over five years?  Ms. Christensen: Yes. The Court: We would say at least $6 million she received in those monthly payments; would you agree to that?  Ms. Christensen: Yes.").

11

37.   Ganieva admits she signed the Agreement. *Id.* 33:16-21 ("We don't dispute that she signed a document at the Four Seasons"). Ganieva chose not to file a proceeding for a pre-action disclosure to obtain the Agreement. *Id.* 34:19-24 ("The Court: If you felt you needed [the signed Release] before you brought this case, which you in the end didn't, then you could have brought a proceeding for a pre-action disclosure, which you didn't. Ms. Christensen: Correct, Your Honor. We did not do that.").

38.   Ganieva also admits that she was the age of maturity when she signed the Agreement, that she is a sophisticated party, a Columbia University graduate, and that she is proficient in English. *Id.* 40:23-41:7, 42:15-17.

39.   The Agreement states that Ganieva "has made certain allegations and asserted certain claims against [Black], which she made under extreme stress and which she now concedes are not true, and which allegations and claims, if made public, would damage [Black's] career, reputation and relationships with others." Exhibit 1.

40.   In the Agreement, Ganieva agreed to release all claims—past, present, or future—against Black arising out of or relating to their relationship, and "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Black], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Black] in connection with the signing of this Agreement and (iii) any other matters that could damage [Black's] career, reputation and relationships with others." *Id.* This Court has held that the Agreement is enforceable and that it "clearly and unambiguously covers all claims arising out of the parties' relationship, past or future, and thus there is no merit to [Ganieva's] argument in that regard." MTD Decision at 11.

INDEX NO. 158062/2023<br>RECEIVED NYSCEF: 08/24/2023

41.     Contrary to Ganieva's false allegations in her complaints, during the negotiations, Black never uttered the following phrases that Wigdor and Ganieva claim to be direct quotes: "If you do not take the money, I will put you in prison"; "If you do not take the money, I will destroy your life"; or "I will be paying you so long as you keep your mouth shut."  The recordings prove that.

42.     Instead, after taking the time to read and ask questions about the one-page agreement, Ganieva signed it and celebrated the deal over dessert while discussing her investment and travel plans with Black and laughing that she was now "a woman of means."  Shortly after leaving the meeting, Ganieva texted Black:  "Thank you for everything.  Talk soon xoxo."

43.     In October 2019, after four years in which there was no direct contact between Black and Ganieva and during which she accepted the £2,000,000 payment and the monthly $100,000 payments, continually re-ratifying the Agreement, Ganieva sent Black a text message referring to "the NDA I signed," evidencing her understanding of the nature and terms of their Agreement.  Ganieva included a copy of this text message in each of her complaints against Black.

44.     The next day, Ganieva sent Black another text message complaining about their arrangement, and falsely claiming that he had forced her to sign the Agreement under duress. Ganieva had never made that claim during the preceding four years.

45.     Black did not respond to these text messages.  He continued to pay her $100,000 per month, and Ganieva continued to accept the payments just as she had in the past, while attending law school, never once seeking to repudiate or void the Agreement, or refusing the money or offering to return the millions she received.

46.     On February 18, 2020, an attorney sent Black a letter stating that Ganieva "has retained our firm to investigate certain matters related to your prior interactions with her and to advise and represent her in connection with same."  The attorney sent a follow-up letter on March

6, 2020.  Black, uncertain whether this was a legitimate demand from Ganieva's counsel, and concerned about whether the request reflected a continuation of Ganieva's extortion, did not respond.  Black continued to pay Ganieva $100,000 per month, and Ganieva continued to accept the payments for more than a year after she was represented by counsel.

47.    This Court has held that Ganieva is barred from claiming that the Agreement is void because she was under duress when she signed it, because "it is undisputed that plaintiff received benefits pursuant to the NDA of approximately $9.5 million over almost six years, and she did not repudiate or contest it during that time period, thereby ratifying it."  MTD Decision at 10.  Ganieva understood the terms of the deal.  She admits Black continued to pay her as long as she acted in accordance with the Agreement.  Hr. Tr. 38:23-25 ("The Court: He never did stop paying as long as she complied with the agreement.  Ms. Christensen: Right."); *Ganieva v. Black,* Index No. 155262/2021 (Sup. Ct. N.Y. Cty. May 6, 2022), NYSCEF Doc. No. 155 ("Ganieva SAC") ¶¶ 247, 255.  Ganieva further admits she was not surprised that her monthly payments stopped after she tweeted allegations that Black sexually assaulted her.  Hr. Tr. 38:5-11 ("[I]t is accurate to say that he paid her until she posted those tweets and then the money ceased.  And it is accurate, as we say in her complaint, that she was not surprised about that.").

48.    Ganieva was likewise not subject to "ongoing duress" after signing the Agreement.  She does not allege any such "ongoing duress" in any of her complaints, nor does she allege that Black even so much as contacted her after she signed the Agreement.  And Wigdor admitted to the Court that it has not identified a single instance of ongoing duress to support Ganieva's claim that the Agreement is invalid.  *Id.* 49:23-50:13 ("The Court: So what was the ongoing duress that's in the complaint?  Ms. Christensen: You mean actual event where he physically or he threatened her again in person or has to say—I don't believe that that's necessary based on the years that they were together and how often he already said it to her.  The Court: So you're saying there was

INDEX NO. 158062/2023
RECEIVED NYSCEF: 08/24/2023

nothing—there was nothing that happened from the signing of this document until her repudiation, say, approximately five years later, six years later—five years later that suggests there was some ongoing duress?  Ms. Christensen: I'm not saying there was….").

49.     Wigdor also told the Court during the February 28, 2023, hearing that it did not know if Ganieva would be willing to return any of the over $9 million she received from Black. Hr. Tr. 54:17-23.  Ganieva continues to keep the money to this day.

### Ganieva's Engagement with Wigdor

50.     Prior to her involvement with Wigdor, Ganieva had repeatedly attempted to publicize details of her relationship with Black through contact with various journalists, all the while accepting $100,000 a month from Black.  On information and belief, none of these efforts were successful because of the reporters' concerns that her allegations were unsubstantiated and potentially libelous.

51.     In addition, and as noted above, before working with Wigdor, Ganieva worked with at least one attorney who was aware of the existence of the Agreement and who did not file any claims or make any public allegations that would have violated the Agreement's terms.

52.     On October 12, 2020, *The New York Times* published a story detailing Black's relationship with Jeffrey Epstein.  The article, authored by Matthew Goldstein, reported that Black had paid Epstein "at least $50 million" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black."

53.     As early as September 29, 2020, Ganieva had initiated contact with Goldstein, the author of that article.  Upon information and belief, Wigdor and Goldstein subsequently began communicating regarding Ganieva's claims.  This was despite the fact that, on information and belief, Wigdor already knew or should have known that Ganieva was subject to a valid release and

confidentially agreement with Black that Ganieva continued to ratify every month by accepting $100,000 from Black.

54.     Once Wigdor began working with Ganieva, it facilitated a broad audience for her claims, paying no heed to the terms of the Agreement or the falsity of her allegations.

55.     On information and belief, Wigdor was motivated to publicize the case for its own self-promotion, namely, to obtain notoriety for the firm by publicizing a high-profile case against a prominent individual such as Black. And it later did so—broadcasting its claims against Black on its website and in interviews—despite the fact that it knew that Ganieva had entered into the Agreement with Black, continued to ratify the Agreement by accepting monthly payments, and was prohibited by its terms from discussing her relationship with Black or from bringing any claims against him.

56.     On October 1, 2020, after accepting payments for five years, Ganieva sent Goldstein a text message on WhatsApp, asking whether sharing her "story" anonymously was an option. Goldstein informed her, "[i]t is possible for us not to use your name but we would still need to document everything. All the text messages you have from Leon and would need to talk to any friends you talked to about the situation. We need to do that to assure the reader your story stands up and can be backed up by contemporaneous factors."

57.     On October 30, 2020, Ganieva sent a WhatsApp message to Goldstein, stating: "Did you speak to Wigdor? He is reaching out about a reporter wanting to speak to me." Ganieva's message referred to Douglas Wigdor, the co-founder and principal of Wigdor LLP. *Ganieva v. Black,* Index No. 155262/2021 (Sup. Ct. N.Y. Cty. Mar. 9, 2022), NYSCEF Doc. No. 144 ¶ 4.

58.     Goldstein responded to Ganieva's message about Wigdor, writing, "[w]e are supposed to talk. But not sure if there is another reporter on this too from another publication."

Goldstein continued, "[t]ho I'm pretty certain it's me. Are you ok with him talking to me on background." *Id.*

59.    On November 5, 2020, Ganieva wrote to Goldstein, "I will let [W]igdor know that if you want to speak with him you can." *Id.* ¶ 5.

60.    On November 10, 2020, Goldstein confirmed his plans to speak to Wigdor, writing to Ganieva, "[h]ey there. Talking to Wigdor tomorrow afternoon. He wanted to review his notes. Let's talk on Wednesday if you are free or Thursday sorta wanted to wait until I spoke to Doug." *Id.* ¶ 6.

61.    On November 16, 2020, Goldstein informed Ganieva, again via WhatsApp message, that he "[h]ad good chat with Wigdor over the weekend." *Id.* ¶ 9.

62.    On January 10, 2022, in connection with (now-dismissed) racketeering and other claims that Black brought in federal court against various parties, including Wigdor and Ganieva, Wigdor represented to the United States District Court for the Southern District of New York that it was "frivolous" for Black to argue that Wigdor had conspired with public relations professionals on Ganieva's behalf as early as March 2021 (when Ganieva took to Twitter) because that was "before Ms. Ganieva ever retained Wigdor." At that time, Wigdor represented that Ganieva formally retained the firm in April 2021. Thus, according to Wigdor, its communications with the press in the Fall of 2020 on behalf of Ganieva—who was not its client—were not within the scope of its duty as attorneys. Wigdor was not acting as Ganieva's counsel when it spoke with the press about Ganieva's relationship with Plaintiff, all the while knowing, upon information and belief, that Ganieva had signed an NDA. Wigdor also knew, on information and belief, that the Agreement was signed in a public place and was not entered into under duress, and that Ganieva had ratified the Agreement by accepting monthly payments. "[U]ntil April 2021, Black deposited $100,000 each month into Ganieva's bank account," which Ganieva always accepted. *Ganieva v.*

*Black*, Case No. 2022-02357 (1st Dep't), NYSCEF Doc. No. 9 at 8. Wigdor and Ganieva also knew the intent of the Agreement was to release legal claims against Black and prevent Ganieva from "talk[ing] about anything involving their relationship." *Id.* Wigdor was actively communicating with Ganieva as early as October 2020 and was speaking with the press in a capacity other than as her counsel, an obvious violation of any NDA ever drafted.

**Ganieva's False Public Statements About Black**

63. On or about March 11, 2021, the Twitter account @GuzelGanieva3 was created.

64. Ganieva, with encouragement and help from Wigdor, on information and belief, composed a series of tweets in which she would publicly and falsely accuse Black of sexual abuse, threats, harassment, and other unlawful behavior.

65. Before Ganieva posted any tweets, only three other Twitter users, all of them prominent journalists, followed her account: Ronan Farrow of *The New Yorker*, Richard McHugh, then of NBC, and Matthew Goldstein of *The New York Times*.

66. Given that Wigdor spoke with Matthew Goldstein on Ganieva's behalf in November 2020 and Wigdor's apparent role in encouraging and helping to draft the tweets, there is reason to believe that Wigdor and Goldstein discussed a plan for Ganieva to publicize her allegations via Twitter, where they would find a receptive audience with Goldstein, who could use his prominent outlet to amplify her false allegations.

67. On March 17, 2021, Ganieva posted three tweets. She posted: "Although I am a private person, in light of the recent media coverage, I think I have an obligation to make a statement regarding Apollo Global Management's CEO and Chairman, Leon Black. I was sexually harassed and abused by him for years. It started in 2008 when I met with him to discuss work. While he understood my career aspirations, he could not understand me when I refused his sexual advances. I was bullied, manipulated, threatened, and coerced. Similarly, under duress, I

18

INDEX NO. 158062/2023
RECEIVED NYSCEF: 08/24/2023

was forced to sign an NDA in 2015.  I am breaking my silence now because I do not want this type of predatory behavior to continue happening to other women.  #MeToo #LeonBlack."  On information and belief, Ganieva's tweets were intended to pressure Apollo to remove Black as CEO and Chairman as soon as possible.

68.      Still, none of Ganieva's three Twitter followers published anything in response to Ganieva's false allegations.  Similarly, Julie Brown of the *Miami Herald*, who was responsible for breaking the Epstein story, and to whom Ganieva emailed her false accusations on multiple occasions, including in the weeks before the tweets, published nothing.  Neither did Jodi Kantor of *The New York Times*, whom Ganieva contacted in 2019.

69.      Black learned about Ganieva's tweets shortly after March 17, 2021.

70.      Given the campaign against Black that began in Fall 2020 and was spurred on by Defendants, Black and Marc Rowan, Black's chosen successor, concluded that Apollo must be protected.  On March 21, 2021, Black resigned as CEO, Director, and Chairman, forcing a transition ahead of schedule, and ending his tenure as Chairman.  As a result, Black lost his position, health insurance, and other valuable benefits.

71.      On information and belief, Wigdor helped to arrange an interview of Ganieva by Josh Kosman, a reporter at the *New York Post* who was a regular recipient of Wigdor's leaks.  On April 8, 2021, Kosman published an "exclusive interview" with her.  The *New York Post* article included Ganieva's false claim that "Black's abuse 'was over a long period of time and it was tragic.'"  Wigdor has leaked information concerning Plaintiff to Kosman on other occasions.  For example, Kosman contacted Plaintiff for comment on some of Ganieva's filings before they had been publicly filed.

72.      On or about April 8, 2021, Black issued a statement regarding his relationship with Ganieva that said, "I foolishly had a consensual affair with Ganieva that ended more than seven

years ago. Any allegation of harassment or any other inappropriate behavior towards her is completely fabricated." Black also stated that Ganieva had extorted him for years and that he had "made substantial monetary payments to her, based on her threats to go public concerning our relationship, in an attempt to spare my family from public embarrassment."

### Ganieva and Wigdor File a Series of False Complaints

73.    On April 9, 2021, after Ganieva's tweets and the day after the Kosman interview was published, Ganieva formally retained Wigdor. Given that Wigdor had been advising Ganieva since at least as early as October 2020, it is not clear why Wigdor and Ganieva waited until April 2021 to execute a formal engagement letter, or whether anyone other than Ganieva was involved in that decision. The timing of the engagement—exactly one day *after* Ganieva's disparaging remarks were published by Kosman—is noteworthy, given that Wigdor had already been advising Ganieva for at least five months.

74.    Upon information and belief, Wigdor waited until after Ganieva's tweets and the Kosman interview were published to formalize its relationship with Ganieva because Wigdor knew that Ganieva's tweets and comments to Kosman were in violation of her confidentiality and release agreement with Black. By officially coming on as Ganieva's attorneys *after* her tweets and her interview, and by publicly proclaiming that it was not engaged as counsel until April 9, 2021, upon information and belief, Wigdor sought to conceal its role in having assisted Ganieva in her contractual breaches before that date. Indeed, Wigdor made repeated efforts to hide its prior involvement and that of its principal, Douglas Wigdor. For example, Wigdor stated in a September 21, 2021, letter to Black's counsel that "Doug Wigdor is not working on this case." Wigdor likewise argued in a December 16, 2021 court filing that Wigdor's conduct could not "ha[ve] any

bearing on the veracity" of an April 8, 2021 statement by Black because "Wigdor LLP did not

even represent Ms. Ganieva until ***after Black made his statement***" (emphasis in original).

75.     Contrary to its usual protocol, Wigdor did not reach out to Black before filing

Ganieva's complaint, nor did it make a settlement demand.  Wigdor would go on to file not one

but three different versions of its baseless and fraudulent complaint on behalf of Ganieva, which

this Court and the Appellate Division have rejected.  Each version was laden with lies disproven

by Ganieva's own statements, which Black had recorded and preserved and offered to Wigdor for

their review.  Wigdor's filing of frivolous proceedings not based in law or fact is a violation of

Wigdor's obligations under the New York Rules of Professional Conduct.  N.Y. R. Prof. Conduct

3.1. ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein,

unless there is a basis in law and fact for doing so that is not frivolous").

76.     Wigdor repeatedly declined to review these tapes and transcripts, claiming—

falsely—that it did not sign routine protective orders that would protect confidentiality.  In fact,

the record demonstrates that Wigdor routinely signs such orders.  *See, e.g.*, Stipulation and Order,

*Kafenbaum v. Soulcycle Inc.*, 20-cv-06315 (AT) (OTW) (S.D.N.Y. Apr. 21, 2021); Stipulation and

Order, *Chase v. Reed Smith LLP*, 20-CV-06121 (JPO) (S.D.N.Y. Jan. 28, 2021); Stipulation and

Order for the Production and Exchange of Confidential Information, *Mann v. MLB Advanced

Media, L.P.*, 651503/2018 (Sup. Ct., N.Y. Cty. Aug. 23, 2018); Stipulation and Order for the

Production and Exchange of Confidential Information, *Town Total Holdings v. Conte*,

656194/2016 (Sup. Ct., N.Y. Cty. Apr. 10, 2017).  Its reluctance to do so in this case—even as it

was filing three false complaints—supports the conclusions that Wigdor consciously avoided

evidence that its client was entirely unreliable, and that it acted in bad faith and outside the scope

of any legitimate duty to represent its client.

77.    On June 1, 2021, Ganieva and Wigdor filed the first of these complaints in New York Supreme Court, New York County.  *See Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct., N.Y. Cty. June 1, 2021), NYSCEF Doc. No. 1 ("Original Complaint").  The Original Complaint asserted four claims: two for defamation based on Black's public statement rebutting Ganieva's tweets; a claim for intentional infliction of emotional distress based on Black's allegedly defamatory statement and extortion accusation; and a claim under the New York City Gender Motivated Violence Act ("GMVA") based on a purported sexual assault.  *Id*. ¶¶ 91-130.

78.    The alleged assault supposedly took place seven years earlier, on July 6, 2014, when the Original Complaint alleges that Black "barged" into Ganieva's apartment "suddenly" and without warning.  *Id*. ¶ 47.[1]  Ganieva alleged that she was so unwell that she was "limp and unable to move."  *Id.* ¶¶ 47, 51.  Ganieva made these allegations even though contemporaneous text messages show that she had invited Black to her apartment.  Ganieva had texted Black, "Baby . . . I'm all alone.  Let's get together soon.  I miss you.  Xoxo," and on the evening of July 6, had asked Black to bring her a bottle of wine.  *See Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct., N.Y. Cty. July 19, 2021), NYSCEF Doc. No. 4 ("Answer") ¶ 49.  The next morning, she thanked him and professed her love.  *Id.*

79.    Within hours of Wigdor filing Ganieva's Original Complaint, Kosman published yet another article quoting Ganieva's false allegations at length.  Kosman's sources commented that the "silver lining" of Ganieva's suit was that it did not "mention Epstein, and therefore doesn't provide grounds for digging into matter pertaining to the dead pedophile."

80.    Black's Answer to the Original Complaint, filed on July 19, 2021, put the lie to the Original Complaint's claims with Ganieva's own words.  A week before the supposed assault, on

---

[1] The complaint was filed in June of 2021.  Ganieva alleges that she was raped in July 2014, just barely within the seven-year limitations period then applicable for GMVA claims.

June 28, 2014, Ganieva sent the text suggesting she and Black should get together "soon." Then, on July 6, 2014, earlier on the day of the supposed assault, it was Ganieva who wrote to Black, unsolicited: "This is love. I need you." Answer ¶ 49. In response, Black said that he would be driving back to New York City the evening of July 6, and inquired if he could "come over and tuck you in at 10:30?" *Id*. Ganieva responded, "[a]aah. Can you please bring a bottle of wine if you can?" *Id*. He agreed.

81.    Ganieva reached out to Black first thing the following morning with a message of thanks and love: "Good morning. It was very nice to see you last night. I already feel better . . . I love you and thank you!!! Xoxoxoxoxo and more love." *Id*. ¶ 52. And on July 9, she thanked Black again, asked if he wanted to get together, and sent "lots of love." *Id*. ¶ 53. When Black did not respond, Ganieva reached out yet again the next day to try to get together. *Id*.

82.    Contrary to the claim in the Original Complaint that "[a]fter this rape, Ganieva took her son and left New York to physically distance herself from Black" (Original Compl. ¶ 55), Ganieva and Black saw each other several times, at her request, between July 6, when Black supposedly raped her, and July 30, when she texted him from the plane as she was departing: "I love you and miss you already" (Answer ¶ 58). Black's Answer—entirely corroborated by contemporaneous text messages—exposed the allegation of sexual assault as false.

83.    Ganieva's claims that Black defamed her in a public statement in which he accurately described her extortion were no less false. Ganieva's extortion is captured on tape. Ganieva repeatedly warned that if Black did not pay her $100 million, she would report their affair to the Apollo Board, Black's family, and the press. Her intent to harm Black's relationship with Apollo was explicit.

84.     Ganieva also alleged that she was threatened by Black and that he forced her to sign the Agreement.  Her Original Complaint offers supposed direct quotations from Black in this regard: "If you do not take the money, I will put you in prison," and "[i]f you do not take the money, I will destroy your life."  Original Compl. ¶ 3; *see also id*. ¶ 63.  Black's recordings of his conversations with Ganieva demonstrate the falsity of these claims.  There are no such threats, nor any need for threats.  Ganieva wanted the money; in fact, she wanted more.  The recordings make clear that Ganieva was pleased with the arrangement.  After agreeing to accept millions of dollars in exchange for not speaking publicly about their affair, she discussed her investment and travel plan, and laughed about the fact that she was "a woman of means now."  Answer ¶ 40.  Shortly after the meeting in which they entered into the Agreement, she texted Plaintiff: "[t]hank you for everything. Talk soon xoxo."  *Id*. ¶ 41.

85.     In Plaintiff's original Answer, filed on July 19, 2021, Plaintiff quoted all of the relevant language of the parties' Agreement—specifically the full text of its release and non-disclosure provisions.

86.     Yet, faced with the clear falsity of the complaint they filed and with the clear terms of the Agreement, on August 9, 2021, Ganieva and Wigdor filed an Amended Complaint almost twice as long as the original, complete with all of the allegations whose falsity had been demonstrated and was now consciously avoided.  *See Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct., N.Y. Cty. Aug. 9, 2021), NYSCEF Doc. No. 26 ("Am. Compl.").  The newly added allegations focused almost entirely on Jeffrey Epstein, who was barely mentioned in the Original Complaint.  Ganieva did not assert any new legal claims premised on these allegations, and indeed the newfound allegations regarding Epstein appear nowhere in any of the actual Causes of Action asserted in any iteration of Ganieva's complaints.  In her Amended Complaint, Ganieva—with Wigdor's assistance, encouragement and at its inducement—again breached the Agreement's

confidentiality and release provisions. In addition to all of her previous false allegations, she now alleged being kidnapped by Black in October 2008, flown against her will to Palm Beach, Florida on Black's private plane, taken to Epstein's home there, and coerced into a meeting with Epstein, Black, and one of Epstein's associates, Sarah Kellen, for the supposed (but never articulated) purpose of gratifying Epstein's sexual desire. Am. Compl. ¶¶ 75-108. During that meeting, Kellen supposedly told Ganieva that Epstein and Black were "sex addicts." *Id*. ¶ 97. Although the Amended Complaint contained boldfaced, block-text quotations supposedly from Kellen, it identified no documentation, recordings, or other memorialization of the alleged conversation between Ganieva and Kellen some 13 years ago. *Id*. And, just like the block quotes wrongly attributed to Black, on information and belief, the alleged quotations from Kellen are fabrications.

87.     The Appellate Division has held that the allegations in the Amended Complaint were "scandalous and prejudicial and not necessary to establish any element of plaintiff's causes of action" and that numerous "inflammatory factual allegations from the first amended complaint" should have been stricken. *Ganieva*, 216 A.D.3d at 425.

88.     Black's Answer to the Amended Complaint (*Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct., N.Y. Cty. Sept. 8, 2021) NYSCEF Doc. No. 36), conclusively debunked Ganieva's new lies. Black used flight manifests to establish that he and Ganieva never took the same-day round trip flight to Florida in October 2008 that is described in the Amended Complaint. Moreover, the contemporaneous recordings of Black and Ganieva from the summer of 2015, shortly after she began extorting him, call into serious question the Amended Complaint's allegation that Ganieva ever even met Epstein, let alone that their meeting was the result of a kidnapping by Black.

89.     Despite facing documentary evidence that the additional allegations in the Amended Complaint were fabricated, on September 20, 2021, Wigdor sought permission to file

yet another complaint, adding even more new lies to the old ones. *See Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct., N.Y. Cty. Sept. 20, 2021), NYSCEF Doc. No. 47 ("Second Am. Compl."). The new round of gratuitous allegations included a tale of an assault of another, unnamed woman at Epstein's Manhattan home some two decades earlier (well before Black met Ganieva) for which the woman was supposedly paid $5,000. *Id.* ¶¶ 51-85. Wigdor eventually revealed this Jane Doe to be Cheri Pierson when it filed yet another lawsuit against Black on behalf of Pierson.

90.    The Second Amended Complaint in *Ganieva v. Black* also included an entire section labeled, "Other Evidence of Black's Close Ties to Epstein's Private Conduct." *Id.* ¶¶ 145-50.

91.    The causes of action in the Second Amended Complaint were identical to those in the Amended Complaint. Ganieva did not assert any new claims based on her new allegations, or even reference them in her Causes of Action. Indeed, Ganieva's legal claims have remained unchanged since the Original Complaint, except for the addition in the Amended Complaint of a claim for "retaliation" under the GMVA, which Wigdor and Ganieva made up out of whole cloth.

92.    The Appellate Division held the allegations in the Second Amended Complaint Wigdor filed were so "palpably insufficient" that Ganieva should never have been granted leave to amend. *Ganieva*, 216 A.D.3d at 425.

93.    In November 2021, Black produced, under an embargo agreement between the parties, a copy of the Agreement and transcripts of all of the recordings cited in Black's Answers. As of that moment, there can be no doubt that Wigdor and Ganieva knew the exact language of the Agreement and that it prohibited their lawsuit. They also knew that a significant number of the allegations that they made in their Complaints, including some of the purported quotes that they

attribute to Black, were objectively and demonstrably false. Despite this, they took no action to withdraw or correct their pleadings.

94.     Wigdor's conduct was malicious and done in bad faith in that Wigdor publicly smeared Black despite knowing that Ganieva's claims were prohibited by the Agreement. Wigdor has used Ganieva's egregiously improper and legally untenable lawsuit to smear Black in a malicious attempt to extract settlements and exorbitant contingency fees. Wigdor continued to pursue and ultimately to file false allegations against Black, even after it knew the allegations were demonstrably false and lacked probable cause.

### Wigdor's History of Questionable Ethics

95.     Black is not the first defendant to be subjected to Wigdor's malicious tactics and questionable ethics. The firm has a long history of unscrupulous practices including failure to properly investigate clients and utilizing the press to render judgment long before defendants have an opportunity to defend themselves in court.

96.     As a result of these tactics, Wigdor has been the subject of numerous sanctions motions. *See Eckhart v. Fox News Network, LLC*, 2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021); *Areu v. Fox News Network, LLC*, 2021 WL 4124226 (S.D.N.Y. Sept. 9, 2021); *Keller v. About, Inc.*, 2021 WL 1783522 (S.D.N.Y. May 5, 2021); *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445 (S.D.N.Y. 2018); *Baskett v. Autonomous Rsch. LLP*, 2018 WL 4757962 (S.D.N.Y. Sept. 28, 2018); *Steele v. CVS Pharmacy, Inc.*, 2016 WL 3042671 (S.D.N.Y. May 18, 2016); *In re Gilly*, 976 F. Supp. 2d 471 (S.D.N.Y. 2013); *Abrams v. Pecile*, 84 A.D.3d 618 (1st Dep't 2011).

97.     Wigdor's track record of pursuing claims without proper investigation and fighting legal battles in the press rather than the court room is extensive. By way of example:

98.     *Tara Reade and Joe Biden*: Wigdor represented Tara Reade in 2020 when she accused then presidential nominee Joe Biden of sexually assaulting her in 1993. Once Reade's

credibility came under harsh scrutiny, including whether Reade made false statements under oath, Wigdor withdrew as counsel. Reade has since defected to Russia.

99. *Haynes v. Bonner*, 69 Misc. 3d 1201(A), 130 N.Y.S.3d 899 (Sup. Ct., N.Y. Cty. June 18, 2020): Wigdor represented Lauren Bonner in a discrimination suit against Doug Haynes, then-president of Point72 Asset Management. Bonner with the encouragement of Wigdor appeared on CNN in 2018 to detail an alleged pattern of abuse including demonstrably false claims that Haynes had a whiteboard in his office and had written the word "PUSSY" on it. "According to Bonner's sworn testimony she did this for two reasons (1) to 'punish' Haynes and Point72 for not paying her the $13 million she demanded; and (2) her attorneys at defendant Wigdor LLP ("Wigdor") put her up to it. Indeed, Wigdor hired two media consulting firms to coach Bonner for her '#MeToo of Wall Street' media tour and explored opportunities to set Bonner up with a book deal and a consulting job on the television show 'Billions.'" Def.'s Mot. to Dismiss, *Haynes v. Bonner and Wigdor LLP*, 2019 WL 9101942 (Sup. Ct., N.Y. Cty. Dec. 2, 2019). Wigdor later withdrew its claims against Haynes to the extent they related to the events described in her CNN interview, but for Haynes, who resigned as President of Point72, the damage was already done.

100. *New York v. Strauss-Kahn*: Wigdor represented a hotel housekeeper who claimed to have been sexually assaulted by then-Managing Director of the International Monetary Fund Dominique Strauss-Kahn. The Manhattan District Attorney indicted Strauss-Kahn on felony charges, and four days later Strauss-Kahn resigned from his post at the IMF and cut off his potential candidacy for the French presidency. After several weeks of investigation, the Manhattan District Attorney asked the court to dismiss its case, citing doubts about the accuser's credibility. Manhattan District Attorney Cyrus Vance explained, "As a prosecutor, you have to follow facts as you have them, when you have them. When those facts change, you have to, as a responsible prosecutor, deal with" the changed outlook. But Wigdor does not abide by the same ethical

28

standards. Despite the Manhattan District Attorney dropping its case, Wigdor continued to pursue

its civil case against Strauss-Kahn, eventually reaching a settlement.

101.    *In re Gilly*, 976 F. Supp. 2d 471 (S.D.N.Y. 2013): Scott Gilly, a former partner of

Thompson Wigdor & Gilly was suspended from practicing law for a year in the Southern District

of New York. Gilly incurred a $15,000 sanction on the firm based on false testimony by Gilly's

client in an employment discrimination case and efforts by Gilly to conceal facts and leverage a

false expert report in order to extract a favorable settlement.

## COUNT ONE
### (Malicious Prosecution)

102.    Black repeats and realleges the allegations in paragraphs 1-101 as if fully set forth

herein.

103.    Black and Ganieva entered into the Agreement on October 19, 2015.

104.    This Court has held that the Agreement is a valid, binding, and enforceable contract

between Plaintiff and Ganieva.

105.    As this Court has held and the recorded conversations make clear, Ganieva was

under no duress in signing the Agreement and, indeed, was pleased to have entered into it.

Ganieva's conduct, both at the time she signed the Agreement and subsequently, demonstrates that

she understood the nature and terms of the Agreement.

106.    This Court has held it is "undisputed that [Ganieva] received benefits pursuant to

the NDA of approximately $9.5 million over almost six years, and she did not repudiate or contest

it during that time period, thereby ratifying it and barring her from alleging duress."

107.    Under their Agreement, Black agreed to: forgive two loans of $480,000 that he

had made to Ganieva that had been accruing interest at 5% per annum for two and four years,

respectively; make a simultaneous payment to Ganieva of $100,000; and provide Ganieva with

"other consideration," which Plaintiff and Ganieva agreed that day would consist of £2 million to secure Ganieva a United Kingdom visa, as well as payments of $100,000 a month for 15 years. This totals approximately $9.5 million in consideration received by Ganieva.

108.    In exchange, Ganieva agreed to release Black from "all matters, causes of action, claims, suits and any and all further liability or accountability, in law or equity, by reason of any matter, cause or thing whatsoever arising prior to the signing of this Agreement, contemporaneous with the signing of this Agreement or any time in the future after the signing of this Agreement."

109.    Ganieva further agreed "never to disclose, directly or indirectly, to any individual, entity or other potential recipient, any information relating to (i) the allegations and claims that she has asserted against [Plaintiff], (ii) the signing, content or other attributes of this Agreement, including any consideration furnished by [Plaintiff] in connection with the signing of this Agreement and (iii) any other matters that could damage [Plaintiff's] career, reputation and relationship with others."

110.    Black faithfully performed under the Agreement for more than five years, from October 2015 through March 2021.

111.    Ganieva never repudiated or sought to rescind the Agreement. To the contrary, she ratified the Agreement by accepting £2,000,000 after the signing of the Agreement and monthly payments of $100,000, including while attending law school, and while represented by counsel. She continued to ratify the contract during and following the Fall of 2020 even as she and Wigdor were discussing her false and disparaging allegations against Black with journalists and revealing information regarding Black, in plain violation of the Agreement.

112.     Despite this, on June 1, 2021, Defendants commenced a meritless civil action against Black in New York Supreme Court seeking damages.  On May 24, 2023, the Court dismissed the action entirely in favor of Black.

113.     Defendants initiated this action without probable cause and despite knowing that the claims were barred by the Agreement.  Further, Defendants pursued the meritless claims even after being confronted with facts that exonerated Black.  Such conduct demonstrates that Defendants acted maliciously and intentionally for the improper purpose of harassing and injuring Black.  Wigdor's malice at the time it filed the *Ganieva* complaints is further confirmed by its subsequent actions, including filing the fictitious *Pierson* and *Doe* lawsuits after Black refused to capitulate to Wigdor's outrageous settlement demands.  Wigdor's malice at the time it filed the *Ganieva* complaints is also evidenced by its false and malicious statements to Air Mail, published on August 5, 2023, that Black is "violent," belongs "behind bars," and "there's a lot to fear with Leon Black."

114.     On information and belief, Douglas Wigdor spoke to the press on Ganieva's behalf as early as November 2020 and encouraged Ganieva to speak publicly and file suit against Black, all the while knowing that Ganieva had signed an agreement prohibiting this very conduct.

115.     On information and belief, Wigdor incited Ganieva to file her fictious claims and urged her to continue to amend the allegations despite knowing Ganieva signed the Agreement and knowing of text messages and audio recordings disproving Ganieva's allegations.

Case 1:23-cv-06418-JGLC    Document 61-8    Filed 10/18/23    Page 33 of 35

116.    As a result of Defendants' conduct, Black's reputation was destroyed, he was forced to step down from the business empire he dedicated his life to building, not to mention leadership positions at numerous philanthropic organizations.  Black has suffered public abuse as a result of Defendants' meritless filings harming personal life and ability to conduct business.  Black has also expended substantial amounts of time, effort and expense defending himself against Defendants' unwarranted allegations.

117.    Defendants' unsupported allegations caused injury to Black's reputation and as a result of the protracted and meritless lawsuit, Black has experienced mental suffering and anguish in an amount to be determined at trial.

118.    Defendants' actions impaired Black's social and business standing.  The lawsuit caused Black to sustain business losses in an amount to be determined at trial.

119.    Defendants' conduct was malicious, oppressive and carried out in disregard of Black's rights.  Accordingly, Black is entitled to an award of punitive damages in an amount sufficient to punish and make an example of Defendants, and each of them, as proven at trial.

Case 1:23-cv-06418-JGLC    Document 61-8    Filed 10/18/23    Page 34 of 35

## **PRAYER FOR RELIEF**

   WHEREFORE, Plaintiff hereby requests judgment against Defendants as follows:

(a)  Enter judgment on the claims in Black's favor;

(b)  Award Black damages against Defendants for any and all other monetary and/or non-monetary losses suffered by him, including, but not limited to, loss of income and related harm, in an amount to be determined at trial, plus prejudgment interest;

(c)  Award punitive damages for Defendants' gross wanton, malicious, and outrageous misconduct in an amount to be determined at trial;

(d)  Award attorneys' fees, costs, and disbursements incurred as a result of this action; and

(e)  Award such other, further, and different relief as the Court may deem just and proper.

## **JURY DEMAND**

   Plaintiff Leon Black hereby demands a trial by jury on all issues.

33

Dated:     August 24, 2023               Respectfully submitted,
           New York, New York

_____

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
jenniferbarrett@quinnemanuel.com

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice* forthcoming)
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132
susan@estrichgoldin.com

PERRY LAW
E. Danya Perry
Peter A. Gwynne
157 East 86th St., 4th Floor
New York, NY 10028
(646) 357-9952
dperry@danyaperrylaw.com
pgwynne@danyaperrylaw.com


*Counsel for Plaintiff Leon Black*

34