**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JANE DOE,

        Plaintiff,

      v.

LEON BLACK,

        Defendant.

Case No. 1:23-cv-06418

**ORAL ARGUMENT REQUESTED**

**DEFENDANT LEON BLACK'S MEMORANDUM**
**OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION**
**FOR LEAVE TO AMEND THE COMPLAINT**

PERRY LAW
E. Danya Perry
Peter A. Gwynne
445 Park Avenue
7th Floor
New York, NY 10022
(212) 213-3070

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice*)
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue
22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Defendant Leon Black*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 2

  I.    PLAINTIFF'S ALLEGATIONS IN THE ORIGINAL COMPLAINT............................ 2

    A.    Allegations Related to Plaintiff's Claims ..................................................... 2

    B.    Plaintiff Fills the Rest of the Complaint with Irrelevant, Scandalous, and Prejudicial Allegations Intended to Damage Black ................................................................. 3

  II.    BLACK'S INVESTIGATION DEMONSTRABLY DISPROVES THE ALLEGATIONS IN PLAINTIFF'S INITIAL COMPLAINT ....................................................... 4

    A.    Refuting Key Allegations ............................................................................ 4

    B.    Plaintiff's History Concerning Health/███████ Issues ........................... 6

    C.    Plaintiff's Years of Social Media Activity ................................................... 7

  III.    BLACK MOVES FOR SANCTIONS AGAINST WIGDOR, WHO FAIL TO MEANINGFULLY RESPOND........................................................................ 8

  IV.    BLACK MOVES TO DISMISS THE INITIAL COMPLAINT ....................................... 9

  V.    PLAINTIFF SEEKS PERMISSION TO AMEND HER INITIAL COMPLAINT MORE THAN ONE YEAR AFTER FILING IT WITHOUT ANY NEW FACTS OR OTHER JUSTIFICATION ................................................................................. 9

ARGUMENT ......................................................................................................................... 12

  I.    LEGAL STANDARD................................................................................................. 12

  II.    PLAINTIFF'S PROPOSED AMENDMENT IS FUTILE ............................................ 13

    A.    Plaintiff's Claims Are Untimely................................................................. 13

    B.    Plaintiff's Proposed FAC Would Not Survive a Motion to Strike.............. 17

  III.    PLAINTIFF'S PROPOSED AMENDMENTS ARE PROFERRED IN BAD FAITH AND FOR AN IMPROPER PURPOSE........................................................ 19

CONCLUSION...................................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albany Area Builders Ass'n v. Town of Guilderland*,
    74 N.Y.2d 372 (N.Y. 1989) ...................................................................................15

*Bellino v. Tallarico*,
    No. 24 Civ. 712, 2024 WL 1344075 (S.D.N.Y. Feb. 21, 2024) ............................16

*Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*,
    148 F. Supp. 2d 321 (S.D.N.Y. 2001)...................................................................20

*Cabble v. Rollieson*,
    No. 04 Civ. 9413, 2006 WL 464078 (S.D.N.Y. Feb. 27, 2006) ............................17

*Cerni v. J.P. Morgan Secs. LLC*,
    208 F. Supp. 3d 533 (S.D.N.Y. 2016)...................................................................21

*Consol. Edison Co. of N.Y. v. Town of Red Hook*,
    60 N.Y.2d 99 (N.Y. 1983) ............................................................................15, 16

*Cresswell v. Sullivan & Cromwell*,
    922 F.2d 60 (2d Cir. 1990)....................................................................................20

*Finnigan v. Lionetti*,
    No. 70001/2019E (Sup. Ct. Bronx County Oct. 7, 2021).......................................16

*Foman v. Davis*,
    371 U.S. 178 (1962)........................................................................................12, 19

*Ganieva v. Black*,
    216 A.D.3d 424 (1st Dep't 2023) .........................................................................19

*Ganieva v. Black*,
    Index No. 155262/2021 (Sup. Ct. N.Y. County 2021) ..........................................19

*ILC Data Device Corp. v. County of Suffolk*,
    182 A.D.2d 293 (2d Dep't 1992) ..........................................................................15

*Jones v. City of New York*,
    571 F. Supp. 3d 118 (S.D.N.Y. 2021)...................................................................17

*Liana Carrier Ltd. v. Pure Biofuels Corp.*,
    151 F. Supp. 3d 319 (S.D.N.Y. 2015)...................................................................13

*Mandala v. NTT Data, Inc.*,
    88 F.4th 353 (2d Cir. 2023) ...................................................................................12

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    402 F. Supp. 2d 434 (S.D.N.Y. 2005) .....................................................................17

*Myart v. Glosson*,
    No. 14 Civ. 831, 2014 WL 6612008 (W.D. Tex. Nov. 20, 2014) ...........................17

*N.Y. State Ass'n for Affordable Hous. v. Council of N.Y.*,
    141 A.D.3d 208 (1st Dep't 2016) .............................................................................15

*Oram v. SoulCycle LLC*,
    979 F. Supp. 2d 498 (S.D.N.Y. 2013) ......................................................................17

*Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*,
    283 F.R.D. 142 (S.D.N.Y. 2012) .............................................................................12

*In re World Trade Ctr. Disaster Site Litig.*,
    722 F.3d 483 (2d Cir. 2013) .....................................................................................21

*Yankelevitz v. Cornell University*,
    No. 95 Civ. 4593, 1997 WL 115651 (S.D.N.Y. Mar. 14, 1997) ............................17

**Statutes & Rules**

28 U.S.C. § 1746 ...........................................................................................................21

Fed. R. Civ. P. 12(f) ......................................................................................................17

Fed. R. Civ. P. 15(a)(2) .................................................................................................12

N.Y.C. Admin. Code § 10-1101 *et seq.* ..........................................................................2

N.Y.C. Admin. Code § 10-1103 ....................................................................................14

N.Y.C. Admin. Code § 10-1105(a) ..............................................................................9, 13

N.Y. Const., art. IX, § 2(c) ...........................................................................................13

N.Y. C.P.L.R. § 214-g ...........................................................................................13, 14, 15

N.Y. C.P.L.R. § 214-j ....................................................................................................16

N.Y. Mun. Home Rule Law § 10(1)(i)-(ii)(a)(12) ........................................................13

S.D.N.Y. L.R. 15.1 ........................................................................................................21

S.D.N.Y. L.R. 15.1(a) ...................................................................................................21

Defendant Leon Black respectfully submits this memorandum of law in opposition to Plaintiff's motion for leave to amend the Complaint (ECF Doc. No. 91).

## PRELIMINARY STATEMENT

Over one year after initiating this action, Plaintiff and her counsel, Wigdor LLP ("Wigdor"), are now asking for authorization to amend the initial Complaint for what they characterize as seemingly benign reasons: in their words, "to clarify and provide context to the existing allegations." (ECF Doc. No. 93 ("Mem.") at 4.) But even the most cursory look at the proposed amendments contradicts that sugarcoated—and objectively false—explanation. In particular, Plaintiff and Wigdor elected to open the proposed First Amended Complaint (ECF Doc. Nos. 92-1, 92-2 (the "Proposed FAC")), with something practically never seen in a legal filing: a large-font, media-friendly, graphic description of the alleged (and fictitious) attack *already* alleged in the original Complaint. The cynical and transparent objective animating Plaintiff's unorthodox maneuver is plain to see: she and Wigdor are obviously trying to use the amendments to once again attack Black in even more lurid ways and smear his reputation not because of any bona fide grievance or legally cognizable claim, but because they are doubling down on an unending, misguided and baseless campaign against him.

Plaintiff's motion is meritless and should be denied:

*First*, the proposed amendments are futile because they have no bearing or impact on the pending motion to dismiss the initial Complaint (ECF Doc. No. 40), which conclusively shows that Plaintiff's claims are time barred. They would also be subject to a motion to strike, and are part of a pattern of bad faith conduct by Wigdor that resulted in a unanimous decision by the First Department that held that similar allegations in a prior case should have been stricken.

*Second*, the proposed amendments —which do not rely on *any* facts or evidence unavailable to Plaintiff when she filed her initial Complaint over one year ago— are the product

of bad faith. They seek to either (i) add prejudicial and scandalous allegations either unrelated to the alleged sexual assault underlying Plaintiff's only claim or, as described above, repetitive of existing allegations, or (ii) recant and/or "correct" allegations Black long ago proved to be false. They also alter certain details, including ████████████████████████████ ████████████████████████ in ways that call into question the veracity of either version of Plaintiff's story. The characters in this story are constantly shifting: "Charlie," who was alleged to be a trafficker and abuser of the Plaintiff in the initial Complaint, is ████████████ ████████████████████████████, who played no significant role previously, ████████████████████████ after Plaintiff became aware that they told Black's investigators the truth about her false claims. ████████████████████████ ████████████████ Such inexplicable changes demonstrate Plaintiff's bad faith in seeking to amend.

The Court should deny Plaintiff's motion, at least until the Court rules on the motion to dismiss and decides the issue of futility.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.    PLAINTIFF'S ALLEGATIONS IN THE ORIGINAL COMPLAINT

### A.    Allegations Related to Plaintiff's Claims

On July 25, 2023, Plaintiff filed this action. (ECF Doc. No. 1 ("Compl.").) The Complaint asserts a single claim: violation of New York City's Victims of Gender-Motivated Violence Protection Law (the "VGMVPL"). N.Y.C. Admin. Code § 10-1101, *et seq*.; Compl. ¶¶ 94-99. The only stated basis for this claim is a single alleged encounter with Black Plaintiff claims occurred in "late spring of 2002 or early summer" in New York City. (Compl. ¶ 60.) Plaintiff falsely alleges Black raped and violently assaulted her during that encounter but makes no other allegation of any other encounter with Black. Despite Plaintiff's inclusion of lurid and graphic details, the

description of the incident fills fewer than three of the Complaint's nineteen pages.

**B.    Plaintiff Fills the Rest of the Complaint with Irrelevant, Scandalous, and Prejudicial Allegations Intended to Damage Black**

The remainder of the Complaint has nothing to do with that alleged encounter. Instead, it tells a lurid story of abuse, grooming, and sex trafficking by Epstein and his associates. Among other things, Plaintiff alleges that she has autism and a form of Down Syndrome and that, when she was 15, she participated in a county cheerleading program for 8- to 12-year-old girls. (*Id.* ¶¶ 10, 13-14.) She specifically alleges that she was allowed to participate, despite being much older than the other girls, because she could fit into the child-sized uniform. (*Id.* ¶¶ 14-15.) She then alleges that she was groomed by the adult who ran the program, whom Plaintiff refers to as "Elizabeth,"[1] and soon began living at Elizabeth's house, while still a high school student. (*Id.* ¶¶ 16-18.) Plaintiff claims that "she did not have her own bed there, much less a bedroom." (*Id.* ¶ 21.) According to Plaintiff, Elizabeth subjected Plaintiff to horrific physical, psychological, and sexual abuse, including forcing her to watch Elizabeth and her male friend, "Charlie," have sex. (*Id.* ¶¶ 19-24.)

Plaintiff next alleges that, "in the late summer of 2001," when she was 15, "Elizabeth and Charlie" took her to "an adult 'party' in a suburb outside of Washington D.C.," where Ghislaine Maxwell "introduced herself to Plaintiff." (*Id.* ¶¶ 27-31.) "The very next week," Plaintiff alleges, Elizabeth "put Plaintiff on a private plane from Virginia to Palm Beach," where Plaintiff was introduced to Epstein and brought into his fold. (*Id.* ¶¶ 37-43.) Plaintiff alleges that she was thereafter "shipped out" to Epstein's homes in Palm Beach and the U.S. Virgin Islands "[m]ost weekends," and, as a result, "missed countless Fridays and Mondays from her junior year of high

---

[1] For ease of reference and to avoid additional redactions/sealing, we refer to this individual as "Elizabeth." Her sworn declaration, submitted in connection with Defendant's motion for sanctions, is available at ECF Doc. Nos. 53 (sealed) and 56 (redacted) (the "Elizabeth Decl.").

school, almost causing her to fail." (*Id.* ¶ 44.) Plaintiff also alleges that Epstein began "hand[ing] [Plaintiff] off" to other men. (*Id.* ¶ 47.)

In a final section titled "Black's Other Victims Through Epstein," Plaintiff includes allegations about a release agreement allegedly discussed in a case against Deutsche Bank and an investigation into Epstein in the Virgin Islands. (*Id.* ¶¶ 86-93.) These additional allegations are unrelated to the Plaintiff and unnecessary to her claim, as she effectively admits, stating that this section is included because it "is clear that Ms. Doe is not the only victim of both Epstein and Black." (*Id.* ¶¶ 88, 93.)

## II.     BLACK'S INVESTIGATION DEMONSTRABLY DISPROVES THE ALLEGATIONS IN PLAINTIFF'S INITIAL COMPLAINT

Soon after Plaintiff filed the Complaint, Black began investigating Plaintiff's allegations. Plaintiff's story immediately began to unravel. Indeed, Black's initial, preliminary investigation gives the lie to Plaintiff's entire narrative, and failed to uncover even a shred of evidence supporting Plaintiff's account. His investigators easily obtained evidence that refute key details in the Complaint. And they uncovered troubling evidence related to Plaintiff's well-known history of fabrications. In particular:

### A.   Refuting Key Allegations

Plaintiff alleged that she began living "nearly full-time" with Elizabeth while Plaintiff was still in high school, that she missed "countless" days of school, and that this is when she was trafficked by Elizabeth and Epstein. (*Id.* ¶ 18, 44.) Plaintiff's family and Elizabeth, however, stated unequivocally that Plaintiff lived at home throughout high school. (ECF Doc. Nos. 52 (sealed) and 55 (redacted) ("Melendez Decl.") ¶ 13.) Plaintiff's ██████████ also stated that Plaintiff drove ██ to school nearly every day during Plaintiff's senior year of high school, when ████████████ ██████. (*Id.* ¶ 13.) Plaintiff's family members and high school classmates deny that Plaintiff

ever lived outside of her home during high school, nor do any of them recall Plaintiff missing school for any significant amounts of time ███████████████████████████████████ ████████████████████████████. (*Id.* ¶ 13.)

Black's investigators quickly determined that Plaintiff in fact lived with Elizabeth for a brief period of time only *after* high school (and after she had turned 18), because Plaintiff enrolled in a college that was closer to Elizabeth's home than to Plaintiff's family, and so Elizabeth, as a favor, offered to let Plaintiff live with her while she attended college. (Elizabeth Decl. ¶ 9.) Plaintiff was 18 years old at the time, and (contrary to the false allegations in the Complaint) had her own bedroom. (*Id.* ¶ 15.) Plaintiff's family, Elizabeth, Elizabeth's son, and Elizabeth's then-boyfriend (who lived with her at the time and is not her ███████████████), all confirm that Plaintiff was a freshman in college during the brief period when she lived with Elizabeth, and that Plaintiff did not live with her during high school. (*Id.* ¶¶ 9-12, 15.)

Contrary to Plaintiff's allegations about being trafficked by Epstein around the country and the U.S. Virgin Islands, all of the interviewees stated that Plaintiff never traveled out of the state, let alone out of the country, other than for ███████████████ and a trip to the Bahamas that she took with Elizabeth, Elizabeth's teenage son, and one of Elizabeth's female friends—which occurred after Plaintiff graduated high school.( Melendez Decl. ¶ 13; Elizabeth Decl. ¶¶ 8, 15.)

As another example, Plaintiff alleged that, as a 15-year-old high school student, she participated in a cheerleading program for 8- to 12-year-old girls, and that she was allowed to participate because she could fit into a child-sized uniform. (Compl. ¶¶ 13-15.) This hyper-specific allegation, no doubt included to make Plaintiff's allegations of underage sex trafficking seem even more heinous, is demonstrably false. Witness statements (including signed, sworn declarations) and photographic evidence prove that Plaintiff participated in a recreational cheerleading program

that was open to high-school-aged girls. (*See, e.g.*, Melendez Decl. ¶ 13; Elizabeth Decl. ¶¶ 3-4.) Furthermore, Plaintiff's physical development was normal, and she could not have fit into a uniform for 8-to 12-year-old children. (Melendez Decl. ¶¶ 11, 13; Elizabeth Decl. ¶ 5.) Numerous photographs of Plaintiff from the time confirm that she was of at least normal size and development. (Melendez Decl. ¶ 11.) Indeed, a dated, official photograph of Plaintiff and her cheerleading team—which Black's investigators were able to easily obtain during their preliminary inquiry—shows that Plaintiff was of normal size and development for her age. (ECF Doc. No. 50 ("Estrich Sanctions Decl.") ¶ 6.)

**B.    Plaintiff's History Concerning Health/▇▇▇▇▇▇ Issues**

In addition to the evidence refuting, and outright disproving, key allegations in Plaintiff's Complaint, Black's investigation also revealed that Plaintiff has a ▇▇▇▇▇▇▇▇▇ ▇▇▇ that pre-date (and also post-date) the events alleged in the Complaint. Among other things, members of Plaintiff's family stated that she has assumed a series of different names and personas over time, is believed to have ▇▇▇▇▇▇▇▇▇▇▇▇, has a history of making up alternate realities, and frequently invents things that, in their words, "become[] her reality." (Melendez Decl. ¶ 13.) ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇. (*Id.* ¶ 13.)

Those issues seem to have led to Plaintiff's claims of autism and Mosaic Down Syndrome. Plaintiff's family members, Elizabeth, and Plaintiff's high school classmates all stated that Plaintiff did not display any symptoms or characteristics of autism while in high school. Indeed, Plaintiff's family confirmed that she was not diagnosed with autism during her childhood or while she lived at home throughout high school. (*Id.* ¶ 13.) Plaintiff's ▇▇▇ who now works with autistic children, stated that Plaintiff only began displaying such behaviors in her twenties, and did so intentionally to present herself as a person with autism. (*Id.*) For example, Plaintiff once noted that

6

people with autism do not look other people in the eye, and thereafter began to avoid looking people in the eye—a behavior she had never displayed before. (*Id.*) Plaintiff's family members also noted that Plaintiff first claimed to have Mosaic Down Syndrome when she was in her thirties, after a cousin posted on social media about her child with Down Syndrome and received positive support and attention. (*Id.*) In addition, contrary to Plaintiff's ████████████ allegations regarding poor performance in high school, she was accepted into and graduated from a major university and has repeatedly claimed online that she is attending law school.

### C.    Plaintiff's Years of Social Media Activity

Plaintiff attempted to spoliate her extensive Twitter history by deleting her account a few months before filing the Complaint. (ECF Doc. Nos. 76 (sealed); 78 (redacted) ("Estrich Stay Decl.") ¶ 5.) Despite these efforts to destroy evidence relevant to her lawsuit, ████████████ ████████████████████████████████████████. These tweets contradict specific allegations in Plaintiff's Complaint and indicate that Plaintiff often fabricates her own reality, just as her family members told Black's investigators. She graphically and frequently claimed conditions, illnesses, and difficult life circumstances to garner online attention and sympathy from her many social media followers.

In sharp contrast to the allegations in the Complaint, as an adult in 2020, ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ (Estrich Stay Decl. ¶ 7.) This praise and these fond memories are entirely consistent with the information Elizabeth provided during her interview with Black's investigators and paint a very different picture than the allegations of abuse and trafficking presented in the Complaint. (Elizabeth Decl. ¶¶ 6, 9.)

Plaintiff also tweeted repeatedly about being diagnosed with numerous serious and rare

medical conditions, in addition to Mosaic Down Syndrome and autism, none of which her family ever mentioned. (Estrich Stay Decl. ¶¶ 11-14.) These include ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(*Id.* ¶ 11.) Following ███████████████████, Plaintiff made repeated false representations

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ (*Id.* ¶¶ 15-20.) As explained in the Estrich Stay Declaration, these claims are demonstrably false. (*Id.* ¶¶ 21-22.)

## III.    BLACK MOVES FOR SANCTIONS AGAINST WIGDOR, WHO FAIL TO MEANINGFULLY RESPOND

On August 25, 2023, Black's counsel sent a Rule 11 letter to Wigdor, warning that the people closest to Plaintiff had contradicted or cast serious doubt on the entire factual basis of their Complaint, including all the facts detailed above. Plaintiff refused to withdraw the Complaint and did not seek to amend the Complaint or attempt to change a word of it, claiming that they were entitled to ignore all the glaring red flags and to refuse to conduct the objectively reasonable investigation that the law requires, especially for salacious charges such as these. Notably, in its opposition to Black's Rule 11 motion (ECF Doc. Nos. 59, 60), Wigdor never once pointed to any investigation that it conducted to confirm its client's discredited account. Plaintiff ████████████████

████████████████████████████████████████████████████ as she now claims.

Plaintiff did not ██████████████████████████████████████████████████

██████████████████████████. Perhaps most shockingly, Wigdor did not identify ███████████

██████████████████ as proof of her outlandish allegations, or even █████████████████████

████████████. Nor did it ever assert that Plaintiff's family members—who provided recorded

statements and sworn testimony refuting Plaintiff's narrative—████████████████████████

████████████████. On this basis alone, the Court should grant Black's motion for sanctions, as it

is now clear that Wigdor failed to make the required inquiry and allowed patently false allegations

to remain in the Complaint for ***more than a full year***.

## IV.    BLACK MOVES TO DISMISS THE INITIAL COMPLAINT

On September 29, 2023, Black moved to dismiss the Complaint because it was untimely.

(ECF Doc. No. 40.) Plaintiff concedes that the default statute of limitations for her VGMVPL

claim has long since expired, but asserts that her claim is nevertheless timely pursuant to N.Y.C.

Admin. Code § 10-1105(a) (the "NYC Revival Statute"). However, that law cannot revive

Plaintiff's claim because under the New York Constitution, municipal ordinances like the NYC

Revival Statute may not conflict with the laws of New York State. As such, Black's motion to

dismiss does not depend on either the sufficiency or the substance of Plaintiff's allegations, but

only the purely legal question of whether the NYC Revival Statute she purports to invoke is

preempted by state law, as Plaintiff and Wigdor admit in their memorandum in opposition to the

motion. (Mem. at 3 & n.2.) As discussed below, Judge Kaplan recently ruled that the NYC revival

provision is preempted by the corresponding provisions in state law.

## V.    PLAINTIFF SEEKS PERMISSION TO AMEND HER INITIAL COMPLAINT MORE THAN ONE YEAR AFTER FILING IT WITHOUT ANY NEW FACTS OR OTHER JUSTIFICATION

On July 22, 2024, almost a year after Plaintiff filed her Complaint, and while Black's

motions for sanctions and to dismiss have been pending, Plaintiff filed a letter, seemingly out of

nowhere, indicating that she was "in the process of drafting a proposed Amended Complaint" and

expected to file a motion for leave to amend "no later than the first week in August." (ECF Doc.

No. 87.) On August 9, 2024, Plaintiff informed the Court that she would "submit her motion for leave to amend the complaint in the coming weeks." (ECF Doc. No. 88.) On August 13, 2024, the Court entered an order requiring that Plaintiff move to amend by August 20, 2024. (ECF Doc. No. 89.) On August 20, 2024, almost 13 months after Plaintiff filed her Complaint and almost one year after Black had moved to dismiss, Plaintiff filed this Motion. (ECF Doc. Nos. 91-93.)

In the Proposed FAC, Plaintiff inserts a graphic, profanity-laced, large font, media-ready, prejudicial attack on Black that is clearly intended to shock its audience and provide clickbait to the media. Plaintiff now claims, *for the first time*, ██████████████████████████ ████████████████████████████████████████ Plaintiff ████████████ on three separate occasions. (Proposed FAC at 1, ¶¶ 2, 98.) She twice refers to ████████████████ ██████████████████████████████████" (*Id.* ¶¶ 3, 99.)

Despite having refused to amend or withdraw the Complaint in response to Black's motion for sanctions, Plaintiff now proposes edits to the Complaint that attempt to correct her earlier lies. She deletes the allegation, now proven false (████████████████████████), that ████ ████████████████████████████ (*Id.* ¶ 24.) She █████ the prior allegation that Plaintiff lived "nearly full time" with Elizabeth, ████████████████████████████████ ███████████████████████████████████████ (*Id.* ¶ 28.)

Plaintiff also drastically alters her previous story by ████████████████████████████ ██████████████████ (*see* Elizabeth Decl. ¶ 10 (sworn testimony that "Charlie" did not live with Elizabeth at the time)), but then contradicts herself by ████████████████ that ████████████ ██████████████████ (*see* Proposed FAC ¶¶ 74-75).

Plaintiff ████████████████████████████ her earlier allegation that Maxwell introduced herself to Plaintiff for the first time at an "adult 'party'" outside of Washington, DC

that she attended with Elizabeth. (Compl. ¶¶ 27, 30-31.) Plaintiff now, 23 years after the fact, recalls for the first time ███████████████████████████████████████████████████ ████████████████████████████████████████████ (Proposed FAC ¶ 37.) This is despite the fact that her mother and other family members specifically told Black's investigators that Plaintiff did not travel to Florida during high school. (Melendez Decl. ¶ 13.) Plaintiff ███████ █████████████ that "[m]ost weekends, Elizabeth sent Plaintiff to Epstein and Maxwell" in "Palm Beach and to the USVI." (Compl. ¶ 44.) Instead, she now conveniently states that ███████ ███████████████████████████████████████████████████████████████ █████████████ (Proposed FAC ¶ 56.) She still insists, contrary to the evidence presented in connection with the motion for sanctions (*see, e.g.*, Melendez Decl. ¶ 13 (Plaintiff's ██████ rode to school with Plaintiff "nearly every single day" and family stated that Plaintiff did not miss school "for any significant amounts of time" other than one unrelated occasion)), that Plaintiff ████████ ██████████████████████ (Proposed FAC ¶ 56), but ██████████████████ that she "missed countless Fridays and Mondays from her Junior year of high school, almost causing her to fail out" (Compl ¶ 44.)

In what is clearly retaliation for the fact that Plaintiff's family told investigators the truth and made it clear that the Complaint was rife with falsehoods, Plaintiff now claims, *for the first time*, that ███████████████████████████████████████████████████████████████ █████████████████████████████████ (Proposed FAC ¶ 57.) It is inconceivable that Plaintiff would not have recalled this detail earlier, or that Wigdor would not have included it in their opposition to the motion for sanctions. They are clearly aware of the devastating nature of the testimony of her family members, relatives, and former classmates, and are trying to neutralize it by belatedly claiming ██████████████████████.



Plaintiff adds a reference ███████████████████████████████████

██████████████████████████ (*Id.* ¶ 68. Strangely and without explanation,

Plaintiff and Wigdor unilaterally redact five words or phrases (that appear to be names) ███████

████ without seeking permission to do so from the Court and without providing a sealed copy

that includes the redacted information. Plaintiff also ███████████████████████████

███████████████████████, again without explanation as to why these quotes were

not included with the similar prior quotes in the original Complaint. (*Id.* ¶ 89-90.)

Plaintiff adds nine new paragraphs to the completely irrelevant section of the Complaint

titled "Black's Other Victims Through Epstein." These new allegations are purely an attempt to

smear Black through alleged character evidence, and have absolutely nothing to do with the alleged

rape in New York. (*Id.* ¶¶ 107-116.) They are instead exclusively related █████████████

██████████████████████████████████████████████████████.

## ARGUMENT

### I.    LEGAL STANDARD

After the period to amend a pleading as of right has passed, Federal Rule of Civil Procedure

15 requires an amending party to seek the opposing party's consent or leave of court. *Soroof*

*Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142, 146 (S.D.N.Y. 2012). While the

Court should "freely give leave [to amend] when justice to requires," that does not mean that

amendment is always proper. Fed. R. Civ. P. 15(a)(2). Specifically, Rule 15 bars amendment if (1)

the party seeking to amend has unduly delayed, (2) the party seeking to amend is acting in bad

faith or with a dilatory motive, (3) the proposed amendment would cause undue prejudice to the

opposing party, or (4) the proposed amendment would be futile. *Foman v. Davis*, 371 U.S. 178,

182 (1962); *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 362 (2d Cir. 2023).

Several of these considerations warrant denial of Plaintiff's motion to amend. Her proposed

amendments are both (1) futile and (2) filed in bad faith and intended to prejudice Black.

## II.    PLAINTIFF'S PROPOSED AMENDMENT IS FUTILE

A proposed amendment is futile if it cannot withstand a motion to dismiss. *See Liana Carrier Ltd. v. Pure Biofuels Corp.*, 151 F. Supp. 3d 319, 324 (S.D.N.Y. 2015). That is the case here: the Proposed FAC, just like the initial Complaint, should be dismissed because Plaintiff's claims are untimely, and the NYC Revival Statute is preempted under settled New York state law.

### A.    Plaintiff's Claims Are Untimely

In Plaintiff's account, the alleged assault that forms the basis for her sole claim occurred some 22 years ago. Accordingly, it is barred by the default limitations periods in the VGMVPL, which provides that a claim must "be commenced within seven years after the alleged crime of violence motivate by gender occurred[,]" or, if the plaintiff was a minor at the time the claim accrued, must be commenced within nine years after becoming an adult. N.Y.C. Admin. Code § 10-1105(a). Plaintiff does not allege that her suit is timely under either of these provisions. Instead, Plaintiff asserts that her claim is timely under the NYC Revival Statute. (Compl. ¶¶ 7, 99; Proposed FAC ¶¶ 13, 124.)

But as Black demonstrated in his motion to dismiss, the NYC Revival Statute is preempted by state law—the revival provision in the Child Victim's Act, N.Y. C.P.L.R. § 214-g (the "CVA Revival Provision"). Therefore, the NYC Revival Statute cannot resurrect Plaintiff's untimely claim. Under New York law, local governments may only enact laws that are "not inconsistent with the" laws of the state. N.Y. Const., art. IX, § 2(c); *see* N.Y. Mun. Home Rule Law § 10(1)(i)-(ii)(a)(12). Because the NYC Revival Statute purports to create a different time period for reviving the same claims that New York State addressed through the CVA Revival Provision, it is preempted and cannot revive a claim that would be untimely under the CVA Revival Provision.

The CVA Revival Provision revived a specifically defined set of expired claims: "every civil claim . . . brought against any party . . . as a result of conduct which would constitute a sexual offense" against a minor as defined in, among other provisions, "article one hundred thirty of the [New York State] penal law," which was "committed against a" minor and was "barred as of" February 14, 2019, because the "applicable period of limitations has expired." N.Y. C.P.L.R. § 214-g. It further provides that such claims are revived for a two-year window extending from August 14, 2019, to August 14, 2021. *Id.* Moreover, it expressly provides that its limited revival window for such claims applies "[n]otwithstanding any provision of law which imposes a period of limitations to the contrary." *Id.* Despite conceding that it applies to her claim, Plaintiff did not take advantage of this revival period, and did not commence this action until almost two full years after the revival period had ended.

The NYC Revival Statute created a two-year revival period, which lasts from March 1, 2023, until March 1, 2025, for expired claims under the VGMVPL. It mirrors the CVA Revival Provision by covering "crime[s] of violence motivated by gender," including "acts that would constitute a misdemeanor or felony against the person as defined in *state* [] law." N.Y.C. Admin. Code § 10-1103 (emphasis added). Put differently, the NYC Revival Statute attempts to revive the same claims as the CVA Revival Provision, but for a different and conflicting two-year window. Indeed, Plaintiff's own allegations make clear that her claim is covered by both revival statutes. Plaintiff asserts that her claim falls within the VGMVPL—and thus is timely under the NYC Revival Statute—because Black's alleged conduct "constitutes a sexual offense as defined in Article One Hundred Thirty of the New York [State] Penal Law." (Compl. ¶ 98; Proposed FAC ¶ 123.) But Article 130 is one of the state-law provisions expressly cross-referenced in the coverage provision of the CVA Revival Provision. N.Y. C.P.L.R. § 214-g.

New York courts have found conflict preemption where, as here, "a state law prohibits what a local law explicitly allows." *N.Y. State Ass'n for Affordable Hous. v. Council of N.Y.*, 141 A.D.3d 208, 214 (1st Dep't 2016) (citation and quotation omitted). Despite the NYC Revival Statute applying to the same claims as the CVA Revival Provision, New York City nevertheless attempted to establish a different, conflicting period for asserting those claims. The preemption analysis is uncomplicated and straightforward—allowing Plaintiff's claim to be revived under New York City law in July 2023 is inconsistent with New York State law, which closed the revival window in August 2021.

Additionally, the NYC Revival Statute is preempted under a field preemption analysis. According to field preemption, when a state legislature has signaled a clear intent to preempt a particular "field" of law, a municipality is impliedly barred from passing conflicting laws in that field. The State's desire to preempt a field "may be implied from a declaration of State policy by the Legislature or from the fact that the Legislature has enacted a comprehensive and detailed regulatory scheme in a particular area." *Consol. Edison Co. of N.Y. v. Town of Red Hook*, 60 N.Y.2d 99, 105 (N.Y. 1983) (citation omitted); *see, e.g.*, *Albany Area Builders Ass'n v. Town of Guilderland*, 74 N.Y.2d 372, 377 (N.Y. 1989); *ILC Data Device Corp. v. County of Suffolk*, 182 A.D.2d 293, 300 (2d Dep't 1992).

Here, with the CVA, the State Legislature clearly and definitively prescribed a specific time window for asserting claims related to sexual offenses against minors throughout New York. The CVA Revival Provision's text employs sweeping and categorical language, declaring that it applies to "*every civil claim* . . . brought against *any party* . . . as a result of conduct which would constitute a sexual offense" against a minor as defined in, among other provisions, "article one hundred thirty of the [New York State] penal law." N.Y. C.P.L.R. § 214-g (emphasis added); *see,*

*e.g.*, *Finnigan v. Lionetti*, No. 70001/2019E, at *10 (Sup. Ct. Bronx County Oct. 7, 2021) (noting that the CVA's "text is the clearest indicator of legislative intent" and that the statutory "language dismisses contradictory statutory time limits"). In addition, the Legislature's intent to occupy the field also follows from the "comprehensive and detailed regulatory scheme" that it adopted in the CVA Revival Provision. *Consol. Edison*, 60 N.Y.2d at 105. Indeed, the revival provision at issue in this case was just one part of the CVA's larger regulatory scheme overhauling state laws—specifically statutes of limitations—applicable to child sexual assault and sexual abuse claims.

Since Black filed his motion to dismiss, another court in this District has reached this very conclusion. In *Bellino v. Tallarico*, No. 24 Civ. 712, 2024 WL 1344075 (S.D.N.Y. Feb. 21, 2024), Judge Kaplan held that the NYC Revival Statute is preempted by the CVA Revival Provision. *Id.* at *1. The court adopted the arguments in defendant's brief, explaining that the CVA and Adult Survivor's Act, N.Y. C.P.L.R. 214-j, "clearly occupy the field regarding the revival of claims derived from state penal sexual assault law," including because the plain language of the CVA applies to "every civil claim or cause of action" alleging sexual offenses against a minor, and that it applies "notwithstanding any provision of law which imposes a period of limitation to the contrary." *Bellino v. Tallarico*, No. 24 Civ. 712, ECF Doc. No. 6, at 14-15.[2] Judge Kaplan later denied plaintiff's motion to amend as futile and dismissed the case. Plaintiff's appeal is pending.

None of Plaintiff's proposed amendments can cure this fatal deficiency—nor are they even intended to do so—because it is undisputed that (1) the conduct on which Plaintiff's claim is premised occurred some 22 years ago, and (2) Plaintiff failed to assert her claim during the revival period created by the CVA Revival Provision. Plaintiff's claim is untimely, and nothing in her Proposed FAC changes that. Accordingly, her Proposed FAC—like the Complaint—would not

---

[2] A copy of the *Bellino* decision and defendant's brief are attached as exhibits to Defendant's Notice of Supplemental Authority dated March 4, 2024. (ECF Doc. Nos. 85, 85-1, & 85-2.)

survive a motion to dismiss, and amendment would be futile. Plaintiff and Wigdor admit as much in their memorandum. (Mem. at 3 ("[T]he clarifications to existing allegations in the proposed FAC *would not impact* the substance of the motion [to dismiss]." (emphasis added).) The motion to amend should therefore be denied. *See Jones v. City of New York*, 571 F. Supp. 3d 118, 126 (S.D.N.Y. 2021) ("Claims barred by an applicable statute of limitations are futile.").

### B.    Plaintiff's Proposed FAC Would Not Survive a Motion to Strike

Plaintiff's proposed amendment is also futile because most, if not all of it, would not survive a motion to strike. *Myart v. Glosson*, No. 14 Civ. 831, 2014 WL 6612008, at *5 (W.D. Tex. Nov. 20, 2014) ("A proposed amendment is futile if it would not survive a Rule 12(b)(6) motion to dismiss or a Rule 12(f) motion to strike."); *see Yankelevitz v. Cornell University*, No. 95 Civ. 4593, 1997 WL 115651, at *4 (S.D.N.Y. Mar. 14, 1997) ("[A]mendment would arguably be futile because [the new allegations] could be stricken under Rule 12(f)"). Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, the court may "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "'Immaterial' matter is that which has no essential or important relationship to the claim for relief, and 'impertinent material' consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 402 F. Supp. 2d 434, 437 (S.D.N.Y. 2005). "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Cabble v. Rollieson*, No. 04 Civ. 9413, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006). A motion to strike may be granted where the allegations "have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones." *Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 511 (S.D.N.Y. 2013) (citation and quotation omitted). Numerous allegations in the Proposed FAC satisfy each of these conditions, and accordingly should be stricken.

The new allegations are immaterial and/or scandalous and prejudicial. Plaintiff's Proposed FAC does not add any new claims. Nor do her proposed amendments have any bearing on the sufficiency of Plaintiff's sole existing claim, which remains the same. Indeed, Plaintiff's account of the alleged sexual assault on which her claim is premised is largely unchanged in her Proposed FAC, and her proposed amendments primarily address other matters. Most egregiously, Plaintiff's Proposed FAC contains ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████. (Proposed FAC ¶¶ 102-18.) In these paragraphs, Plaintiff discusses—in breathless, tabloid-ready prose—████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████. Based on nothing more than speculation, unfounded and illogical conclusions, and suggestions of conspiracy and cover-up, Plaintiff concludes, ███████ ████████████████████████████████████████████████ (Proposed FAC ¶ 118.) In her latest filing with the Court, Plaintiff admits that these new allegations are irrelevant, stating that they are "already well-publicized details of Black's close personal relationship with Jeffrey Epstein ('Epstein') *having nothing to do with Plaintiff*." (ECF Doc. No. 96 at 1 (emphasis added).) The remainder of the new allegations simply include additional alleged "details" of the incident, such as the inclusion of more purported quotes from Black that are unnecessary to support Plaintiff's claim and prejudicial toward Black. There is no reason for these new allegations to be included in the pleadings. They are accordingly subject to striking, rendering Plaintiff's proposed amendments futile.

Wigdor previously attempted this exact same tactic against Black in a different case. *See Ganieva v. Black*, 216 A.D.3d 424 (1st Dep't 2023). There, Wigdor represented an individual who had engaged in a consensual extramarital affair with Black and who alleged that Black had assaulted her in 2014. Compl., NYSCEF Doc. No. 1, *Ganieva v. Black*, Index No. 155262/2021 (Sup. Ct. N.Y. County 2021). Ganieva and counsel amended the complaint twice, both times adding irrelevant, scandalous and prejudicial allegations about Black, including an alleged encounter with Epstein that was demonstrably false and a section that claimed to catalog "other evidence of Black's close ties to Epstein's private conduct." *Id.*, NYSCEF Doc. No. 47. Black moved to strike these allegations, and the First Department agreed. *Ganieva*, 216 A.D.3d at 425. It held that the allegations in the first amended complaint should have been stricken because they "employed rhetoric or detailed defendant's misconduct toward other women and his relationships with notorious third parties, were scandalous and prejudicial, and not necessary to establish any element of plaintiff's causes of action." *Id.* It also ruled that the motion to file a second amended complaint should have been denied because the allegations regarding Black's "relationship with one of the notorious third parties" were irrelevant and did not "establish any element of plaintiff's causes of action." *Id.* As in *Ganieva*, the allegations here, ███████████████████ ██████, have nothing to do with the alleged assault at issue in this case. Because these, and the other new allegations, are unnecessary, scandalous and prejudicial, Plaintiff's efforts to include them should be rejected as futile.

## III.    PLAINTIFF'S PROPOSED AMENDMENTS ARE PROFERRED IN BAD FAITH AND FOR AN IMPROPER PURPOSE

In addition to futility, leave to amend should also be denied if the party seeking to amend has unduly delayed, is acting in bad faith or with a dilatory motive, or the proposed amendment would prejudice the opposing party. *Foman*, 371 U.S. at 182. Each of these factors is present here.

When viewed in its full context, the timing and substance of Plaintiff's amendment, and her lack of any purported rationale for amending, compels the conclusion that her proposed amendment is intended solely to harass Black and create additional (perceived) leverage to extract as much money from him as possible for something that never happened. The Court should not countenance such gamesmanship, and her motion should be denied.

First, amendment was inexplicably sought over a year after the first Complaint was filed. "The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). Here, however, Plaintiff has not offered any reason why she chose to seek leave to amend now. Plaintiff did not seek leave to amend in response to Black's motions to dismiss or for sanctions. As discussed above, her proposed amendments have no bearing whatsoever on the motion to dismiss. Many of the new allegations double down on allegations already proven false in the sanctions motion and add even more spurious allegations that strain credulity. All of these allegations could presumably have been included in the Complaint, or within the allowed time to amend.

The fact that Plaintiff only now makes reference to supposed evidence bolstering her claims for the first time makes the timing of her motion particularly suspect. Neither Plaintiff nor Wigdor has ever mentioned these new allegations or supposed evidence in any of their prior filings, not even in response to Black's motion for sanctions, where the adequacy of Wigdor's pre-filing investigation and the reasonableness of their belief in the truth of the allegations in Plaintiff's initial Complaint were directly at issue. Against this backdrop, Plaintiff's delay in offering these allegations and supposed evidence is highly indicative of bad faith, and is sufficient grounds to deny Plaintiff's motion. *See, e.g.*, *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, 148 F. Supp. 2d 321, 326 (S.D.N.Y. 2001) ("[D]elay as a predicate for a finding of bad faith is a sufficient reason

to deny leave to amend.").

Second, as discussed above, the substance of Plaintiff's proposed amendments is suspect. Plaintiff's Proposed FAC does not add any new claims. Nor do her proposed amendments have any bearing on the sufficiency of Plaintiff's sole existing claim, which remains the same. Indeed, Plaintiff's account of the alleged sexual assault on which her claim is premised is largely unchanged in her Proposed FAC, and her proposed amendments primarily address other matters.

To the extent Plaintiff is seeking to "clarify" her pleading, another court in this District has rejected such a justification for amendment, because it "suggests that [the plaintiff] had the facts relevant to [his] claim all along." *Cerni v. J.P. Morgan Secs. LLC*, 208 F. Supp. 3d 533, 544 (S.D.N.Y. 2016). In short, there is no legal reason why *any* of Plaintiff's proposed amendments are necessary. If true, her new allegations and supposed evidence could be proffered during the course of discovery. But that would not serve Plaintiff's true intention—using the imprimatur of the judicial system and the presumption of public access to launder her false and salacious allegations.[3]

---

[3] Plaintiff's motion papers also contain multiple errors that render her motion procedurally deficient. *First*, the declaration of Plaintiff's counsel submitted in support of the motion (ECF Doc. No. 92) does not comply with the statutory requirements for such a submission. Pursuant to 28 U.S.C. § 1746, a declaration executed within the United States must state: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." Counsel's declaration, however, does not contain any language even remotely resembling this—nowhere does she state, under penalty of perjury, that the contents of her declaration are true and correct. *See In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013) (to substantially comply with 28 U.S.C. § 1746, "the declarant must (1) 'declare (or certify, verify, or state),' (2) 'under penalty of perjury,' (3) that the matter sworn to is 'true and correct'" (quoting the statute)). Unfortunately, this is not the first time Plaintiff's counsel flouted the requirements of 28 U.S.C. § 1746. (*See* ECF Docs. No. 7, 34, 57, 61, 62.) *Second*, Plaintiff failed to file a true and accurate redline of her proposed amendments as required by Local Rule 15.1. Local Rule 15.1(a) requires that the movant must submit "a version of the proposed pleading that shows—through redlining, underlining, strikeouts, or other similar typographic method—*all* differences from the pleading that it is intended to amend or supplement." (emphasis added). Plaintiff's redline (ECF Doc. No. 92-1), however, fails to show all differences from the original Complaint. Our analysis indicates that there are dozens of errors in the purported "redline," including that footnote 1 was deleted without any indication in the redline, and that the redline misnumbers all paragraphs after paragraph 4 of the original Complaint.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's motion and grant Defendant such other and further relief as the Court deems just and proper.

Dated:  September 4, 2024
        New York, New York

Respectfully submitted,

/s/ E. Danya Perry

PERRY LAW
E. Danya Perry
Peter A. Gwynne
445 Park Avenue, 7th Floor
New York, NY 10022
Tel: (212) 213-3070
Facsimile: (646) 849-9609
dperry@danyaperrylaw.com
pgwynne@danyaperrylaw.com

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice*)
947 Berkeley St.
Santa Monica, CA 90403
Tel: (213) 399-2132
susan@estrichgoldin.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Michael B. Carlinsky
Jennifer J. Barrett
51 Madison Avenue
22nd Floor
New York, NY 10010
Tel: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
jenniferbarrett@quinnemanuel.com

*Attorneys for Defendant Leon Black*

23