# EXHIBIT A



**Meredith A. Firetog**
mfiretog@wigdorlaw.com

October 21, 2024

**VIA PERSONAL SERVICE**

██████████████████

    Re:    *Doe v. Black*, Case No.: 23-cv-06418 (JGLC)

Dear Ms. ████

This Firm represents Plaintiff Jane Doe in connection with her claims against Defendant Leon Black. Enclosed, please find a subpoena for production of documents in connection with the above-referenced matter. This subpoena requires that you produce the requested documents on or before November 15, 2024. We are requesting that you produce the requested documents *via* e-mail to jchristensen@wigdorlaw.com and mfiretog@wigdorlaw.com.

A courtesy copy of the subpoena has been provided to counsel for Leon Black.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Meredith A. Firetog

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Southern District of New York

| | |
|---|---|
| JANE DOE | ) |
| *Plaintiff* | ) |
| v. | ) |
| LEON BLACK | ) |
| | ) |
| *Defendant* | ) |

Civil Action No. 1:23-cv-06418-JGLC

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: ▮▮▮▮▮▮▮

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Appendix A.

| Place: U.S. Courthouse at 350 West 1st Street Ste. 4311, Los Angeles, California 90012-4565 OR via email or file transfer to jchristensen@wigdorlaw.com | Date and Time: 11/15/2024 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/16/2024

| CLERK OF COURT | | OR | |
|---|---|---|---|
| _____ | | | *Jeanne Christen* |
| *Signature of Clerk or Deputy Clerk* | | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Plaintiff
Jane Doe _____ , who issues or requests this subpoena, are:

Jeanne M. Christensen, Esq., Wigdor LLP, 85 Fifth Ave, New York, NY 10003, (212) 257-6800, jchristensen@wigdorlaw.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:23-cv-06418-JGLC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____
on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify a subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## APPENDIX A

### DEFINITIONS

1.  **"Identify"** shall mean in connection with the identity of a Person, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. In connection with the identity of any minors, indicate identity by initials only.

2.  The terms **"documents"** and **"electronically stored information"** or "ESI" are defined to be synonymous in meaning and equal in scope to the usage of these terms in Federal Rule of Civil Procedure 34(a), including, without limitation, data or data compilation stored in any medium. A draft or non-identical copy is a separate document within the meaning of this term. The terms also include handwritten or typed notes, text messages, other instant messages, online postings or communications and/or emails.

3.  The term **"communication"** means any manner or form of information or message transmission, however produced or reproduced, whether by document or electronically stored information ("ESI") as herein defined, orally or otherwise, which is made, distributed or circulated between or among persons, data storage or processing units, including, but not limited to, **e-mails, text messages and/or instant messages** and all documents containing, consisting of, or relating to, referring to or recording of in any way, either directly or indirectly, a "communication," including all associated meta-data. The term communication includes any conversation, discussion, meeting, conference or any other oral statement.

4.      The term **"person"** shall mean any natural person, corporate entity, partnership, association, joint venture, governmental entity, trust, or any other organization or entity engaged in commerce, and shall include the Company.

5.      The term **"concerning"** shall mean containing, consisting of, relating to, referring to, describing, regarding, evidencing, or constituting, in whole or in part.

6.      The term **"date"** means the exact day, month and year, <u>if ascertainable</u>, or if not, the best approximation thereof.

7.      The terms **"You"** or **"Your"** shall mean ███████████

8.      The connectives **"and"** and **"or"** shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

9.      **"Any"** means **"all,"** **"each and every"** as well as **"anyone."**

10.      **"He"** shall mean **"she"** and vice versa.

11.      **"His"** shall mean **"hers"** and vice versa.

12.      The use of the singular form of any word includes the plural and vice versa.

13.      For the purposes of these requests, the terms **"Plaintiff"** or **"Ms. Doe"** shall mean Jane Doe.

14.      The terms **"Defendant"** or **"Black"** shall mean Leon D. Black.

15.      The term **"Black Entity or Agent or Affiliate"** shall refer to and include, but is not limited to: Black Family Foundation; Black Family Partners LP; Elysium Management LLC; Apollo; BV70 LLC; or any financial or legal advisor to Leon Black or Leon Black Entity or Agent.

16.      The term **"Black Family Office"** shall mean Leon Black's family office that is now located at 445 Park Avenue, #1401, New York, New York, that operates as the "Leon Black Family Foundation Inc." and/or the "Debra and Leon Black Family Foundation," EIN 13-3947890.

17.     The terms "**Apollo**" the "**Company**" or "**Apollo Entity**" shall mean Apollo Global Management, Inc., its directors, officers, trustees, employees, attorneys, agents, consultants, and representatives, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and the directors, officers, trustees, employees, attorneys, agents, consultants, and representatives of its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures.

18.     The term "**Epstein**" refers to Jeffrey E. Epstein.

19.     The term "**Epstein Entity or Agent or Affiliate**" shall refer to and includes but is not limited to: Jeffrey E. Epstein; Estate of Jeffrey E. Epstein; the 1953 Trust; JEGE, LLC; Cypress Inc.; Financial Ballistics LLC; FSF, LLC; FT Real Estate, Inc.; Great St. Jim, LLC; Hyperion Air, LLC; IGO Company, LLC; Jeepers, Inc; Laurel, Inc; Little St. Jim LLC, LSJE, LLC; LSJ Emergency, LLC; Maple, Inc.; Michelle's Transportation Company, L.L.C.; Nautilus, Inc.; Plan D, LLC, Poplar, Inc.; Prytanee, LLC, Southern Country International, Ltd, Southern Trust Company, Inc.; Southern Trust, LLC; Southern Financial LLC; Thomas World Air, LLC; VT&T, LLC; Zorro Management, LLC; Mort, Inc; CDE, Inc.; Freedom Air Petroleum, LLC; C.O.U.Q. Foundation; Epstein Foundation, Inc.; Epstein Interests; Gratitude American Ltd; J. Epstein Foundation, Inc; Southern Trust Co.; Financial Trust Co.; IGY-AYH St. Thomas Holdings, LLC Butterfly Trust; LSJ Employees, LLC; CDE, Inc.; NES, LLC; Financial Informatics; Ergo EB 2014 Ltd.; Aviloop, LLC; HBRK Associates; JSC Interiors, LLC; and SLK Designs LLC.

20.     The term "**Epstein's homes**" or "**Epstein Property**" shall mean 358 El Brillo Way, Palm Beach, Florida 33480; 9 East 71st Street, New York, New York 10021; Zorro Ranch, Stanley, New Mexico 87056; Little St. James Island, US Virgin Islands 00830; and the property on Avenue Foch, France 75016.

21.     The term **"Epstein's Director role"** shall refer to his role as a Director in Black's Family Office from 1998 through 2012.

22.     The term **"Dechert"** refers to Dechert LLP.

23.     The term **"the Dechert Report"** refers to the Memorandum sent to the Apollo Conflicts Committee regarding "Investigation Of Epstein/Black Relationship And Any Relationship Between Epstein and Apollo Global Management, Inc." on January 22, 2021 (the "Memorandum") and/or the investigation done by Dechert into the relationship between Black and Epstein (the "Investigation") as filed with the U.S. Securities and Exchange Commission and available at:

https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm

24.     The term **"Complaint"** shall mean the complaint filed in this action, *Jane Doe v. Leon Black*, on behalf of Jane Doe on July 25, 2023 in Federal Court in the Southern District of New York, Civil Action Number 1:2023-CV-06418, which is attached hereto as Exhibit A.

## INSTRUCTIONS

1.     The following requests for information and documents constitute a continuing demand to the fullest extent permitted by law. This subpoena shall be deemed continuing in nature so as to require production of all documents responsive to any request included in this subpoena produced or obtained by You up to fifteen (15) calendar days prior to the date of Your full compliance with this subpoena.

2.     Except for privileged material, You will produce each responsive document in its entirety by including all attachments and all pages, regardless of whether they directly relate to the specified subject matter. Except for privileged material, You will not redact, mask, cut, expunge, edit, or delete any responsive document or portion thereof in any manner.

3.      In responding to this subpoena, You must furnish all documents and ESI available, including documents in the possession, custody or control of anyone else acting on Your behalf, and not merely those documents and ESI held by You. If You are unaware of the existence of any documents or ESI responsive to a request contained herein, You should expressly so indicate, answer to the extent possible and identify any person(s) who may have additional documents to complete the response.

4.      Each request shall be responded to fully, unless it is objected to in good faith, in which event the reasons for the objections shall be stated with specificity. If an objection pertains to only a portion of a request, or to a word, phrase or clause contained therein, You shall state Your objection to that portion only and respond to the remainder of the request.

5.      If any document or ESI is withheld from production or redacted on grounds of privilege and/or attorney work product doctrine, You should provide a statement signed and verified by Your counsel which sets forth as to each such document a sufficient description to enable the Court to rule on the validity of the claim of privilege and/or attorney work product doctrine, which includes at least the following information:

(a)     the name and address of the person(s) who possess or control the document and each copy thereof;

(b)     the name of the author of the document;

(c)     the name of the sender of the document if different from the author or creator, and, in the case of electronically stored information, the name of the person(s) to whom copies were sent or otherwise made available, including without limitation the name of each person designated to:, from:, cc: and bcc:, if applicable, for the entire e-mail chain of any responsive e-mails;

(d)     the name of the person(s) known to have seen or have possession of a copy of the document if not identified above;

(e)    the business affiliation and job title of every person named in (a), (b), (c) and (d) above;

(f)    the date(s) of creation or otherwise indicated dates of the document;

(g)    a brief description of the nature (*e.g.*, letter, memorandum) and subject matter of the document; and

(h)    the basis for the privilege claimed.

6.    If any document or ESI that would have been responsive to this subpoena has been destroyed or is no longer in Your possession, custody or control, provide the following information:

(a)    the date of creation, destruction or otherwise indicated date(s) of the document;

(b)    the names and job titles of the preparer(s), sender(s) and recipient(s) of the documents;

(c)    the date of and the identity of the person responsible for its destruction, loss, transfer or other act or omission by which the document left Your possession, custody or control; and

(d)    the circumstances surrounding the loss of the document or the reason for its destruction.

## DOCUMENTS AND INFORMATION REQUESTED

1.    Identify when and where You first were introduced to Leon Black.

2.    Identify the number of times that You were at a Jeffrey Epstein property and Leon Black was also present.

3.    Produce all information You have regarding Leon Black's personal relationship with Jeffrey Epstein.

4.    Produce any communications in writing by You relating in any way to Leon Black from 2019 through the present.

5.      Produce any communications in writing by You relating in any way to Jeffrey Epstein from 2019 through the present.

6.      Produce any communications in writing by You relating in any way to Ghislaine Maxwell from 2019 through the present.

7.      Produce all letters, correspondence or documents You sent or someone on Your behalf sent to Leon Black or to his agents from 2021 through the present.

8.      Produce all documents, agreements or writings relating to claims You alleged against Leon Black.

9.      Produce all documents or information showing Your receipt of funds from Leon Black, or from any agent on behalf of Leon Black, including any entities created for the purpose of sending You funds, from January 2023 through the present.

10.     Produce any retainer agreements or letter agreements between You and Bradley Edwards, or any lawyer affiliated with Bradley Edwards.

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JANE DOE,

                              Plaintiff,

        v.

LEON BLACK,

                              Defendant.

------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.


**COMPLAINT**


**Jury Trial Demanded**

Plaintiff Jane Doe,[1] by and through counsel Wigdor LLP, alleges against Defendant Leon

Black ("Black" or "Defendant"), as follows:

        1.      In 2002, at his Manhattan townhouse, 9 East 71st, Jeffrey Epstein executed a "hand

off" to his close friend Leon Black. But what passed directly to Black's hands from the hands of

Jeffrey Epstein was a human being – not a ball.

        2.      The human being, Jane Doe, is autistic, and she was 16 when Jeffrey Epstein

introduced her to Black and said she was to give his "special friend Leon Black" the same kind of

massage that she had to give to Jeffrey Epstein when he ordered her to. Even as Black grabbed

her hand so hard that she thought he broke bones, Jeffrey Epstein knew Jane Doe would never

disobey. Developmentally she is about 12, and when she was threatened to do as told because

"bad girls" get in "trouble," she did as she was told.

        3.      Black took her to the third floor of the townhouse, to a massage room where she

had been before with Jeffrey Epstein. There, using adult sex toys in her anus and vagina, he raped

---

[1]      Plaintiff intends to file a motion to proceed under the pseudonym "Jane Doe" in this case
to protect her privacy because her allegations concern sexual abuse that occurred when she was a
minor. The disclosure of her name in connection with the allegations would cause her further harm
and potentially endanger her safety.

her. His physical force such that when he left her on the floor sobbing, she was bleeding. As set forth below, Jeffrey Epstein refused to take her to a doctor, and instead said that Ghislaine Maxwell would take care of it.

4.      Sadly, Ms. Doe's experience is one more in a long line of despicable and heinous experiences inflicted on a minor trapped in Jeffrey Epstein's web – a web that extended to a group of powerful and influential men, including Leon Black.

## JURISDICTION, VENUE & LIMITATIONS PERIOD

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

6.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful sexual assaults alleged herein, occurred in this district, and Defendant resides in this district.

7.      Pursuant to the New York City Victims of Gender-Motivated Violence Protection Act (VGMVPL), as amended, N.Y.C. Admin. Code § 10-1105(a), this case is timely.

## PARTIES

8.      Plaintiff Jane Doe is over the age of 18, and is a citizen of the U.S.

9.      Defendant Leon Black is over the age of 18, is a citizen of the U.S. and resides in New York, New York.

2

## FACTUAL ALLEGATIONS

### I.    PLAINTIFF IS AUTISTIC

10.    Ms. Doe is autistic,[2] and was born with Mosaic Down Syndrome, a rare condition where only some of the body's cells contain an extra chromosome (in contrast to an individual with typical Down Syndrome, who is born with an extra chromosome in every cell in her body). As a result, while Plaintiff does not appear physically or outwardly different from a neurotypical individual, she suffers from many of the same neurological disabilities and health issues that are tragically common among individuals with Down Syndrome.

11.    Although Ms. Doe has an above average intelligence quotient (IQ), her developmental age is around 12 years old.

12.    Because Ms. Doe is autistic, it is difficult for her to understand social cues based on the behavior of people she encounters. To be clear, being able to "read the room," is an impossible task. Instead, Plaintiff experiences the world in a child-like way and sees situations in terms of whether something is "right" or "wrong," or "good" versus "bad."

---

[2]    According to Dr. Daniel Geschwind, professor of human genetics, neurology and psychiatry at UCLA, "autism refers to a broad range of conditions characterized by challenges with social skills and social and communication and repetitive behaviors, resistance to changes in routine, or restricted interests. … it's not one thing, and no two autistic children or adults are exactly alike even though they may share basic features."
https://www.cnn.com/2023/04/12/health/what-is-autism-explainer-wellness/index.html; the National Institute of Mental Health describes autism as: "a neurological and developmental disorder that affects how people interact with others, communicate, learn, and behave. Although autism can be diagnosed at any age, it is described as a "developmental disorder" because symptoms generally appear in the first 2 years of life."
https://www.nimh.nih.gov/health/topics/autism-spectrum-disorders-asd; the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, states that people with autism often have: difficulty with communication and interaction with other people; restricted interests and repetitive behaviors; and symptoms that affect their ability to function in school, work, and other areas of life.

13.     As with most autistic people, she is extremely trusting.  Sadly, this is one factor which places girls with autism at a substantially increased risk of being sexually assaulted.[3]

14.     Plaintiff was a perfect target for Jeffery Epstein and his accomplice Ghislaine Maxwell.

15.     Epstein and Maxwell seized upon Plaintiff's developmental disabilities, coupled with her outwardly physical appearance, specifically fair skin, blue eyes and blond hair, for their own deviant sexual predation.

16.     Disgustingly, Epstein and Maxwell trafficked Ms. Doe to other men in their circle, including Defendant Black.

## II.     PLAINTIFF IS TRAFFICKED TO JEFFREY EPSTEIN AND GHISLAINE MAXWELL

13.     During the summer of 2001, Ms. Doe signed up for a county recreational program geared towards girls ages 8-12 interested in cheerleading.  The program was run by an adult volunteer named "Elizabeth," about age 40, who upon information and belief, had no background in cheerleading instruction.

14.     Elizabeth told Plaintiff that even though she was 15, she could participate in the recreational cheerleading if she could fit into the uniform, the largest size which was meant for 12-year-olds.

15.     Plaintiff fit into the uniform.  Because of her developmental disabilities, the fact that she was in a cheerleading group with girls as young as eight years old was not a problem for Ms. Doe.  She was happy to be participating.

---

[3]     Studies show that girls with autism from ages 9 to 18 years are three times as likely to experience sexual assault when compared to their neurotypical counterparts. https://www.psychologytoday.com/us/blog/talking-about-trauma/202209/girls-autism-face-three-times-the-risk-sexual-assault

16.     Elizabeth soon showed Plaintiff extra attention.  Not long after she began attending the cheerleading program, Plaintiff was told by Elizabeth that she was going to live at Elizabeth's house several days a week.  Of course, Plaintiff's parents were involved in the living arrangements.

17.     As the adults in her life undoubtedly anticipated, Plaintiff did as she was told and never questioned Elizabeth or her parents.

18.     Soon, several days a week turned into most days a week.  By the time school started in the fall, Plaintiff was living nearly full-time with Elizabeth.  Little did Plaintiff know what horrors were ahead for her.

19.     From the beginning of her time living with Elizabeth, Plaintiff was subjected to horrific, unimaginable physical abuse as part of the "training" Elizabeth believed necessary to prepare her for what Elizabeth had planned.

20.     By way of example only, Elizabeth violently physically abused Plaintiff, by punching and kicking her and even dragging Plaintiff up multiple flights of stairs in her townhouse by Plaintiff's ponytail.  Elizabeth psychologically abused Plaintiff by depriving her food and water and punishing Plaintiff anytime Elizabeth was dissatisfied with Plaintiff's behavior (which was often), including by locking her a room for hours, making her dress in small children's clothing and making her work out for hours at a gym until Plaintiff was too exhausted to stand, often after denying her any food.

21.     Although Ms. Doe had moved in with Elizabeth, she did not have her own bed there, much less a bedroom.  Instead, Elizabeth repeatedly told Plaintiff that she did not "deserve" her own bedroom in her house and that Plaintiff would not receive one until she "worked for it." Sadly, Plaintiff did not understand what Elizabeth meant, but she never questioned anything Elizabeth did or said, especially because physical violence was something she wanted to avoid.

22.     Elizabeth had a number of sexual partners at the time, including a man who lived in the same house, as well as other male "friends," who would visit Elizabeth. One of these men, "Charlie," was a white male in his late 40s. Together with Charlie, Elizabeth began sexually grooming Plaintiff as soon as she started staying overnight with Elizabeth.

23.     The sexual grooming included forcing Plaintiff to watch them have sex. Ms. Doe had never engaged in sexual conduct herself. Again, Plaintiff did everything that Elizabeth and Charlie told her to do.

24.     Horribly, Elizabeth threatened Ms. Doe with the fact that she had a gun permit and kept a gun in the house. She told Ms. Doe that if she ever told anyone about the things she and Charlie made her do, that Plaintiff would go "missing," and since no one loved or cared for her, she would not be missed. Plaintiff never doubted what Elizabeth told her because her parents told her to live with Elizabeth.

25.     Plaintiff was forced to submit to Elizabeth's degrading and violative conduct on a daily basis. She feared being killed and believed everything that Elizabeth said.

26.     Saying no to Elizabeth was not an option for Plaintiff. To this day, Plaintiff lives in fear of Elizabeth and what will happen if Elizabeth ever learns that Plaintiff has found the courage to tell her story.

## III.   ELIZABETH AND CHARLIE ARRANGE FOR MAXWELL AND EPSTEIN TO MEET MS. DOE

27.     Sometime in late summer of 2001, Elizabeth told Plaintiff that she was taking her to what she referred to as an adult "party" in a suburb outside of Washington D.C.

28.     Elizabeth and Charlie drove Ms. Doe to a large home, with a circular drive, fountain and pillars. Plaintiff was told to go inside and she did.

29.     The only people inside were adults – mostly men – who seemed "old" to Plaintiff.

6

30.    She was approached by a woman with dark hair and a British accent, who introduced herself to Plaintiff and sat with her, feigning interest in her safety and well-being.

31.    It was only later that Plaintiff learned that this woman was Ghislaine Maxwell ("Maxwell"), the convicted sex offender currently in prison serving a 20-year sentence.

32.    Maxwell led plaintiff over to a large white couch and took pains to give Plaintiff the impression that she cared about her and was genuinely interested in what she had to say. Maxwell seemed to ignore Plaintiff's natural difficulties in conversing in social settings – her inability to hold eye contact, her difficulties in picking up on social cues, how much she struggled to keep up with conversations – and instead focused on making her feel comfortable. As a result, Plaintiff mistakenly believed that Maxwell truly cared about her.

33.    Maxwell spent the conversation lavishing Plaintiff with compliments, referring to her as "a beautiful darling girl" and said that she was "a beautiful girl with the most beautiful bright blue eyes, blonde hair and perfect hair" that made her look like a living "doll."

34.    Seemingly already aware of Plaintiff's developmental disabilities, Maxwell treated her like a child, holding her hand, bringing her to the bathroom and making her stand right outside the door so Maxwell could keep talking to her the way mothers do with young children.

35.    What Plaintiff did not realize at the time was that Maxwell was merely taking a page out of what had by then become a well-rehearsed script, making efforts to bond with a vulnerable young girl so that she would lower her guard by the time Maxwell introduced them to Epstein. Although she did not know who the man was, Plaintiff noticed the constant looks passing between Maxwell and a man on the other side of the room throughout the evening.

36. At some point Maxwell brought Plaintiff out to the driveway where Elizabeth and Charlie were waiting. She told Elizabeth that Plaintiff was a "darling," a "good girl," and a "beautiful girl."

37. The very next week, Elizabeth put Plaintiff on a private plane from Virginia to Palm Beach. There she was picked up by a man who drove her in a large SUV to Epstein's home.

38. Maxwell and Epstein began exposing Plaintiff to their sexual deviance less than an hour after she first arrived. They placed her in a swivel chair in a hallway outside of their bedroom and told her to "not move." She did not move from the chair, but instead turned around and around in the swivel chair while she listened to them having sex in the next room with the door open. When they were done, they came out into the hallway, and acted happy and told Plaintiff she was a "good girl" for staying seated. They then acted as if nothing had happened and took her downstairs.

39. Quickly, Maxwell showed Plaintiff how to "make Jeffrey happy." Maxwell held Plaintiff's hand the first time she showed her the way to massage Jeffrey and make him ejaculate through oral sex – both Maxwell and Epstein gave Plaintiff "happy claps" for her brilliant success, the way parents do with five-year-olds.

40. They made Plaintiff share a bed with them at night so that they could "cuddle" and Epstein could wrap his arms around both Plaintiff and Maxwell.

41. Sarah Kellen (Kellen), not Maxwell, is the one who taught Plaintiff how to make "Jeffrey happy" by having sexual intercourse with him.

42. On other occasions, Plaintiff was required to sit on Epstein's lap with her feet draped over Maxwell's legs as Epstein also complimented her about how beautiful she was and how much he was drawn to her mix of blonde hair and blue eyes and porcelain skin.

8

43.    Epstein often told Plaintiff that she was his "very special girl," and commented on her "special innocence."

44.    Most weekends, Elizabeth sent Plaintiff to Epstein and Maxwell – what Elizabeth referred to as "shipping you out." Plaintiff was "shipped out" to Palm Beach and to the USVI. Plaintiff missed countless Fridays and Mondays from her junior year of high school, almost causing her to fail.

45.    Epstein often required Plaintiff to give him massages, and he would strip completely naked prior to receiving the massage from Plaintiff. Plaintiff, who had turned 16 shortly before first meeting Maxwell, sometimes also was required to remove all of her clothing before giving Epstein this massage.

IV.    **THE "HAND OFF"**

46.    Once Epstein was satisfied that Plaintiff knew how to give him a massage involving sexual intercourse, which happened quickly, he began what Plaintiff knows as the "hand off."

47.    The "hand off" meant that Plaintiff had to go with any other man (usually a white male that seemed very "old" to Plaintiff) to give him a massage and have sexual intercourse. The first several times Plaintiff had to do this took place in Palm Beach and on Epstein's island in the USVI.

48.    When Plaintiff was shipped back to Elizabeth, Charlie often picked her up from the airport. Plaintiff feared nothing more than Elizabeth saying that she did not get a "good report" that Plaintiff had been a "good girl" by Epstein and Maxwell.

49.    If Plaintiff had not been a "good girl," she would be subjected to intensified physical and psychological abuse by Elizabeth.

50.     Before Plaintiff was shipped back, Maxwell, or Sarah Kellen, or another girl named Nadia, would put an envelope in Plaintiff's bag. She was told not to touch it. They warned Plaintiff that the amount of money in the envelope was known, so if Plaintiff removed any, she would be caught.

51.     Plaintiff was not allowed to unpack her own bag when she returned to Elizabeth's. This was a task reserved for Elizabeth.

52.     One time when an envelope had been placed in Plaintiff's bag but it was not completely sealed, even though Plaintiff had not touched the envelope, much less taken cash from it, Elizabeth subjected Plaintiff to a beating simply because Elizabeth decided she was a "fucking idiot."

53.     Regularly, Elizabeth would reiterate her threats to kill Plaintiff if she ever discussed what had happened to her.

54.     Plaintiff believed Elizabeth's claim that no one in the world cared enough for her to notice if she disappeared.  She therefore lived in constant fear of what Elizabeth would do to her.  She never dared to tell anyone and kept silent for years.

## V.     PLAINTIFF IS TRAFFICKED BY EPSTEIN TO HIS NYC TOWNHOUSE FOR THE PURPOSE OF BEING HANDED OFF TO LEON BLACK

55.     On two occasions, Epstein and Maxwell made Plaintiff stay with them in NYC, at Epstein's townhouse located at 9 East 71st Street.

56.     Not long after Plaintiff had been trained to give Epstein massages involving sex, with the assistance of Elizabeth and Charlie, Epstein and Maxwell trafficked Plaintiff across several state lines, to New York City, to sexually service Epstein and Maxwell and those she was handed off to.

10

57.    The first time Plaintiff was made to stay at Epstein's townhouse, which upon information and belief was late fall 2001 or winter 2002, she slept in his bedroom, in the same bed as Epstein and Maxwell.

58.    Plaintiff was never allowed to leave any of the residences alone, and certainly not in NYC, where she had never been before. Yet, one time Epstein and Maxwell took Plaintiff to what she believed was a theater for ballet but not to see a performance. Instead, Epstein and Maxwell met with some individuals there, in what seemed like offices behind the stage, and Plaintiff was introduced to a dancer.

59.    Another time during this NYC stay, Maxwell brought Plaintiff to a different, smaller townhouse, not far away from Epstein's. Maxwell told Plaintiff that she needed to get a few things. Upon information and belief, this was Maxwell's townhouse located at 116 East 65th Street.

60.    In or around late spring of 2002 or early summer, Elizabeth told Plaintiff that she was being "shipped off" to New York City. She said that Charlie would be driving her to meet Epstein's "special friend," a man named Leon Black. Elizabeth emphasized that Leon Black was a "very important and special person" to "Jeffrey," and she threatened Plaintiff that she "better" receive a "good report" that Plaintiff was a "good girl" for Jeffrey and his important, special friend.

61.    Charlie drove Plaintiff to Epstein's New York City townhouse.

62.    There, she was summoned to Epstein. She found him standing with a huge older man — Black is 6' 4" and about 300 pounds. The two men appeared to be having a conversation.

63.    Epstein introduced Plaintiff to Leon Black, using his full name, and told her that Black was "important" and "special" to Epstein. Plaintiff was struck by Black's immense size. Plaintiff's initial impression of Black was that he looked like an "ogre," and she felt frightened.

11

64.     Plaintiff noticed Black's bulbous nose and that his face and neck had a number of skin tags and moles.

65.     Epstein told Plaintiff that because she was his "special girl," he had selected her specifically to give his "special friend," Black, a massage.

66.     Epstein told Plaintiff that she was to give Black the same kind of "massage treatment" that she gives Epstein – meaning that it would involve sexual intercourse and she was expected to strip naked.

67.     Black took Plaintiff by her hand, squeezing it so hard that she thought he might have broken bones, and led her upstairs to a massage room on the third floor of the townhouse. She had been in the room with Epstein on her prior stay at the townhouse.

68.     In the room there were a variety of oils and adult sex toys next to the massage table.

69.     Plaintiff assumed that Black would proceed to disrobe before laying down on the massage table, the way Epstein usually did.

70.     Instead, Black picked Plaintiff up and threw her over his shoulder and then threw her violently down on the massage table on her back, so hard he knocked the wind out of Plaintiff. She thought the massage table might have broken. She tried to scream but Black placed his hand over her mouth and leaned over her while ripping off her shirt and under her skirt pulling her underwear off.

71.     Plaintiff was crying and terrified. Black asked her repeatedly what made her "Jeffrey's special girl" and throughout the assault called her demeaning, shameful, disgusting names. Plaintiff was in a complete state of shock because this was nothing like the massages she had been taught to give Epstein.

12

72.    She tried to move off the table but Black had her pinned down. Black laughed at Plaintiff's futile attempts to escape his grasp, and he asked her if she considered herself "feisty" and mocked her by claiming that that he wanted Plaintiff to show him why Epstein referred to her as his "special girl."

73.    Plaintiff could not see, but rather heard Black rummaging among the adult toys nearby and he roughly snapped her legs apart causing Plaintiff to feel as if her pelvic bone had been broken. Using the adult toys, Black then penetrated Plaintiff simultaneously in both her vagina and rectum, using such force that Plaintiff felt tearing in her internal tissue. When Plaintiff screamed out in agony, Black again covered her mouth with one of his hands.

74.    Plaintiff was crying still when Black placed his mouth on her vaginal area. At this point, Plaintiff realized that struggling would be useless given how much stronger and physically more massive Black was and instead pleaded with Black to stop as she sobbed.

75.    She felt a sharp pain in her vagina, like a hard pinch and she let out a loud scream. At the scream, Black lifted his head out from under her skirt and she saw blood on his mouth and she panicked and kicked him with her right leg. Her "kick" landed on his chest, and while it likely did not hurt him, he was enraged that she struck out at him and he began viciously cursing her.

76.    He then called her a "whore" and a "slut," and picked Plaintiff up off the massage table and threw her to the floor.

77.    Once on the floor, Plaintiff attempted to scramble towards the door but Black instead grabbed her legs, pulled Plaintiff towards him and she saw blood on the floor which likely was from her rectum.

78.    Black got on top of her. Plaintiff went into shock and began to disassociate, trying to convince herself that she was somewhere else but the unimaginable pain she experienced

13

prevented her from even this temporary respite. He continued to violently thrust himself on her with such force, that she felt he was crushing her pelvic and hip bones.

79.     Despite violently thrusting over her with his extreme weight, Black kept telling Plaintiff to "stay still." She felt like she could not breathe.

80.     When Black appeared to be finished, he grabbed Plaintiff up by her wrists and slammed her into the wall and watched as she slid down to a sitting position – still crying in fear and pain.

81.     After what seemed like a long time to Plaintiff, Epstein came in and found her still against the wall and crying. Plaintiff begged Epstein to take her to a doctor because she was in physical agony and was continuing to bleed but he refused, instead telling her that Maxwell would take care of her.

82.     Epstein summarily handed her towels to clean herself up. He then took her down to the second floor of his townhouse and told her to wait in a chair. Epstein grew increasingly frustrated as Plaintiff continued to cry. He demanded that she pull herself together as he was expecting a visitor. Shortly thereafter, a thin, middle-aged blonde woman arrived at the townhouse and had folders in her hands which she gave to Epstein. Upon information and belief, this woman was Leslie Groff, Epstein's long-time New York based assistant.

83.     Although Epstein trafficked Plaintiff to other men, both before and after Black, she was never again taken to NYC. The violent and sadistic nature of Black's rape left an indelible mark on her, both physically and psychologically. Plaintiff suffered internal abrasions in her rectum that continue to cause her pain.

84.     To this day, Plaintiff often is triggered each month at the beginning of her menstrual cycle as the sight of blood from her body causes Plaintiff to suffer from panic attacks, reliving the attack that she endured ay Black's hands.

85.     Although Epstein and Maxwell did not take Plaintiff to the doctor that day, she was taken to the airport where she went back to Elizabeth's, with a thick envelope that she was not allowed to open and required to hand over to Elizabeth.

## VI.    BLACK'S OTHER VICTIMS THROUGH EPSTEIN

86.     Appallingly, Plaintiff is not the only female who Epstein and Black sexually violated.

87.     For example, on March 13, 2023, in the matter of *Jane Doe 1, et al. v. Deutsche Bank Aktiengesellschaft et al.*, Index No. 22 Civ. 10018 (JSR) (Southern District of New York), the district court heard oral argument on the defendant's motion to dismiss. As part of Jane Doe 1's claims, she had alleged that,

> "There came a time when Epstein forced Jane Doe 1 to give massages to his powerful friends. During some of these massages, Jane Doe 1 was sexually abused by force and against her will by Epstein's friends, by whom she had been required to do massage."

88.     Deutsche Bank introduced a release agreement ("Release") between Jane Doe 1 and Epstein in support of its motion to dismiss. This Release included a carve out of Jane Doe 1's claims against Black, as well as another individual, James (Jes) Staley, a former banker who Black introduced to Epstein in or around 2000.

89.     At oral argument, the portions of the Release were read into the record, including, in relevant part that:

> While the parties do not believe there is any reasonable interpretation that this general release could be construed to **release James (Jes) Staley, Leon Black or their respective entity affiliations**. For clarity, this general release and settlement agreement specifically does not include **James (Jes) Staley, Leon Black or any company or entity which either is or was beneficially owned or controlled by James (Jes) Staley or Leon Black** as a releasee or released party under this general release and settlement agreement.

90.     Of course, if Black had not engaged in sexual misconduct or other tortious claims against Jane Doe 1, there would have been no reason to include him in the carve out along with Jes Staley.

91.     On July 21, 2023, the *New York Times* reported that Black agreed to pay the U.S. Virgin Islands Office of the Attorney General $62.5 million in order to avoid possible claims stemming from his relationship with Epstein.[4]  As reported, Black entered into that settlement agreement with the Office of the Attorney General in January 2023.

92.     Over the last several years, the U.S. Virgin Islands has been conducting extensive investigations into Epstein's sex trafficking activities, culminating in a lawsuit against Epstein's estate. That lawsuit was settled between the Office of the Attorney General for the U.S. Virgin Islands and Epstein's estate in December 2022 for over $100 million.

93.     Furthermore, according to the *New York Times*, "Some victims of Mr. Epstein who had received settlements directly from his estate were granted permission by the estate's executors to pursue claims against a handful of men who had socialized with Mr. Epstein, according to a person with knowledge of the matter. Mr. Black was one of those men." It is clear that Ms. Doe is not the only victim of both Epstein and Black.

---

[4]     https://www.nytimes.com/2023/07/21/business/leon-black-settlement-jeffrey-epstein-claims.html (last visited July 24, 2023).

**CAUSE OF ACTION**
**Victims of Gender-Motivated Violence Protection Law (VGMVPL)**

94.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as though set forth fully herein.

95.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assault and rape of Plaintiff constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by the New York City Victims of Gender-Motivated Violence Protection Act (VGMVPL), as amended, N.Y.C. Admin. Code § 10-1101, *et seq.*

96.    The above-described conduct of Defendant Black, including, but not limited to, Defendant Black's sexual assault and rape of Plaintiff constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

17

97.    As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

98.    The above-described conduct of Defendant Black constitutes a sexual offense as defined in Article One Hundred Thirty of the New York Penal Law ("Article 130").

99.    Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendant and any and all persons acting in concert with him, from engaging in any such further unlawful conduct, including the conduct complained of herein;

C.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her physical injuries and emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, reputational harm in an amount to be determined at trial, plus prejudgment interest;

F.      An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 25, 2023
     New York, New York              Respectfully submitted,

                                  **WIGDOR LLP**

                                  By: _Jeanne Christen_
                                     Jeanne M. Christensen

                                  85 Fifth Avenue
                                  New York, NY 10003
                                  Telephone: (212) 257-6800
                                  Facsimile: (212) 257-6845
                                  jchristensen@wigdorlaw.com

                                  *Counsel for Plaintiff Jane Doe*