UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

                              Plaintiff,

                -against-

LEON BLACK,

                              Defendant.

23-CV-6418 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

This case is an action under the New York City Victims of Gender-Motivated Violence Protection Law. Plaintiff Jane Doe alleges that Defendant Leon Black brutally raped and assaulted her in New York City in 2002, when she was only sixteen years old. She claims that prior to this assault, she was abused and groomed by Jeffrey Epstein ("Epstein") and Ghislane Maxwell ("Maxwell")—who then trafficked her to other men, including Defendant.

Although the parties have exchanged almost no discovery, Defendant brings a Motion for Case-Terminating Sanctions based on lies, fraud, and spoliated evidence that he contends render this case rotten to the core. Ultimately, the Court finds that both Plaintiff's former attorney Jeanne Christensen ("Ms. Christensen"), on behalf of Wigdor LLP ("Wigdor"), and Plaintiff Jane Doe have engaged in serious, sanctionable misconduct in this case. However, taking seriously its obligation to remedy prejudice with lesser sanctions where available, the Court finds that this misconduct need not doom Plaintiff's claim.

The Court issues various factual and legal findings to support sanctions here. Plaintiff's former counsel—Ms. Christensen—lied repeatedly to the Court and to opposing counsel in this litigation about what was happening in a related action. Ms. Christensen also directed Plaintiff to destroy a relevant social media account that Plaintiff used to communicate publicly about her

experiences as a purported Epstein victim. And, Plaintiff falsified sonogram images in her personal journals, which her First Amended Complaint relies on to support the allegations in this action.

In light of the serious and varied misconduct committed by both Plaintiff and her former counsel, the Court strongly considered granting the case-terminating sanctions Defendant requests in this matter. However, the Court ultimately concludes that lesser sanctions can address the misconduct. As such, the Court issues a number of sanctions against Plaintiff, Ms. Christensen, and Wigdor. Ms. Christensen must file this Opinion and Order in any case in any federal court within the Second Circuit in which she is counsel of record, from the date of publication until one year from today. For a period of five years, Ms. Christensen must also share this Opinion and Order with any federal court within the Second Circuit where a sanctions motion has been filed against her, her employer, or her client, and she is counsel of record. Additionally, Ms. Christensen and Wigdor must pay Defendant's reasonable attorneys' fees and costs in bringing this Motion. Plaintiff, meanwhile, is barred from using any of the personal journals in which the Court has found falsified sonograms in prosecuting this action. The Court will also instruct the jury that the Court found that portions of these journals were falsified by Plaintiff. Similarly, given the spoliation of Plaintiff's social media account, Defendant may present evidence about the account's deletion and advise the jury about its potential relevance. The Court will instruct the jury that it may consider the account and the circumstances under which it was destroyed.

With respect to anonymity and sealing, the Court denies Defendant's request to de-anonymize Plaintiff. Ultimately, the Court concludes that the relevant factors favor Plaintiff's continued anonymity. The Court does, however, unseal the filings related to this Motion, with

redactions for information that would tend to reveal Plaintiff's identity or involve other narrow categories of sensitive information.

This Opinion and Order is divided into three sections: (1) factual and procedural background, (2) Defendant's Motion for Case-Terminating Sanctions, and (3) outstanding sealing and anonymity issues. First, the Court reviews the complex factual background of this case—including Plaintiff's allegations (and how they have evolved), the actions Plaintiff and her former Wigdor attorneys undertook in a related case brought by Epstein survivors, and this lawsuit's procedural history. Next, the Court enumerates the bases under the Federal Rules of Civil Procedure and the Court's inherent powers for issuing sanctions; renders limited factual findings necessary to levy sanctions; and determines, as a matter of law and the Court's discretion, which sanctions are appropriate. Finally, the Court reconsiders Plaintiff's anonymity and the ongoing practice of sealing filings in this case. A table of contents is provided below for ease of reference.

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 5

    I.    Allegations in the Instant Case ................................................................... 5

    II.   JPMC Action ............................................................................................. 10

    III.  Request for Case-Terminating Sanctions................................................. 21

    IV.  Anonymity and Sealing............................................................................ 24

MOTION FOR CASE-TERMINATING SANCTIONS .......................................... 27

    I.    Legal Standard ......................................................................................... 28

        A.   Federal Rule of Civil Procedure 11 ............................................... 28

        B.   Federal Rule of Civil Procedure 37(e) ........................................... 29

        C.   The Court's Inherent Powers .......................................................... 30

    II.   Findings of Fact ....................................................................................... 31

        A.   Wigdor Delayed Amending the Complaint in This Action, but Counsel Gave Ms. Doe Sufficient Opportunity to Review the Complaint and the FAC ...................... 33

        B.   Ms. Christensen Lied Repeatedly in This Litigation................................. 36

        C.   Ms. Christensen Directed Jane Doe to Destroy Her Twitter Account Without Preserving Potentially Relevant Communications ...................... 41

        D.   Plaintiff's Journals, Which Are Featured in the FAC, Include Falsified Sonogram Photographs ...................... 43

    III.  Conclusions of Law ................................................................................. 52

        A.   There Is No Evidence That Wigdor Failed to Adequately Investigate the Complaint ...................... 52

        B.   Wigdor's Delay in Amending the Complaint Was Not Unreasonable ................... 55

        C.   Sanctions Are Warranted for the Lies That Wigdor, Through Ms. Christensen, Told the Court and Opposing Counsel ...................... 56

        D.   Plaintiff, at Ms. Christensen's Direction, Spoliated Evidence ............................. 58

        E.   Plaintiff's Falsification of Evidence Warrants Sanctions ....................................... 62

        F.   The Court Levies Appropriate Sanctions Against Wigdor, Ms. Christensen, and Plaintiff ...................... 62

        G.   The Court Declines to Impose Case-Terminating Sanctions................................. 65

REQUESTS TO DE-ANONYMIZE AND UNSEAL ............................................... 68

    I.    Legal Standard ......................................................................................... 68

    II.   Discussion ................................................................................................ 71

CONCLUSION .......................................................................................................... 74

**BACKGROUND**

Through counsel, Plaintiff filed the instant case on July 25, 2023. *See* ECF No. 1

("Compl."). The Complaint centers on events that, for the most part, allegedly took place

between 2001 and 2002, when Plaintiff was a junior in high school. The Court first reviews the

underlying allegations in Plaintiff's pleadings in this action. Next, the Court reviews what

happened in a related proceeding brought by and on behalf of Epstein survivors, *Doe 1 v. JP

Morgan Chase & Co.*, 22-CV-10019 (JSR) ("JPMC Action" or "JPMC"), over which Judge

Rakoff in this District presided. Lastly, the Court provides a procedural history in this case,

focusing on Defendant's Motion for Case-Terminating Sanctions and Plaintiff's anonymity and

sealing requests.

I.      **Allegations in the Instant Case**

This case involves allegations of horrific child sexual abuse and trafficking. Plaintiff

alleges that this abuse came at the hands of Jeffrey Epstein, Ghislaine Maxwell, Defendant Leon

Black, and many others. Plaintiff first spoke with attorneys about her claims in 2022. *See* ECF

No. 233-4 at 20.[1] Around the same time, Plaintiff created a Twitter account to "use her voice as a

survivor of #Jeffrey Epstein . . . ." ECF No. 233-30 at 8. Plaintiff created public posts and sent

private messages to strangers on the platform about her allegations of abuse. *See* ECF Nos. 233-

29, 233-33 to 233-34. In March 2023, she then began working with Jeanne Christensen and other

attorneys at Wigdor. *See* ECF No. 233-4 at 21. They filed the Complaint in this case four months

later, asserting one claim under the New York City Victims of Gender-Motivated Violence

---

[1] Most documents related to this case, including all those related to the current Motion before the
Court, are sealed. For the reasons stated below in Section II, *Requests to De-Anonymize and
Unseal*, the Court unseals the bulk of these filings.

Protection Law ("VGMGPL"). Compl. As described below, Wigdor withdrew from representing Ms. Doe in April 2025. ECF Nos. 238, 241.

Wigdor, on behalf of Plaintiff, has filed two versions of the Complaint in this case. *See* Compl.; ECF No. 152 ("FAC"). Each provides a somewhat different account of how the allegations against Black came to pass. The original Complaint was filed on July 25, 2023. Compl. It alleged that Jeffrey Epstein trafficked Plaintiff to Leon Black in 2002, when she was 16 years old, leading to Black violently assaulting and raping her in Epstein's Manhattan townhouse. *Id.* ¶¶ 1–3. The Complaint alleged that Plaintiff was connected to Epstein through "Elizabeth," her one-time cheerleading coach, and Elizabeth's boyfriend, "Charlie."[2] *Id.* ¶¶ 13, 22, 27, 31. Elizabeth and Ms. Doe first met during a cheerleading camp in 2001, when Ms. Doe was in high school and Elizabeth took a keen interest in her. *Id.* ¶ 13. The two spent increasing time together outside of cheer camp over the course of the summer until, by the fall, Ms. Doe was "living nearly full-time" at Elizabeth's house. *Id.* ¶¶ 16–18. Plaintiff's biological parents agreed to the arrangement. *Id.* ¶¶ 16, 24. The Complaint described deplorable living conditions: Elizabeth physically and psychologically abused Plaintiff, deprived Plaintiff of food and water, locked Plaintiff in her room for hours, required Plaintiff to work out in the gym to the point of complete exhaustion, and forced Plaintiff to watch her and Charlie have sex. *Id.* ¶¶ 19–25. Elizabeth threatened Plaintiff that she would go "missing" if Plaintiff told anyone else about what was happening, and Plaintiff believed Elizabeth. *Id.* ¶ 24.

It was under these conditions that Plaintiff originally alleged that, in the summer of 2001, Elizabeth and Charlie drove her to a house party in Virginia where she met Ghislaine Maxwell.

---

[2] The Complaint and First Amended Complaint use pseudonyms for these two individuals to protect Plaintiff's anonymity, and the Court adopts those pseudonyms here.

*Id.* ¶¶ 27–31. Plaintiff spent much of that evening talking with Maxwell. *Id.* ¶¶ 30–35. When she was leaving the party, Plaintiff saw Maxwell and Elizabeth speak in the driveway. *Id.* ¶ 36. One week later, "Elizabeth put Plaintiff on a private plane from Virginia to Palm Beach." *Id.* ¶ 37. The Complaint appears to have alleged that Ms. Doe met Epstein on this trip. *See id.* ¶¶ 37–38. The Complaint described Epstein's sexual abuse of Plaintiff, which occurred "[m]ost weekends" during Plaintiff's junior year of high school when Elizabeth "shipped out" Plaintiff to either Palm Beach or the United States Virgin Islands ("USVI"). *Id.* ¶¶ 38–45. The Complaint also alleged that Plaintiff was "hand[ed] off" to other men for sex. *Id.* ¶ 47. Elizabeth continued to physically and psychologically abuse Plaintiff during this period, responsive in part to "reports" from Epstein and Maxwell about whether Ms. Doe "had been a 'good girl.'" *Id.* ¶¶ 48–49, 52–53. Plaintiff came back from each trip with an envelope full of money that Elizabeth took upon arrival. *Id.* ¶¶ 50–52.

Plaintiff alleged that she met Leon Black in 2002, during her second trip to visit Epstein and Maxwell in New York City. *Id.* ¶¶ 55–57, 63. Elizabeth had warned Ms. Doe about how important it was to receive a "good report" from Mr. Black—Epstein's "special friend." *Id.* ¶ 60. Charlie drove Plaintiff to Epstein's Manhattan residence for the occasion. *Id.* ¶ 61. The Complaint alleged that Epstein told Plaintiff to give Black the "massage treatment," which she understood to involve sexual intercourse. *Id.* ¶ 66. The violent assault that followed left Plaintiff "crying and terrified." *Id.* ¶ 71. She claimed that Black violently threw her down on a table and then onto the floor, bit her genitals, painfully raped her, and crushed her—telling her to "stay still" while she could not breathe. *Id.* ¶¶ 70–80. The Complaint explained that Ms. Doe was not allowed to see a doctor after the assault and that internal abrasions from that day continued to cause her pain more than 20 years later. *Id.* ¶¶ 83, 85.

7

More than a year after filing the Complaint, Wigdor, on behalf of Ms. Doe and with the Court's leave, filed a First Amended Complaint ("FAC"). ECF No. 91; FAC (filed on Nov. 7, 2024). The FAC's allegations about an assault by Leon Black remain substantially the same. *See* FAC ¶¶ 75–93. But Plaintiff's account of meeting Maxwell and being trafficked to Epstein and Maxwell changed significantly. In this account, Ms. Doe first met Maxwell in Clearwater, Florida on a trip with Plaintiff's biological mother earlier the same year. *Id.* ¶ 37. During that encounter, Ms. Doe "was asked" to undress in front of Maxwell. *Id.* The FAC still explains that Ms. Doe attended an "adult party" in McLean, Virginia in summer 2001, but it no longer alleges that Charlie drove her to the party or sexually groomed her. *Id.* ¶¶ 32, 38–39, 47. The FAC also alleges that Plaintiff contemporaneously wrote in a journal about her interaction with Maxwell at the party, recognized her as the "British lady from Clearwater," and noted that Maxwell wanted Plaintiff to visit her in Florida. *Id.* ¶ 48. The FAC also alleges that Elizabeth was not the only person to traffic Plaintiff; rather, Plaintiff's family and close family friends also participated. *Id.* ¶ 57. Instead of being trafficked "most weekends" to faraway places, Plaintiff now alleges that she was sent to have sex with "powerful and wealthy men" locally, which caused her to miss days of school. *Id.* ¶ 56. The FAC maintains, however, that Plaintiff visited Epstein multiple times in Palm Beach and the USVI, and that those visits often involved her being "hand[ed] off" to other men for sexual intercourse. *See id.* ¶¶ 49, 60, 68.

A significant change between the Complaint and the FAC is that the FAC incorporates excerpts from Ms. Doe's journals. These journals purport to chronicle Ms. Doe's experiences with Epstein, Maxwell, Black, and others during her adolescence. The FAC integrates quotes from Ms. Doe's journals throughout its narrative, including at the top of the FAC and in discussing the alleged assault by Black. *See id.* ¶¶ 2–3, 68, 98. In her briefing, Ms. Doe explains

8

that she alerted her attorneys to the journals' existence on October 28, 2023, and that she subsequently sent the journals to Ms. Christensen sometime between late February and early March 2024. ECF No. 274 ("Pl. Dec.") ¶¶ 26, 29.

In both complaints, Plaintiff alleges that she has several disabilities. She describes having autism and Mosaic Down Syndrome, a condition that causes neurological disabilities and other health issues similar to those with Down Syndrome. Compl. ¶ 10; FAC ¶ 16. Although Plaintiff has an above-average IQ, her neurodivergence renders her "extremely trusting" and makes it "difficult for her to understand social cues." FAC ¶¶ 17–19. The pleadings suggest that Plaintiff's abusers sought to, and successfully did, exploit her disabilities.

After Plaintiff filed the initial Complaint in this action, Defendant filed two motions, ECF Nos. 22, 40, both of which the Court denied, ECF No. 106 ("MTD Opinion"). The first was a motion for Rule 11 sanctions, claiming that the allegations regarding Mr. Black in the Complaint were "utterly and demonstrably false" and that counsel's investigation "failed to uncover even a shred of evidence supporting Plaintiff's account." ECF No. 23 at 2, 6. At that time, the Court denied Defendant's motion for sanctions, finding "no basis from which to conclude that the facts alleged in the Complaint are false or that Plaintiff did not undertake a reasonable inquiry as a matter of law" because of the lack of discovery at that juncture. MTD Opinion at 19 (citing *Gartenbaum v. Beth Israel Med. Ctr.*, 26 F. Supp. 2d 645, 649 (S.D.N.Y. 1998)).

Defendant also moved to dismiss the case, arguing that the single claim Plaintiff asserted in this action under the VGMVPL was time-barred. ECF Nos. 40–41. The Court denied this motion in September 2024. *See* MTD Opinion. Because of the novel legal question at issue, the Court certified the MTD Opinion for interlocutory appeal. ECF No. 153. This appeal is technically still pending—but, in a related action, the Second Circuit certified the relevant

9

question to the New York Court of Appeals. *See Parker v. Alexander*, No. 25-487-CV, 2026 WL 796168, at *6 (2d Cir. Mar. 23, 2026). Following Defendant's interlocutory appeal, the parties began discovery at the Court's direction. MTD Opinion at 14. The Court then stayed discovery pending the resolution of the instant sanctions motion. ECF No. 204.

## II.    JPMC Action

Beyond this action, Plaintiff has also been involved in another case in this District related to Epstein's crimes. In 2022, a class of plaintiffs proceeding anonymously sued JPMorgan Chase Bank, N.A., alleging that the bank violated the federal Trafficking Victim Protection Act and committed other torts because of its "participation and intentional involvement in Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom." First Amended Complaint at 1, JPMC Action (Jan. 13, 2023), ECF No. 36. The case settled for $290 million in June 2023, and the court provided final approval in November 2023. Stipulation of Settlement, JPMC Action (June 22, 2023), ECF No. 181-1 ("JPMC Settlement"); Order and Final Judgment, JPMC Action (S.D.N.Y. Nov. 13, 2023), ECF No. 284. The settlement included a fund for survivors of Epstein's abuses to compensate "personal physical injury," "personal physical sickness," and emotional distress attributable to JPMC's alleged misconduct, with a Claims Administrator appointed to oversee the fund's allocation. JPMC Settlement ¶¶ 1.2, 2.2.

To receive compensation under the fund, claimants were required to submit a questionnaire and release signed under penalty of perjury. *Id.* ¶ 5.1. The settlement empowered the Claims Administrator to determine the appropriate allocation based upon:

> the circumstances, severity, type, and extent of the alleged harm, injury, exploitation, abuse or trafficking, the nature and duration of the relationship with Epstein, any cooperation with government investigations    or    refusal    to    cooperate    with    government

10

investigations or refusal to cooperate with this civil litigation including any convictions relating to Epstein's sex trafficking venture, and the impact of the alleged conduct on the Participating Claimant.

*Id.* ¶ 5.2. The settlement also permitted the Claims Administrator to request supporting documents from claimants and notify Class Counsel—Bradley J. Edwards and Brittany Henderson of Edwards Henderson Lehrman PLCC and Andrew Villacastin of Boies Schiller Flexner LLP—of concerns about the accuracy of claimant materials. *Id.* ¶¶ 1.3, 5.3–5.4. Judge Rakoff retained final approval over any claim determinations. *See id.* ¶ 2.1 ("The obligations incurred pursuant to the Stipulation are . . . subject to approval by the Court . . . ."); *id.* ¶ 9.13 ("The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Stipulation . . . ."); Order at 2, JPMC Action (Jan. 5, 2024), ECF No. 290 (explaining that the court intended "to exercise a continuing, *ex parte*, oversight role to ensure that the allocation of class funds was fair and reasonable as between class members"); ECF No. 233-7 ("March Hearing") at 3:6–10 ("[W]ith the consent of all parties, I reserved expressly the power to exercise supervision over the claims administrator and to review any decisions that she might make if I felt review was called for, and I've now done that on a number of occasions.").

In August 2023, one month after filing her Complaint in this action, Plaintiff submitted a claim in the JPMC Action, *see* ECF No. 184 at 2; ECF No. 233-4, that she supplemented two months later, *see* ECF No. 233-3. The Claims Administrator interviewed Ms. Doe in late October 2023. Pl. Dec. ¶ 34. On January 5, 2024, Judge Rakoff approved the Claims Administrator's proposed allocation determinations for all claimants, including Plaintiff. Order, JPMC Action (Jan. 5, 2024), ECF No. 290. On January 11, 2024, Ms. Doe received a notice that the Claims Administrator had allocated her a significant damages award. ECF No. 233-6 at 11 ("JSR

11

Letter"); ECF No. 233-24 at 1; *see also* ECF No. 184 at 4. Shortly thereafter, Wigdor disclosed the fact of this award to Black's counsel. *See* ECF No. 233-8 at 16.

Black's counsel, Susan Estrich, then contacted Judge Rakoff and Class Counsel. Her letter claimed that Plaintiff was perpetrating "serious fraud" on the court and was not a legitimate victim of Epstein. Letter from Susan Estrich to Judge Rakoff, Feb. 21, 2024, at 1. Ms. Estrich claimed that she had "reason to believe . . . that Court-appointed Class Counsel in this matter would have knowledge concerning the validity of the claim." *Id.* at 2.

Subsequently, Class Counsel and Judge Rakoff took a closer look at Plaintiff's claim. On February 26, 2024, Class Counsel sent a sealed letter to Judge Rakoff describing inconsistencies in Plaintiff's account and—following independent investigation into her claims—doubting that she was a veritable victim of Epstein and his associates. Letter from Bradley J. Edwards and Brittany N. Henderson to Judge Rakoff, Feb. 26, 2024. On March 1, 2024, Ms. Christensen wrote a letter to Judge Rakoff criticizing the intervention of Mr. Black's counsel in the JPMC Action and levying allegations of impropriety against Class Counsel. ECF No. 233-8. In that letter, she disclosed to Judge Rakoff that Plaintiff had kept journals from ages 16 to 19 documenting her alleged abuse, and that those journals had, until recently, been kept in a storage unit belonging to Plaintiff's adoptive father.[3] *Id.* at 18–19 & n.15. On March 6, 2024, Black's counsel submitted a letter to Judge Rakoff with more than thirty exhibits, which they argued demonstrated inconsistencies in Ms. Doe's account and her proclivity for making up falsehoods. *See* Letter from Susan Estrich to Judge Rakoff, Mar. 6, 2024.

---

[3] Plaintiff was adopted as an adult in early 2022 by the same couple who had adopted one of her biological sons in 2017. ECF No. 283-2 ¶ 5. Plaintiff first met her adoptive mother in 2012, when the latter worked at the college Plaintiff attended. *Id.* ¶¶ 5–6.

12

On March 15, 2024, Judge Rakoff held an evidentiary hearing regarding Plaintiff's claim. All relevant counsel were present, including Ms. Christensen and other attorneys from Wigdor. March Hearing; JSR Letter at 3. Judge Rakoff sealed the proceedings and excluded Mr. Black's counsel from the hearing, over their objections. *See* March Hearing at 80:1–4; Protective Order ¶ 8, JPMC Action (S.D.N.Y. Jan. 12, 2023), ECF No. 35. Ms. Christensen conducted the direct examination of her client, and Class Counsel cross-examined her. *See generally* March Hearing. Plaintiff's adoptive mother sat by her side in the witness box for support. *See id.* at 4:21–5:4.

Ms. Christensen's examination placed Plaintiff's journals at the center of her testimony. Ms. Christensen based many of her questions on the journals' contents. *See* March Hearing at 7:7–26:9 (16 years old); *id.* at 26:22–31:25 (17 years old); *id.* at 32:5–34:10 (18 years old); *id.* at 91:5–12 (26 or 27 years old). Four of Plaintiff's journals are alleged to have been written between 2001 and 2005, when Plaintiff was between 16 and 19 years old. *Id.* at 96:13–14. These journals are allegedly contemporaneous with the abuse and trafficking Plaintiff claims she experienced at the hands of Epstein, Black, and others. A fifth journal allegedly dates back to 2012, when Plaintiff was 26 or 27 years old, but it includes references to her prior abuse. *Id.* at 91:5–95:16.

During Plaintiff's testimony, and as referenced in her journals, she asserted that Epstein and others impregnated her repeatedly during her teenage years. *Id.* at 29:18–30:9, 63:11–64:22. Plaintiff testified that the last time she saw Epstein was in New York City in 2010 for the birth of one of their children together. *Id.* at 54:7–55:8. Overall, Ms. Doe testified that Epstein fathered four of her five children—born, respectively, in 2004, 2005, 2006, and 2010. *Id.* at 56:21–57:7.

13

One of those children, Plaintiff testified, still lives with Plaintiff's biological parents.[4] *Id.* at 61:23–62:4. To Plaintiff's knowledge, these children were not named in Epstein's will or estate. *Id.* at 62:21–24.

Ms. Doe's testimony described an "impregnation game" that was also referenced in her journals. According to Plaintiff, she was forced to carry out pregnancies that resulted from the men who sexually abused her, and Maxwell took photographs of Plaintiff's body as it changed during her pregnancies. *Id.* at 63:11–64:10, 64:25–65:17. Plaintiff testified that all of the sonograms in the journals were hers from several abuse-related pregnancies, including some pregnancies that came to term and others that were terminated. *Id.* at 28:21–25, 31:1–5, 66:22–67:1. She explained that she received the sonograms from Maxwell, who had taken Plaintiff to doctor's appointments in Palm Beach, Florida over the course of multiple pregnancies. *Id.* at 29:4–30:9. As a result of this "impregnation game," Ms. Doe testified, she was forced to have at least five abortions in a house in Palm Beach. *Id.* at 64:7–18, 66:10–13.

Ms. Doe also testified to a number of other topics. She testified that she was scared of her biological mother. *Id.* at 94:6–95:16. She alleged that her sister physically assaulted her at one point. *Id.* at 94:19. She testified about meeting ███████, a known Epstein associate, who "was around a lot." *Id.* at 25:22–26:7, 48:14–23. And she testified about a photograph she alleged depicted her and Epstein together in Martha's Vineyard. *Id.* at 35:13–23.

On cross-examination, however, Ms. Doe revealed ways in which her account differed from the experiences of other Epstein survivors and some of the available evidence. She testified that she sometimes slept in the same bed as Epstein and Maxwell and often "snuggled" with

---

[4] Plaintiff has another child who is not alleged to be the result of this abuse. *Compare* March Hearing at 56:21–75:7 *with* ECF No. 232 ¶ 34. That child was adopted by Plaintiff's adoptive parents. *See* ECF No. 283-2 ¶ 5; March Hearing at 61:23–62:4.

Maxwell. *Id.* at 44:24–45:1, 46:2–47:5. But she later admitted that she was not aware of Maxwell cuddling or snuggling with any other victims. *Id.* at 46:20–47:5. She also testified that she was never paid for any of the interactions with Epstein, *id.* at 44:9–11, even though Epstein was known to pay his victims, ECF No. 233-15 ("June Conference") at 9:8–18. She admitted that law enforcement, who was investigating Epstein from 2001 to 2007, never contacted her. March Hearing at 47:6–16. She claimed that she had been on Epstein's private planes multiple times, *id.* at 75:13–77:18, even though she does not appear in any of his flight logs, ECF No. 233-9 ("Class Counsel Ltr.") at 3, 8. And she could not identify other victims of Epstein in photographs, even though she claimed she knew them. *See* March Hearing at 50:3–51:4; June Conference at 14:5–22.

In light of Plaintiff's conflicting and, at times, far-fetched testimony, Judge Rakoff considered the journals Plaintiff discussed to be central in determining whether Plaintiff was credible. He found that there was "no independent record of [Plaintiff's] presence [or] involvement" with Epstein other than her journals. March Hearing at 48:2–12. He noted that if the journals were legitimate, they demonstrated "detail[ed] and emotional reactions . . . to someone [namely, Epstein,] who . . . was not a particularly infamous person at that time." *Id.* at 96:20–97:2. To assess whether the journals were from the dates Plaintiff claimed, Judge Rakoff, with counsel's consent, appointed an expert to assess the ink dating on Plaintiff's journals. *Id.* at 99:23–101:4, 110:5–8.

The court appointed Gerald M. LaPorte to examine the journals. *See* ECF No. 272-19 ("LaPorte Report") ¶ 1. Mr. LaPorte opined that he could not determine whether the written entries in the journals were executed in or around the years they were alleged to have originated. *Id.* ¶ 27(b). He did not believe that the journals recently purchased or entirely fabricated; but

15

ultimately, the writing implements used in large swaths of the journals were undatable. *Id.* More specifically, the journals include writing in pencil, "aqueous-based ink" (like gel pens), and "acrylic writing" (like markers), for which forensics lacks an "accurate and reliable methodology." *Id.* LaPorte found some limited support that the ink entries he tested from the 2012 journal were in fact from that year. *See id.* ¶¶ 27(e), 62–65. However, he found that certain entries in that journal, including those that were written upside down, on the backs of pages and in pencil, could not be dated. *See id.* ¶ 56. Accordingly, Judge Rakoff found that "the controversy cannot be resolved through . . . laboratory analysis." June Conference at 5:1–2.

On May 10, 2024, Class Counsel filed written briefing indicating they did not believe that Plaintiff's claim was meritorious or that her testimony was reliable. Class Counsel Ltr. The letter focused on inconsistencies between Ms. Doe's testimony and patterns observed among other Epstein victims, and on inconsistencies within Ms. Doe's own account. *Id.* Among the inconsistencies: The probate of Epstein's estate found that Epstein "does not have any living children"; Plaintiff is the only victim Class Counsel was aware of who alleged that Epstein's abuse involved various men intentionally impregnating her; and Plaintiff is the only long-term survivor of Epstein's abuse that Class Counsel had met who was not on Epstein's flight logs. *Id.* at 3–4, 8. The letter ultimately concluded that Ms. Doe "never met" Epstein or Maxwell. *Id.* at 1.

On May 20, 2024, Ms. Christensen responded on behalf of Ms. Doe. ECF No. 233-24. Among her arguments, Ms. Christensen noted that the journals, which an expert did not find to be fraudulent, specifically reference Ghislaine Maxwell, other abusers, a "mystical island," and the attack by Leon Black. *Id.* at 10–11. Ms. Christensen also explained that Plaintiff's claim that Epstein fathered four of her children was merely Plaintiff sharing what Epstein told her, not a representation of the truth. *Id.* at 22–23.

Following these written submissions, Judge Rakoff held a conference with Wigdor and Class Counsel on June 25, 2024. *See* June Conference. In that conference, Class Counsel explained why survivors of Epstein's prolonged abuse all interacted with one another. *Id.* at 8:12–10:7; *see also* Class Counsel Ltr. at 5–6, 8–9. Class Counsel further explained that, having personally "spent countless hours" with the 71 victims they represented over 16 years of investigating Jeffrey Epstein, "[n]obody has ever mentioned [Plaintiff's] name one time." June Conference at 10:20–21. "She doesn't show up in any document at all," they added. *Id.* at 10:21. Class Counsel explained that they showed a contemporaneous photograph of Plaintiff to █████, Epstein's associate, who did not recognize Plaintiff. *Id.* at 11:2–16. Plaintiff had also been unable to recognize ██████████ in a photograph, despite stating that she knew a "████," and Class Counsel further explained that ██████████ was not even in the country during the relevant time period. *See* March Hearing at 68:4–7; Compl. ¶ 50; Class Counsel Ltr. at 12; June Conference at 14:12–14; *cf.* ECF No. 92-1 ("Redlined FAC") ¶ 63 (removing ████ from the FAC).

Ms. Christensen refuted many of Class Counsel's points. While discussing the issue of Plaintiff's pregnancies, Ms. Christensen affirmed that Plaintiff had friends who would attest to her being pregnant when she said she had been. *See* June Conference at 23:13–21. During a colloquy about how often Plaintiff was alleged to have been trafficked, Ms. Christensen disputed Class Counsel's representation, also in the Complaint in this case, that Plaintiff was trafficked "most weekends." *Id.* at 28:8–10, 31:17–32:5; Compl. ¶ 44. Ms. Christensen stated, "clearly it wasn't accurate," and it was "not the only incorrect thing . . . that I have in those allegations." June Conference at 31:17–32:5. She also stated: "Your Honor, if every complaint that I have ever drafted as a plaintiff's counsel had correctly alleged things, that unfortunately is not the case." *Id.*

17

at 31:17-19. Judge Rakoff recommended that Ms. Christensen bring the inaccuracies to this Court's attention, which Ms. Christensen stated would not be "a good thing" in light of Defendant's pending motion to dismiss. *Id.* at 32:6–16.

Judge Rakoff subsequently conducted a remote evidentiary hearing in July 2024. ECF No. 233-28 ("July Hearing"). This time, only the Claims Administrator, counsel for the Claims Administrator, and Plaintiff were present to create a "low-pressure" situation. *Id.* at 2:1–25. The Claims Administrator represented that she received Ms. Christensen's permission to proceed in that manner, and that Ms. Christensen was "right outside" the hotel room Ms. Doe was in. *Id.* at 3:3–7. Plaintiff also agreed to conduct the hearing without Ms. Christensen present. *Id.* at 3:13–15. In the hearing, Judge Rakoff asked Plaintiff to clarify elements of her claim that remained in doubt. *See, e.g.*, *id.* at 7:19–8:6. Instead of clarifying these issues, Ms. Doe, unprompted, stated that her adoptive father was abusive and did not permit her to drive, have a job, have friends, leave the house, or consume media without prior approval. *Id.* at 12:19–21, 14:22–25, 15:5–13. Before Ms. Christensen began to visit her, Plaintiff claimed, she "had actually not . . . had any human contact with anybody outside of the home for several years . . . ." *Id.* at 15:15–16. Ms. Doe also stated that her adoptive father had sexually assaulted her. *Id.* at 16:9–10.

Judge Rakoff then asked Plaintiff about her Complaint in this action. *Id.* at 16:16–17:3. She explained that "most weekends" referenced the time she spent with "Elizabeth," who sent her to places connected to Epstein and also to men outside of Epstein's orbit locally around Washington, D.C. *Id.* at 17:4–9. To explain why other victims did not remember her, Ms. Doe explained that she did not readily make friends with them and that other victims would "make fun of" her because of her disabilities. *Id.* at 19:4–20:15. She also went on to claim that, because she had "so much hormone fluctuation going on," she would look "drastically different" over the

course of even three or six months. *Id.* at 21:7–13. Following the hearing, Judge Rakoff indicated that he was prepared to rule on Plaintiff's claim but gave the parties until July 31, 2024, to pursue settlement. *See* JPMC Action (Nov. 12, 2024), ECF No. 308-4.

Judge Rakoff denied Plaintiff's claim under the settlement in a "bottom-line" order on July 31, 2024. ECF No. 233-1. "However, before the [c]ourt could issue a detailed opinion stating the reasons for this ruling, the Class Administrator and the Claimant entered into a Stipulation of Settlement, approved by [the] [c]ourt on August 21, 2024 . . . ." JSR Letter at 12; *see also* ECF No. 272-15. Consequently, Judge Rakoff never made particularized factual findings on the record regarding Ms. Doe's allegations or Defendant's argument that Plaintiff's claim in the JPMC Action was fraudulent. ECF No. 180-1 ("JPMC Unsealing Order") at 5 ("Thus, the most that can be inferred from the Court's ruling is that Claimant failed to prove her claim.").

On November 12, 2024, Black's counsel moved to intervene in the JPMC Action to seek documents related to Plaintiff. *See* Motion to Intervene, JPMC Action (Nov. 12, 2024), ECF No. 306. At that time, Judge Rakoff had sealed all documentary submissions, testimony, and judicial determinations related to Plaintiff's claim. Defendant argued that "the materials and testimony provided to [the JPMC] [c]ourt and any decisions issued . . . in connection with Doe's claim . . . will demonstrate the falsity of Doe's allegations in the case before Judge Clarke" because whether Ms. Doe was a victim of Epstein's trafficking is "a fundamental factual issue at the very heart of the *Black* Action." Motion to Intervene at 2, JPMC Action, (Nov. 12, 2024), ECF No. 307. Defendant also indicated that the materials and testimony provided to Judge Rakoff would "bear on Doe's credibility more broadly and her propensity to make up false allegations." *Id.* On behalf of Plaintiff, Wigdor opposed the motion, arguing that the claims process was conducted to

19

ensure confidentiality and that Ms. Doe's claim against Mr. Black is a "stand-alone question." ECF No. 272-21 at 6–8.

Judge Rakoff partially granted Black's motion in another "bottom-line" order on November 15, 2024, and followed that up with a memorandum explaining his reasoning. JPMC Action, Sealed Order of Nov. 21, 2025. Judge Rakoff later granted Defendant permission to view certain sealed documents and records—giving Defendant access to three submissions from Class Counsel, the court's "bottom-line" determination of Plaintiff's claim, and Plaintiff's stipulation of settlement. JPMC Unsealing Order at 6. On consent, Judge Rakoff also directed Wigdor to directly share their written submissions in the matter. *Id.* Judge Rakoff declined to unseal any other documents, including the transcripts of Plaintiff's testimony, because Plaintiff could be separately deposed in this action and her reliance on sealing was "especially acute" in her testimony. *Id.* at 6–7. Judge Rakoff left any further unsealing determinations up to this Court's discretion. *Id.* at 7.

After receiving the documents Judge Rakoff unsealed, Defendant filed a letter with this Court stating that the case against Black "should be summarily dismissed with prejudice." ECF No. 180 at 1. According to Defendant, the JPMC proceedings demonstrated that Plaintiff was perpetrating a fraud on the Court and proved, "beyond a shadow of a doubt, that *Plaintiff never even met Epstein*" and therefore could not have been trafficked by him to Black. *Id.* (emphasis in original).

Ms. Christensen responded to Defendant's letter several days later. *See* ECF No. 184 ("Christensen Ltr."). She argued that Plaintiff was entitled to litigate her case against Black, that Defendant's counsel improperly interfered with Plaintiff's JPMC claim, and that nothing in the JPMC Action is definitive, admissible proof that Plaintiff's allegations against Black are untrue.

*Id.* As relevant to this Motion, Ms. Christensen also claimed to this Court that Plaintiff was "subjected to horrendous treatment and scrutiny" during the proceedings held before Judge Rakoff. *Id.* at 4. Specifically, she wrote:

> As unbelievable as it may sound, it is true that the allocation review process by Judge Rakoff included him questioning Plaintiff under oath <u>without permitting her counsel to be present</u>, knowing of her developmental disabilities and autism but nevertheless subjecting her to his private cross-examination for over an hour. Worse, during this questioning without her counsel, Judge Rakoff asked her highly personal questions having zero connection to Epstein, Ghislaine Maxwell or what the Claims Administrator had reviewed to render her allocation award.

*Id.* (emphasis in original). At that time, this Court was unaware of what had occurred in the JPMC Action.

On December 30, 2025, the Court received a letter from Judge Rakoff in response to the accusations that Ms. Christensen leveled at him. The letter was copied to all counsel, among other interested parties. As explained by Judge Rakoff, Ms. Christensen's letter contained "numerous material misrepresentations regarding the proceedings in [his] case . . . ." Judge Rakoff's letter detailed how: (1) Ms. Christensen's statement that she was not permitted to be present during the questioning of her client was false; (2) Ms. Christensen's characterizations about Judge Rakoff's questioning of Plaintiff were false; and (3) Ms. Christensen admitted to Judge Rakoff that portions of the allegations in this case were inaccurate. This Court also obtained from Judge Rakoff all the underlying, sealed documents from the JPMC Action related to Plaintiff. *See* ECF No. 182.

## III.    Request for Case-Terminating Sanctions

On January 15, 2025, Defendant notified the Court that in light of Judge Rakoff's letter, he intended to "seek leave to submit a motion for sanctions, seeking dismissal of this case with

prejudice, based on Plaintiff's and her counsel's knowing, serial misrepresentations to this Court and to Judge Rakoff." ECF No. 198 at 1–2. Defendant also requested all of the transcripts and submissions related to Plaintiff's JPMC claim and requested that the Court stay discovery. *Id.* at 2–4. Based upon the Court's initial review of the JPMC records and in light of the credible allegations of misconduct against Ms. Christensen, the Court granted the motion in its entirety. ECF No. 205. The Court also ordered the parties to brief which documents should remain sealed in this action related to this dispute and Defendant's forthcoming motion. ECF No. 209 ("Conference of Jan. 16, 2025") at 4:21–5:2.

Shortly before filing his case-terminating sanctions motion, Defendant requested permission to inspect Plaintiff's journals referenced in the FAC and in the JPMC Action. ECF No. 219. At the time, Defendant had reason to suspect that portions of the journal were fabricated, *id.* at 1, and the Court granted Defendant's inspection request, ECF No. 223. The Court also ordered Wigdor to preserve all journals and to keep them in the firm's possession until further order of the Court. *Id.*

Defendant filed his Motion for Case-Terminating Sanctions ("CTS Motion") on March 3, 2025, based in significant part on the unsealed documents from the JPMC Action. ECF No. 224. In the Motion, Defendant accuses both Wigdor and Plaintiff of engaging in sanctionable conduct. Defendant argues that: (1) Plaintiff's claims are inherently not credible and lack evidentiary support; (2) Plaintiff's only evidence—her journals (and in particular, sonograms in her journals)—was clearly manipulated; (3) Wigdor failed to conduct basic due diligence to uncover Plaintiff's lies; (4) Wigdor lied to the Court about the JPMC Action; and (5) Wigdor, as was uncovered in the unsealed documents, spoliated evidence by directing Plaintiff, shortly before

22

filing suit, to delete her Epstein-focused Twitter account. ECF No. 225 ("CTS Motion") at 12–33.

To support this Motion, Defendant filed a number of exhibits, including declarations from Plaintiff's family and other witnesses that disavowed her allegations and a limited number of Plaintiff's Twitter posts that Defendant was able to recover. *See* ECF Nos. 226–233. Defendant also included as an exhibit an expert report, which concluded that some elements of Plaintiff's journals, including the sonograms of her purported pregnancies, were not produced on the dates Plaintiff alleged. *See* ECF No. 226-2. One month later, Wigdor disavowed three of the eleven sonograms contained within Plaintiff's journals, which they had proffered as evidence in the JPMC Action. ECF No. 259. Days later, Wigdor withdrew as counsel for Ms. Doe. ECF Nos. 238, 241. Consequently, Wigdor and Ms. Doe, representing herself, each opposed the CTS Motion independently. *See* ECF Nos. 271 ("Wigdor CTS Opp.") at 1 n.1; ECF Nos. 274–75, 277. Oppositions were filed on June 23, 2025. *See* ECF Nos. 258, 271, 274–75, 277. Due to technical difficulties, Plaintiff submitted her Opposition in full on June 30, 2025. *See* ECF No. 283.

Plaintiff's Opposition references numerous communications she had with Wigdor. *See* ECF Nos. 274, 277. After it was filed, Defendant moved to compel production of (1) documents relied upon in Plaintiff's submission, (2) all attorney–client communications, because Defendant argued that the privilege had been waived, and (3) any attorney–third party communications that involved "Wigdor's representation of or advice to Ms. Doe." ECF No. 284 at 1. While the parties and Wigdor briefed the motion to compel, the Court held Defendant's Reply in support of the CTS Motion in abeyance. ECF No. 286. During this time, Plaintiff also filed an "emergency" motion to stay all proceedings—stating, among other things, that she was experiencing a medical emergency and was unable to proceed with the litigation. ECF No. 295. Following briefing, the

23

Court denied Defendant's Motion to Compel and Plaintiff's Motion to Stay as moot. ECF No. 306. Finally, the CTS Motion was fully briefed at the end of August 2025. *See* ECF Nos. 323–26. No party requested an evidentiary hearing on this Motion.

## IV.    Anonymity and Sealing

In preparation for Defendant's CTS Motion, the Court directed the parties to brief their positions on which documents should remain sealed in this action. At various points in this litigation, Defendant has also challenged Plaintiff's use of a pseudonym. As such, the Court provides background regarding anonymity and sealing in this case.

Plaintiff, through counsel, requested to appear anonymously soon after commencing this action. ECF No. 6. Defendant did not oppose this request. ECF No. 15 at 1. The Court granted Plaintiff's motion, permitting her "to proceed anonymously at this time," because her identity was disclosed to Defendant's counsel and Defendant did not identify any prejudice stemming from her anonymity. ECF No. 16 at 3.

Sealed filings in this case were designed to protect Plaintiff's anonymity and other sensitive information from public disclosure. The Court ordered that "information related to Plaintiff's identity, including her name, her tweets, information about her family, information about her country of origin, and other information tending to reveal her identity may be properly redacted." MTD Opinion at 16. The Court also approved the redaction of "information regarding Plaintiff's medical records, treatment, and diagnosis." *Id.* at 17 (citing *Valentini v. Grp. Health Inc.*, No. 20-CV-9526 (JPC), 2020 WL 7646892, at *2 (S.D.N.Y. Dec. 23, 2020)).

On October 7, 2024, after the Court denied his Motion to Dismiss, Defendant filed a motion to unseal filings on the docket and de-anonymize Plaintiff. *See* ECF Nos. 115–120. The Court heard oral argument on the question of Plaintiff's anonymity on November 7, 2024. ECF

24

No. 157 ("Oral Argument of Nov. 7, 2024"). Counsel for Defendant argued that the burden of Plaintiff's anonymity was particularly prevalent during discovery. *Id.* at 10:13–11:16. Counsel identified specific records and individuals that Black would have liked to subpoena during discovery that Plaintiff's anonymity prevented them from accessing. *See id.* at 11:21–24. Defendant's Counsel also contended that the Court should not consider Plaintiff's disabilities as a reason to keep her identity protected, arguing that precedent does not support such a finding and that, in any event, Plaintiff is not particularly vulnerable. *See id.* at 13:4–14:1 ("She filed in her own name, so she is competent to make these types of decisions and there is no evidence that she cannot."). At the time, Wigdor argued that Defendant was able to conduct extensive interviews without revealing Plaintiff's identity and that Plaintiff's anonymity would not bar access to the records Defendant sought. *Id.* at 15:20–16:14, 21:14–23.

On January 16, 2025, the Court held a conference to discuss Defendant's request to file a case-terminating sanctions motion and his request to de-anonymize Plaintiff. Conference of Jan. 16, 2025. In the conference, the Court found that maintaining Plaintiff's anonymity was warranted at the time. *Id.* at 6:2–11; *see also* ECF No. 204. Separately, the Court directed the parties to provide their positions on "what, if anything . . . should be unsealed with respect to [Defendant's Motion for Case-Terminating Sanctions]; Judge Rakoff's December 13, 2024, decision; and the documents currently under seal in this case at ECF Nos. 178, 180, 184, 186, 194, 198 and 202, including any exhibits." Conference of Jan. 16, 2025, at 5:5–10.

In its original CTS briefing, Defendant argued that documents related to the instant motion, including Judge Rakoff's JPMC Unsealing Order, "should be unsealed entirely save for references to Doe's real name, and those of her family . . . ." CTS Motion at 34. Plaintiff opposed unsealing and de-anonymization, citing safety concerns from "unsolicited emails from

incarcerated men in four separate states" to her litigation email address. ECF No. 277 at 28. Wigdor similarly opposed unsealing, citing Plaintiff's "multiple assurances of complete confidentiality" as part of the JPMC proceedings. ECF No. 271 ("Wigdor Opp.") at 29.

On December 20, 2025, Plaintiff alerted the Court that she had spoken with congressional staffers regarding her claims and sought advice from the Court for how to proceed if served with a subpoena. ECF No. 349-1. In response, Defendant urged the Court to reconsider Plaintiff's continued anonymity, in light of her "selective[] invo[cation of] anonymity as a shield in this litigation" and the "reputational and financial harm" that Black has experienced as a result. ECF No. 351 at 2. Plaintiff averred that she has consistently maintained her anonymity and that she was simply responding to outreach from a member of Congress. ECF No. 355-2 at 4.

On January 30, 2026, pursuant to federal law, the Department of Justice published nearly 3.5 million pages of documents collected in relation to federal investigations of, and cases brought against, Epstein and Maxwell in Florida and New York. U.S. Dep't of Just., "Department of Justice Publishes 3.5 Million Responsive Pages in Compliance with the Epstein Files Transparency Act" (Jan. 30, 2026), https://www.justice.gov/opa/pr/department-justice-publishes-35-million-responsive-pages-compliance-epstein-files. Among those documents are now-redacted versions of at least four of the journals reviewed by the Court for this case and various communications between Wigdor and federal law enforcement regarding Plaintiff's claim against Leon Black. *See* EFTA02731433, EFTA02731341, EFTA02731361, EFTA02731393, EFTA02731260. Based on the Court's review of what has been published in these files, Plaintiff's name remains redacted and has not been revealed.

Shortly thereafter, Plaintiff alerted the Court that her private materials had been made public and that she "did not consent to those materials [being] used or shared, was not informed

that they had been provided to the government, and had no opportunity to seek protection before they became public." ECF No. 359-1. News media took an interest in Plaintiff's journals and her allegations that she had conceived a child with Epstein, and various outlets reported on the story in the days that followed. *See, e.g.*, ECF No. 360-1 to 360-6. Some stories mentioned the instant case against Leon Black. *See, e.g.*, ECF No. 360-1 at 8; ECF No. 360-2 at 7.

Defendant subsequently filed two letters in rapid succession urging the Court to "deanonymize" Plaintiff and to unseal large swaths of documents related to his Motion for Case-Terminating Sanctions and the related JPMC determinations, among other documents. *See* ECF Nos. 357, 360. Defendant also urged the Court to pursue "Plaintiff's serious accusation that [Wigdor] shared Plaintiff's fraudulent journals with the government in an attempt to catalyze criminal charges against Black without Plaintiff's consent." ECF No. 357 at 5. Defendant contended that Wigdor's report to law enforcement, if unauthorized, violated the Protective Order in this case. ECF No. 364 at 3. In response, Wigdor offered to provide for *in camera* review evidence of the propriety of its discussions with federal law enforcement on Plaintiff's behalf. ECF No. 362 at 11. The Court then ordered and received *in camera* submissions from Wigdor and Plaintiff on this issue. ECF Nos. 366, 374. The Court, by separate order, concluded that there was no basis to find that Wigdor had acted without Plaintiff's consent or that Wigdor had violated the Protective Order in its communications with law enforcement on Plaintiff's behalf. *See* ECF No. 378.

## MOTION FOR CASE-TERMINATING SANCTIONS

In assessing Defendant's Motion for Case-Terminating Sanctions, the Court first sets out the legal standard for imposing sanctions. Next, the Court makes factual findings relevant to its

27

determination, before concluding which conduct at issue is sanctionable. The Court then imposes

sanctions against Plaintiff, Ms. Christensen, and Wigdor.

## I.    Legal Standard

Courts may impose a wide range of sanctions, including dismissal, under Federal Rules

of Civil Procedure 11 and 37 and the Court's inherent powers. Accordingly, the Court considers

the standards for each basis in turn.

### A.  Federal Rule of Civil Procedure 11

Rule 11(b) of the Federal Rules of Civil Procedure requires that parties, in making

representations to the Court, certify that all submissions are for a proper purpose, that factual

contentions are supported by available evidence, and that denials of factual contentions are

warranted on the evidence. Fed. R. Civ. P. 11(b). Rule 11 creates an "incentive to stop, think and

investigate more carefully before serving and filing papers." *Cooter & Gell v. Hartmarx Corp.*,

496 U.S. 384, 398 (1990) (internal quotation marks omitted). It "explicitly and unambiguously

imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of

a pleading before it is signed." *AJ Energy LLC v. Woori Bank*, 829 Fed. App'x 533, 535 (2d Cir.

2020) (quoting *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998)). But an attorney's obligations

under Rule 11 do not cease after a pleading has been filed. Rather,

> a litigant's obligations with respect to the contents of papers are not
> measured solely as of the time they are filed with or submitted to the
> court, but include reaffirming to the court and advocating positions
> contained in those pleadings and motions after learning that they
> cease to have any merit.

*Galin v. Hamada*, 753 F. App'x 3, 8 (2d Cir. 2018) (cleaned up). Similarly, a plaintiff has a

"'continuing obligation' to ensure that the action has reasonable support and, if not, to withdraw

it." *Klein v. Aicher*, No. 19-CV-9172 (RA), 2020 WL 4194823, at *11 (S.D.N.Y. July 21, 2020)

(citing *Galin v. Hamada*, 283 F. Supp. 3d 189, 202 (S.D.N.Y. 2017), *aff'd*, 753 F. App'x 3 (2d Cir. 2018)).

"[S]anctions are appropriate only where 'it should have been patently obvious to any attorney who had familiarized himself or herself with the law' that the action was frivolous." *Galin*, 283 F. Supp. 3d at 201 (quoting *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988)) (cleaned up). "The imposition of Rule 11 sanctions is discretionary and should be reserved for extreme cases, and 'all doubts should be resolved in favor of the signing attorney.'" *Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 626 (S.D.N.Y. 2016), *aff'd*, 683 F. App'x 33 (2d Cir. 2017) (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 131 (2d Cir. 1995)).

Rule 11 permits courts to impose an array of sanctions. Although sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," they "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

### B. Federal Rule of Civil Procedure 37(e)

"A litigant has the 'duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.'" *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010) (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). "[N]o duty to preserve arises unless the party possessing the evidence has notice of its relevance." *Turner*, 142 F.R.D. at

29

72–73. "A party is on notice to preserve relevant documents when litigation is reasonably anticipated and at least by the time the complaint is served." *Passlogix*, 708 F. Supp. 2d at 409 (cleaned up).

The Court has a variety of available remedies when electronic information "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the Court finds that another party is prejudiced when electronic information is lost, the Court may order measures to cure that prejudice. *Id.* at 37(e)(1). If the Court finds that a party acted with "intent to deprive" another party of a litigation use for that information, the Court may presume that the lost information was unfavorable to the first party and can instruct the jury to that effect. *Id.* at 37(e)(2). The Court may also dismiss the action in its entirety. *Id.*

### C. The Court's Inherent Powers

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)). Courts may issue sanctions under their inherent powers even when much of the misconduct in question is sanctionable under existing statutes or rules. *See Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44.

To impose sanctions under its inherent powers, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay." *Eisemann v.*

*Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (cleaned up); *see also Wilson v. Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir. 2012) (per curiam) (requiring an "explicit finding that the sanctioned party, whether a party or a party's counsel, acted in bad faith in engaging in the sanctionable conduct"); *United States v. Seltzer*, 227 F.3d 36, 40 (2d Cir. 2000) (requiring a bad faith finding when a court "imposes attorney's fees as a sanction, or when the court sanctions an attorney for conduct that is integrally related to the attorney's role as an advocate for his or her client"). "[A] claim is 'entirely without color' when it lacks any legal or factual basis." *Sierra Club v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985) (quoting *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980)). "[B]ad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (cleaned up). Courts must make the underlying factual findings with "a high degree of specificity." *Eisemann*, 204 F.3d at 396. Even when both required elements are met, however, courts retain discretion to impose or decline the most serious sanctions. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45; *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020) (citing *Murray v. City of Columbus*, 534 F. App'x 479, 485 (6th Cir. 2013)) ("The imposition of sanctions pursuant to a court's inherent authority is truly discretionary.").

## II.    Findings of Fact

The Court renders findings of fact relevant to the sanctionable conduct at issue. First, the Court finds that Wigdor delayed in alerting the Court that it needed to amend its Complaint, even though Wigdor knew that the Complaint contained inaccuracies. Contrary to Defendant's argument, however, the Court also finds that Plaintiff had sufficient opportunity to review, and in fact did review, both the Complaint and the FAC. Second, the Court finds that Jeanne

31

Christensen, Plaintiff's lead counsel at Wigdor, lied to this Court in a letter about the JPMC

Action and Plaintiff's testimony in those proceedings. Third, the Court finds that Ms.

Christensen directed Plaintiff to destroy her Twitter account shortly before this action began

without taking any remedial preservation measures. And finally, the Court finds that Plaintiff

falsified portions of the journals used to support her claims in this case. In rendering findings of

fact, the Court relies on the extensive record before it from the JPMC Action, including

submissions and hearing transcripts, and the exhibits supplied in the CTS Motion briefing.

Unless otherwise noted, however, the Court does not utilize the non-party lay witness

declarations that both parties submitted to determine disputed facts. No evidentiary hearing has

occurred in this action, nor is this Opinion and Order a merits determination on Plaintiff's

claim. Accordingly, the factual determinations rendered herein are only those essential to this

Opinion and Order.[5]

 Lastly, the Court acknowledges that counsel for Defendant spends much of their brief

noting the various inconsistences in Plaintiff's account, particularly where it involves Epstein.

*See, e.g.*, CTS Motion at 13, 27, 31. These inconsistencies include how and when Plaintiff visited

New York and the involvement of her biological parents in her alleged trafficking. *Id.* Defendant

also focuses on the implausibility of some of Plaintiff's claims, including the number of times

she claims she was pregnant, her pregnancies with Epstein, and the alleged kidnapping of three

---

[5] The Court also does not address Plaintiff's various other filings beyond this matter's scope, including her requested sanctions motion, *see* ECF Nos. 313, 332-2, and her grievances about the conduct of Class Counsel Brad Edwards, *see, e.g.*, ECF No. 346-2; Pl. Dec. ¶¶ 60, 69. Plaintiff's arguments that Wigdor acted beyond the scope of her consent in sharing materials with law enforcement have already been addressed in a previous Order. *See* ECF Nos. 359-1, 378. Furthermore, this action is not the proper forum for her disputes with her former counsel or with Class Counsel from the JPMC Action. Any motion filed related to these issues is therefore likely to be denied.

of her children. *See id.* at 12–13. Plaintiff fails to substantively respond to or explain many of these inconsistencies. Nevertheless, the Court does not find that they are a basis for sanctions at this time. *See Crown Awards, Inc. v. Trophy Depot, Inc.*, No. 15-CV-1178 (LAK) (AJP), 2017 WL 564885, at *12 (S.D.N.Y. Feb. 13, 2017) (cleaned up) (concluding that even intentional lies in depositions are an insufficient basis for sanctions where the falsehoods do not rise to the level of "an unconscionable scheme . . . that defiled the court itself so that the judicial machinery cannot perform in the usual manner"). Instead, Defendant is free to, and certainly will, use any inconsistencies to impeach Plaintiff's account at any trial in this action. Furthermore, unlike the Court's conclusion that Plaintiff's journals clearly contain falsified evidence (described below in Section II.D, *Motion for Case-Terminating Sanctions*), the Court cannot reach the same conclusion regarding how these inconsistencies came about and whether they indicate some bad faith on Plaintiff's part, in part because no substantive discovery has occurred in this case, and Plaintiff is proceeding pro se. Therefore, these inconsistencies are not further addressed below.

### A. Wigdor Delayed Amending the Complaint in This Action, but Counsel Gave Ms. Doe Sufficient Opportunity to Review the Complaint and the FAC

On August 20, 2024, more than a year after filing this action, Wigdor sought leave to amend the Complaint. ECF No. 91. Wigdor's conduct in filing and amending the Complaint raises two initial concerns. First, Plaintiff disclaimed information in the Complaint in later testimony before Judge Rakoff and averred that she had not read the Complaint her counsel drafted. *See* July Hearing at 16:16–20, 17:10–14. She also contended that her journals were included in the FAC without her "fully informed consent." Pl. Dec. ¶ 99. Second, Ms. Christensen acknowledged to Judge Rakoff that the Complaint in this action contained inaccuracies, and there is a question about whether she unduly delayed correcting those

inaccuracies or alerting this Court to their existence. June Conference at 31:17–32:5. The Court reaches factual findings about issue in turn.

On July 8, 2024, in a hearing before Judge Rakoff, Ms. Doe testified that she never reviewed the Complaint in this action. *See* July Hearing at 16:16–20, 17:10–14. Her testimony also explicitly disavowed certain allegations therein, including the frequency with which she was trafficked to Epstein. *See, e.g.*, *id.* at 16:21–17:14 (stating it was "not correct" that she was trafficked to Epstein "most weekends"). Ms. Doe also later claimed that she did not give Wigdor permission to include her journals in the FAC. Pl. Dec. ¶ 99.

The Court finds, however, that Ms. Doe was given the opportunity to review—and in fact did review—both the Complaint and the FAC before each document was filed. In her Declaration in this action, Plaintiff explains that her JPMC testimony is misleading: "Given how I process information, my words were literal and true—the complaint was first read TO me, WITH my mom reading sections first due to the traumatic and graphic nature and then reading those sections aloud to me." Pl. Dec. ¶ 75 ("[I]n saying I had not read it, those words were true because it had been read TO me."). At this more recent and considered juncture, Plaintiff agrees that she also had an opportunity to review the FAC and provide "corrections" before it was filed. *Id.* ¶¶ 99, 102. Under penalty of perjury, Wigdor offered to show the Court, *in camera*, communications demonstrating that Ms. Doe received the draft Complaint before this action began. ECF No. 272 ¶ 26. Although the Court did not request such materials, it is satisfied that Plaintiff was provided an opportunity to review, and in fact did review, the pleadings in this case before they were filed.

Wigdor did delay alerting the Court about the material inaccuracies it knew were in the Complaint, because Ms. Christensen was aware that the Complaint needed to be amended as early as nine months before she moved to amend it. *See* ECF No. 233-5. In an internal

memorandum dated December 11, 2023, Ms. Christensen described how she had learned—two weeks earlier—that Plaintiff's biological mother first introduced Plaintiff to Ghislaine Maxwell in Clearwater, Florida. *Id.* at 1–2. Plaintiff also testified multiple times at the March 2024 JPMC Hearing that she first met Ghislaine Maxwell in Clearwater, Florida. March Hearing at 10:3–25, 73:3–7. However, the Complaint told a different story—it alleged that Elizabeth introduced Plaintiff to Maxwell at a party in Virginia. Compl. ¶¶ 27–31.

The December 11, 2023 memorandum also reflects Ms. Christensen's contemporaneous impression that Plaintiff's biological mother knew about and helped strategize how to traffic Plaintiff. ECF No. 233-5 at 2–3. At the March 2024 JPMC hearing, Ms. Christensen told Judge Rakoff that Plaintiff's biological parents "play[ed] important roles in trafficking [Plaintiff] to Jeffrey Epstein." March Hearing at 6:4–6. And in June 2024, Ms. Christensen stated on the record in the JPMC Action: "I am saying that [Plaintiff's] biological mother 100 percent is the person who, in the very first instance, sent her to Ghislaine Maxwell, and then had been telling her about this very important wealthy man." June Conference at 17:14–17. "So, yes, I am saying that her mother was intimately involved," Ms. Christensen made clear. *Id.* at 17:20–21. Ms. Christensen also acknowledged during that conference that Wigdor had been speaking to law enforcement about Plaintiff's biological mother. *See id.* at 18:4–6. In stark contrast to Ms. Christensen's many representations outside of this action, the Complaint did not allege that Plaintiff's biological mother played any role in her trafficking.

Finally, at the June Conference, Ms. Christensen explicitly acknowledged having included "incorrect" and inaccurate claims in the Complaint. *See id.* at 32:2–5. Judge Rakoff recommended raising those issues with this Court, but Ms. Christensen indicated that an amendment would be ill advised. *See id.* at 31:17–32:16. Ms. Christensen also appeared to take a

flippant approach regarding her duty to amend inaccuracies in complaints in general. Troublingly, she told Judge Rakoff: "Your Honor, if every complaint that I have ever drafted as a plaintiff's counsel had correctly alleged things, that unfortunately is not the case." June Conference at 31:17-19.

Ultimately, Wigdor only alerted the Court that it intended to file a motion to amend the Complaint on July 22, 2024, one week before Judge Rakoff handed down his determination in the JPMC Action. *See* ECF Nos. 87, 233-1. The firm eventually filed its Motion to Amend on August 20, 2024. ECF No. 91. Because Ms. Christensen knew about the inaccuracies as early as December 2023, nearly nine months elapsed between when Ms. Christensen first became aware that an amendment was needed and Wigdor's Motion to Amend.

During that time, neither the Court nor Defendant was informed that Wigdor knew that Plaintiff's trafficking had transpired differently than what was alleged in the Complaint. The Court was similarly unaware of this background when it noted, on November 7, 2024, that there had been no "undue delay" or "bad faith" in amending the Complaint because discovery had not yet commenced. Oral Argument of Nov. 7, 2024, at 5:7–24.

### B. Ms. Christensen Lied Repeatedly in This Litigation

The Court concludes that Ms. Christensen told several lies to this Court and opposing counsel about what occurred in the JPMC Action. On December 18, 2024, Ms. Christensen filed a letter opposing Defendant's attempts to seek documents from the JPMC Action. *See* Christensen Ltr. at 1. In her letter, she described the proceedings that had taken place in front of Judge Rakoff. She explained that Plaintiff had been "subjected to an allocation review process that took place entirely behind closed doors, initiated by the lawyers representing Black in this action after violating a confidentiality order in mediation to penalize Plaintiff for suing Black

herein." *Id.* at 4. Ms. Christensen's letter also addressed Judge Rakoff's conduct directly. Specifically, Ms. Christensen represented that the allocation review involved Judge Rakoff "questioning Plaintiff under oath without permitting her counsel to be present, knowing of her developmental disabilities and autism but nevertheless subjecting her to his private cross-examination for over an hour." *Id.* (cleaned up). Her letter emphasized that Judge Rakoff's examination included "highly personal questions" with "zero connection" to the issues in the case. *Id.* Finally, Ms. Christensen made concrete factual representations about Plaintiff's sealed testimony, including that "it is completely false that Plaintiff said she was the mother of Epstein's children." *Id.* at 8. The Court first addresses Ms. Christensen's characterization of Judge Rakoff before considering the substance of Plaintiff's testimony.

Ms. Christensen's letter directly mischaracterized the JPMC proceedings and Judge Rakoff's approach. This Court's review shows that Judge Rakoff chose the format for the July Hearing based on the Claims Administrator's recommendation for a trauma-informed proceeding, and that Wigdor and Plaintiff both consented to that format. JSR Letter at 5; July Hearing at 2–3. Judge Rakoff provided Plaintiff this second opportunity to testify—instead of simply denying her claim—because, although he harbored "serious doubts about Plaintiff's credibility" after the March Hearing and June Conference, he wanted a less adversarial setting for Plaintiff to share her testimony. JSR Letter at 5. This approach was done for Plaintiff's benefit. Indeed, before any hearings took place, Ms. Christensen indicated that she thought an examination by only Judge Rakoff, outside of the presence of Class Counsel or counsel for Defendant, would be preferable. *See* ECF No. 233-8 at 3. To accommodate the absence of Class Counsel, the July Hearing had no counsel from any side present other than counsel for the Claims Administrator. JSR Letter at 3, 5.

Judge Rakoff confirmed this plan on the record at the beginning of the Hearing. The entire exchange proceeded as follows:

> THE COURT: Okay. Now by way of putting this on the record, after the last hearing, which raised some questions about this claim, the claims administrator suggested - I thought it was a great suggestion - that I should talk to the claimant once again, but in a, if you will, low-pressure type of situation without her counsel. But, of course, I can only do that with the permission of her counsel and the permission of the claimant. I take it the claim administrator obtained the permission of her counsel?
>
> [CLAIMS ADMINSTRATOR]: We did. And, Judge Rakoff, . . . [Plaintiff], right now, is in a hotel room by herself and Jeanne Christensen, her lawyer, is right outside. And [Plaintiff], if I'm saying anything that's not accurate, please just jump right in. Okay?
>
> [PLAINTIFF]: Okay.
>
> THE COURT: . . . . You've agreed to have this conversation without your lawyer being present; is that right?
>
> [PLAINTIFF]: Yes. Yes, your Honor.
>
> THE COURT: Okay. If at any time you change your mind, she's right outside, just let me know, we'll stop the music and you can go out and talk with her. Okay?
>
> [PLAINTIFF]: Okay, thank you.

July Hearing at 2:20–3:19.

Similarly, it is inaccurate to say—as Ms. Christensen did—that Judge Rakoff's questions at the July hearing had no connection to the case. The transcript shows that Judge Rakoff's questions focused on his doubts about Plaintiff's story, all of which were relevant to Plaintiff's claim. First, he questioned Plaintiff about her unusual adulthood adoption and adoptive parents, which is relevant to how any monetary award would be administered. *Id.* at 4:13–7:18. He then asked Plaintiff about her contact and relationship with Ghislaine Maxwell. *Id.* at 7:19–13:16. Next, Judge Rakoff asked Plaintiff about the frequency with which she saw Epstein in high

38

school, a point of significant contention in the March Hearing. *Id.* at 16:21–17:3. Judge Rakoff also asked Ms. Doe about whether she had formed any relationships with other Epstein survivors, based on Class Counsel's skepticism that a veritable Epstein survivor could be unknown to all others, and about her allegations of forced sex with other men. *Id.* at 19:4–10. And, among other topics, Judge Rakoff asked Ms. Doe about her belief that she had four children with Epstein, another point of significant contention. *Id.* at 24:14–25:6. Throughout the hearing, Judge Rakoff encouraged Plaintiff and expressed sympathy for the difficulties she had endured. *See, e.g.*, *id.* at 14:3–5 ("Well, there's nothing wrong with your intelligence. In fact, you did very well in school, if I remember correctly."); *id.* at 27:1–3 ("Just so the claimant understands, all of us, I feel, have a great deal of sympathy for you. You've had a very harsh life and our hearts go out to you."). Plaintiff also spoke at length, of her own volition, about wide-ranging topics that were often not responsive to any of Judge Rakoff's questions. *See, e.g.*, *id.* at 8–12, 17–19.

Ms. Christensen further misstated facts when she claimed in her letter that "it is completely false that Plaintiff said she was the mother of Epstein's children." Christensen Ltr. at 8. During the March JPMC hearing, Ms. Doe testified that the last time she saw Epstein was in 2010 for "[t]he birth of a little girl," whom Ms. Doe stated was fathered by Epstein. March Hearing at 54:23–55:8. The Court subsequently asked Ms. Doe: "And of those five [children you gave birth to], how many, is it your understanding, Jeffrey Epstein was the father of?" *Id.* at 56:25–57:1. In response, Ms. Doe stated: "Four, your Honor." *Id.* at 57:2. In the July hearing, Judge Rakoff again asked Ms. Doe about her children:

> THE COURT: Now again changing topics, you said that Mr. Epstein told you that some of your children were children he had fathered, yes?
>
> [PLAINTIFF]: Yes, your Honor.

39

THE COURT: How, if you remember, exactly how did he put that?

[PLAINTIFF]: Just that that was -- that he felt happy to hear that he had fathered these children . . . .

THE COURT: So if you were having relations with many men, what made him think this was his child or children?

[PLAINTIFF]: I'm not sure, your Honor. I just know that is what he had said.

July Hearing at 24:14–25:8. Ms. Christensen was present and actively objecting during the March Hearing, and she had access to a transcript following the July Hearing. The record demonstrates that Ms. Christensen lied to this Court about the substance of Ms. Doe's testimony by claiming that Plaintiff *never* said she was the mother of Epstein's children.

Defendant also argues that Ms. Christensen lied about Wigdor's reasons for amending the Complaint in this action. CTS Mot. at 8–9; *see also* ECF No. 324-1 ¶ 15. Previously, on October 1, 2024, Defendant suggested that "the proposed amended complaint . . . was in response to the matters submitted to (and potentially decided by) Judge Rakoff" in the JPMC Action. ECF No. 108 at 2. In response, Ms. Christensen denied that the decision to amend the Complaint had anything to do with the JPMC Action. *See* ECF No. 110 at 4. She called Defendant's theory a "conspiracy" that was "unfounded" and a continuation of Defendant's "pattern of setting forth outrageous and unsupported theories." *Id.*

The Court finds that Wigdor clearly amended its Complaint in this case to account for representations by Plaintiff and her former counsel in the JPMC Action. Therefore, the Court also finds that Ms. Christensen misled this Court by referring to Defendant's suggestion as a "conspiracy," particularly in light of Wigdor's one-sided access to the sealed JPMC proceedings. Three examples of narrow changes to the Complaint underscore the Court's conclusion. First, whether Ms. Doe was in fact trafficked to Epstein "most weekends" came under dispute in the

40

JPMC hearings, when Ms. Christensen and Ms. Doe both disclaimed that allegation. *See* June Conference at 31:17–32:5; July Hearing at 16:21–17:14. In the FAC, that phrase was narrowly excised. *See* Redlined FAC ¶ 56. Second, the FAC similarly removed the allegation that Plaintiff "was never again taken to NYC" after she was allegedly assaulted by Mr. Black, following Ms. Doe's JPMC testimony that she returned to Manhattan in 2010. *See id.* ¶ 100; March Hearing at 54:7–55:8. Third, after Class Counsel indicated that ███████████ was not in the country during the relevant time period, the FAC removed the name ████ from portions of the allegations. *See* Class Counsel Ltr. at 12; Redlined FAC ¶ 63.

It is clear that the JPMC hearings and filings motivated these amendments. Indeed, Judge Rakoff specifically asked Ms. Christensen about amending the Complaint in this case after its inaccuracies came to light. *See* June Conference at 32:6–16. Wigdor also proposed the FAC mere weeks after Judge Rakoff issued his "bottom-line" order denying Ms. Doe's JPMC claim. *See* ECF Nos. 91, 233-1. Consequently, the Court finds it reasonable to infer that Wigdor was motivated by the JPMC Action to amend its Complaint in this action and that Ms. Christensen's statements to the contrary were accordingly false.

### C. Ms. Christensen Directed Jane Doe to Destroy Her Twitter Account Without Preserving Potentially Relevant Communications

The Court finds that Ms. Christensen directed Plaintiff to delete her Twitter account, which likely contained relevant information to the instant case. As part of the JPMC Action, Ms. Christensen supplied the Claims Administrator with pertinent evidence. One of the documents she submitted included a description of Ms. Doe's former Twitter account and its relevance to her claim. *See* ECF No. 233-30 at 8. This document also included, among other things, a screenshot showing that Ms. Doe had been in contact with a public survivor of Jeffrey Epstein. *See id.* at 2, 10.

According to Ms. Christensen, Plaintiff created the Twitter account in 2022 to "use her voice as a survivor of #JeffreyEpstein to spread awareness about the unique risks that young #autistic girls and women like her face." *Id.* at 8.[6] Ms. Christensen went on to explain that, in May 2023, "[a]s soon as I heard about [Plaintiff] being on Twitter I had her cancel the account and pull it down." *Id*. Ms. Christensen did not instruct Plaintiff to save any items from the account, and Ms. Doe was not able to recover anything from the deleted account. *Id.* Consequently, Ms. Christensen only had access to information that Plaintiff had previously saved from the account—before the account was deleted. *Id.* Even in her Opposition to Defendant's CTS Motion, Ms. Christensen does not provide any further explanation for her conduct.

The portions of Ms. Doe's Twitter activity in the record demonstrate that she discussed matters relevant to this case, including Epstein and other figures referenced in the Complaint. Some of Ms. Doe's Twitter activity has been preserved and docketed in this action. *See* ECF Nos. 162-1 to 162-6, 233-31 to 233-33; ECF No. 75 at 6 ("[S]ome of Plaintiff's tweets are publicly available through the Internet Archive."). Even this highly incomplete record of Ms. Doe's Twitter activity references individuals at issue in this litigation. For example, Ms. Doe spoke positively on Twitter about people who her Complaint alleges trafficked her to Epstein and Black. *Compare, e.g.*, FAC ¶¶ 23–49 (discussing "Elizabeth") *with* ECF No. 233-31 (praising her cheer coach). She also discussed her alleged interactions with, and trafficking by, Epstein in public posts and in direct messages. *See* ECF Nos. 233-29, 233-33 to 233-34.

Although Wigdor and Christensen did not explain their conduct in the context of this sanctions motion, they have, in the past, mentioned that they are unaware of any posts or

---

[6] The actual origination date of the account is unclear, because several exhibits provided to this Court predate 2022. *See* ECF Nos. 233-31 to 233-32.

communications that Plaintiff made on Twitter about Leon Black. ECF No. 162 at 2. Nonetheless, Plaintiff's pleadings position Jeffrey Epstein as important to this case. Much of the Complaint and the FAC discusses how Plaintiff was repeatedly trafficked and abused by Epstein as a lead into the allegations against Black. *See, e.g.*, Compl. ¶¶ 1–4; FAC ¶¶ 4–9. The credibility of Ms. Doe's allegations against Epstein and the traffickers she alleges brought her to him thus bear on the credibility of her allegations against Black. The Court, therefore, finds that Plaintiff's deleted Twitter account contained evidence relevant to this action.

### D. Plaintiff's Journals, Which Are Featured in the FAC, Include Falsified Sonogram Photographs

The Court finds that portions of the journals Plaintiff used and referenced in this action and in the JPMC Action were falsified. After this case commenced, Plaintiff allegedly found personal journals from her adolescence and young adulthood that chronicled the abuse she experienced at the hands of Epstein, Black, and others. Ms. Christensen first learned about Plaintiff's 2012 journals a few months after the initial Complaint was filed. *See* Pl. Dec. ¶¶ 27–28; ECF No. 233-26. These were journals from Plaintiff's stay at a treatment center, when Plaintiff was in her mid-twenties. ECF No. 233-26. But, according to Plaintiff, as her adoptive father began cleaning out a storage unit afterward, he found four additional journals among Ms. Doe's things. *See* ECF No. 233-8 at 18 n.15 (discussing, in March 2024, the discovery of Plaintiff's other journals). These additional journals purportedly dated between 2001 and 2004, with one for each age between ages 16 and 19, and Plaintiff subsequently alerted Ms. Christensen to their existence. FAC ¶¶ 1–3; Pl. Dec. ¶ 27.

The FAC opens with excerpts from these journals in which Plaintiff describes Defendant's alleged assault. Plaintiff alleges she used the journals as a way to be able to document what she endured at a time when she "had almost no ability to speak out." *Id.* ¶ 1.

43

Quotations from the journals are woven throughout the FAC. *See id.* ¶¶ 2, 48, 68, 98–99.

Below is a table identifying each journal at issue:[7]

| Name | ECF No. | Alleged Creation Date | Plaintiff Age |
|---|---|---|---|
| Journal 1 | ECF No. 233-11 | 2001–2002 | 16 |
| Journal 2 | ECF No. 233-12 | 2002–2003 | 17 |
| Journal 3 | ECF No. 233-13 | 2003–2004 | 18 |
| Journal 4 | ECF No. 233-14 | 2004–2005 | 19 |
| Journal 5 | ECF Nos. 233-18 to 233-21 | 2012 | 26 or 27 |

Journals 1 through 4, alleged to be contemporaneous with Plaintiff's allegations, contain a collage of magazine clippings, headlines, poems, and handwritten entries. *See generally* ECF Nos. 233-11 to 233-14. The FAC references portions of Journal 1 where Plaintiff specifically identifies and describes Defendant and the alleged assault. *See, e.g.*, FAC ¶¶ 2–3. Journal 5 follows a different format and contains handwritten notes from other patients at the treatment center where Plaintiff lived at the time, together with written entries from Plaintiff herself. *See generally* ECF Nos. 233-18 to 233-21, 233-36 to 233-37.[8] As Ms. Doe explained to Judge Rakoff, she often wrote her journals in a "code." March Hearing at 7:22–8:6.

[7] The Court assigns the journals numbers based on their purported chronological order. These numbers differ from those assigned by the LaPorte Report. Moreover, the Court only considers the five journals examined and disputed in this action, although other journals may exist. *See* Pl. Dec. ¶ 30 (referencing seven journals, two of which were not retained by any court).

[8] The Court notes that ECF Nos. 233-18 to 233-21 (collectively, "Defendant's Exhibit 18") overlap significantly with ECF Nos. 233-35 to 233-37 (collectively, "Defendant's Exhibit 32"). Based on Ms. Christensen's testimony in the JPMC March Hearing, the Court understands Exhibit 18 to be the translated excerpts provided by Wigdor to Judge Rakoff in JPMC, whereas Exhibit 32 is the original copy of Ms. Doe's journal. The Court refers to all of these exhibits together as Plaintiff's 2012 journal, or "Journal 5."

44

The JPMC court-appointed expert and an expert hired by Defendant have both examined the journals. *See* LaPorte Report; ECF No. 226-2 ("Stewart Report"). Neither Plaintiff nor Wigdor include an expert report in their briefing. The JPMC expert report was inconclusive as to the authenticity of the journals because the expert, Gerald M. LaPorte, could not date the individual written entries. *See* LaPorte Report ¶ 27(b) (describing that the journals are mostly written in pencil, paint marker, and gel or rollerball pen—none of which can be dated). However, LaPorte found "limited support for the proposition that the [pen] journal entries were executed sometime in 2012" in Journal 5 and "no evidence that [any of the journals] were recently purchased and used to entirely fabricate an entire journal." LaPorte Report ¶ 27(a), (e). Indeed, he found that Journals 1 through 4 "have evidence of significant wear and tear, including bowed and torn covers, edge dismemberment, and discoloration," while Journal 5 exhibits "characteristics of wear and tear, including wrinkled pages and moderate deterioration." *Id.* ¶¶ 48–49.

Defendant's expert Larry F. Stewart, on the other hand, found that although "portions of the journals appear legitimate with respect to their respective approximate dates of creation, [] some of the material appears to have been added and manipulated." Stewart Report at 20. Stewart found that "the type of binding [used in the journals] can be easily opened allowing for pages to be removed or inserted," and that the journals both "contain indications [that] they have come into contact with liquid(s) and display accelerated aged appearances," visible through the "wavy edges" of many pages. *Id.* at 3–5. Although the intentional application of artificial aging agents, like heating or household chemicals, could produce this effect, so too could innocuous drink spills of coffee or tea. *Id.* The Stewart Report provides only one example evidencing this change in texture between pages. *See id.* at 5. Stewart also notes that Journal 5 is written "largely

45

in pencil," and that one of the only non-pencil pages has the top-right portion of the page cut out where Stewart believes a date or contact information was likely written. *Id.* at 17–19.

The Stewart Report conclusively supports that some of the sonogram images purporting to represent contemporaneous pregnancies in the journals were falsified and that all of the images were manipulated in some way. In 2006, Plaintiff, who was then around 21 years old, was pregnant with and gave birth to a child. ECF No. 232 ¶ 56; March Hearing at 58:5. The Stewart Report includes a legitimate sonogram from Plaintiff's 2006 pregnancy that he obtained from the declaration Defendant secured from Plaintiff's biological mother. *See* Stewart Report at 6. The Stewart Report concludes that the journals contain sonograms from Plaintiff's 2006 pregnancy that she has sought to pass off as sonograms from earlier pregnancies. *Id.* at 20.

The Report begins with an original reference sonogram, from Plaintiff's 2006 pregnancy, that is not in her journals:



ECF No. 232-1. The image indicates that it is from a 2006 pregnancy, which Plaintiff's

biological mother confirms, ECF No. 232 ¶ 56, and which Plaintiff, in Opposition to this Motion,

does not dispute. The sonogram also indicates that it was taken at the Association of Alexandria

Radiology, which had two locations in Virginia between 2001 and 2023. Stewart Report at 7

(citing https://web.archive.org/web/20010517211946/http://www.alexandriaradiology.com/;

https://web.archive.org/web/20030324150207/http://alexandriaradiology.com/;

https://web.archive.org/web/20031204160531/http://alexandriaradiology.com/html/sites.html).

Stewart found that none of the sonograms in the journals appeared in their full form. *Id.*

at 20. For example, the images in Journal 1 (Plaintiff at 16 years old) are devoid of any of the

identifying features (including patient name, date, location, fetus size, and gestational age) that

are included in her 2006 sonogram above. *See* Journal 1 at 31, 38.[9] Three ultrasound images

appear in Journal 2 (Plaintiff at 17 years old). *See* Journal 2 at 11, 22, 26.  Two of these images

are similarly devoid of identifying features, except for an apparent gestational age and size in the

second image. *See id.* at 22. The third image, however, includes identifying features that appear

to have been modified. *Id.* at 26. Namely, where the practice name should appear as it does in the

2006 ultrasound, Stewart observed "the use of opaquing fluid," as well as a cut-off edge. Stewart

Report at 11–12.



---

[9] One page of Journal 1 appears differently in the journal exhibit submitted to the Court as compared to the Stewart Report. In the version of Journal 1 presented to the Court, the page with the poem "Stopped Dead" on it only includes one sonogram image. *See* Journal 1 at 31. But in the Stewart Report, that same page has a second sonogram image at the top of the page. Stewart Report at 8. The Court does not consider the second sonogram image here.

Journal 2 at 26.

Turning to Journal 3 (Plaintiff at 18 years old), Stewart found that, upon peeling back a magazine cut-out, the sonogram image in the journal bore markings consistent with those on the 2006 sonogram. Stewart Report at 14; *see also* Journal 3 at 21. Taken together, the identifying markings suggest that the image is from the same Virginia practice—and potentially even the same appointment—as the 2006 sonogram. Below, the Court diagrams the similarities between the two images:



Journal 3 at 21; ECF No. 232-1; *see also* Stewart Report at 14. The images demonstrate that the partial markings on the bottom left side of the sonogram in Journal 3 are the same as those in the

2006 sonogram, and that the heading formatting appears to be the same in both images, including remnants of the same medical practice name and gestational age.

Stewart observes that the Journal 4 (Plaintiff at 19 years old) sonogram similarly omits complete patient and facility information. *See* Stewart Report at 15; ECF No. 233-14 at 17. However, the last three digits visible of the patient identification number, "53Q," match the last three digits of the patient identification number in Plaintiff's 2006 sonogram. Stewart Report at 16; Journal 4 at 17; ECF No. 232-1. Additionally, "Assoc of" is visible in the header, which is the same partial practice name as the 2006 sonogram. Journal 4 at 17.



*Id.* Similar to other sonograms, this sonogram also shows the use of a "dark opaquing fluid" to block out some of the patient identification number, which Stuart explains "is commonly used by photographers to mask out certain areas of a photographic negative." Stewart Report at 16. The Court thus infers that that the Journal 4 sonogram was likely taken at the same Virginia practice as the 2006 sonogram.

Finally, Stewart notes that sonograms in Journals 2 (Plaintiff at age 17) and 4 (Plaintiff at 19 years old) share the same name, date of birth, gestational age (down to the day), and font. *Id.* at 15–16. They also share the same header format. These similarities support an inference that the two sonograms were taken during the same appointment, even though they depict different images.

To summarize, none of the sonograms in Plaintiff's journals contain visible, complete dates, locations, or practice names denoting where the sonograms were taken, and several sonograms even omit Plaintiff's name. In several of the images, this information is cut off,

scratched out, or covered with an obscuring liquid. At least three of the sonogram photographs spread across three years of journals appear to have been taken in Virginia during Plaintiff's known 2006 pregnancy, despite Plaintiff's representation that these sonograms were taken between 2002 and 2005 in Palm Beach, Florida. *See* Journal 2 at 26; Journal 3 at 21; Journal 4 at 17; March Hearing at 29:4–30:9. For those three photos, the Court agrees with Stewart's conclusion and finds by clear and convincing evidence that these three sonograms "do not indicate pregnancies prior to the known 2006 pregnancy of the Plaintiff." Stewart Report at 20.

For the remainder of the sonograms, the Court finds clear evidence that the images were manipulated in a manner that renders them untraceable by date and location. Consequently, the Court cannot agree with Stewart that these sonograms are traceable to Plaintiff's 2006 pregnancy. *See* Stewart Report at 20. Rather, they seem to have been consciously manipulated to obscure their origins, and they appear in the context of other manifestly altered images. Accordingly, even though the Court finds reason to be suspicious of these sonograms' authenticity, it does not find clear and convincing evidence that the remaining ten sonograms are fraudulent.

Wigdor came to the same conclusion as the Court a month after Defendant filed the Stewart Report. In a letter to Judge Rakoff and this Court, Wigdor determined that it "must, as a matter of ethics . . . disavow this evidence," citing the three sonograms the Court has attributed to Plaintiff's 2006 pregnancy. ECF No. 259 at 1. In her briefing, Plaintiff acknowledges that three sonograms in her journals do not represent pregnancies from the time period of the journals. Instead, she contends they were "replaced," and "speculate[s]" without proof that her biological family members altered the images. Pl. Dec. ¶ 31.[10] Plaintiff maintains she did not

---

[10] Plaintiff's biological mother denies tampering with Plaintiff's journals. ECF No. 325 ¶¶ 7–11.

alter any of the images herself. *Id.* The Court does not find Plaintiff's explanation credible, and in light of her admission that the sonograms are inaccurate, the Court finds that the journals contain three falsified sonograms.

Defendant also identifies signs of more widespread fabrication in the journals. For example, Defendant notes that Plaintiff wrote her Journal 5 entries about being trafficked only in pencil—an undatable instrument—opposite letters from fellow patients and counselors that were almost exclusively written in ink. CTS Motion at 22–23; *see also* LaPorte Report ¶ 56. He also observes that Plaintiff's entries commented on her use of pencil. *See* ECF No. 233-35 at 4 ("Ugh, I hate writing in pencil but that was all I could find and now it will be like this forever for consistancy [sic]. Maybe I can work on that and try to switch to pen, but I doubt it."); *id.* at 30 ("But I still cannot change to pen even though this pencil is driving me insane.").

The Court, however, declines to reach any conclusions about whether this evidence demonstrates that the journals were, as a whole, fabricated. This case is largely pre-discovery, and Plaintiff was newly pro se during the briefing of this Motion. Neither expert report produced to the Court determined that Plaintiff's journals were not contemporaneous based on her handwriting—and the only neutral report before this Court found "no evidence that [any of the journals] were recently purchased and used to entirely fabricate an entire journal." LaPorte Report ¶ 27(a)–(b). Defendant's observations are better assessed at a later date, on a fuller record, before the finder of fact. Therefore, based on the record before it today, the Court cannot conclude that the journals are wholesale fabrications—even though it concludes that three sonograms were falsified.

## III.    Conclusions of Law

Defendant encourages the Court to issue terminal sanctions and provides several grounds to support his argument, including that: Wigdor engaged in misconduct in bringing this action without first conducting a reasonable investigation; Ms. Christensen improperly delayed amending the Complaint in this action; Ms. Christensen repeatedly lied to the Court; Plaintiff's journals are fraudulent and demonstrate that Plaintiff is lying about ever having met Epstein; and Plaintiff, at Ms. Christensen's direction, spoliated critical evidence in this case—namely, her Twitter account.

As discussed above, upon finding that it may impose sanctions, the Court retains ultimate discretion over whether and in what form to impose those sanctions. Thus, the Court first analyzes the misconduct alleged to have been committed by Wigdor and Plaintiff, determines appropriate, lesser sanctions for this conduct, and then concludes that terminal sanctions are not warranted here.

### A.   There Is No Evidence That Wigdor Failed to Adequately Investigate the Complaint

Defendant does not demonstrate that Wigdor failed to conduct an adequate investigation before filing the Complaint in this action. Rule 11 required Wigdor to make a "reasonable inquiry" into the factual allegations and to have either evidentiary support for those allegations or a reasonable belief that evidentiary support would appear through further investigation or discovery. *AJ Energy*, 829 Fed. App'x at 535; Fed. R. Civ. P. 11(b)(3). Ms. Christensen attests that she undertook "the necessary diligence . . . not to knowingly advance a case which was frivolous and/or was based upon fraudulent information." ECF No. 272 ¶ 25.

Defendant's cited reasons do not controvert that representation. First, as stated above, the Court finds that Wigdor did review the Complaint with Plaintiff. *See supra* Section II.A, *Motion*

52

*for Case-Terminating Sanctions*. Second, Wigdor's history of using "colorful" language in complaints, CTS Motion at 28, does not bear on any investigation that Wigdor may or may not have conducted here. Third, Defendant appears to fault Wigdor for not consulting with Class Counsel before filing a case on behalf of an alleged Epstein victim, *see id.* at 29—but no rule required Wigdor to do so. That Class Counsel shared reasons to doubt Ms. Doe's account of meeting Epstein and Maxwell in May 2024, *see* Class Counsel Ltr., after Wigdor filed this action, does not bear on the due diligence Wigdor undertook nearly a year earlier in bringing this case. Wigdor amended the Complaint after the JPMC determination, responsive in part to Class Counsel's examination of Plaintiff.

Wigdor was also entitled to rely on what Plaintiff told them in bringing this case. *See Goldman v. Barrett*, 825 F. App'x 35, 38 (2d Cir. 2020) (summary order) (citing *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329–30 (2d Cir. 1995)) ("Attorneys may, when reasonable, rely on what their clients tell them to support a claim."). The cases that Defendant cites, which find that the plaintiffs conducted inadequate investigations before filing their complaints, are readily distinguishable from this one. In *Goldman v. Barrett*, for example, the court found that counsel made objectively unreasonable allegations when he relied on his client's speculation—on matters about which the client did not claim any actual knowledge—to assert that those allegations "likely" took place. *See* 825 Fed. App'x at 38. Wigdor's reliance on Plaintiff's representations are not analogous. Plaintiff represented that these things happened to her, and her attorneys believed her. It appears to the Court that Wigdor omitted allegations that required the kinds of inferential leaps admonished in *Goldman*. For example, the Complaint does not reference Plaintiff's claims about having Epstein's children. That is likely because Ms.

Christensen believes, as she explained, that Plaintiff was told that information and not that it is true.

Defendant also relies on *Pitre v. City of New York*, 731 F. Supp. 3d 661 (S.D.N.Y. 2024). In that case, utilizing its inherent powers, the court criticized the plaintiff's lack of supporting evidence in his complaint—after full discovery was exchanged and a trial had taken place. *Id.* at 668–69. Here, the Court does not treat the record before it as a trial record, in part because Plaintiff has not had any meaningful opportunity to engage in discovery. *See* Wigdor Opp. at 16 ("Black has not produced a single page in discovery and instead repeatedly moved to stay discovery."). Plaintiff told Wigdor directly about experiences she alleged, supported by her adoptive mother's statements, and produced records supporting a history of trauma and sexual abuse. Defendant has therefore failed to show that Wigdor inadequately investigated Plaintiff's claims before filing the Complaint.

To the extent Defendant alleges that Wigdor failed to investigate as it prepared the FAC, the Court similarly declines to find a sanctionable offense. Defendant argues that Wigdor "should have been immediately suspicious of the journals" when they were suddenly "discovered," and that if Wigdor had not previously been on notice, they were constructively put on notice by Class Counsel's May 10, 2024 letter in JPMC. CTS Motion at 24. Despite these warnings, Defendant argues, Wigdor relied inappropriately on Plaintiff's journals in the FAC. *Id.* The Court disagrees. When Wigdor moved to amend the Complaint in the summer of 2024, they only had a neutral expert report that did not find any evidence of fraud in the journals. *See* LaPorte Report. Although Ms. Doe's story has evolved since the Complaint was filed, her journals appeared reasonably consistent with her account at the time they were offered. Accordingly, the Court does

54

not find any failure to investigate that is sanctionable under Rule 11 or the Court's inherent powers.

## B. Wigdor's Delay in Amending the Complaint Was Not Unreasonable

Rule 11 imposes obligations on attorneys to no longer affirm a position in pleadings or motions if they learn it no longer has merit, and to "correct or withdraw documents that are found to lack support." *Robinson v. De Niro*, 614 F. Supp. 3d 73, 75 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19-CV-9156 (LJL) (KHP), 2022 WL 7091518 (S.D.N.Y. Oct. 12, 2022) (citing *Galin v. Hamada*, 753 F. App'x 3, 8 (2d Cir. 2018)).

The Court determined, *supra*, that Wigdor filed its Motion to Amend the Complaint nearly nine months after Ms. Christensen learned that allegations in the Complaint were false or misleading. During that disputed period, however, Wigdor filed few items in this case. Wigdor only submitted briefing regarding Defendant's Motion to Stay Discovery, ECF Nos. 79–81, 86, and otherwise notified the Court to expect an amended complaint, ECF Nos. 87–88. Wigdor, therefore, did not reference or reassert any of the false allegations during that time. Furthermore, although several months elapsed before Wigdor ultimately amended the Complaint, that delay was not unreasonable in light of the circumstances of this case. In particular, this case involves highly sensitive allegations that occurred long ago, Wigdor was navigating an unusual review process with its client, and the case was largely stayed pending a decision on Defendant's Motion to Dismiss. As such, Wigdor's several-month delay in ensuring an accurately amended complaint did not violate Rule 11, and the Court imposes no sanction related to this conduct.

The Court does, however, take this opportunity to admonish Ms. Christensen for her comments to Judge Rakoff about the accuracy of complaints she has filed in the past. Ms. Christensen stated: "Your Honor, if every complaint that I have ever drafted as a plaintiff's

counsel had correctly alleged things, that unfortunately is not the case." June Conference at 31:17–19. Her comments are indicative of someone who does not take seriously their Rule 11 obligations. Of course, when representing a client, it is possible that a client's memory of long-ago events might change over time or that factual inaccuracies might inadvertently be included in a complaint. Nonetheless, it is the duty of counsel to ensure that a complaint is consistent with their client's allegations, and, at a minimum, counsel must take that obligation seriously. Ms. Christensen is admonished to do so in the future.

### C. Sanctions Are Warranted for the Lies That Wigdor, Through Ms. Christensen, Told the Court and Opposing Counsel

Wigdor and Ms. Christensen, in her individual capacity, warrant sanctions for lying to the Court about the JPMC proceedings and their reasons for amending the Complaint. As the Court found above, Ms. Christensen lied to this Court in her factual representations of both Judge Rakoff's conduct in the JPMC proceedings and Ms. Doe's testimony. The Court also found that Ms. Christensen lied when she represented that her reasons for amending this Complaint were wholly unrelated to the JPMC Action. These actions are sanctionable under Rule 11 and the Court's inherent powers. Here, the Court attributes many of these actions to Ms. Christensen individually, because the letters that the Court has found to contain lies were signed by her alone. *See* ECF No. 110 at 4; Christensen Ltr. at 9. The Court further observes that Wigdor's response to the instant motion, which included a declaration from Ms. Christensen, failed to counter Defendant's arguments that she misled the Court.

Rule 11 sanctions are warranted here because Ms. Christensen violated its requirement that, in any pleading, motion, or other paper to the Court, "factual contentions have evidentiary support" and "denials of factual contentions are warranted on the evidence." Fed. R. Civ. P. 11(b)(3)–(4). Although the Court is inclined to hold only Ms. Christensen responsible for these

lies, the Federal Rules require otherwise. When a court finds that Rule 11 has been violated and the procedural requirements have been met, Rule 11 instructs that, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1). Because the Court does not find any exceptional circumstances here—nor did the parties raise any—Ms. Christensen and Wigdor are held jointly responsible for Ms. Christensen's lies under the Rule 11 analysis.

Sanctions under the Court's inherent power are also warranted under the test laid out by the Second Circuit. *See Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). "[I]nherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Id.*

Here, Ms. Christensen's lies were without color for the reasons outlined above. *See Sierra Club*, 776 F.2d at 390 (explaining that a claim is "'entirely without color' when it lacks any legal or factual basis" (quoting *Nemeroff*, 620 F.2d at 348)). Similarly, the Court finds that Ms. Christensen acted in bad faith. She mischaracterized Judge Rakoff's actions in JPMC while knowing that she had consented to the procedures he proposed. And she lied about Plaintiff's clear, and often repeated, testimony—in an apparent attempt to fool this Court or embarrass Defendant's counsel. Because bad faith can be inferred where actions are "so completely without merit," the Court finds it present here. *Schlaifer*, 194 F.3d at 336; *see also Macolor v. Libiran*, No. 14-CV-4555 (JMF), 2015 WL 1267337, at *4 (S.D.N.Y. Mar. 18, 2015) ("Whatever the appropriate definition [of bad faith], making a false statement with the intent to mislead the Court certainly meets that definition."). Accordingly, the Court finds good cause to sanction Ms. Christensen and Wigdor because of this conduct.

### D. Plaintiff, at Ms. Christensen's Direction, Spoliated Evidence

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (internal quotation marks omitted). Rule 37(e) prescribes the measures that a court can take to address spoliation of electronically stored information ("ESI"), depending on whether the party who spoliated the evidence simply failed to take reasonable steps to preserve it, Fed. R. Civ. P. 37(e)(1), or if they acted with an intent to deprive an opposing party of evidence, Fed. R. Civ. P. 37(e)(2). *See Hoffer v. Tellone*, 128 F.4th 433, 437–38 (2d Cir. 2025). If a party failed to take reasonable steps to preserve ESI, then a court is limited to imposing a measure against the destroying party that is no greater than necessary to cure the prejudice. *See PDV USA, Inc. v. Interamerican Consulting Inc.*, No. 20-CV-3699 (JGK) (RWL), 2026 WL 203036, *7 (S.D.N.Y. Jan. 27, 2026). If, however, the party destroyed ESI with intent to deprive, then a court may impose severe measures, such as issuing mandatory adverse inference instructions that the lost information would have been unfavorable to the destroying party or entering default judgment against the destroying party. *Id.* In sum, in applying Rule 37(e), courts must decide: (1) whether a party failed to take reasonable steps to preserve ESI that should have been preserved in the anticipation or course of litigation; (2) whether another party has been prejudiced by the loss of information; and (3) whether the destroying party acted with an intent to deprive. *Id.*; Fed. R. Civ. P. 37(e).

Here, Plaintiff had a clear obligation to preserve her Twitter account when she was directed to, and in fact did, delete it in May 2023. The duty to preserve arises when a party reasonably anticipates that evidence may be relevant to current or future litigation. *Fujitsu Ltd. v.*

*Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Courts are directed to "consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Plaintiff retained Wigdor in March 2023 to represent her in her civil rape cases, after which point, in May 2023, two months before filing the instant case, Plaintiff deleted her Twitter account. ECF No. 233-4 at 21; ECF No. 233-30 at 8. Neither Plaintiff nor Wigdor contests that Plaintiff was under a duty to preserve relevant documents at that point.

The communications and posts Plaintiff made on Twitter are also relevant to this case. Even assuming that Plaintiff did not discuss Black on her Twitter account, there is no dispute that Plaintiff discussed Epstein. *See, e.g.*, ECF No. 233-33. Indeed, as discussed above, Ms. Christensen acknowledged that was the main reason Plaintiff started the account. *See supra* Section II.C, *Motion for Case-Terminating Sanctions*; ECF No. 233-30 at 8. Plaintiff consistently alleges that Epstein trafficked her to Black; her relationship with Epstein is thus relevant to this case. Plaintiff also discussed and spoke positively on Twitter about her alleged trafficker, "Elizabeth." *See* ECF No. 233-31. What Plaintiff said about her relationships with these individuals before and after filing suit is certainly relevant to her claims here. Defendant likely could have used any discrepancies to cast doubt on the truthfulness of her account. Therefore, Plaintiff should have preserved her Twitter account.

It is also clear that the deletion of Plaintiff's Twitter account prejudices Defendant. He has lost one part of a record, with timelines, that he could have used to assess and question Ms. Doe's credibility. Although methods exist to retrieve many of Plaintiff's public posts, such tools do not fully compensate for the deletion of her posts. *See, e.g.*, *Leidig v. Buzzfeed, Inc.,* No. 16-

CV-542 (VM) (GWG), 2017 WL 6512353, at *13 (S.D.N.Y. Dec. 19, 2017) (finding that a website's presence on the Wayback Machine does not mitigate prejudice for its deletion). Further, it appears that Plaintiff's private messages are deleted forever. Thus, Defendant can only recover private messages to the extent that he discovers who Ms. Doe was messaging with and receives their records.

Plaintiff, through Ms. Christensen, failed to take reasonable steps to preserve her account. Unfortunately, the deletion of Plaintiff's Twitter account appears to be entirely attributable to Ms. Christensen's conduct, *see* ECF No. 233-30 at 8—even though Ms. Christensen is an experienced attorney and law firm partner who knew better than to instruct a client to destroy evidence without preserving it. Ms. Christensen never responded to the spoliation allegations in Wigdor's Opposition. The record indicates that concern for Plaintiff's safety motivated Ms. Christensen, at least in part. *See id.* Still, Ms. Christensen knew or should have known that the account could have been protected from online strangers without deleting it entirely, or that the account could have been deleted while preserving its contents. Ms. Christensen chose neither acceptable option. Without any other word on this topic from Ms. Christensen, it is clear that she, and therefore Plaintiff, failed to take reasonable steps to preserve this evidence.

Nevertheless, the record does not indicate that Ms. Christensen or Plaintiff deleted the account with intent to deprive Defendant of evidence. "[T]he intent to deprive standard is both stringent and specific, and contemplates not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Hoffer*, 128 F.4th at 440 (cleaned up). In *PDV USA, Inc. v. Interamerican Consulting*, for example, the court found that "selective deletion, secrecy, shifting explanations, contradictory testimony, and obfuscation and obstruction" by the sanctioned party demonstrated an intent to defraud. 2026 WL 203036, at *17.

60

By contrast, in *Leidig v. Buzzfeed,* the court found that although the plaintiffs intentionally deleted relevant emails and took down websites with news stories central to the case, those actions did not demonstrate an intent to deprive the defendant of that evidence in litigation. 2017 WL 6512353, at \*11. Instead, the court credited an alternate explanation that the plaintiffs deleted emails "intentionally, to create more space" and "unintentionally as a result of corruption in those files." *Id.* That the plaintiffs disabled a website relevant to the parties' dispute also did not demonstrate intent to deprive. *See id.* at \*5, \*9. Without more, the court found, this conduct amounted to an "unreasonable" and "negligent" failure to preserve evidence, not an intent to deprive the defendant of evidence. *Id.* at \*12.

Here, Defendant similarly has not demonstrated that Ms. Christensen or Plaintiff possessed the hallmarks of intent to deprive. Ms. Christensen admitted openly in a memorandum to the JPMC Claims Administrator that she directed Plaintiff to delete her Twitter account. ECF No. 233-30 at 8. Her explanation for this action has not changed, and she has not attempted to shift blame for the deletion onto Plaintiff. Ms. Christensen also did not selectively delete Twitter items that would have been particularly damaging to Plaintiff's claim. *Cf. Leidig*, 2017 WL 6512353 at \*11 (distinguishing from a case finding intent to deprive where selectively deleted emails "sought to 'direct the exact contents of [a] witness statement.'" (quoting *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 581 (S.D.N.Y. 2017)). And the Court credits Ms. Christensen's explanation that she sought to protect Plaintiff's safety as forming at least part of her motivation to instruct Plaintiff to delete the account.

Ultimately, as in *Buzzfeed*, the evidence certainly suggests that Ms. Christensen acted unreasonably and negligently. But the Court does not find that Plaintiff's Twitter account was

61

deleted with an intent to deprive Defendant of its use. The Court will therefore issue a remedial measure to cure the prejudice Defendant faces.

### E. Plaintiff's Falsification of Evidence Warrants Sanctions

Under its inherent powers, the Court concludes that sanctions are warranted against Plaintiff for the falsified sonograms in several of her journals. The Stewart Report, combined with the Court's own evaluation, determines by clear and convincing evidence that Plaintiff's journals contain at least three falsified sonograms. *See supra* Section II.D, *Motion for Case-Terminating Sanctions*. The Court attributes knowledge of their falsity to Plaintiff and, as discussed above, does not credit Plaintiff's speculation that her biological mother may have been responsible for the falsification. Plaintiff presented the journals to her counsel, and the Court holds her responsible for their contents. The three falsified sonograms were physically altered with scratches, opaquing fluid, and strategic covering of relevant information. These alterations manifest a clear intent to mislead about what the sonograms represent. Accordingly, the presentation of Plaintiff's falsified sonograms was "entirely without color" and done in clear bad faith, permitting the Court to exercise its inherent powers. *See Eisemann*, 204 F.3d at 396; *Sierra Club*, 776 F.2d at 390.

### F. The Court Levies Appropriate Sanctions Against Wigdor, Ms. Christensen, and Plaintiff

Based on the findings above, the Court: (1) sanctions Ms. Christensen and Wigdor for lying to this Court under Rule 11 and the Court's inherent powers; (2) issues remedial measures in light of the spoliation of Plaintiff's Twitter account under Rule 37(e)(1); and (3) sanctions Plaintiff for the falsified sonograms in her journal pursuant to the Court's inherent powers. "Sanctions should be no more severe than reasonably necessary to deter repetition of the misconduct or comparable conduct by similarly situated persons." *Usherson v. Bandshell Artist*

*Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 3483661, at \*18 (S.D.N.Y. June 26, 2020), *aff'd in part sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 858 F. App'x 457 (2d Cir. 2021), and *aff'd sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021) (cleaned up).

The Court imposes the following sanctions against Wigdor and Ms. Christensen in light of the findings above. First, Ms. Christensen must file this Opinion and Order in any new or ongoing case in federal court within the Second Circuit in which she is counsel of record, from the date of this Order's publication until one year from today. And, for five years from the date of publication, Ms. Christensen is directed to file this Opinion and Order in any federal court within the Second Circuit in which a sanctions motion is filed against her, her employer, or her client, and she is counsel of record. The Court finds it appropriate to levy this sanction against Ms. Christensen because only her signature appears on the letters containing lies, and there is no indication that her co-counsel at Wigdor knew about or participated in those lies. It is similarly only Ms. Christensen's conduct that traces to the deletion of Plaintiff's Twitter account. The Second Circuit has upheld similar non-monetary sanctions. *See, e.g.*, *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021) (requiring a sanctioned attorney and firm to serve a copy of the district court's order on all clients, to file the order in any pending cases nationwide, and to file a copy of the order in any new cases filed in the next year).

Second, the Court holds Wigdor and Ms. Christensen responsible for Defendant's reasonable attorneys' fees incurred between January 15, 2025, and August 22, 2025, that are related to the cost of bringing the instant motion. This seven-month period covers the dates between which the Court received notice that Defendant planned to file a motion for case-terminating sanctions and the date of Defendant's Reply. *See* ECF Nos. 198, 326. The Court finds attorneys' fees warranted because of Wigdor's objectively unreasonable conduct in this

63

case, including lying to the Court and destroying evidence. *See Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000) ("[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness." (citation omitted)); *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 60 (S.D.N.Y. 2020) ("In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." (citations omitted)); *see also, e.g.*, *Macolor*, 2015 WL 1267337, at *4 (imposing escalating fines for lying to the court because, "[w]hatever the appropriate definition, making a false statement with the intent to mislead the Court certainly meets that definition" of subjective bad faith required by courts in the Second Circuit for *sua sponte* Rule 11 sanctions).

The Court also imposes the following measures against Plaintiff. First, in light of the destruction of her Twitter account, at any trial in this action Defendant will be permitted to present evidence about the loss of Plaintiff's Twitter account and the likely relevance of its contents. The jury will be instructed that they can consider this evidence, along with all other evidence, in rendering a verdict in this case. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 498 (S.D.N.Y. 2022) (holding that "more serious" sanctions under Rule 37(e)(1) may include "preclusion of evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, and instructions to the jury as to how to consider such evidence." (cleaned up)); Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Defendant will also be permitted to use at trial and on summary judgment any relevant Twitter posts he was able to recover from Plaintiff's account.

Second, under its inherent power, the Court precludes Plaintiff from utilizing the journals containing falsified sonograms to support her case. In other words, Plaintiff will not be permitted

to utilize Journal 2, Journal 3, or Journal 4, covering ages 17 to 19, at trial, summary judgment, or otherwise, in prosecuting this case. The Court will also instruct the jury that the Court found that portions of these journals were falsified by Plaintiff.

### G.  The Court Declines to Impose Case-Terminating Sanctions

While the Court finds these sanctions necessary to address the array of misconduct committed by Plaintiff and Wigdor, the Court finds it unnecessary to impose case-terminating sanctions at this juncture. "Because a sanction that has the effect of ending the case and granting judgment to one of the parties is such a harsh remedy, it should be imposed only in the most extreme of circumstances." *Flycatcher Corp. v. Affable Ave. LLC*, No. 24-CV-9429 (KPF), 2026 WL 306683, at *11 (S.D.N.Y. Feb. 5, 2026) (internal quotations omitted). These circumstances include when allowing a case to continue to trial "would be a futile waste of judicial resources" or when lesser sanctions "would be insufficient to remedy the impact of [the sanctioned party's] misconduct or to deter future misconduct." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 141–42 (2d Cir. 2023). The Second Circuit has made clear that terminal sanctions "require[] a district court to at least consider lesser remedial measures before imposing that sanction." *Shepherd v. Annucci*, 921 F.3d 89, 97–98 (2d Cir. 2019) (collecting cases).

Here, Plaintiff and Wigdor's conduct, while extremely troubling, does not warrant the extreme measure of terminal sanctions. The lesser sanctions levied against Wigdor and Ms. Christensen, which include a significant monetary penalty and a requirement to notify future courts of this Opinion and Order, suffice to deter future misconduct. Ms. Christensen's lies were contained to relatively few filings and, to the Court's knowledge, she has not previously been sanctioned. Because these lies were quickly identified, they did not prejudice Defendant on the merits of this dispute. Furthermore, because the Court does not find that Ms. Christensen

65

directed Plaintiff to delete her Twitter account with the intent to deprive Defendant of the evidence in litigation, terminal sanctions are not available to the Court under Rule 37(e). Plaintiff's conduct falsifying sonogram images can also be remedied by precluding that evidence at trial.

The misconduct found here also pertains almost exclusively to Plaintiff's alleged abuse by Epstein. Although Plaintiff's relationship with Epstein is certainly relevant for the reasons described herein, the crux of this action is whether Defendant Leon Black raped and assaulted Plaintiff. None of the lies and fabrications substantively bear on this central issue. *See Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188 (JMF), 2022 WL 3646205, at *2 (S.D.N.Y. Aug. 24, 2022) ("The document is far from 'the linchpin' of [the plaintiff's] case."). This fact distinguishes this case from several of those where courts have ordered case-terminating sanctions. *See, e.g.*, *Chalfin v. Go Big Solar, LLC*, No. 24-CV-4768 (KPF), 2025 WL 2022012, at *22–23 (S.D.N.Y. July 17, 2025) (involving a pro se plaintiff who fabricated a contract provision between the parties that was the basis for his claims); *Network Data Rooms, LLC v. Saulrealism LLC*, No. 22-3226, 2023 WL 7103280 (2d Cir. 2023) (upholding the dismissal of an action where a witness for a party falsified evidence that was "integral to [the plaintiff's] theory of the case"); *Shangold v. Walt Disney Co.*, No. 3-CV-9522 (WHP), 2006 WL 71672, at *5 (S.D.N.Y. Jan. 12, 2006), *aff'd*, 275 F. App'x 72 (2d Cir. 2008) (finding "tainted evidence at the heart of their dispute"); *Lawrence v. City of New York*, No. 15-CV-8947 (WHP), 2018 WL 3611963, at *6 (S.D.N.Y. July 27, 2018) (finding that the conduct of a pro se plaintiff who staged 67 photographs alleged to depict the aftermath of the incident at issue "goes to the heart of the case . . . making it apparent that defendants can rely only on fraudulent or defective records"); *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 462 (S.D.N.Y.

2002) (finding case-terminating sanctions where the plaintiff engaged in "dishonest behavior, which pervades every aspect of this case"); *cf. Rybner v. Cannon Design, Inc.*, No. 95-CV-279 (SS), 1996 WL 470668, at *4 (S.D.N.Y. Aug. 20, 1996) ("Despite the egregious nature of [the plaintiff's] conduct, I find it does not warrant dismissal of the Complaint because although the issue of [the plaintiff's] credibility is important, the falsehoods at issue are not central to the claim in dispute and [the plaintiff's] correction of his misstatements was not unduly delayed."). Although the FAC places Plaintiff's journals at issue in this case, the truth of her underlying allegations does not rely on sonograms purporting to depict pregnancies with Epstein. The Court also did not find any falsified sonograms in the journal she cites in the FAC that specifically references Defendant.

Furthermore, many of the cases where courts have granted case-terminating sanctions involve a lengthy pattern of misconduct by one party directed at opposing counsel and the Court. *See, e.g.*, *Ime Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2026 WL 350827, at *14 (E.D.N.Y. Feb. 9, 2026) (describing a lengthy pattern of "obfuscation, deception, concealment, and defiance by Defendants" warranting dismissal); *cf. Duka v. All. Tri-State Constr., Inc.*, No. 20-CV-6648 (ER), 2021 WL 4461019, at *5 (S.D.N.Y. Sept. 29, 2021) (rejecting case-terminating sanctions where the plaintiff's alleged conduct of soliciting false testimony was an isolated incident and "not part of a pattern, scheme, or prolonged campaign of misconduct"). Here, Plaintiff never presented the falsified sonograms, or even the relevant journals, to this Court. And the Court never relied on them or on any of Ms. Christensen's lies to reach any conclusions in this action.

Lastly, in most cases where terminal sanctions have been granted, the parties have engaged in significant discovery or other fact finding. *See, e.g.*, *DAG Jewish Directories, Inc. v.*

67

*Y & R Media, LLC*, No. 9-CV-7802 (RJH), 2010 WL 3219292, at *1 (S.D.N.Y. Aug. 12, 2010) (awarding dismissal sanctions after expedited discovery, supplemental submissions, and an evidentiary hearing); *Shangold*, 2006 WL 71672, at *1–2 (awarding dismissal sanctions after at least four depositions); *McMunn*, 191 F. Supp. 2d at 449 (awarding dismissal sanctions after interrogatories, "extensive depositions," and documentary discovery); *cf. Passlogix*, 708 F. Supp. 2d at 385, 392 (declining terminal sanctions after a five-day evidentiary hearing). Here, other than the investigation that Defendant has conducted, relatively little discovery has taken place, and neither side requested an evidentiary hearing with respect to these issues. Also, it is unrefuted that "Black has not produced a single page in discovery," and Plaintiff has not had a chance to depose Defendant or any other witnesses. Wigdor Opp. at 16.

For these reasons, the Court finds that case-terminating sanctions are not warranted at this juncture.

## REQUESTS TO DE-ANONYMIZE AND UNSEAL

The Court denies Defendant's renewed request to de-anonymize Plaintiff in this action but grants his request to unseal much of the record. The Court first reviews the applicable legal standards before applying them to the instant case.

### I.    Legal Standard

The Federal Rules of Civil Procedure require that the "title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). This rule "serves the vital purpose of facilitating public scrutiny of judicial proceedings." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188 (2d Cir. 2008). However, this rule is not absolute. *See id.* at 189 ("Courts have nevertheless 'carved out a limited number of exceptions to the general requirement of disclosure [of the names of

parties], which permit plaintiffs to proceed anonymously.'" (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 685 (11th Cir. 2001))).

The Second Circuit has held that, "when determining whether a plaintiff may be allowed to maintain an action under a pseudonym, the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant." *Sealed Plaintiff*, 537 F.3d at 189. The Second Circuit has further laid out a non-exhaustive list of factors that courts should consider when balancing these interests:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the . . . party seeking to proceed anonymously or even more critically, to innocent non-parties; (3) whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity; (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of their age; (5) whether the suit is challenging the actions of the government or that of private parties; (6) whether the defendant is prejudiced by allowing the plaintiff to press their claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation and whether any prejudice can be mitigated by the district court; (7) whether the plaintiff's identity has thus far been kept confidential; (8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose their identity; (9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities; and (10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff.

*Id.* at 190 (cleaned up). Courts are "not required to list each of the factors or use any particular formulation as long as it is clear that the court balanced the interests at stake in reaching its conclusion." *Id.* at 191 n.4.

With respect to sealing, "[t]he common law right of public access to judicial documents is firmly rooted in our nation's history." *Stafford v. Int'l Bus. Machines Corp.,* 78 F.4th 62, 69 (2d

69

Cir. 2023) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006)). "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Id.* (quoting *Lugosch*, 435 F.3d at 119). "[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to [e]nsure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *See Lugosch*, 435 F.3d at 119–20. First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id.* at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id.* Third, a court must enumerate and balance "competing considerations" against the weight of the presumption of access. *Id.* at 120.

In addition to the common law right of access, there is also a qualified First Amendment right to access judicial documents. *Id.* Under the First Amendment "experience and logic" test, the Court must consider whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Id.* (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004)). If a First Amendment right of access applies, documents may only be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve

70

higher values and is narrowly tailored to serve that interest." *Id.* (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

## II.      Discussion

This case has changed drastically since the Court last considered Plaintiff's anonymity and the sealing of various materials on the docket. The allegations in this case have come under more intense public scrutiny, and the Court has now found that Plaintiff and her former attorneys made vital misrepresentations to the Court. Defendant argues that the prejudice he faces in being unable to fully defend himself in the media requires revealing Plaintiff's identity and unsealing the docket. ECF No. 351. Ms. Doe argues that she would face retaliatory physical or mental harm were her identity to be disclosed, citing unsolicited messages to her litigation email account from incarcerated men who she fears. ECF No. 277 at 28; *see also* ECF No. 355-2 at 2–3. She also argues that the disclosures she provided in the JPMC Action "were made under explicit assurances of confidentiality," and that removing that protection after the fact "would violate the very principle of trust upon which survivor participation in legal processes depends." ECF No. 277 at 29.

The Court agrees that Plaintiff's anonymity should be maintained at this time. The *Sealed Plaintiff* factors continue to weigh in her favor because of the highly sensitive nature of the matters discussed in filings before this Court and in the JPMC Action, and because of Plaintiff's distinct vulnerabilities. *See* ECF No. 16 (describing the Court's reasoning for granting anonymity). It is also notable that all plaintiffs and claimants in the JMPC Action are anonymous.

Defendant claims he is prejudiced in his ability to obtain discovery in light of Plaintiff's anonymity. *See* Oral Argument of Nov. 7, 2024, at 10:13–11:24. However, for reasons the Court

71

explains below, *see Conclusion*, the Court continues the stay of discovery in this case, undermining any prejudice to Defendant. As such, Plaintiff shall remain anonymous in this action, and any information tending to reveal her identity (such as her name, current and former addresses, schools she attended, names of family members and adoptive parents, and social media handles) shall continue to be redacted on the public docket. Plaintiff's medical records, medical diagnoses (other than those previously made public in this action), and other information tending to reveal non-public, medical diagnoses or treatment shall also be redacted. Finally, the parties shall redact the names of any third parties, including victims of Epstein's conduct, as well as any other third party who has not been previously publicly identified in this action.

The Court, however, finds that all other documents, including those at issue in the JPMC Action shall be unsealed. The Court is mindful that Plaintiff participated in the JPMC Action with the promise that the information stated therein "will be kept confidential from the public" and that "[a]nyone who submits a Questionnaire and Release will not be publicly identified." ECF No. 233-10 at 2. Furthermore, as Wigdor noted, "[t]he court in the JPMC Action kept the entire challenge to Doe's allocation award under seal and did not place a single entry on the docket relating to Doe." Wigdor Opp. at 29. Judge Rakoff also heard Ms. Doe's testimony in a sealed courtroom. *See* ECF No. 272-16 at 3.

Nonetheless, unsealing is appropriate here because materials filed in connection with a motion for sanctions are judicial documents. "[M]ost material filed on a federal court's docket in the ordinary course of litigation will consist of judicial documents giving rise to a presumption of public access . . . ." *Giuffre v. Maxwell*, 146 F.4th 165, 176 (2d Cir. 2025). "To qualify as a 'judicial document' the materials at issue must be 'relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141,

145 (2d Cir. 1995)). "A document is thus 'relevant to the performance of the judicial function' if it would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers . . . ." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (quoting *Amodeo*, 44 F.3d at 145–56). Here, the Court relied on the documents from the JPMC Action and other exhibits in reaching its conclusions about sanctions.

The weight of the presumption of public access is also strong. The weight does not depend on the extent to which the Court relied on any given document in rendering its decision but rather on the fact of their presentation before the Court. *See Lugosch*, 435 F.3d at 123. The allegations in this case and in other related cases have been discussed intensely in the media; public access to the documents underpinning the Court's reasoning and decision both allows the public to "monitor the judicial process" and helps "promote public confidence in the judicial system." *Id.*

The Court last considers the "competing considerations" against the weight of the presumption of access. *Id.* at 120. Established "competing considerations" include "the privacy interests of those resisting disclosure," *id.*, as well as the "nature and degree of injury" that may result from disclosure, the "reliability of the information," and "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995). Parties "opposing disclosure [of a judicial document] must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Id.*

73

Here, the Court finds that Plaintiff's privacy interests and the potential for injury that could result from disclosure are sufficiently protected by Plaintiff's continued anonymity. By maintaining Plaintiff's anonymity, the Court ensures that Plaintiff will not face personal threats to her safety as a result of her allegations in this case, and that the information she disclosed in JPMC with the promise of confidentiality will still be subject to some level of protection in that it cannot be attributed to her directly. At the same time, the Court does not unnecessarily shield from the public's view documents that elucidate Wigdor and Plaintiff's misconduct. Accordingly, the Court unseals the record pertaining to Defendant's CTS Motion, including all briefings and exhibits from Defendant, Wigdor, and Plaintiff. These documents shall be redacted as outlined below.

## CONCLUSION

For the foregoing reasons, the Court does not impose terminal sanctions in the instant case but levies other sanctions against Wigdor, Jeanne Christensen, and Plaintiff. Plaintiff, however, is warned: If further evidence demonstrates that she has falsified evidence before this Court, the Court will renew its consideration of case-terminating sanctions.

The Court also denies Defendant's request to de-anonymize Plaintiff but grants his request to unseal, with redactions, the filings at ECF Nos. 178, 180, 184, 186, 194, 198, and 202, and those relevant to this Motion (the "sealed filings at issue"). The parties shall redact Plaintiff's name, current and former addresses, schools she attended, names of family members and adoptive parents, social media handles, medical records, medical diagnoses other than those previously made public in this action, and other information tending to reveal non-public, medical diagnoses or treatment. The parties shall also redact the names of any third parties, including victims of Epstein's conduct, as well as any other third party who has not been

74

previously publicly identified in this action. Because the Court is unsealing records related to the CTS Motion, the Motion to Intervene at ECF No. 379 is denied as moot.

By May 21, 2026, Wigdor is directed to publicly file redacted versions of all sealed filings at issue by Wigdor, Defendant and Plaintiff, including those filings that Plaintiff submitted to the Court via electronic mail and are attached to Court orders, in accordance with the specifications in this Opinion and Order. Wigdor is also directed to publicly file redacted versions of the documents that the Court cited in rendering this decision but do not yet appear on any docket, including:

- Letter from Susan Estrich to Judge Rakoff, Feb. 21, 2024

- Letter from Bradley J. Edwards and Brittany N. Henderson to Judge Rakoff, Feb. 26, 2024

- Letter from Susan Estrich to Judge Rakoff, Mar. 6, 2024

- JPMC Action, Sealed Order of November 21, 2025

With respect to the fees ordered in this case, by May 7, 2026, counsel for Defendant shall submit to Wigdor an accounting of their reasonable attorneys' fees and costs related to bringing the instant motion between January 15, 2025, and August 22, 2025. If there is a dispute regarding the fees owed after the parties meet and confer in good faith, Defendant shall file a motion by June 4, 2026. Any opposition from Wigdor is due June 18, 2026, and any reply is due June 25, 2026.

Although the Court stayed discovery in this case in light of Defendant's Motion, discovery shall remain stayed until the Second Circuit resolves the issue of the timeliness of Plaintiff's claim. The Court understands that the majority of outstanding VGMGPL actions that are subject to the same timeliness issue have been either partially or completely

stayed pending a decision from the Second Circuit. Accordingly, the Court stays discovery until this issue is resolved.

Lastly, now that the Court has adjudicated this Motion, Wigdor shall provide Plaintiff's Journals 1 and 5 to the Court to maintain until Plaintiff secures new counsel or, if Plaintiff does not secure new counsel, until the conclusion of this action. Wigdor shall return the remaining journals in its possession to Plaintiff.

The Clerk of Court is directed to terminate ECF No. 379.

Dated:  April 23, 2026
       White Plains, New York

SO ORDERED.

_Jessica Clarke_

JESSICA G. L. CLARKE
United States District Judge