UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

                PLAINTIFF,

    -AGAINST-

LEON BLACK,

                DEFENDANT.

Case No. 23-cv-06418-JGLC

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL DOCUMENTS AND APPOINT AN INDEPENDENT EXAMINER**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Michael B. Carlinsky
Jennifer J. Barrett
Ryan A. Rakower
Jacqueline M. Stykes
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
jenniferbarrett@quinnemanuel.com
ryanrakower@quinnemanuel.com
jacquelinestykes@quinnemanuel.com

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice*)
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132
susan@estrichgoldin.com

PERRY LAW
E. Danya Perry
Alexander K. Parachini
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 213-3070
dperry@danyaperrylaw.com
aparachini@danyaperrylaw.com

*Counsel for Defendant Leon Black*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................II

PRELIMINARY STATEMENT ........................................................................................................1

FACTUAL BACKGROUND ..............................................................................................................4

I.      WIGDOR'S SERIAL LITIGATION CAMPAIGN AGAINST BLACK ..........................4

II.     WIGDOR DESTROYS EVIDENCE AND IGNORES WARNINGS ..............................4

III.    WIGDOR AND DOE FILE A COMPLAINT RIDDLED WITH LIES ............................6

IV.    WIGDOR AND DOE TRY TO INSTIGATE A GOVERNMENT INQUIRY
INTO BLACK ...........................................................................................................................7

V.     JPMC PROCEEDING EXPOSES FRAUD ............................................................................8

VI.    WIGDOR AMENDS THE COMPLAINT TO CONCEAL—NOT CORRECT—
ITS FALSEHOODS...................................................................................................................11

VII.   WIGDOR LIES TO THIS COURT ABOUT THE JPMC RECORD ..............................13

VIII.  DOE'S AND WIGDOR'S FALSE CLAIMS UNRAVEL FURTHER ........................13

         A.    Expert Analysis Proves Doe Fraudulently Manipulated Her Journals.....................14

         B.    Doe's Explanation Is Not Credible...............................................................................16

         C.    Wigdor Withdraws As Counsel ....................................................................................16

IX.    THE COURT SANCTIONS DOE AND WIGDOR ............................................................17

ARGUMENT ........................................................................................................................................19

I.      THE COURT'S OWN FINDINGS ESTABLISH THE PREDICATE FRAUD..............20

II.     DOE'S COMMUNICATIONS WITH WIGDOR WERE INTENDED TO
FACILITATE THE FRAUD ...................................................................................................21

III.    THE CRIME-FRAUD EXCEPTION REQUIRES DISCLOSURE
CONCERNING DOE'S FRAUD ............................................................................................24

IV.    AN INDEPENDENT EXAMINER SHOULD BE APPOINTED TO
INVESTIGATE THE FULL SCOPE OF WIGDOR'S AND DOE'S FRAUD................26

CONCLUSION.....................................................................................................................................27

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Amusement Indus., Inc. v. Stern*,
   293 F.R.D. 420 (S.D.N.Y. 2013) ........................................................................................20

*Clark v. United States*,
   289 U.S. 1 (1933)...........................................................................................................19, 23

*Ganieva v. Black*,
   No. 155262/2021 (N.Y. Sup. Ct.) .........................................................................................4

*In re Gilly*,
   976 F. Supp. 2d 471 (S.D.N.Y. 2013)...................................................................................5

*In re Grand Jury Subpoenas Dated Sept. 13, 2023*,
   128 F.4th 127 (2d Cir. 2025) .........................................................................................20, 22

*HSH Nordbank AG New York Branch v. Swerdlow*,
   259 F.R.D. 64 (S.D.N.Y. 2009) ..........................................................................................19

*Jane Doe 1 v. JPMorgan Chase Bank N.A.*,
   22-cv-10019 ...........................................................................................................................8

*Oakley v. MSG Networks, Inc.*,
   792 F. Supp. 3d 377 (S.D.N.Y. 2025)...................................................................................5

*Passlogix, Inc. v. 2FA Tech., LLC*,
   708 F. Supp. 2d 378 (S.D.N.Y. 2010)..................................................................................26

*Pierson v. Black*,
   No. 952002/2022 (N.Y. Sup. Ct.) .........................................................................................4

*In re Search Warrant Dated Nov. 3, 2021*,
   2024 WL 3507596 .............................................................................................................20, 22

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   319 F.R.D. 100 (S.D.N.Y. 2017) .........................................................................................19

*U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*,
   338 F.R.D. 309 (S.D.N.Y. 2021) ...........................................................................20, 21, 22, 23

*United States v. Ceglia*,
   2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015) ........................................................20, 22, 24

ii

*Wigdor v. Black*,
   No. 651246/2026 (N.Y. Sup. Ct.) ......................................................................................4

*Zimmerman v. Poly Prep Country Day Sch.*,
   2012 WL 2049493 (E.D.N.Y. June 6, 2012) ........................................................................21

## **Other Authorities**

DOJ, *Epstein Library Submissions* EFTA02731473 .........................................................................7

DOJ, *Epstein Library Submissions* EFTA02731490 .........................................................................8

DOJ, *Epstein Library Submissions* EFTA02731724 ......................................................................8, 9

## PRELIMINARY STATEMENT[1]

This Court has found a brazen fraud perpetrated by Plaintiff Jane Doe and her former counsel Wigdor LLP ("Wigdor").  Doe fabricated physical evidence, which she and Wigdor then prominently featured in two federal cases, lying repeatedly to the Court in the process.  They even submitted the same fraudulent evidence to the Department of Justice ("DOJ"), which then unwittingly released the fabrications to the public, triggering a wave of news reports and commentary by authors who had no way of knowing they were reporting on fake documents, because the evidence proving the fraud was under seal.  While fabricating inculpatory documents, Doe and Wigdor also intentionally spoliated a trove of exculpatory documents.  This is not just sanctionable, but criminal.

In its April 23, 2026 Opinion and Order, this Court found by clear and convincing evidence that Doe's journals—the centerpiece of her case and the only evidence she proffered to corroborate her accusations against Leon Black—contained non-contemporaneous sonogram images which were "physically altered with scratches, opaquing fluid, and strategic covering of relevant information," manifesting "a clear intent to mislead."  *Opinion and Order*, ECF 388, at 62 (Apr. 23, 2026) ("Op.").  It found that Plaintiff's former counsel and Wigdor partner Jeanne Christensen "lied repeatedly to the Court."  *Id*. at 1.  As a result, the Court sanctioned Doe, Christensen, and Wigdor.  And it warned Doe explicitly: "If further evidence demonstrates that she has falsified evidence before this Court, the Court will renew its consideration of case-terminating sanctions."  *Id*. at 74.

---

[1]  We have redacted from this motion information that is not yet public but that will be made public on or before May 21, 2026, pursuant to the Court's April 23, 2026 sanctions order.  ECF 388 at 75.  We request that this Court make the unredacted version of this motion public when the non-public information contained therein is made public.

The allegations underlying this fraud were preposterous on their face. Doe claimed, in sworn testimony before a federal judge, that she gave birth to four children fathered by Epstein— ██████████████████████████████ was forced to engage in an "impregnation game" with Epstein and numerous prominent men, resulting in at least five forced abortions; ████████████

████████████████████████████████████████████

██████████████████████████████████ Doe claimed in her complaint in this action that between late 2001 and early 2004 she was trafficked by Jeffrey Epstein and Ghislaine Maxwell on "countless Fridays and Mondays" to New York, Palm Beach, and the U.S. Virgin Islands. ECF 225 at 8-9. Not a single flight log, financial record, photograph, witness, or investigative record from the vast files compiled by the Palm Beach Police Department or the FBI places Doe anywhere near Epstein. Class Counsel—who spent 15 years investigating Epstein and interviewed more than 200 survivors—confirmed that no one, including members of Epstein's inner circle, had ever heard of her. ████████████████████████████████████████

████████████████████████████████████████████ The journals that Doe fabricated to paper over these impossibilities have now been held by this Court to contain fraudulent and intentionally manipulated materials. Op. 62.

What this Court has already found is the tip of the iceberg. The Court's sanctions opinion is necessarily limited by what was in the record before it. The Court has not seen all of the private communications between Doe and Wigdor, between Doe and her adoptive parents, between Wigdor and Doe's adoptive parents, and between Wigdor and other third parties that will reveal the full extent of this fraud. Those communications exist. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

2

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████    These glimpses confirm a larger and more egregious fraud. The full record of those communications will prove it—and will provide the "further evidence" that the Court identified as the predicate for case-terminating sanctions. Op. 74.

This Court has the authority—and Black respectfully submits, the obligation—to ensure the fraud committed by Doe and Wigdor is fully investigated and referred for prosecution. Black accordingly asks the Court to order the immediate production of all communications between Doe, Wigdor, and third parties concerning the journals pursuant to the crime-fraud exception to the attorney-client privilege. Black also requests that the Court authorize depositions of Doe, her adoptive parents, Jeanne Christensen, and Doug Wigdor, and grant leave to serve a subpoena on the Fairfax Radiology Center of Alexandria (the practice that is the source of the journal sonograms).[2] The Court should then hold an evidentiary hearing on these issues.[3] Black further requests that the Court appoint an independent examiner under Fed. R. Civ. P. 53 to investigate the full scope of Doe's and Wigdor's fraudulent conduct, and to direct the preparation of a report as a predicate for criminal referral to the appropriate authorities.

---

[2] The sonograms were originally taken at The Association of Alexandria Radiology, a practice that was acquired by Fairfax Radiology Center of Alexandria in 2023.

[3] Doe herself argues that an evidentiary hearing should have been held before the Court entered its sanctions order. *See* Doe. Mot. Reconsideration 2-3. While this is not a basis to revoke the Court's sanctions award (as Doe argues), Black welcomes an evidentiary hearing to reveal "further evidence that [Doe] has falsified evidence" such that "the Court will renew its consideration of case-terminating sanctions." Op. 74.

3

## FACTUAL BACKGROUND

### I.    WIGDOR'S SERIAL LITIGATION CAMPAIGN AGAINST BLACK

Wigdor has now filed four separate lawsuits against Black. The first three—on behalf of Guzel Ganieva (2021), Cheri Pierson (2022), and Doe (2023)—all rest on false allegations of sexual misconduct; the first two have already been dismissed with prejudice, and Wigdor has now withdrawn in ignominy from the third.

In June 2021, Wigdor filed a defamation and gender-motivated violence action against Black on behalf of Guzel Ganieva, with whom Black had a years-long consensual relationship. *Ganieva v. Black*, No. 155262/2021 (N.Y. Sup. Ct.). In November 2022, Wigdor filed a second lawsuit on behalf of Cheri Pierson—an individual Black has never met—alleging that Black sexually assaulted her at Epstein's townhouse. *Pierson v. Black*, No. 952002/2022 (N.Y. Sup. Ct.). Both suits have been dismissed with prejudice. No. 155262/2021, NYSCEF Doc. No. 292; No. 952002/2022, NYSCEF Doc. No. 104. In July 2023, after failing to extort a settlement, Wigdor filed this action accusing Black of raping Doe when she was 16 at Epstein's townhouse. ECF 1 (the "Complaint").

On March 2, 2026, just weeks after this Court noted that it would issue a sanctions ruling "expeditiously," ECF 374, Wigdor filed a complaint against Black in New York Supreme Court that was, by design, rife with irrelevant allegations intended solely to generate negative press. *Wigdor v. Black*, No. 651246/2026 (N.Y. Sup. Ct.). Black has moved to dismiss the complaint, strike its gratuitous allegations, and obtain sanctions. No. 651246/2026, NYSCEF Doc. Nos. 8, 12, 14.

### II.    WIGDOR DESTROYS EVIDENCE AND IGNORES WARNINGS

*Spoliation:* This Court has found that Doe and Wigdor spoliated evidence, Op. 32, and "that the deletion of Plaintiff's Twitter account prejudices Defendant," *id*. at 59. The fragments of

4

Doe's Twitter account that we have seen are damning.  Doe praised as heroes the very people she now accuses of trafficking her.  She posted affectionate tributes to "Elizabeth"—the woman she claims trafficked her, ECF 233-28—and wrote warmly of adoptive relatives whom she now accuses of facilitating her abuse, ECF 233-29.  In messages to individuals she knew only through Twitter, Doe also made claims related to Epstein that are contradicted by other evidence. ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ █

By deactivating Doe's Twitter account in May 2023 without preserving its content, Wigdor and Doe ensured it would be unavailable to Black when they filed the Complaint in July 2023.  Christensen, whose firm has been sanctioned for concealing evidence, *see In re Gilly*, 976 F. Supp. 2d 471 (S.D.N.Y. 2013), and chastised for failing to take reasonable steps to preserve evidence, *see Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 385-86 (S.D.N.Y. 2025), was well aware of the obligation to preserve material relevant to anticipated litigation.  Communications between Wigdor, Doe, and Doe's adoptive parents would shed light on the extent and motive behind this blatant spoliation of evidence.

*Ignored Warnings:* Brad Edwards, Class Counsel in the JPMC proceeding and an attorney who has spent years representing dozens of confirmed Epstein survivors, warned Wigdor and Doe's prior counsel that Doe's claims were fabricated and that she lacked any credibility.  ECF 233-9 at 1-2, 13. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

5

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Wigdor ignored these warnings at every stage and aggressively pursued Doe's fraudulent case anyway.

## III.    WIGDOR AND DOE FILE A COMPLAINT RIDDLED WITH LIES

On July 25, 2023, Wigdor commenced this action by filing a lurid Complaint on behalf of Doe designed to maximize reputational damage against Black.  ECF 1.  The Complaint alleged that Epstein performed a literal "hand off" of Doe to Black and that Black sexually assaulted Doe during a single encounter at Epstein's Manhattan townhouse in 2002.  ECF 1 ¶¶1-3.  The Complaint alleged that Doe was 16 years old at the time, that Doe had autism and Mosaic Down Syndrome, and that Doe's developmental age is around 12 years old.  *Id.* ¶¶2, 10-11.  The Complaint further alleged Epstein and Maxwell had been "traffick[ing]" Doe since 2001, flying her on private planes and "almost causing her to fail" school.  *Id.* ¶¶13-18, 37-41, 44.  It alleged that Elizabeth, a cheerleading coach, had subjected Doe to abuse and torture as "training," and that Maxwell and Epstein taught Doe to perform sex acts.  *Id.* ¶¶19-20, 39.

The allegations in the Complaint were contradicted at every turn by evidence that was readily accessible before Wigdor ever filed suit.  Doe's school records—which Wigdor apparently never requested or reviewed prior to filing the Complaint—disprove Doe's allegations of missing "countless Fridays and Mondays" of school due to her trafficking.  ECF 225 at 8-9.  ████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████Every person Black's investigators interviewed—including Doe's biological mother, sister, and friends— confirmed these facts.  *E.g.*, ECF 227 ¶¶3-9; ECF 229 ¶¶5, 17-18; ECF 231 ¶¶13-19; ECF 232 ¶¶23, 25.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ Despite these clear red flags, Wigdor launched a coordinated press offensive against Black. Christensen, the lead Wigdor partner on the matter, gave interviews describing Black as "violent" and declaring he belongs "behind bars." ECF 233-2 at 5.

Black served a Rule 11 letter on August 25, 2023 that set out in detail the results of his investigation and put Wigdor on notice that Defendant would seek sanctions based on Wigdor's apparent failure to conduct any investigation. ECF 29 ¶7. ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ Black moved for sanctions on September 20, 2023. ECF 49. In its opposition, Wigdor failed to identify a single step it took to verify Doe's allegations, even in the face of Black's Rule 11 letter. *See* ECF 65 at 2-5.

## IV.    WIGDOR AND DOE TRY TO INSTIGATE A GOVERNMENT INQUIRY INTO BLACK

While the Doe case was pending, Doe and Wigdor attempted to foment state and federal criminal investigations into Black. Christensen contacted prosecutors the night before the Complaint was filed, urging them to open a criminal investigation and declaring it "outrageous that criminal charges have not been brought" against Black. *See* DOJ, *Epstein Library Submissions* EFTA02731473.

Christensen and Doug Wigdor then pressed their case over the following months, appearing on emails sharing Doe's doctored journals with prosecutors, offering to bring the original notebooks to prosecutors' offices, and arranging follow-up calls to discuss the fraudulent

7

"evidence." *See* DOJ, *Epstein Library Submissions* [EFTA02731490](); [EFTA02731775]();
[EFTA02731512](); [EFTA02731633](); [EFTA02731724]().

## V.     JPMC PROCEEDING EXPOSES FRAUD

A month after Doe filed her lawsuit against Black, she, through Wigdor, submitted an application to the Claims Administrator in the *Jane Doe 1 v. JPMorgan Chase Bank N.A.*, 22-cv-10019 proceeding (the "*JPMC* proceedings") seeking compensation from the JPMorgan Chase class settlement fund overseen by Judge Rakoff. ECF 184 at 2. With each submission, Doe's story grew more elaborate and improbable—but Christensen still put her name on each one. The original submission described two visits to Epstein's New York home. ECF 233-4 at 000323-26. The second added claims of six forced abortions and an impregnation "game" ██████████ ██████████████████████ ECF 233-3 at 000311-16. The third introduced the allegation that Doe's own biological mother facilitated Doe's trafficking—a claim absent from all prior accounts, but that coincidentally appeared only after Doe's family gave the lie to Doe's allegations, including Doe's initial Complaint in this case. ECF 233-5 at 000305-07. The details of how Doe purportedly met Maxwell also changed markedly between submissions. ECF 326 at 11-12.

████████████████████████████████████████████

██████ Wigdor promptly attempted to leverage that award to extract a settlement from Black through mediation. ECF 233 ¶6. Black's counsel alerted Judge Rakoff, leading to an inquiry including written submissions, *see* ECF 233-8, 233-9, 233-16; an evidentiary hearing on March 15, 2024, ECF 233-7; argument on June 25, 2024, ECF 233-15; and a follow-up interview of Doe on July 8, 2024, ECF 233-25. ████████████████████████

████████████████████████████████████████████

██████ Edwards explained that no known Epstein survivors or associates had ever encountered Doe. ECF 233-9 at 6-7. Edwards confirmed that Doe was absent from every travel record,

financial record, photograph, and investigative file maintained by the Palm Beach Police Department and the FBI. *Id*. at 7-9.

Doe's sworn testimony before Judge Rakoff in March 2024 further illustrated the implausibility of her allegations. ECF 233-7. Doe claimed, under oath, for the first time ever, that she had traveled to New York in 2010 to deliver a fourth Epstein child, ECF 233-7 at 54:7–55:8— *seven years* after the period she had previously identified as the extent of her contact with Epstein ███████████████████████████████████████████, and contradicting her allegation in the Complaint that she was "never again taken to NYC" after the supposed 2002 assault, ECF 1 ¶83. During that same testimony, Christensen led Doe through a direct examination regarding Doe's journals and the sonograms therein. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Judge Rakoff was specifically concerned about the lack of corroboration for Doe's claim. *See* DOJ, *Epstein Library Submissions* EFTA02731724.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ And, in a troubling admission, Christensen told Judge Rakoff that not everything she includes in complaints is true. ECF 233-15 at 31:17-19 ("Your Honor, if every

9

complaint that I have ever drafted as a plaintiff's counsel had correctly alleged things, that unfortunately is not the case.")  As this Court found, Christensen demonstrated a "flippant approach regarding her duty to amend inaccuracies in complaints in general." Op. 35-36.  This Court admonished that "[h]er comments are indicative of someone who does not take seriously their Rule 11 obligations." *Id.* at 56.

Doe testified again in July 2024, and only compounded her credibility issues.  ECF 233-25 at 2-3.  When Judge Rakoff asked Doe questions intended to clarify inconsistencies in her story, she provided rambling non-responses.  █████████████████████████████████

████████████████████████████████████████████████████████████

██████████  Doe expounded at length about her living situation with her adoptive parents, ultimately volunteering—unprompted—that her adoptive father is ███████████████████

███████████████  And when Judge Rakoff gave Doe another opportunity to clarify this inconsistency, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  █

Nothing in *JPMC* prompted Wigdor to reexamine its position or withdraw any allegation.  Instead, despite acknowledging to Judge Rakoff that the Complaint contained false statements and declining to correct them,

██████████████████████████████████████████████████████████████████████████

███████████████████████

## VI.    WIGDOR AMENDS THE COMPLAINT TO CONCEAL—NOT CORRECT—ITS FALSEHOODS

Following Judge Rakoff's ruling, Wigdor sought leave to amend the Doe Complaint, writing that it was "in the process of drafting a proposed Amended Complaint" that "will be filed no later than the first week in August."  ECF 87.  This was not an honest effort to correct the Complaint's documented falsehoods.  Instead, Wigdor's motive was to repackage the case to remove certain newly indefensible allegations and rely heavily on the fabricated journals.  This Court agreed, finding that "Wigdor clearly amended its Complaint in this case to account for representations by Plaintiff and her former counsel in the JPMC Action."  Op. 40.

There was no mention of the scrapbook journals in Doe's original Complaint, any of her JPMC claims submissions, or any other written record before 2024.  ECF 326 at 8.  ██████████

███████████████████████████████████████████████████.  ECF 326 at 9.  The account of how the journals supposedly resurfaced was unclear and constantly shifting. Wigdor told Judge Rakoff that Doe's adoptive father discovered them in a storage facility.  ECF 233-8 at 00112.  ████████████████████████████████████████████

████████████████████████████████████

Despite having ample reason to be suspicious, Wigdor did not perform any forensic examination of the journals before deciding to stake the case on them.  ██████████████

████████████████████████████████████████████████████████████████████████████

████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

11

ECF 283-4 at 21 (emphasis added). Wigdor then submitted the journals to Judge Rakoff and quoted them in the Amended Complaint—all, as Doe asserts, without Doe's consent and without her seeing the final draft. *See* ECF 274 ¶¶84, 86, 99, 102; ECF 277 at 10, 22, 26.

Doe and Wigdor also amended allegations contradicted in the JPMC proceedings, further revealing the amendment's true motivation. ECF 92-1 (Redline of Amended Complaint). It was now Doe's family members who trafficked her and Doe's biological mother (not Elizabeth) who first introduced her to Maxwell. *Id.* 7-8, 11. Now, that introduction happened in a hotel room in Florida, not at an "adult party" in a Washington, D.C. suburb. *See id.* at 8-10. When questioned by Judge Rakoff about these inconsistencies in her story (before she amended her Complaint), Doe failed to provide a satisfactory explanation. ECF 233-7 at 8-13. That was because the changes were strategic—a direct response to Doe and Wigdor learning that Doe's biological parents had rebutted her allegations to Black's investigators.

The Amended Complaint also removed other debunked allegations, including that: (i) Doe could fit into a child-sized cheerleading uniform ███████████████████ (ii) Doe missed "countless" days of high school and almost failed out ███████████████ ███████████████████████████████ (iii) Doe lived with Elizabeth "nearly full time" ███████████████████████████████████████████ ; (iv) Doe never returned to New York City after being assaulted by Black and was taken to the airport following that alleged assault (at the JPMC hearing, Doe testified that her parents drove her home from New York in 2002 and that she returned to New York in 2010 to give birth to Epstein's child); and (v) Epstein and Maxwell forced her to share a bed with them (in

JPMC, ███████████████████████████████████████████ ECF 92-1 at 5-6, 10, 12-13, 18.

## VII.   WIGDOR LIES TO THIS COURT ABOUT THE JPMC RECORD

On December 18, 2024, Wigdor filed a letter to this Court flagrantly mispresenting the proceedings before Judge Rakoff.  For example, Wigdor described Judge Rakoff's questioning of Doe in the JPMC hearing as "unbelievable," because, Wigdor claimed, Judge Rakoff questioned Doe under oath without permitting Wigdor to be present.  ECF 184.  Wigdor further depicted Judge Rakoff's questioning as even "[w]orse" because he asked Doe "highly personal questions having zero connection" with Doe's allegations, ECF 184 at 4, specifically about Doe's "sexual abuse in the present," ECF 202-2 at 6.  This Court found that "Ms. Christensen's letter directly mischaracterized the JPMC proceedings and Judge Rakoff's approach," noting Judge Rakoff's approach "was done for Plaintiff's benefit," not as an affront to her rights.  Op. 37.

Wigdor also blithely asserted that "it is completely false that [Doe] said she was the mother of Epstein's children, ███████████████████████████████████████  But as Wigdor knew and the JPMC transcripts confirmed later, Doe testified exactly that under oath, ECF 233-7 at 54:14-62:7, and Doe's journals likewise include claims of carrying Epstein's children, ECF 233-12 at 000069-70; ECF 233-13 at 000098-99.  This Court was unequivocal:  "Ms. Christensen lied to this Court about the substance of Ms. Doe's testimony by claiming that Plaintiff *never* said she was the mother of Epstein's children."  Op. 40 (emphasis in original).

## VIII.   DOE'S AND WIGDOR'S FALSE CLAIMS UNRAVEL FURTHER

On March 3, 2025, Black moved for case-terminating sanctions, submitting sworn declarations from Doe's biological mother, biological sister, and other fact witnesses, together with expert reports demonstrating that the sonogram images embedded in Doe's journals had been fabricated.  ECF 225; ECF 226-232.

### A.    Expert Analysis Proves Doe Fraudulently Manipulated Her Journals

Black submitted expert forensic analysis from Larry Stewart demonstrating that Doe falsified sonogram photographs in her journals, which Doe and Wigdor claimed were contemporaneous from her teenage years and had been taken in Palm Beach, Florida.  ECF 226-2 at 7-20.  The Court agreed with the conclusion of Black's expert and found that at least three sonograms spread across three journals were actually derived from a pregnancy when Doe was 21 years old, were taken at a Virginia radiology practice known as the Association of Alexandria Radiology (now known as Fairfax Radiology Center of Alexandria), and had identifying information deliberately scratched out, covered with "opaquing fluid," or cut off to obscure their origins.  Op. 46-50.

The Court found "by clear and convincing evidence that these three sonograms 'do not indicate pregnancies prior to the known 2006 pregnancy of the Plaintiff.'"  *Id*. at 50.  Notably, Wigdor itself reached the same conclusion roughly one month after Black's motion was filed, formally disavowing the three sonograms as "a matter of ethics."  *Id*.

Stewart's analysis further showed, and the Court agreed, that every single one of the 11 sonogram images in Doe's journals had been "manipulated in a manner that renders them untraceable by date and location" to "obscure their origins."  *Id*.  Both Stewart and the Court also noted other indicia of fraud and manipulation.  For example, the journals "contain indications [that] they have come into contact with liquid(s) and display accelerated aged appearances."  Op. at 45 (alteration in original).  Additionally, the journals are mostly written using undatable writing instruments, such as pencil.  *Id.*  Indeed, Doe even went out of her way to comment on her use of a pencil, writing, "[u]gh, I hate writing in pencil but that was all I could find and now it will be like this forever," and "I still cannot change to pen even though this pencil is driving me insane."  ECF 225 at 22; ECF 233-32A at 001217, 001243. All these peculiarities led Stewart to conclude

14

that the journals ███████████████████████████████████████████████████████

███████████████████████████████████████████████

Even putting aside the physical and circumstantial evidence of manipulation, the scrapbook

journals are facially implausible. ██████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████   ECF 233-11 at 000024-25, 000036-37; 233-12 at 000047-49, 000069-70; ECF

233-13 at 000076-78, 000094-95, 000098-101; ECF 233-14 at 000110-11, 000120-21; ECF 233-

9 at 4.  Nobody noticed these pregnancies at the time, ECF 227 ¶27; ECF 228 ¶16; ECF 229 ¶20,

and ███████████████████████████████████████████████████████████

████████████████████████████████████   The journals also implausibly say ███

██████████████████████████████████████████████████

███ and Doe was part of an impregnation "game" resulting in numerous pregnancies, births, and

forced abortions in just a few short years.  The journals also reference specific Epstein victims.

ECF 233-11 at 000043.  Class Counsel for actual Epstein victims confirmed that while all the

survivors were generally aware of each other, neither the referenced individual nor any other

Epstein survivor he spoke to had ever seen or heard of Doe.  ECF 233-9 at 4-5.

Black was not the only person to come forward with clear evidence that Doe's journals and

allegations are a sham.  Dana Chasin, a policy advisor and political fundraiser (whom Doe accused,

both in her journal and in communications which her former counsel sent to federal prosecutors,

of providing a plane on which Doe traveled to Epstein's New York City townhouse), has stated

---

[4]  The same deliberate-concealment pattern infects Doe's journal that she purportedly kept in 2012 at a treatment center, in which every trafficking entry was written in pencil—an undatable instrument—while more than 40 co-patients and counselors wrote their notes in ink, and identifying contact information was physically cut from at least one page before the journal was submitted to Judge Rakoff.  Op. 51.

15

unequivocally that Doe is demonstrably a liar.  ECF 380 at 6.  Despite Doe's allegation and references to Chasin's "plane" in her journals, Chasin has never owned or leased a plane, has never met or communicated with Jeffrey Epstein, and has never visited any of Epstein's properties.  *Id.*

### B.    Doe's Explanation Is Not Credible

Doe's attempt to deflect responsibility by speculating without evidence that her biological mother had altered the images was rejected by the Court as not credible, particularly since Doe had personally presented the journals to her counsel.  Op. 50-51.



Ultimately, roughly one month after Black's motion was filed, Wigdor too concluded that the journals were fabricated and formally disavowed the three sonograms as "a matter of ethics."  Op. 50.

### C.    Wigdor Withdraws As Counsel

After Black raised the journal fraud to this Court, Wigdor sought sworn declarations from Doe and her adoptive mother regarding the origin of the sonogram photographs embedded in the journals.  Doe describes Wigdor applying sustained pressure on her to sign a declaration she did

16

not understand,

Neither Doe

ultimately signed the declaration Wigdor prepared;

The communications surrounding this pressure

campaign—what Wigdor knew, what it sought to memorialize in sworn form, and why it coerced

both its client and a third party—go to the heart of the fraud.

On April 4, 2025, Wigdor moved to withdraw as Doe's counsel,

On the same day, Christensen sent a letter to Judge Rakoff in

which the firm

This Court granted Wigdor's withdrawal motion on April 9, 2025.  ECF 241.

Doe continued the litigation *pro se*.

On June 23, 2025, Doe and Wigdor filed separate oppositions to Black's sanctions motion.

ECF 271; ECF 277.  Black filed replies on August 22, 2025, addressing each opposition in turn.

ECF 323; ECF 326.

## IX.    THE COURT SANCTIONS DOE AND WIGDOR

On April 23, 2026, this Court issued a 76-page Opinion and Order resolving Black's

Motion for Case-Terminating Sanctions.  ECF 388.  The Court found that "both Plaintiff's former

17

attorney Jeanne Christensen ('Ms. Christensen'), on behalf of Wigdor LLP ('Wigdor'), and Plaintiff Jane Doe have engaged in serious, sanctionable misconduct in this case." Op. 1. The Court's findings were sweeping and damning, documenting a pattern of lies, fabricated evidence, and destruction of relevant materials that pervaded the litigation from its inception.

With respect to Wigdor and Christensen, the Court made four key findings. First, the Court found that "Wigdor delayed in alerting the Court that it needed to amend its Complaint, even though Wigdor knew that the Complaint contained inaccuracies." *Id*. at 31. Second, the Court found that Christensen "lied repeatedly to the Court and to opposing counsel" about the JPMC Proceedings, including by fabricating a narrative that Judge Rakoff had improperly interrogated Doe without counsel, and by flatly denying that Doe had ever claimed to be the mother of Epstein's children—a claim Doe had made under oath. *Id*. at 1; *see also id.* at 36 ("The Court concludes that Ms. Christensen told several lies to this Court and opposing counsel."). Third, the Court found that Christensen "directed Plaintiff to destroy her Twitter account"—an account that contained communications directly relevant to the claims in this case—"without taking any remedial preservation measures." *Id.* at 32. Fourth, the Court found "Plaintiff falsified portions of the journals used to support her claims in this case." *Id*.

As for Doe, the Court disbelieved her explanation that her biological mother somehow was responsible for the 2006 sonograms appearing in journals that were supposedly kept when Doe was a teenager; found that Doe submitted fraudulent evidence; barred Doe from using the journals purporting to be from ages 17, 18, and 19 at trial; and ordered that the jury be instructed that "the Court found that portions of these journals were falsified by Plaintiff." *Id*. at 51, 65. However, the Court stopped short of barring Doe's use of her "age 16" journal. *Id.* And despite "strongly consider[ing] granting the case-terminating sanctions Defendant requests in this matter," *id*. at 2,

the Court allowed Doe's claims to proceed.  Still, the Court warned Doe that "[i]f further evidence demonstrates that she has falsified evidence before this Court, the Court will renew its consideration of case-terminating sanctions." *Id*. at 74.  The communications between Doe, her adoptive parents, and Wigdor regarding the journals, and the further limited information we seek herein, will provide the "further evidence" needed for the Court to impose case-terminating sanctions, and we intend to renew our request for case-terminating sanctions once they are provided.

## ARGUMENT

The attorney-client privilege "takes flight" the moment "the relation is abused."  *Clark v. United States*, 289 U.S. 1, 15 (1933).  It is considered black letter law that "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." *Id*.  This rule, enforced through the crime-fraud exception, rests on the principle that the attorney-client privilege exists to facilitate "sound legal advice," and "advice in furtherance of a fraudulent or unlawful goal cannot be considered "sound." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 110 (S.D.N.Y. 2017) (cleaned up).  Accordingly, the attorney-client privilege "is 'to be invaded when it is abused for purposes of engaging in fraud.'" *HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 73 (S.D.N.Y. 2009).

The crime-fraud exception applies when a party demonstrates probable cause as to two prongs: (1) that the client communication itself was in furtherance of a crime or fraud; and (2) that the communication was intended to facilitate or conceal the criminal activity.  *In re Grand Jury Subpoenas Dated Sept. 13, 2023*, 128 F.4th 127, 141-42 (2d Cir. 2025).  This standard is "not an overly demanding one" and does not require a definitive showing of fraudulent intent—"there need only be presented a reasonable basis for believing that objective was fraudulent." *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426-27 (S.D.N.Y. 2013).

19

Both prongs are satisfied here. Doe's communications concerning the fabricated journals and their inclusion in the Amended Complaint should be produced immediately.

## I.    THE COURT'S OWN FINDINGS ESTABLISH THE PREDICATE FRAUD

This Court was explicit in its sanctions opinion, stating that it "determine[d] by clear and convincing evidence that [Doe]'s journals contain at least three falsified sonograms." Op. 62. Doe presented that fraudulent evidence to Wigdor and then both Doe and Wigdor used it as foundational support for Doe's allegations in the Amended Complaint. *See* Op. 2 ("Plaintiff falsified sonogram images in her personal journals, which her First Amended Complaint relies on to support the allegations in this action."). This Court found that these sonograms "do not indicate pregnancies prior to the known 2006 pregnancy" despite Doe representing in her journals that they reflected pregnancies between 2002 and 2005. *Id.* at 50. This finding alone satisfies the first prong as courts have found the crime-fraud exception applies on far less than clear and convincing evidence. *See, e.g.*, *U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 338 F.R.D. 309, 320 (S.D.N.Y. 2021) (probable cause existed to find that party made false statements to counsel that she intended to be communicated to the SEC); *United States v. Ceglia*, 2015 WL 1499194, at *3 (S.D.N.Y. Mar. 30, 2015) (applying crime-fraud exception where government made a prima facie showing of probable cause that defendant's lawsuit was carried on to substantially further a fraud); *In re Search Warrant dated Nov. 3, 2021*, 2024 WL 3507596, at *5 (2d Cir. July 23, 2024) (attorney-client privilege did not protect documents that magistrate judge had found with probable cause were created in furtherance of the conspiracy).

In addition to the three clearly fraudulent sonogram images, this Court further found that *all* of the journal sonograms were manipulated to obscure identifying information like the date and location where the sonogram was taken. Op. 50. The Court expressly found that the physical alterations—scratching, opaquing fluid, and strategic covering of identifying information—

20

"manifest a clear intent to mislead about what the sonograms represent." *Id*. at 62. This Court attributed knowledge of this falsity directly to Doe and held that the presentation of the falsified sonograms—through Wigdor—was "entirely without color" and done in "clear bad faith." *Id*.

Doe's Motion for Reconsideration of the Sanctions Opinion ("Reconsideration Motion") confirms that she communicated the details of her manipulations to Wigdor. Doe admitted that she "intentionally obscured" names and identifying information in the journals—including the sonogram images—for "privacy and safety reasons," and that she "explained to former counsel that the journals had been structured in that manner intentionally." Doe Reconsideration Mot. at 3. This admission goes to the heart of the crime-fraud inquiry. The alterations this Court found were deliberate—scratching, opaquing fluid, strategic covering of identifying information—and Doe now concedes she told Wigdor about them before the journals were used in this case.

This submission of fabricated evidence is fraud on the court, the paradigmatic predicate for the crime-fraud exception. Fraud on the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process," including through the fabrication of evidence. *Zimmerman v. Poly Prep Country Day Sch.*, 2012 WL 2049493, at *33 (E.D.N.Y. June 6, 2012). Courts consistently find that the crime-fraud exception applies under similar circumstances. *See Collector's Coffee*, 338 F.R.D. at 319-20 (applying crime-fraud exception where client fabricated documents and used attorney to transmit false statements); *In re Search Warrant*, 2024 WL 3507596, at *5 (crime-fraud exception applied where documents were created to conceal the conspiracy or present false evidence).

## II.    DOE'S COMMUNICATIONS WITH WIGDOR WERE INTENDED TO FACILITATE THE FRAUD

The second prong of the crime-fraud analysis requires probable cause that the attorney-client communications at issue were themselves "in furtherance of" the fraud and "intended in

some way to facilitate or to conceal [it]." *In re Grand Jury Subpoenas*, 128 F.4th at 141-42. There must be a "purposeful nexus" between the communications and the fraudulent activity such as where the communications "reasonably relate" to the crime or fraud. *Collector's Coffee*, 338 F.R.D. at 316. Where, as here, a client presents fabricated evidence to counsel and counsel then deploys it before a court, that nexus requirement is satisfied. *Ceglia*, 2015 WL 1499194, at *4 (finding nexus where client's communications with counsel directly furthered his purpose of prosecuting a lawsuit based on fabricated evidence). Doe provided the falsified journals to Wigdor with the intent that Wigdor would then deploy them before this Court and Judge Rakoff. Her communications with Wigdor regarding those journals—producing them to counsel, representing their origin and authenticity, describing their contents, directing or approving their incorporation into the Amended Complaint—were the essential steps by which her fraud on the courts was effectuated.

*Ceglia* is instructive, as there, the client fabricated a contract and then filed a federal lawsuit to recover on it, using his attorneys to advance claims he knew were based on forged documents. 2015 WL 1499194, at *1. The court applied the crime-fraud exception because the attorney-client communications were the vehicle through which the fraudulent litigation was prosecuted—the client's purpose could not have been advanced without counsel drafting pleadings, engaging experts, and presenting evidence. *Id*. at *4-5, *7-8; *see also Collector's Coffee*, 338 F.R.D. at 319-20 (applying crime-fraud exception where client fabricated an employment agreement and used her attorney to transmit false statements about it to SEC investigators). Likewise, at least on Wigdor's account, Doe used Wigdor as the vehicle through which her fabricated evidence reached the courts.

22

The full record of the communications between Doe, her adoptive parents, and Wigdor regarding the journals is also necessary to determine each actor's responsibility for the fraud. Doe now claims that she "relied heavily on counsel's framing of allegations" in an apparent effort to shift responsibility to Wigdor. Reconsideration Mot. at 4. Meanwhile, Wigdor blamed Doe for its withdrawal, citing her failure to cooperate and her refusal to sign the declaration Wigdor prepared. ECF 238 at 2. Those communications will reveal whether Doe presented the journals to Wigdor as altered documents she knew were manipulated, whether Wigdor encouraged or facilitated the alterations, or both. That is precisely the inquiry the crime-fraud exception is designed to enable.

Wigdor never should have relied on the journals, but even if Wigdor's reliance had been in good faith, it would be immaterial. Courts have found the crime-fraud exception applies even where attorneys are unaware that their services were used to further fraud. *See Clark*, 289 U.S. at 15 ("The attorney may be innocent, and still the guilty client must let the truth come out"); *Collector's Coffee*, 338 F.R.D. at 315-316 ("It is sufficient to come within the exception that the client intended to use the attorney's services in furtherance of a crime or fraud even if the attorney was unaware of this purpose."). Plaintiff's fraudulent intent has been established by this Court's findings, the physical alterations themselves demonstrate deliberate manipulation, and the Court attributed knowledge of the falsity to Doe. Op. 62.

At bottom, the journals were central to Doe's fraud, forming the foundation of her narrative. Doe used the journals to corroborate her claim that she had been repeatedly trafficked by Epstein during the period covered by the journals. Op. at 13-14. And that alleged relationship with Epstein is the predicate for her claims against Black. The fabrication of the sonograms and

23

the pregnancies they purportedly evidence are therefore not incidental to this litigation but rather serve as the backbone for Doe's entire chain of allegations.

### III.   THE CRIME-FRAUD EXCEPTION REQUIRES DISCLOSURE CONCERNING DOE'S FRAUD

*Ceglia* also provides guidance as to the scope of the exception, holding that it applies to communications that were: (1) "created in furtherance of the litigant's fraudulent purpose, even if the person who creates it did not know the purpose was fraudulent, and (2) reasonably relates to the fraudulent portion of the litigation."  2015 WL 1499194, at *4.  Applying that standard, the court ordered production of: (i) communications between Ceglia and counsel in which Ceglia reviewed and commented on drafts of pleadings and sworn declarations, *id.* at *4; (ii) litigation strategy communications among counsel discussing their approach to obtaining discovery, the content of motions and declarations, and conclusions reached by retained consultants and experts, *id.* at *6–7; (iii) communications with forensic consultants retained to evaluate the authenticity of the fabricated contract, *id.* at *8–9; and (iv) communications with a private investigator retained to assess a potential witness, *id.* at *9.

The same reasoning applies here.  The Court should order production of the following categories immediately from Jane Doe, Jeanne Christensen, Doug Wigdor, any employee or partner at the Wigdor firm, and Doe's adoptive parents: (i) all communications in which Doe produced, described, or transmitted the journals to Wigdor and represented their authenticity and origin; (ii) all communications in which Wigdor and Doe directed, approved, or discussed the incorporation of journal excerpts into the Amended Complaint and the litigation strategy surrounding it; (iii) all communications concerning the journals' authenticity, any expert or forensic examination of the journals, ████████████████████████████████████ ████████████████████████████████████, and Wigdor's ultimate decision to

disavow the evidence; (iv) all communications with third parties—including Doe's adoptive parents, any retained experts or investigators, and law enforcement to whom Wigdor submitted the journals, that reasonably relate to the journals; and (v) all communications between Doe and Wigdor concerning Doe's alleged pregnancies, the evidence she claimed supported them, and her alleged relationship with Epstein, including any investigation Wigdor conducted into those allegations. The Court should also order depositions of Doe, her adoptive parents, Christensen, and Doug Wigdor, and grant leave to serve a subpoena on the Fairfax Radiology Center of Alexandria—the practice that is the source of the sonograms in Doe's journals. Black believes that this subpoena will yield the "further evidence" the Court identified as the predicate for case-terminating sanctions, including evidence that the sonograms in Doe's "Age 16" journal (which is quoted liberally in the Amended Complaint) are in fact from one of Doe's adult pregnancies. Op. 74. Finally, Black requests an evidentiary hearing. In her Motion for Reconsideration, Doe contends that the Court's sanctions were without basis because "no evidentiary hearing occurred" regarding the journals and sonograms. Doe Reconsideration Mot. at 2-3. While Doe is incorrect in asserting that this is a proper basis to reverse the Court's sanctions award, Black welcomes an evidentiary hearing to be held after Black receives the discovery requested above, as the hearing will reveal "further evidence" that Doe "falsified evidence before this Court" such that case-terminating sanctions will be warranted. Op. 74. Although such a hearing was not needed in the first instance, it should be ordered now for a full and final disposition of these issues.

Discovery in this case has been stayed pending the Second Circuit's and New York Court of Appeals' resolution of the preemption issue, leaving Black unable to develop the "further evidence" the Court stated would warrant case-terminating sanctions while Doe proceeds with her

claims.  *Id.*   The limited discovery requested here can be completed quickly, resolves this unfairness, and does not implicate the concerns underlying the stay.

## IV.    AN INDEPENDENT EXAMINER SHOULD BE APPOINTED TO INVESTIGATE THE FULL SCOPE OF WIGDOR'S AND DOE'S FRAUD

This Court has found extraordinary fraud: Doe fabricated evidence and, through Wigdor, presented it to two federal judges and the DOJ; Wigdor repeatedly lied to this Court; and Doe, at Wigdor's instruction, destroyed key evidence in this case.  This Court has inherent authority to "conduct an independent investigation in order to determine whether it has been the victim of fraud." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 394 (S.D.N.Y. 2010).  The Court's inherent powers serve "to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." *Id*.  Black requests that the Court appoint an independent examiner pursuant to Fed. R. Civ. P. 53 or its inherent powers to investigate the full scope of the fraudulent conduct underlying this litigation and to prepare a report for submission to this Court and the appropriate authorities.

To start, the fraud here was extensive.  It was perpetrated before this Court, before Judge Rakoff, and before the DOJ.  The relevant witnesses—Christensen, her partners at Wigdor (including Wigdor's name partner, Doug Wigdor), Doe, and Doe's adoptive parents—all have acute interests in the outcome of any investigation and every incentive to delay party-driven discovery.  A neutral examiner with investigative authority is needed here.

Next, the public interest demands complete accounting.  Because Wigdor submitted the forged journals to the DOJ, they were released under the Epstein Files Transparency Act while the evidence disproving them—the expert reports, the sworn declarations, the full sanctions record— initially remained under seal.  For months, the public was exposed to fabricated accusations

26

presented as fact, while the truth was hidden.  An independent report, publicly filed, will provide the accounting the public is owed.

Finally, the examiner's report will serve as the predicate for criminal referral.  Falsifying evidence and presenting it to federal courts, lying to federal judges, suborning perjury, tampering with evidence, and submitting false materials to the DOJ are federal crimes.  This Court has found facts sufficient to support those charges.  The individuals responsible for this fraud should face criminal consequences, not merely civil sanctions.

## CONCLUSION

For the above reasons, Black respectfully requests that the Court find that the crime-fraud exception applies to Doe's attorney-client communications with Wigdor and order the immediate production of all communications from Jane Doe, Jeanne Christensen, Doug Wigdor, any employee or partner at the Wigdor law firm, and Doe's adoptive parents relating to the journals and Doe's pregnancies, including at minimum: (i) all communications in which Doe produced, described, or transmitted the journals to Wigdor and represented their authenticity and origin; (ii) all communications in which Wigdor and Doe directed, approved, or discussed the incorporation of journal excerpts into the Amended Complaint and the litigation strategy surrounding it; (iii) all communications concerning the journals' authenticity, any expert or forensic examination of the journals, ███████████████████████████████████████████████████ ███████████ and Wigdor's ultimate decision to disavow the evidence; (iv) all communications with third parties—including Doe's adoptive parents, any retained experts or investigators, and law enforcement to whom Wigdor submitted the journals that reasonably relate to the journals; and (v) all communications between Doe and Wigdor concerning Doe's alleged pregnancies, the evidence she claimed supported them, and her alleged relationship with Epstein, including any investigation Wigdor conducted into those allegations.  Black also requests an

27

evidentiary hearing regarding the journals, and requests that the Court authorize depositions of Doe, her adoptive parents, Christensen, and Doug Wigdor, and grant leave to serve a subpoena on the Fairfax Radiology Center of Alexandria in advance of that hearing.  Finally, Black requests that the Court assign an independent examiner to investigate the full scope of Wigdor's and Doe's fraudulent actions and prepare a report that can be used as the predicate for a criminal referral.

Respectfully submitted,

Dated: New York, New York
      May 13, 2026

**QUINN EMANUEL URQUHART
   & SULLIVAN, LLP**

By:    */s/ Michael B. Carlinsky*
Michael B. Carlinsky
Jennifer J. Barrett
Ryan A. Rakower
Jacqueline M. Stykes
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
jenniferbarrett@quinnemanuel.com
ryanrakower@quinnemanuel.com
jacquelinestykes@quinnemanuel.com

PERRY LAW
E. Danya Perry
Alexander K. Parachini
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 213-3070
dperry@danyaperrylaw.com
aparachini@danyaperrylaw.com

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice*)
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132
susan@estrichgoldin.com

29

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, Michael B. Carlinsky,  an attorney duly admitted to practice, before this Court, hereby certify pursuant to Local Civil Rule 7.1(c), that annexed Memorandum of Law was prepared using Microsoft Word and the document contains 8,720 words as calculated by the application's word-counting function, excluding the parts of the Memorandum of Law exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on May 13, 2026, in New York, New York.

/s/ Michael B. Carlinsky
Michael B. Carlinsky